# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

PACIFIC EMPLOYERS INSURANCE COMPANY,

**Civil Action No. 1:11-CV-0912**

Plaintiff,                                          (TJM/RFT)

-against-

TROY BELTING & SUPPLY COMPANY,
THE HARTFORD INSURANCE COMPANY and
ABC COMPANIES 1 THROUGH 20

Defendants,

---

TROY BELTING & SUPPLY COMPANY,

Third-Party Plaintiff,

-against-

UNIGARD INSURANCE COMPANY,
QBI AMERICAS, INC., THE TRAVELERS
COMPANIES, INC., CONTINENTAL CASUALTY
COMPANY, CAN FINANCIAL  CORPORATION,
FIREMAN'S FUND INSURANCE COMPANY, THE
NORTH RIVER INSURANCE COMPANY, CRUM &
FORSTER HOLDINGS CORP., LIBERY MUTUAL
GROUP, INC., HARLEYSVILLE GROUP, INC.,
HARLEYSVILLE INSURANCE COMPANY,
HARLEYSVILLE INSURANCE COMPANY OF NEW
YORK, and BERKSHIRE MUTUAL INSURANCE
GROUP,

Third-Party Defendants

---

**Expert Report of Robert N. Hughes**

---

{A0286375.1 }1

I, Robert N. Hughes, offer the following report containing a statement of my opinions and the bases and reasons therefor, the data or other information considered in forming the opinions, my qualifications, and the compensation I am to be paid.

### Qualifications

My full name is Robert Neal Hughes.  I received a Bachelor of Business Administration degree, with honors (*cum laude*), from Southern Methodist University with a major in Insurance. I have worked in the insurance industry full-time since 1960 as a licensed agent and consultant. Since 1978 I have been the principal of Robert Hughes Associates, Inc., an insurance consulting firm.  I am a consultant in matters involving insurance coverage.  My background and qualifications are set out in more detail in the attached curriculum vitae (Exhibit A), which is true and correct.  I have attached as Exhibit B a list of all of the testimony I have given either by deposition or at trial for the past four years.  Since 1990, I have been retained in over 600 separate matters involving insurance disputes and have testified on 255 occasions—194 by deposition and 61 at trial or hearing. In addition, I have acted as an arbitrator in five matters.

### Compensation

Robert Hughes Associates, Inc. is compensated for my services based upon a billing rate of $700 per hour.

### Background

I have been retained by Troy Belting & Supply Company, et al ("Troy Belting") in this case to review and assess the documentation listed in Exhibit C and to determine, if possible, the existence of and the terms and conditions of liability insurance policies issued to Troy Belting by the insurers listed in the chart below.  My opinions will be given in the context of the standard of the preponderance of the evidence, i.e., "more likely than not."

The policies and policy periods that are the subject of this report are listed in a spread sheet prepared by Insurance Archaeology Group, Inc. which is attached hereto as Exhibit E.

## Opinions

### Existence of the Policies

It is my professional opinion that, more likely than not, Jamestown Mutual Insurance Company issued liability policies to Troy Belting for a period from July 18, 1949 to October 3, 1974.[1]

It is my professional opinion that, with little doubt, Insurance Company of North America ("INA") issued policy number XBC099288 to Troy Belting effective 10/3/74, expiring 10/3/75.

It is also my professional opinion that, with little doubt, St. Paul Fire and Marine ("St. Paul") issued policy number 531XA3394 for the period from 10/3/75 to 1/21/77.[2]

It is my further professional opinion that, with little doubt, Continental Casualty Company ("Continental") issued policy number 293-38-68 for the period from 1/21/77 to 11//1/78 and more likely than not the actual policy number is RDU 293 38 68.

A letter dated November 18, 1977 from Troy Belting & Supply Company to Insurance Company of North America listed the above listed excess policies with policy numbers and expiration dates.[3]

---

[1] See Field exhibit 22, Miller exhibit 8 and Field exhibit 6
[2] See letter dated 11/18/77 from Allan Decker of Troy to William Field of INA and letter dated 2/8/78 to Troy Belting from Larry Holweger of St. Paul
[3] See PEIC 013949

**Terms and Conditions of the Policies**

It is my professional opinion that, more likely than not, the liability policies issued to Troy Belting by Jamestown Mutual Insurance Company employed the then-current iteration of the standard, ISO Comprehensive General Liability wording and that the policies provide coverage for at least the premises, operations, products and completed operations hazards.

It is my professional opinion that Independent Contractor's coverage was added by endorsement amending policy number 63-M29311 as of September 4, 1964.

It is my further professional opinion that, prior to October, 1974, Troy Belting purchased liability limits of $500,000 per occurrence and as of October 3, 1974 that limit was reduced to $300,000 as the result of the purchase of an umbrella excess policy.  While there are several items that confirm the $500,000 limit of liability there is no evidence that Troy Belting ever purchased lower limits prior to October 3, 1974.

It is my professional opinion that, without a doubt, the terms and conditions of the excess liability policies issue to Troy Belting by St. Paul Fire and Marine, INA and Continental Casualty provided that the excess policy would at least follow the terms and conditions of the underlying policies and, in the event that the occurrence was not covered by the underlying policies but was covered by the excess policy the excess policy would provide coverage in excess of the insured's retained limit.  It is my further opinion that the excess carriers' policies provide that they have the right and duty to defend the insured in the event the underlying insurance is exhausted.[4]

---

[4] See Exhibit F

**Background**

**Sources of Policy Information**

The reconstruction of coverage when actual primary evidence (such as copies of the policies themselves) is not available involves two essential processes: (i) the establishment of the existence of the policies and (ii) the determination of the terms and conditions of those policies. Evidence, other than actual policies, that supports the existence of a policy and/or its terms and conditions is referred to as "secondary evidence." Besides witness memory and testimony, this evidence comes in various forms including related policies, such as those "above" and "below" the missing policy and those issued before and after the missing policy, and other documents referring or relating to missing policies such as correspondence and exemplar policies. This evidence can come from insurance company and/or agent records, insurance company stipulations, policyholder records, and the records of third parties.

The following secondary sources are available to me in this case:

*Patterns of Practice*

The presence of a consistent pattern in the terms of policies of insurance forming an insurance program can often be the basis for developing opinions regarding the terms of one or more of those policies. In this case, the evidence shows that Troy Belting purchased its liability coverage from Jamestown for decades. The documentation includes some information regarding limits of liability. The documents indicate that limits of the underlying primary policy were reduced from $500,000 combined single limits ("CSL") to $300,000 CSL during 1974. These variations were more likely than not responses to insurance market conditions regarding the underlying insurance requirements of umbrella policies and were typical of the times. In other words, insureds were able to increase their total coverage limits by reducing the underlying limit

and adding an umbrella on top of the reduced limits.[5]  Prior to that time there is no evidence that

Troy purchased primary liability coverage for a limit less than $500,000 CSL.

In addition to evidence pointing to patterns of practice for individual insureds,

information regarding conditions in the industry or industries represented by the individual

company is at least helpful and, in many cases, critical to developing credible opinions regarding

the existence of and terms of missing insurance policies.  In this case, we know, for instance, that

Troy Belting and Supply Company was engaged in the distribution of industrial supplies and

equipment including power transmission equipment and industrial rubber products.  We also

know, according to information on their letterhead and in their correspondence that they engaged

in electric motor repair and rewinding.  In addition, the January 21, 1986 minutes describe the

formation of Division #3 which was providing engineering and technical services for electrical

distribution equipment and were also going to install electrical and mechanical equipment.  This

information assists greatly in the determination of the character of the insurance program that

was purchased by Troy, to wit:

1.  A significant proportion of their business involved the sale of industrial equipment.  It

would not be reasonable to presume that any company could involve themselves in such a

business without having product liability coverage;

2.  The sale of power transmission equipment would most likely be to contractors who

would, without a doubt, be required by their customers to provide certificates of insurance

evidencing at least premises, operations and products/completed operations coverage with

significant limits of liability;

---

[5] The reduction of Troy's primary limits to $300,000 from $500,000 occurred contemporaneously with the purchase by Troy of an umbrella liability policy XBC099288 from INA which became effective on October 3, 1974.

3.  The installation of electrical and mechanical equipment would only have been possible if Troy could have provided certificates of insurance in their own name evidencing the existence of liability coverage for at least the premises, operations, products and completed operations coverage.

In addition, the corporate minutes reflect that the board of directors met every year, carefully considered the profit/loss status of the company and determined whether or not dividends should be declared.  Those same minutes also reflected that the board kept close track of outstanding third party product liability claims that were outstanding against the company.  In each year I reviewed the decision was made to pay a dividend, a circumstance that, in my professional opinion, would have been unlikely if the board had perceived that they had no insurance coverage for the claims or if their coverage was likely to be inadequate.  As a matter of fact, the board increased their liability limits twice in response to their concern that their limits might be inadequate.  The limits were increased to $2,500,000 in January 1977 and to $5,500,000 in 1978.[6]

### *Policyholder Records*

Correspondence between the policyholder and parties such as the insurer and the agent or accounting and legal correspondence often contains important evidence of insurance coverage.  Also relevant are invoices, coverage and renewal summaries, certificates of insurance, and other records in the policyholder's possession that reference insurance.   The documentation reviewed in this matter falls into a number of these categories.

Policyholder records often contain documents that include lists of policies with pertinent information such as dates, limits of liability and coverages.  As in this case, this documentation often appears in very old, hand written ledgers and/or journals.  It is often the case that the

---

[6] See Minutes Of Directors Meeting dated 1/17/78 and 1/18/77

authors of such documentation are deceased, incapacitated or simply do not remember where they obtained the information.  In such cases, I employ a logic principle known as Occam's Razor which admonishes one to choose, from a set of otherwise equivalent models of a given phenomenon, the simplest one.  For instance, in viewing ledger entries listing information regarding historic policies there are numerous possible answers as to the source of the information.  It could be, simply that the writer was actually looking at the policies or at some source that the author him/herself considered credible and reliable.   On the other end of the scale, the author may have concocted the data out of his/her imagination with no foundation at all.  Occam's Razor requires that the analyst choose the simplest answer which is usually that the author of the list had a reliable source from which the entries were derived and that the ledger entries are faithful representations of the existence of the policies and, in many cases, at least some of the terms and conditions of those policies.  In this case, I have presumed that the information contained in several documents on which I have relied came from a credible and reliable source that actually existed at the time of the writing.

The document marked "Miller 8" is a letter dated November 16, 1977 to Allen Decker of Troy Belting from Nicholl and MacChesney, Inc., the brokers handling the Troy insurance account advising Mr. Decker that Jamestown Mutual Casualty (Unigard) had been the insurer for the liability coverage "for the past ten years."

A letter dated September 15, 1978 to Mr. Decker from the same broker states that Unigard had provided Troy's liability coverage from July 15, 1949 to October 3, 1974.

INA, in a letter to Troy Belting dated 12/18/78, stated, "We also had excess policy XBC 199288 in effect on 11/11/74 with limits of one million."

St. Paul, in a letter to Troy Belting dated February 8, 1978 stated "we provided excess liability coverage to Troy Belting and Supply Company Inc. during the policy term of 10/3/75 to 11/1/76."   The letter further stated, "(P)lease be advised that the limits under your Umbrella Excess Liability policy issued by St. Paul Insurance Company was in the amount of $1,000,000 and therefore , the combined total of the primary and excess coverage is $1,500,000."

The November 18, 1977 letter from Troy Belting to INA listed all of the excess policies, one of which was a Continental Casualty Company policy #293-38-68 effective January 21, 1977 to November 1, 1978.[7]

### Insurance Company/Agent Records

The existence of policies is often evidenced by the records and/or correspondence of the policy-issuing insurance company and/or the agent or broker.  There were a number of documents that I was able to review which fall into this category.

The document labeled "Miller Exhibit C" is what is known as a "General Change Endorsement."  It was issued by Jamestown Mutual Insurance Co. of Jamestown, New York on September 15, 1964 and indicates that it was an "Amendment of Declarations Items 4 &5" amending policy No. 63-M29311 which is described as a "Manufacturers' and Contractors' Liability Policy" ("M&C".)  The endorsement added Independent Contractors coverage to the policy as of September 4, 1964. The insured is described as "Troy Belting & Supply Company, Inc."  The fact that the endorsement states that it modifies  a Manufacturer's and Contractor's ("M&C") liability policy raises several questions regarding the coverage provided by the policy. The primary question is whether or not the policy provided to Troy Belting by Jamestown really is a M&C policy or if it, in fact, is a comprehensive general liability ("CGL") policy.  The question is important because the unadorned M&C policy excludes products liability while the

---

[7] Note my commentary elsewhere regarding the likelihood that this policy number had the prefix "RDU."

CGL covers products liability automatically.  The coverage added by the endorsement was made necessary by the construction of a new building in Albany, N.Y..[8]

The CGL policy came into being in 1941.  Soon after that it became the policy of choice for both policyholders and insureds, so much so that by the time I entered active practice as an insurance agent in Texas in 1960 the use of mono-line policies, such as the M&C, had almost disappeared.  So, it is in my professional opinion, likely that the pre-printed endorsement amending the policy was simply a mistake, i.e., the wrong form, that was actually added to a CGL policy rather than a M&C policy.  This possibility is supported by the fact that the documentation reflects, in my professional opinion, that both the insured and the broker were competent and diligent in their administration of Troy Belting's insurance program.  In fact, the minutes of the board of directors memorialize the almost continual concern expressed in board meetings about the character and amount of liability insurance that was available to the company in the light of several claims that arose over the years.

The other possibility, however, is that the policy numbered 63-M29311 was, in fact, a M&C policy.  If so, coverage for products liability could have (and almost certainly would have) been added by endorsement.[9]  Therefore, if one accepts that (a) the preponderance of the evidence clearly indicates that Troy Belting consistently and continuously purchased products liability coverage then it makes no difference to the question of coverage whether the policy in question is a CGL with automatic products liability coverage or a M&C with products coverage added by endorsement.

Further evidence of the existence of the Jamestown Mutual policies issued to Troy Belting can be found in the claims files regarding what is known as the "Pennell" matter.  A

---

[8] See Exhibit H

[9]  Note the discussion appearing elsewhere in this report regarding the absolute necessity for a company like Troy Belting to have liability insurance that included products liability coverage.

number of items of correspondence, primarily between Unigard and INA, reflect that Unigard was actively investigating the Pennell matter and monitoring the defense.  It is telling, in my professional opinion, that the correspondence does not include a denial or disclaimer from Unigard.[10]  This indicates to me that Unigard believed that one or more Jamestown policies insuring Troy Belting existed and that there was at least the potential for coverage for the Pennell matter.

*Standardization and Exemplar Policies*

*Standard Primary Policies*

The insurance industry has historically been divided into two camps, stock companies and mutual companies.  Each faction maintained its own rating organization until the early 1970's. The National Bureau of Casualty Underwriters (NBCU) represented stock companies and the Mutual Insurance Rating Bureau (MIRB) represented the mutual companies.  The first Comprehensive General Liability policy was drafted and promulgated jointly in 1941 by committees out of the two bureaus.  The NBCU and MIRB then filed the forms with the various state regulatory agencies on behalf of their members and subscribers.  Subsequent policies and endorsements were also jointly drafted.

On January 2, 1968 the NBCU merged with the National Automobile Underwriters Association and changed its name to the Insurance Rating Bureau (IRB.)  The IRB and MIRB continued to jointly draft and publish policies.

In the early 1970's the two remaining entities (IRB & MIRB) were merged into the Insurance Services Office (ISO) which has continued, until recently, to serve as the rating and

---

[10] See PEIC 013210, 013414, 013265, 013275, 013362, & 013376.

forms bureau for both groups of companies.  For purposes of discussion in this report I will use the term "ISO" to describe the current entity and the predecessor organizations as well.

the mission of the ISO is, *inter alia*, "...developing and assisting in the implementation of policy forms...making available advisory rates...gathering, compiling and disseminating statistical and other property-casualty insurance information."[11]

I have attached as Exhibit G copies of pages from the 1950 Best's Insurance Reports which indicate that Jamestown Mutual Insurance Company was a member of the Mutual Insurance Rating Bureau ("MIRB") during 1950-1951.  I have also included in the same exhibit the December 31, 1970 list of the membership of the MIRB, which I maintain in my library, that indicates that Jamestown Mutual Insurance Company was a member at that time.  At some point the name of the company was changed to Unigard Jamestown Mutual Insurance Company and on December 31, 1974 the company was merged into and became a part of Unigard Mutual Insurance Company.[12]

Because most U.S. insurers use standard forms for primary Comprehensive General Liability ("CGL") policies, and because those forms are most often developed and filed by the Insurance Services Office ("ISO") or its predecessor groups, such as the National Bureau of Casualty Underwriters ("NBCU"), the Mutual Insurance Rating Bureau ("MIRB"), the Multi-line Insurance Rating Bureau ("MLIRB") or the Insurance Rating Board ("IRB") on behalf of its member and subscriber companies, sample copies of those standard forms provide reliable information regarding the terms and conditions of missing policies.[13]  The first of these jointly developed bureau CGL forms was published in 1941.  Subsequent versions were published in

---

[11] See LIBDC 050932, "Insurance Services Office, Inc., **Mission Statement**
[12] See Best's Insurance Reports, Property-Casualty, 1978, p. 637B
[13] E. Wiening & D. Malecki, <u>Insurance Contract Analysis</u>, American Institute for Chartered Property Casualty Underwriters, First Edition, 1992, p 46

1943, 1955, 1966, 1973, 1982 and later.  In cases such as this where the evidence indicates that, more likely than not, a policy or policies existed but the policy wording is incomplete or missing one can refer to the standard wordings that were filed by the insurers in the relevant state in order to establish the terms and conditions of policies.[14]

Therefore, a CGL policy issued to York between 1949 and 1955 would use the standard, ISO wording promulgated in 1943.  A new version of the CGL was published by the bureaus in 1955.  The standard CGL was again revised in 1966 and policies issued after the publication of the standard ISO CGL on October 1, 1966 contain the 1966 version of the wording.  Likewise, policies written after the publication of the 1973 CGL wording in January of 1973 would use that wording until a new version that was actually promulgated in 1981 came into actual use in 1986. I have attached copies of the 1943, 1955, 1966 and 1973 standard CGL wordings as Exhibit D.

*Exemplar Policies*

The documentation I reviewed includes a copy of a Comprehensive General Liability Policy ("CGL") issued by Jamestown Mutual Insurance Company.  The policy has an expiration date of January 1, 1962.  The policy wording is the standard, 1955 CGL wording promulgated jointly by the Mutual Insurance Rating Bureau ("MIRB") and the National Board of Casualty Underwriters ("NBCU").

*Standard Excess Policies*

Unlike primary CGL/CAL policies, excess liability policies have not been promulgated by rating bureaus.  Standardization in the excess liability field has come about through extensive copying of earlier forms and through consistent standardized use by individual insurance

---

[14] The MIRB filed the standard wordings for the CGL in New York on behalf of their members, one of which was Jamestown.  Thus, Jamestown would have been required to issue policies containing that standard, approved language.  Copies of those wordings are readily available today and I have attached the relevant wordings as exhibits to this report.

companies.  In 1949 a form of excess liability insurance was developed which became known as "umbrella" coverage and began to be broadly used in the mid-1950s.  These forms not only increased the limits of the underlying policies but were even broader, providing "drop down" coverage in areas where the primary policies were deficient.  In 1960, certain members of the Non-Marine Association ("NMA"), a group of Lloyd's underwriters and brokers, developed what became known as the LRD60 form.  The initials LRD stand for Leslie R. Dew, who at the time was at Lloyd's and was a prominent lead underwriter for North American umbrella business.  The May 1960 edition of this form ultimately became the hallmark for umbrella coverage and was duplicated by most U.S. insurance carriers who had entered the market in competition with London.  It was revised by a committee of the NMA in 1971 and that form became known as the London Umbrella form, which had as its companion the London XS Umbrella form.  A very substantial portion of the wordings employed in the policies at issue in this case are derived from the LRD60 form.  Almost all U.S. umbrella forms were "clones" of the LRD60 form.

The International Risk Management Institute, a respected insurance information source states in its preface to "Comprehensive Liability Insurance":

"Prior to 1940, insurance companies designed their own individual general liability insurance forms.  The resulting variety of policy provisions created a great deal of confusion among insurance agents and brokers, insurance buyers, claims adjusters, and the courts.  Coverage and price among competing insurance products could not be easily compared; loss statistics for the industry as a whole could not be assimilated for enhanced statistical accuracy; and court interpretations of one policy's language were not necessarily of any use in resolving similar coverage disputes under other policies."

I have attached redacted copies of actual umbrella policies issued by INA, St. Paul and Continental as Exhibit F.

The INA policy is a 1971-1972 "Excess Blanket Catastrophe Policy" with a policy prefix of XBC. The wording would be the same or substantially similar to INA policy XBC099288 issue to Troy Belting. The policy provides broad coverage in the context of its own terms and conditions. In the event that underlying insurance also covers an occurrence the INA policy applies in excess of the underlying policy limits. In the event that an occurrence that is covered by the INA policy is not covered by the underlying policies the INA policy will apply in excess of the "retained limit" stated in the St. Paul policy. This limit was $10,000 in many states and in others, such as Texas, was $25,000. In the event of exhaustion of the underlying limits of liability INA will have the right and duty to defend suits against the insured seeking damages on account of a covered event or allegations of a covered event.

The St. Paul policy is an "Umbrella Excess Policy" which contains a policy wording dated 11/73 which would have been the wording used in policy 531XA3394 issued to Troy Belting. The policy provides broad coverage in the context of its own terms and conditions. In the event that underlying insurance also covers an occurrence the St. Paul policy applies in excess of the underlying policy limits. In the event that an occurrence that is covered by the St. Paul policy is not covered by the underlying policies the St. Paul policy will apply in excess of the "retained limit" stated in the St. Paul policy. This limit was $10,000 in many states and in others, such as Texas, was $25,000.

The Continental Casualty Company policy is an "Umbrella Excess Third Party Liability Policy" dated 11/30/1979 to 11/30/1972. During the relevant period of this report, i.e. 1968 to 1974, CNA Financial operated a number of companies that were capable of issuing umbrella

liability policies.  CNA made umbrella filings in the 1960s and 1970s with insurance regulators

on behalf of Continental Casualty Company, Transportation Insurance Company,

Transcontinental Insurance Company, National Fire Insurance Company of Hartford, American

Casualty Company of Reading, Pennsylvania and Valley Forge Insurance Company.  The filings

that are most pertinent to this matter are represented by the documents attached Bates #000122-

000137.  These filings involved the "A", "B" and "C" iterations of CNA's Umbrella Excess

Third Party Liability Policy form G-40240.  The form is characterized, among other things, by

the use of the prefix "RDU" in the policy number and by the fact that it was simultaneously used

by Continental Casualty Company, Transportation Insurance Company, National Fire Insurance

Company of Hartford, Transcontinental Insurance Company, American Casualty Company of

Reading Pa., and Valley Forge Insurance Company with the final page of the policy wording

containing the signatures of the presidents and secretaries of all the companies.  Therefore, it is

more likely than not that the actual policy number of the policy indicated in the correspondence

as having been issued to Troy Belting by Continental Insurance Company was actually " RDU

2933868."

One important characteristic of all three of the umbrellas forms previously described is

that the insurer has the right and duty to defend the insured upon exhaustion of the underling

insurance, presuming that the duty of the underlying insurer does not survive the exhaustion of

its limits.


### Chronology

On November 16, 1977 Edward D. Nicoll of Nicoll & MacChesney, Inc., insurance

brokers, wrote Allen E. Decker of Troy Belting & Supply Company stating that "the carrier of

the liability coverage for the past ten year period prior to July 8, 1976 was the Jamestown Mutual

Insurance Company (Unigard Insurance Company.)"   This could not be correct, however, since

INA policy number AGP135165 was effective on October 3, 1974.  A letter dated 12/18/78 from

William R. Field of INA to Troy Belting acknowledged that the manifestation date of a claim for

which they were accepting coverage was 11/11/74.  Mr. Nicoll again wrote to Mr. Decker on

September 15, 1978 saying that "…our records show that the Jamestown Mutual Insurance

Company (Unigard Insurance Company) provided coverage from July 18, 1949 to October 3,

1974 at which time the policy was cancelled."  Therefore, it is obvious that the Jamestown

Mutual Coverage ceased on October 3, 1974.

This information is supported by handwritten entries in several ledger pages which

indicated payments being made to "Jamestown" and "Jamestown Mut." during the 1950s and

1960s.  A number of the entries include references to "Nicoll" which corroborates the

information that Nicoll placed coverage with Jamestown on behalf of Troy.

There is a reference to policy limits in the January 18, 1977 Minutes of Director's

Meeting which states, in regards to a May, 1974 accident, that "Unigard Insurance Group was

our insurance carrier May 19, 1974" and "…our Liability Coverage at the time of the accident

was only $500,000."  The minutes also state that "…we are increasing, effective January 1977,

our total Liability coverage to $2,500,000.00."  This increase was effected through the purchase

of an excess liability policy in the amount of $2,000,000 which applied in excess of the

underlying $500,000.

Additional evidence indicates that the limit of liability for the primary liability insurance

purchased by Troy continued to be $500,000 until 11/15/77.  (See PEIC 013057.)

The "basic" (i.e., "minimum") limits for Bodily Injury coverage during the relevant period were $5,000 per person/ $10,000 per accident and for Property Damage coverage were $5,000 per accident.  The primary policy carries the duty to defend with no limit.

The January 18, 1977 "Minutes of Directors' Meeting" discusses the Daurio lawsuit arising out of "…a Horton clutch we furnished Thos. A. Galante on a High Boy Folder."  The date of injury is stated to be May 9, 1974.   The January 19, 1982 "Minutes of The Directors Meeting" reports that the Daurio lawsuit was "settled out of court" and Unigard paid $2,000 as their part.  This matter was clearly a products liability case and Unigard defended and paid indemnity.  The triggered policy would have been the policy in force on May 9, 1974.

The Daurio matter was a product liability case.  The fact that Unigard paid $2,000 makes it clear that the Jamestown Mutual policies provided product liability coverage.

*****

This report sets forth the opinions I have rendered to date based upon the documentation listed.  It is my understanding that, in the event new evidence of coverage arises, I may be asked to review additional materials and render additional opinions.  I am prepared to render my opinions at trial.

Respectfully submitted,


Robert N. Hughes, CPCU, ARM, MAE, FAAFE, DABFE

October 5, 2015