# EXHIBIT 2

**TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016**

Page 1

```
1
2   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF NEW YORK
3   _____
4
    PACIFIC EMPLOYERS INSURANCE COMPANY,
5
         Plaintiff,
6
    vs.                        Civil Action No.:  1:11-CV-0912
7                                                 (TJM/RFT)
8   TROY BELTING & SUPPLY COMPANY,
    THE HARTFORD INSURANCE COMPANY and
9   ABC COMPANIES 1 through 20,
10       Defendants.
    _____/
11
12  TROY BELTING & SUPPLY COMPANY,
13       Third-Party Plaintiff,
14  vs.
15  UNIGARD INSURANCE COMPANY, QBE AMERICAS,
    INC., ST. PAUL FIRE AND MARINE INSURANCE
16  COMPANY, CONTINENTAL CASUALTY COMPANY,
    FIREMAN'S FUND INSURANCE COMPANY, THE
17  NORTH RIVER INSURANCE COMPANY, CRUM &
    FORSTER HOLDINGS CORP., LIBERTY MUTUAL
18  GROUP, INC., HARLEYSVILLE GROUP, INC.,
    HARLEYSVILLE INSURANCE COMPANY, HARLEYSVILLE
19  INSURANCE COMPANY OF NEW YORK and BERKSHIRE
    MUTUAL INSURANCE GROUP,
20
         Third-Party Defendants.
21  _____/
22
        Telephone Deposition of ROBERT NEAL HUGHES, held on
23  Wednesday, January 6, 2016, taken at the Renaissance Dallas
    Richardson Hotel, Conference Room, 900 East Lookout Drive,
24  Richardson, Texas, 75082, commencing at 10:09 a.m., before Christy
    R. Sievert, a CSR, RPR and Notary Public in and for the State of
25  Texas.
```

Page 2

```
1
2       APPEARANCES:
3
        For the Plaintiff:
4   SIEGAL & PARK
    533 Fellowship Road, Suite 120
5   Mt. Laurel, New Jersey  08054
    Phone:  (856) 380-8300
6   E-mail:  brian.fox@mclolaw.com
    BY:  MR. BRIAN G. FOX, ESQ.
7
8       For Unigard Insurance Company and Qbe
    Americas, Inc.:
9   RIVKIN RADLER, LLP
    926 RXR Plaza
10  Uniondale, New York  11556
    Phone:  (516) 357-3000
11  E-mail:  michael.kotula@rivkin.com
    BY:  MR. MICHAEL A. KOTULA, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2       APPEARANCES:  (CONT'D.)
3
        For Continental Casualty Company:
4   CARROLL, McNULTY & KULL, LLC
    570 Lexington Avenue, 8th Floor
5   New York, New York  10022
    Phone:  (646) 625-3973
6   E-mail:  jyoung@cmk.com
    BY:  MS. JOANNA L. YOUNG, ESQ.
7
8       For Troy Belting & Supply Company:
    PHELAN, PHELAN & DANEK, LLP
9   300 Great Oaks Boulevard, Suite 315
    Albany, New York  12203
10  Phone:  (518) 640-6900
    E-mail:  tim@ppdlawfirm.com
11  BY:  MR. TIMOTHY S. BRENNAN, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2       APPEARANCES:  (CONT'D.)
3
        For Nationwide Mutual Insurance Company,
4   Assuccessor by Merger to Harleysville Mutual
    Insurance Company, as Successor in Interest
5   Toberkshire Mutual Insurance Company:
    RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
6   Headquarters Plaza, One Speedwell Avenue
    Morristown, New Jersey  07962
7   Phone:  (973) 451-8429
    E-mail:  jbeer@riker.com
8   BY:  MR. JEFFREY A. BEER, JR., ESQ.
    (VIA TELEPHONE)
9
10      For Hartford Accident and Indemnity Company,
    Hartford Casualty Insurance Company, and
11  Hartford Insurance Company of the Midwest:
    SHIPMAN & GOODWIN, LLP
12  1875 K Street NW, Suite 600
    Washington, DC  20006
13  Phone:  (202) 469-7774
    E-mail:  cleasure@goodwin.com
14  BY:  MR. CHARLES E. LEASURE, III, ESQ.
    (VIA TELEPHONE)
15
16
17
18
19
20
21
22
23
24
25
```



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 5

INDEX

WITNESS                                    PAGE

ROBERT NEAL HUGHES

Examination                               11-207
by Mr. Kotula

Examination                              207-238
by Mr. Fox

Examination                              238-265
by Ms. Young

Page 7

INDEX OF EXHIBITS  (CONT'D.)

DESCRIPTION                               MARKED

Exhibit-7                                   109
(11-16-77 letter from E. Nicoll to A. Decker)

Exhibit-8                                   110
(9-15-78 letter from E. Nicoll to A. Decker)

Exhibit-9                                   113
(11-16-77 letter from A. Decker to E. Nicoll)

Exhibit-10                                  121
(Deposition excerpt, pages 64 - 66, 86 - 88,
152 - 156)

Exhibit-11                                  127
(6-25-01 letter from A. Jordan to J.
Prestage)

Exhibit-12                                  139
(Troy Belting ledger entries)

Page 6

INDEX OF EXHIBITS

DESCRIPTION                               MARKED

Exhibit-1                                    11
(Expert Report)

Exhibit-2                                    73
(Expert Report - Montello)

Exhibit-3                                    87
(Deposition excerpt, pages 91 - 93)

Exhibit-4                                    94
(Deposition excerpt, pages 98 - 99)

Exhibit-5                                    95
(Amendment of Declarations, Items 4 & 5)

Exhibit-6                                    97
(Jamestown Mutual Insurance Company, Policy
Number 61-CGL7788 ECRI 000001 - 000022)

Page 8

INDEX OF EXHIBITS  (CONT'D.)

DESCRIPTION                               MARKED

Exhibit-13                                  146
(Memos re:  1959, 1960, 1963 and 1964)

Exhibit-14                                  149
(8-25-09 letter from P. Cremo to D. Barcomb)

Exhibit-15                                  153
(Binder, Troy Belting & Supply Company and
N/W Corner of Cohoes Road and Elm Street,
Maplewood)

Exhibit-16                                  154
(Insurance policy, Troy Belting & Supply
Company, Inc.)

Exhibit-17                                  160
(AIG, Troy Belting & Supply Company, Primary
Liability Coverage 1949-1984)


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 9

1
2                    INDEX OF EXHIBITS  (CONT'D.)
3
        DESCRIPTION                                MARKED
4
5       Exhibit-18                                 168
        (8-15-11 letter from D. Pager to R. Miller)
6
7       Exhibit-19                                 175
        (1-18-77 Minutes of Directors Meeting, Troy
8       Belting & Supply Company)
9
        Exhibit-20                                 180
10      (1-19-82 Minutes of Directors Meeting, Troy
        Belting & Supply Company)
11
12      Exhibit-21                                 192
        (Nebraska Law Review, Insurance Protection for
13      Products Liability and Completed Operations -
        What Every Lawyer Should Know)
14
15      Exhibit-22                                 220
        (11-18-77 letter from A. Decker to W. Field)
16
17
18
19
20
21
22
23
24
25

Page 10

1
2                    INDEX OF EXHIBITS  (CONT'D.)
3
        DESCRIPTION                                MARKED
4
5       Exhibit-23                                 220
        (12-18-78 letter from W. Field to A. Decker)
6
7       Exhibit-24                                 256
        (Deposition Excerpt, pages 41 - 42, 68, 99)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1
2              DEPOSITION OF ROBERT NEAL HUGHES
3                    JANUARY 6, 2016
4    Thereupon,
5                    ROBERT NEAL HUGHES,
6    having been first duly sworn, testified as
7    follows:
8                    EXAMINATION
9    BY-MR.KOTULA:
10       Q.   Good morning, Mr. Hughes.
11       A.   Good morning.
12       Q.   I represent defendants Unigard
13   Insurance Company and QBE Americas, Inc., in
14   this case brought by Troy Belting.
15            Would you be kind enough to state
16   your full name for the record?
17       A.   My name is Robert Neal Hughes.  Neal
18   is spelled N-e-a-l.
19            MR. KOTULA:  Mark this as Exhibit-1.
20            (Whereupon, Exhibit Number-1 marked.)
21   BY-MR.KOTULA:
22       Q.   Placed before you, Mr. Hughes, is
23   what the court reporter has kindly marked as
24   Hughes Exhibit-1.  And for the record, it is
25   a document that states it is the Expert

Page 12

1
2    Report of Robert N. Hughes in the matter of
3    Pacific Employers Insurance Company against
4    Troy Belting & Supply Company, et al, which
5    is the matter that we are taking your
6    deposition in today.  Do you understand that?
7        A.   I do.
8        Q.   Can you tell me, does what we have
9    marked as Hughes Exhibit-1 appear to be a
10   true and correct copy of your expert report
11   in this matter?
12       A.   Yes, it does.
13       Q.   Is it complete?
14       A.   It appears to be complete, yes.
15       Q.   Can you explain the circumstances of
16   how you were retained as an expert by Troy
17   Belting & Supply Company in this matter?
18       A.    To the extent I can remember.  I --
19   as usual, I think the call came to our
20   office rather than directly to me, and it
21   was referred to me, searching for a -- one
22   of our people to serve as an expert in a
23   missing policy case.  And I handle the
24   missing policy cases, generally, in our
25   company.  So it was referred to me.


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 13

1
2       I spoke, I believe it was, with Tim.
3   And after some discussion where I explained
4   our standard operating procedures, I believe
5   I sent a sample copy of our standard
6   agreement, and I was retained.
7       Q.   And by "Tim," you mean counsel
8   seated to -- seated to your left at the
9   table here today?
10      A.   Yes.  Yes, sure.
11      Q.   Who's counsel of record in this
12  matter for Troy Belting & Supply Company,
13  correct?
14      A.   Yes.  Well, I presume that he is,
15  yes.
16      Q.   He told you he was, right?
17      A.   That's what I've been told.  And by
18  the way, I don't think we said it on the
19  record, it's Timothy Brennan.
20      Q.   Yes.
21           Can you tell us, after you had a
22  signed agreement from Mr. Brennan on behalf
23  of Troy Belting, what, if anything, you did
24  next?
25      A.   And I will -- some of this will

Page 14

1
2   have to be based upon what my typical
3   procedures are because I'm not sure I
4   remember every single detail.  But I know I
5   asked -- well, I asked particularly early the
6   nature of the case, and then asked him to
7   send me basically all of the physical
8   evidence that they had, documentation that
9   would support the question as to whether the
10  policies in question existed and whether or
11  not we could reconstruct the terms and
12  conditions.  And they -- they did so.
13           And a great deal of what they sent
14  me was on disks.  I have the disks with me.
15  I don't know whether you want all of them or
16  not, but I have them.  I don't have the
17  hard copies.  And I  examined all of the
18  documentation and reached some conclusions.
19           And in these missing policy cases,
20  almost without exception, the standard of
21  proof is preponderance of the evidence, that
22  is to say more likely than not.  And so I
23  reviewed all the documentation, determined
24  whether I could render an opinion that was
25  based on that particular standard, and I

Page 15

1
2   determined that I could and then proceeded to
3   write the report that listed what my opinions
4   are, documented the bases of those opinions
5   and submitted that report to Mr. Brennan for
6   his review.
7       Q.   Did you meet with him?
8       A.   No.  We -- this is the first time
9   we've met, yesterday.
10      Q.   And did you meet with him in
11  preparation for your deposition today?
12      A.   Yes, yesterday.
13      Q.   And how long did you meet with him?
14      A.   A couple of hours.
15      Q.   Did you meet with him in the
16  afternoon or in the morning?
17      A.   In the morning.
18      Q.   You said the standard is usually a
19  preponderance of the evidence test in these
20  cases; is that right?
21      A.   Right.
22      Q.   Are you aware of any other standards
23  that have been applied in lost policy
24  matters?
25      A.   I may have been involved in one case

Page 16

1
2   where the standard was clear and convincing
3   evidence, but if so, it's only one.  At
4   least as far as my cases are concerned,
5   virtually all of them say for that one, and
6   maybe two, has been preponderance of the
7   evidence.
8       Q.   Are you a lawyer, sir?
9       A.   No, I'm not.
10      Q.   And are you testifying as an expert
11  that -- as to what the standard should be in
12  this case?
13      A.   No, I am not.  However, I was
14  directed by counsel who retained me that --
15  that my opinion should be determined under a
16  standard of more likely not, which are
17  the preponderance of the evidence.
18      Q.   Right.  So counsel instructed you to
19  use a preponderance of the evidence --
20      A.   Right.
21      Q.   -- standard, correct?
22      A.   Right.  For -- for the -- my review
23  and my -- and my opinionation, yes.
24      Q.   So you're not going to offer an
25  opinion to this court as to whether a


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 17

1
2      preponderance of the evidence standard should
3      be used or some other standard should be
4      used?
5          A.   Absolutely not.  I mean, the Court
6      will direct that and -- and it -- if the
7      Court directs some other standard, then so be
8      it.  But it's not my place to determine what
9      the standard is.
10         Q.   Did you consider whether the evidence
11     in this case met the clear and convincing
12     standard?
13         A.   I did not.
14         Q.   Do you have any opinions about
15     whether the evidence in this case meets a
16     clear and convincing standard?
17         A.   I really don't because I haven't
18     examined it really from that standpoint.  I
19     mean, there are probably -- I think in a
20     couple of cases in my report, I commented on
21     -- my opinion was without a doubt or with
22     little doubt that had to do with the
23     insurance company -- the INA policy, the St.
24     Paul policy, the Continental Casualty policy,
25     all of those -- those three opinions I

Page 18

1
2      expressed as with little doubt or without a
3      doubt.  So I would  presume that -- that --
4      I mean, it's not for me to say that they
5      would meet the standard of clear and
6      convincing, but more than likely, they would.
7          Q.   Do you have any opinions in this
8      case that have not been set forth in Hughes
9      Exhibit-1, your expert report?
10         A.   No, I don't think so.
11         Q.   So you're not going to offer any
12     opinions that aren't already set forth
13     somewhere in your expert report that we've
14     marked as Exhibit-1, correct?
15         A.   That -- that's correct.  Now,
16     sometimes after a deposition things change,
17     new evidence comes to light, and I'm asked
18     to either amend the report or expand on the
19     report, at which time, of course, the rules
20     would have to be observed and you would have
21     to be advised.  But as I sit here today, I
22     have no plans to issue any other opinions
23     other than those that are contained in the
24     report.
25         Q.   It's my understanding, the fact

Page 19

1
2      discovery has been completed in this case
3      already and that what the parties are doing
4      in this stage in the case is expert
5      discovery, which we're taking the depositions
6      of each other's experts.
7          A.   Right.
8          Q.   So with that -- with that
9      understanding, do you intend to issue any
10     additional opinions beyond those set forth in
11     Hughes Exhibit-1?
12         A.   Right.  Well, I don't intend to
13     issue any additional opinions, period.
14         Q.   Can you tell us approximately how
15     much time you spent reviewing materials or
16     preparing your opinions in your expert report
17     in this matter?
18         A.   Not really.  I just -- I would have
19     to guess.
20         Q.   I don't want you to guess.  What --
21     what I would like you to do is give me an
22     approximation if you can't recall the exact
23     amount.
24         A.   So examining the materials and
25     writing the report?

Page 20

1
2          Q.   Combined.
3          A.   Well, I just -- I'm not going to
4      tell you this is exactly correct, but I
5      would say in the range of 30 to 40 hours.
6          Q.   And what's the rate that you charge
7      for your services in this case?
8          A.   $700 an hour.
9          Q.   Is your rate the same for office
10     work and for testifying?
11         A.   Yes, it is.
12         Q.   Your report sets forth Exhibit-C,
13     Documents Reviewed and Considered By Robert
14     Hughes.  Do you see that?
15         A.   I do.
16         Q.   And can you tell us, did you review
17     any other documents in preparation of your
18     opinions and your report that aren't set
19     forth on this Exhibit-C?
20         A.   Not that I know of, no.
21         Q.   And whether something supports your
22     opinion or doesn't support your opinion, did
23     you review anything that -- in preparing your
24     opinions that isn't on this Exhibit-C?
25         A.   No.  My practice is to list


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 21

1
2  everything that I reviewed, regardless of its
3  impact on my opinions.
4      Q.   So in reviewing the materials that
5  Mr. Brennan sent you in connection with
6  retaining you as an expert in this matter,
7  did you become aware that Troy Belting &
8  Supply Company didn't have any of its
9  insurance policies that had been issued to
10 it, whether they be automobile liability,
11 workers' compensation liability, or liability
12 policies generally from its inception until
13 approximately 1974?
14     A.   Yes.
15     Q.   And did you also become aware that
16 Troy had been existence -- in existence since
17 sometime in the late 1800s as a business?
18     A.   I believe I became -- I was aware
19 of that, yes.
20     Q.   So from sometime in the late 1800s
21 until 1974, it's your understanding Troy
22 doesn't have a single copy of any automobile
23 liability policy, workers' compensation
24 liability policy or any other liability
25 policy?

Page 22

1
2      A.   Yes, it is.
3      Q.   Are you familiar with the phrase
4  "liability policy"?
5      A.   Well, sure.  I mean, that's a very
6  broad phrase, but I'm familiar with it, yes.
7      Q.   What does it mean?
8      A.   It means a policy that provides
9  coverage for the named insured's and perhaps
10 other insured's against damages that might be
11 assessed against them arising out of their
12 liability, usually for either bodily injury
13 or property damage.
14     Q.   Are there different types of
15 liability policies?
16     A.   Yes.
17     Q.   Can you list them for us?
18     A.   I mean, I can -- I can try.
19     Q.   I'd appreciate it.
20     A.   Okay.  Well, you have -- and how
21 far back do you want to go?
22     Q.   Well, Troy was in existence since
23 the late 1800s, and they can't find policies
24 from the late 1800s until 1974.  So for that
25 period, what types of liability policies are

Page 23

1
2  you aware existed?
3          MR. BRENNAN:  Object to the form.
4          You can go ahead.
5      A.   Third-party liability insurance
6  appeared in the United States, oh, arguably
7  in the mid- to late 1800s, and it first
8  appeared as liability of employers for injury
9  to their employees.  A little bit later it
10 expanded to include liability for bodily
11 injury to nonemployees, that is to say
12 members of the public.
13         And that -- at that time, it became
14 known as public liability.  And, frankly, the
15 nomenclature "public liability" clung to what
16 later became known as bodily injury for a
17 long time.  When I entered practice in 1960,
18 people were still talking about they wanted
19 to buy insurance policies that covered PL and
20 PD, meaning public liability and property
21 damage.  A little bit later, the PL changed
22 to BI, meaning bodily injury.
23         So as time progressed, the amount of
24 -- the type of coverage that was available
25 expanded, generally following cultural changes

Page 24

1
2  and environmental changes, which expanded the
3  number of exposures that a business had to
4  third-party liability.
5          Earlier, however, when automobiles
6  came into being, the industry very quickly
7  responded by providing liability coverage for
8  injury or damage arising out of the use of
9  the automobile.  I'm not sure exactly when
10 that was, but it was, I think, in the early
11 1900s.
12         Eventually, the types of coverage
13 that was available to a business expanded to
14 include -- and, generally divide -- were
15 divided into two nomenclatures, one being
16 manufacturers and contractors and the others
17 being owners, landlords and tenants.
18         It doesn't take very much
19 concentration to figure out why those two
20 were separated.  Manufacturers and contractors
21 were people who were generally involved in
22 operations inherently more dangerous than a
23 dry goods store, let's say, and most of them
24 occurred away from the premises.
25         Owners, landlords and tenants coverage



ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 25

1
2    was, as it described, for people who owned
3    property, who rented property, who were
4    tenants of property, and generally involved
5    classifications that were fairly nonhazardous,
6    such as dry good stores or stores of
7    different kinds.
8         Now, at -- then the types of
9    liability coverage really sort of exploded,
10   and you had -- gee, I mean, I -- I wouldn't
11   even attempt to name all the different kinds
12   of liability coverage that's available to a
13   business.  But then -- then you began to
14   have coverages that were added that didn't
15   require physical injury or physical damage,
16   and those were called personal injury
17   coverages, and those protected the
18   policyholder against damages that were claimed
19   against them for, say, disparagement of goods
20   or libel or slander, such things that were
21   non injur -- not involved in physical injury.
22        And originally, as liability insurance
23   -- business liability insurance developed, it
24   developed on a monoline basis.  It was not
25   expansive like we have today.  And so you

Page 26

1
2    would have manufacturers and contractors
3    coverage, you would have owners, landlords
4    and tenants coverage, et cetera, et cetera.
5         In 1941, a gentleman named -- I
6    shouldn't have started that because I won't
7    remember his name.  But a gentleman who was
8    the head lawyer for the National Bureau of
9    Casualty Underwriters, E.W. -- I'll think of
10   it in a minute -- promoted and was
11   successful in getting the rating bureaus of
12   the day to join together and develop what
13   became known as the comprehensive general
14   liability policy that was ultimately published
15   for the first time in 1943.
16        And what that policy did was to
17   bring the various individual lines, such as
18   manufacturers and contractors, premises and
19   operations, independent contractors, all the
20   various lines of coverage that could be
21   purchased, bring all those together in a
22   single policy where you could buy them on a
23   combined basis.  Products -- of course,
24   products-completed operations was one of those
25   coverage lines.  And from 1943 forward, the

Page 27

1
2    use of the comprehensive general liability
3    policy, which is now known as the commercial
4    general liability policy, expanded
5    considerably.
6         And when I first entered the
7    practice of insurance in 1960, one of the
8    first things I did was to basically expunge
9    all the monoline coverages in the agency and
10   switch all of my clients over to a
11   comprehensive general liability policy because
12   it didn't cost them anything and it gave
13   them the opportunity to expand their coverage
14   and, frankly, gave me the opportunity to sell
15   them some additional insurance without
16   changing their policy.
17        Now, other than those sorts of
18   things, of course, you have aircraft
19   liability, you have marine liability, et
20   cetera.  I don't know how far you want me
21   to go with that.  But I've about exhausted
22   my -- my brain on that subject at the
23   moment.
24   BY-MR.KOTULA:
25       Q.   Okay.  Do folks generally use the

Page 28

1
2    terms "liability policy" and "liability
3    coverage" somewhat interchangeably?
4        A.   Yes.
5        Q.   So if someone has a liability
6    policy, they might say that they have
7    liability coverage?
8        A.   Most likely, yes.  And vice versa,
9    actually.  If they have liability coverage,
10   they would say they have a liability policy.
11       Q.   So a manufacturers and contractors
12   policy, or it's sometimes also referred to as
13   an M&C policy -- M&C policy, correct?
14       A.   Yes.
15       Q.   That's a liability policy?
16       A.   It is.  And the manufacturers and
17   contractors nomenclature doesn't have anything
18   to do with the type of liability coverage
19   that's provided.  It has to do with the type
20   of industry that's -- that's going to be
21   insured.  And, in fact, if you're an agent,
22   it directs you to which manual of liability
23   insurance you would use to rate the policy.
24   Because there was a manual for manufacturers
25   and contractors, and there was a manual for



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 29

1
2      OL&T, there was a manual for independent
3      contractors and on and on and on.
4          Q.   And so M&C coverage or an M&C policy
5      would be rated typically using payroll as a
6      basis for calculating premium, correct?
7          A.   That's -- that's exactly right.  The
8      rule -- and by the way, there's really no
9      such thing as M&C coverage, but it's used
10     exactly the way you used it in a fairly
11     cavalier manner.  And I probably do it
12     myself.  But the -- the -- sorry, what was
13     it that -- that you had said that I was
14     reexplaining?
15         Q.   We could have the question read
16     back.
17              MR. BRENNAN:  I'm going to object to
18     the form since he doesn't know what he's
19     answering.
20              Can you read the question back,
21     please?  Yeah, that's going to be a
22     challenge.
23              COURT REPORTER:  I'm sorry.  Can I
24     just turn it so he can read it?
25              THE WITNESS:  Oh, yeah.

Page 30

1
2              MR. BRENNAN:  Can you read it out
3      loud just to -- so that --
4              THE WITNESS:  "And so M&C coverage
5      or an M&C policy would be rated typically
6      using payroll as a basis for calculating
7      premium, correct?"
8      BY-MR.KOTULA:
9          Q.   I think you answered that question.
10         A.   Well, not really, because I was
11     going to tell you the rule was that -- no,
12     I think that's correct, that M&C -- M&C
13     classifications were generally rated on a
14     payroll basis.  Now, some of them, such as a
15     brewery, was -- would be rated on gallons of
16     production, and refineries the same way.
17     But, generally, M&C classifications were rated
18     on a -- on a payroll basis.
19         Q.   And I'll just say if anybody needs a
20     break, including our court reporter, you
21     know, just let me know.  As long as we're
22     not in the middle of a question that hasn't
23     been answered, I'm glad to accommodate.  We
24     will take breaks as well.
25         A.   Okay.

Page 31

1
2          Q.   So if someone says that a company
3      has a liability policy or liability coverage,
4      do we know if it has an M&C policy, an OL&T
5      policy or a CGL policy?
6          A.   Not without some additional
7      information, no.
8          Q.   Is there a cost difference between
9      an M&C policy and a CGL policy or an OL&T
10     policy and a CGL policy?
11         A.   Not for -- if -- not if the only
12     thing that you're putting on the CGL policy
13     is the same lines of coverage that you would
14     have purchased independently on an M&C or an
15     OL&T policy.  But if you -- let's say you
16     have an insured who moves from an M&C policy
17     to a comprehensive general liability policy,
18     they automatically get, for instance,
19     products-completed operations coverage unless
20     they have it removed.  And so it's possible
21     that by simply moving to a CGL policy, they
22     get expanded coverage.  But if you're just
23     going to take exactly the same coverage
24     that's written on an M&C policy and put it on
25     a CGL policy, the cost is essentially the

Page 32

1
2      same.  There may be a minor charge, maybe
3      $50.
4          Q.   Well, let's say that an insured has
5      an M&C policy but they don't have all of the
6      other things that are added in to achieve a
7      CGL policy.
8          A.   Right.
9          Q.   Is the cost in terms of a premium
10     cheaper for that M&C policy that doesn't have
11     all those other things?
12         A.   Yes.
13              MR. BRENNAN:  Object to the form.
14              THE WITNESS:  Sorry.
15         A.   Yes.
16     BY-MR.KOTULA:
17         Q.   Is it a lot cheaper?
18         A.   Well, it depends on when you're
19     talking.  If you're talking back in the '40s
20     and '50s, no, nothing was expensive.  The --
21     the insurance coverage was remarkably
22     inexpensive.  But if you're talking about,
23     say, in the 1990s, most likely if you're
24     talking about a manufacturing company or a
25     distribution company, and you're going from a


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials ● Conference Facilities
Videoconferencing ● Legal Video Services ● Exhibit Scanning
Transcript / Video Synchronization ● 24-7 Online Repository
1.888.ACR.3335 ● 1.800.862.4206 (FAX)
info@acrdepos.com ● www.acrdepos.com ● scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 33

```
1
2        -- just an M&C policy that covers only
3    premises and operations and you're going to
4    put it on a CGL policy that covers all the
5    lines of coverage, such as products-completed
6    operations, independent contractors, et cetera,
7    yes, it's likely going to be considerably
8    more expensive.
9        Q.   Okay.  But even in the '40s and the
10   '50s and the '60s, and let's throw in the
11   '70s, there would be a cost difference
12   between an M&C policy that just has M&C
13   coverage and everything else that goes into a
14   CGL policy?
15       A.   You did it again.  There's no such
16   thing as M&C coverage.
17       Q.   Let me rephrase the question.
18       A.   All right.
19       Q.   Even in the 1940s, 1950s, 1960s, and
20   even 1970s, there would be a cost difference
21   if one bought an M&C policy versus buying a
22   CGL policy if the M&C policy didn't include
23   the other things that go into making up a
24   CGL policy, correct?
25       A.   That's right.  Assuming that the M&C
```

Page 34

```
1
2    policy covered only premises and operations,
3    and you buy a CGL policy that covers all the
4    things that -- such as products-completed
5    operations, the ones that I named a while
6    ago, yes, there would be a cost differential.
7        Q.   Does an M&C policy by itself afford
8    coverage for product liability?
9        A.   No, it doesn't.
10       Q.   So it doesn't have any product
11   hazard coverage?
12       A.   Not -- not unless it's endorsed it.
13   It's possible to endorse it on there.  But
14   unlike a CGL policy, it's not automatically
15   included.
16       Q.   If your experience -- I guess,
17   strike that.
18            You started out in the insurance
19   industry on the producer side, working as an
20   agent; is that right?
21       A.   That's correct.
22       Q.   What kind of agent was it, a retail
23   agent?  A wholesale agent?
24       A.   Our family agency was a retail
25   agency; however, we had general agency
```

Page 35

```
1
2    contracts with all of our companies, which
3    means that we had underwriting authority as
4    described in our contract.  I, for instance,
5    could bind our insurance carriers for a CGL
6    policy with the limits of 100,000 per person,
7    300,000 per accident.  That sort of thing.
8        Q.   That's for companies that had an
9    agency agreement with you?
10       A.   Yes.  In Texas -- there's no such
11   thing as a retail broker in Texas.  You have
12   to be an agent of the company, and you have
13   to have a contract with that company in
14   order to produce business.  So that's why
15   retail producers in Texas are called
16   insurance agents because, in fact, that's
17   what they are.
18            So, yes, and I had -- we had agency
19   contracts.  My -- my family's business had
20   agency contracts with actually a lot of
21   insurers because our largest source of income
22   was the sale of crop hail insurance, that is
23   to say covering crops, particularly cotton,
24   for damage from hail.  It was a huge, huge
25   industry.
```

Page 36

```
1
2            And we -- and the exposures were so
3    gigantic, that we had to have, in some
4    cases, 20 or 30 insurance companies in order
5    to be able to place the coverage.  So we --
6    we represented a lot of insurers and had
7    underwriting authority with a lot of them.
8        Q.   So how long did you serve as an --
9    as an insurance agent in Texas?
10       A.   Twelve years.
11       Q.   So that takes us from 1960 to 1972?
12       A.   Correct.
13       Q.   And were you mainly working with
14   customers who became policyholders in Texas
15   in that practice?
16       A.   It depends on what time you're
17   talking about.  When I first entered the
18   practice in 1960, I was working with my
19   parents.  Actually, my -- our agency went
20   back to 1926.  It was founded by my
21   grandfather.  And I had grown up in the
22   business, helped out from the time that I
23   was a teenager.
24            But the -- when I entered the
25   business in 1960, what I did was handled
```



ACR ACCURATE COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 37

2  what we called the automobile desk, which
3  means that when people bought automobile
4  insurance, I -- I counseled with them,
5  discussed with them and decided what coverage
6  they wanted and eventually issued the
7  policies.  A little bit later on, of course,
8  I became much more widely involved.
9       And my clientele ultimately involved
10 manufacturing firms that were domiciled in
11 places other than where I lived, mostly the
12 Dallas-Fort Worth area.  And those
13 manufacturing firms had operations all over
14 the United States, and in some cases,
15 internationally.
16      Our largest client was
17 Transcontinental Telephone & Electronics, which
18 eventually became GTE.  And they were the
19 third largest telephone company in the
20 country.  So they were in most states.
21 Q.  They were based here in Texas?
22 A.  They were based in -- their base was
23 in the Dallas-Fort Worth area, but they had
24 locations and operations in probably 40
25 states.

Page 38

2  Q.  Is it safe to say, though, in that
3  1960 to 1972 period, you were dealing with
4  insurance purchasers who lived in Texas?
5       MR. BRENNAN:  Objection.
6  BY-MR.KOTULA:
7  Q.  Maybe covering businesses else --
8  that had operations in multiple states, but
9  the actual buyers were here in Texas?
10      MR. BRENNAN:  Object to form.
11 A.  That's generally correct.  Yes, I
12 had one client that operated in a ski area
13 in New Mexico.  But generally speaking,
14 that's correct.
15 BY-MR.KOTULA:
16 Q.  In your experience working as an
17 insurance agent in that time frame, did you
18 become aware that customers often made
19 decisions based on price or cost?
20 A.  Sure.
21 Q.  And that they were looking for a
22 cost-benefit type of analysis to that?
23 A.  If you're talking about commercial
24 insured's, which I presume you are, not so
25 much.  My commercial clientele were vitally

Page 39

2  interested in having the coverage that
3  covered their exposures adequately.  They
4  weren't so concerned about whether it was
5  going to cost 30 -- or 40 -- or $50 or
6  $300 more to get adequate coverage.
7       And you need to recall -- or you
8  wouldn't recall, but I need to tell you that
9  in the area of 1960 to 1972, the question of
10 limits of liability was not an expensive
11 issue.  You could increase the limits of
12 liability on a firm similar to Troy Belting,
13 and I had a number of firms that were very
14 similar to Troy Belting that were -- that I
15 insured, and you could increase their limits
16 of liability from, say, to 50,000 to 300,000
17 for probably 100 -- to $150 a year.
18      So it was not -- and as a matter of
19 fact, that's one of the things that I
20 discovered as a young kid in the insurance
21 business, there were seven agencies in our
22 little downtown of 13,000 people.  Generally,
23 because of the huge agricultural premiums
24 that were involved, I had to figure out a
25 way to do something better than the other

Page 40

2  guys, the old moss-heads that had been in
3  the business forever.
4       And so I determined that I would
5  simply adopt a practice of increasing limits
6  of liability on my clients' policies
7  automatically and sending them the new policy
8  with a letter saying:  I have increased your
9  limits.  It cost you $50.  If you don't
10 like it, let me know, and I'll take it off.
11 Q.  Was everybody else doing that?
12 A.  No.
13 Q.  So you kind of set yourself apart
14 from the rest of the herd?
15 A.  Well, I tried to.  I never have
16 anybody turn me down.
17      But back to commercial insured's, of
18 course, they were concerned about costs.  The
19 cost concerns were generally handled in the
20 conferences that I would -- had with my
21 clients about their renewals, or if I was
22 going to sell a new client insurance,
23 outlining all the options and alternatives,
24 et cetera.  And, of course, they were
25 concerned about the cost.


ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 41

1
2      Q.    I mean, there came a point in time
3    where you could -- you could sell umbrella
4    liability coverage as well --
5      A.    Exactly.
6      Q.    -- correct?
7      A.    And this -- interestingly enough,
8    this particular case is a -- is a good
9    example of what we did in our agency and
10   what a lot of people did.  Whereas, they
11   were carrying a $500,000 limit, and when they
12   found that they were able to buy an umbrella
13   policy, they reduced that limit to 300,000
14   because they put an umbrella policy on top
15   of that.
16     Q.    Did everybody -- did everybody in
17   every business buy umbrella liability coverage
18   when it first became available?
19     A.    No, they didn't.
20     Q.    Why not?
21     A.    Well, because probably insurance
22   agents didn't know how to explain it to
23   their clients.  Because it was not expensive.
24   I mean, when umbrella coverage first came out
25   and became available, it was before I entered

Page 42

1
2    the practice of insurance in the mid- to
3    late 1950s.
4          But by the time I got in the
5    insurance business, it was a fairly lively
6    issue and gave me, as a person who came out
7    with a degree in insurance and an
8    understanding of what umbrella policies really
9    did, an opportunity to sell them.  And one
10   of the things that I was able to sell was
11   let's reduce your underlying limits, put a $5
12   million umbrella on top of it; although, most
13   people didn't buy $5 million at that time.
14         And, you know, at that time, you
15   could buy an umbrella for probably in the
16   range of $200 a million.  So you could buy
17   a $5 million umbrella for a thousand dollars.
18     Q.    But everyone didn't buy them?
19     A.    No, everyone didn't buy them.  But
20   in my -- in my case, everyone that I offered
21   the opportunity to buy them, bought them.
22     Q.    And, again, you kind of set yourself
23   apart from the herd because you were aware
24   of about umbrella liability coverage and that
25   it was somewhat inexpensive.  So you -- you

Page 43

1
2    were putting people in it and kind of
3    differentiating yourself from the -- from
4    your competitors?
5          MR. BRENNAN:  Objection.
6    BY-MR.KOTULA:
7      Q.    Is that right?
8      A.    Well, I hope so, yes.
9      Q.    So not everybody was -- was doing
10   what you were doing?
11     A.    No, they weren't.
12     Q.    And some companies wouldn't buy
13   umbrella liability coverage because they
14   hadn't had an exposure that -- that high,
15   correct?
16     A.    I don't know.  I didn't have -- I
17   never experienced that.
18     Q.    As an agent or as a consultant --
19   because I think, as I understand your
20   background, you started out as an agent, and
21   then you did -- well, why don't you tell us
22   what you did after you served as an agent
23   from 1960 to 1972.
24     A.    I served as an agent from 1960 to
25   1972.  And in 1972, I sold the insurance

Page 44

1
2    agency, moved to Dallas and went and joined
3    another fellow in a consulting firm called
4    RIMCO.  That's an acronym, R-I-M-C-O.  No,
5    it's not an acronym.  It's a word.  Excuse
6    me.  And that was strictly a consulting
7    firm.  We offered advice and counsel for --
8    about insurance matters for an hourly fee.
9      Q.    And how long did you do that?
10     A.    Six years.
11     Q.    So that takes us to 1978?
12     A.    Right.  Well, actually, it was
13   January of '79.
14     Q.    And then what did you do?
15     A.    I formed Robert Hughes Associates,
16   Incorporated, and set up my own business.
17     Q.    And what's the nature of that
18   business, when you first started it and
19   through today?
20     A.    When I first started it, it was
21   purely an insurance consulting firm, exactly
22   like RIMCO, we gave advice and counsel to
23   corporate insurers or business insured's for
24   a fee.  And, you know, what we did was we
25   would review their insurance program, write



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 45

1
2    reports and -- and suggest how they could
3    improve their coverage or improve their
4    costs.  And in some cases, we were retained
5    to be their surrogate risk managers on a fee
6    basis.
7         And that continued for a few years.
8    And as the sophistication of our clientele
9    grew, we found ourselves having the need to
10   design and implement alternative funding
11   programs, such as captive insurance companies.
12        Our clients, many of -- many of them
13   got to the point where they were actually
14   larger than some of the insurers that they
15   were buying insurance from, and so they
16   didn't have a need to buy 300,000 or a 3
17   million or whatever their -- their retention
18   capability was.  And so we opened an
19   actuarial practice to respond to that need.
20        And we also began implementing and
21   designing captive insurance companies, largely
22   offshore, but in some cases in Texas, which
23   was a fertile field because Texas had a rule
24   that they would not charge a certain tax to
25   locally domiciled companies that wrote only

Page 46

1
2    Texas employees in the workers' compensation.
3    So that gave a captive insurance company at
4    that time maybe a 20 percent differential in
5    their cost.
6         And we set up a -- a management
7    side where we actually provided administrative
8    services and management services to Texas
9    captive insurance companies.  So that -- we
10   got help consulting, actuarial, and now we
11   have captive management.
12        And then in -- in two-thousand-and-
13   -- no, in 1990, I got a call from one of
14   my clients, which at the time was called
15   Enserch -- which was basically the TXU, Texas
16   Utilities.  It was the power company for
17   North Texas -- who said that they had a --
18   an insurance coverage case that was being
19   litigated and they needed an insurance expert
20   and wanted to know if I would serve, and I
21   said sure.  Their -- their attorneys were
22   Covington & Burling.  And --
23   Q.   Know them well.
24   A.   Well, and you know that they had a
25   big insurance coverage practice, and still

Page 47

1
2    do.
3    Q.   And still do.
4    A.   And so I fell under the tutelage of
5    -- of a gentleman named -- Nichols was his
6    last name.  I can't remember his first name.
7    But --
8    Q.   At Covington?
9    A.   At Covington.  And that case was the
10   Washington Public Power Company case, which
11   was very famous and very large, and it went
12   on for quite some time.
13        So after that, we began continually
14   getting requests to provide expert witness
15   testimony, and we opened our insurance
16   litigation support business.  And today that
17   makes up about 80 percent of the income of
18   the company.  We have 26 testifying experts
19   all over the country.  So that's pretty much
20   a thumbnail sketch of Robert Hughes
21   Associates.
22   Q.   Excellent.
23        Mr. Hughes, as an agent or a
24   consultant or in any capacity, have you ever
25   placed any policy of insurance from Jamestown

Page 48

1
2    Mutual Insurance Company?
3    A.   No.  I had never heard of Jamestown
4    Insurance Company until this case.
5    Q.   And the same question about Unigard
6    Insurance Company?
7    A.   Well, no, we never represented
8    Unigard, but certainly know them well.  But
9    I have not placed insurance at Uni -- with
10   Unigard.
11   Q.   So you never assisted a policyholder
12   in purchasing a policy of insurance from
13   either Jamestown Mutual Insurance Company or
14   Unigard Insurance Company?
15   A.   Well, when you put it that way, yes,
16   a lot of my consulting clients bought their
17   insurance from Unigard.  I can't tell you
18   exactly who they were, but a lot of them
19   did.
20   Q.   Can you tell me in what time frame?
21   A.   Probably most prolifically in the
22   time frame from 1973 to the early to
23   mid-'80s.
24   Q.   And can you recall the name of any
25   policyholder that bought a Unigard policy



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

ACCURATE
COURT REPORTING, INC.

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 49

1
2    with your assistance?
3        A.   No, I can't.  No, I can't.
4        Q.   Do you recall reviewing Unigard
5    insurance policies in that time frame?
6        A.   I do.
7        Q.   What types of policies were they?
8        A.   For the most part, they were general
9    liability policies.  In some cases, they were
10   property policies.
11       Q.   Did you ever review any M&C policy
12   issued by Unigard?
13       A.   Not that I recall.
14       Q.   So as I understand your testimony,
15   before this case, you had never even heard
16   of Jamestown Mutual Insurance Company and you
17   had never reviewed a Jamestown Mutual
18   Insurance Company policy?
19       A.   That's correct.
20       Q.   And as to Unigard, you believe that
21   you reviewed Unigard CGL policy sometime in
22   the 1973 to early/mid-1980 period?
23       A.   That's my belief, yes.
24       Q.   But you can't remember any of the
25   names of the -- of your clients or the

Page 50

1
2    policyholders that purchased those policies?
3        A.   I cannot.
4        Q.   And were those Unigard policies
5    primary CGL, or were they something else?
6        A.   Probably both primary and excess.
7        Q.   Had you ever seen a policy issued by
8    Jamestown Mutual Insurance Company before this
9    case?
10       A.   No.
11       Q.   And as to Unigard, you've -- you
12   just told us you'd -- you'd reviewed CGL
13   policies and perhaps excess policies that
14   Unigard issued in that '73 to early/mid-1980s
15   period?
16       A.   That's what I said.  But I believe
17   I also told you that I reviewed some
18   property policies as well.
19       Q.   Right, and some property policies.
20       A.   And at one point in time, Unigard
21   was, at least in our area, a very prolific
22   provider of CGL coverage, and that would have
23   been in that same period of time.  So we --
24   we had a lot of clients who bought insurance
25   from the Unigard companies.  I'm not sure

Page 51

1
2    exactly when Unigard came into existence as
3    Unigard, but --
4        Q.   Sir, do you have a library of
5    insurance materials that you maintain?
6        A.   I do.
7        Q.   Can you tell us about it?
8        A.   Well, sure.  It's a room about the
9    size of this room.  The walls are covered
10   with books and -- and folders with documents
11   in it, and they go up about eight feet.
12   And that contains a large number of
13   textbooks.
14            Oh, by the way, sorry, we just
15   opened another room in our library where we
16   put all of our -- our Appleman and Couch
17   library, which is considerably large.
18            But in the other libraries, we have
19   textbooks, treatises, general books that have
20   been published to support the insurance
21   industry in general.  We have the
22   International Risk Management Institute books;
23   however, we switched over to those in --
24   electronically.
25            We have -- we have a huge section

Page 52

1
2    devoted entirely to the London Non-Marine
3    Association production that we were fortunate
4    to come by when the clients for London in
5    the Union Oil Company case produced all of
6    their documentation without a -- without a
7    nondisclosure agreement.  So they became
8    immediately available in the public domain,
9    and we have all of those.
10            And then we have a large block of
11   what we call drafting history, which is
12   documents, largely minutes and correspondence
13   from and between the participants in the
14   joint drafting of the various policies going
15   as far back as 1943.  And let's see.  Have
16   I left something out?
17       Q.   What about insurance policies, do you
18   have insurance policies?
19       A.   Yes, we do.  We have about 6,000
20   insurance policies.
21       Q.   And are those issued by numerous
22   insurance companies?
23       A.   Yes.
24       Q.   Are they issued to specific
25   insured's, or are they specimen forms?



ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 53

1
2      A.    No, they're issued to specific
3  insured's.
4      Q.    Did you check that collection of
5  6,000 or so insurance policies to see if you
6  had any policies issued by Jamestown Mutual
7  Insurance Company?
8      A.    I sure did.
9      Q.    Did you have any?
10     A.    No.
11     Q.    Did you check that collection of
12  over 6,000 policies to see if you had any
13  policies issued by Unigard Insurance Company?
14     A.    I did not.  I know that we do, but
15  I didn't think that to be necessarily
16  pertinent.  I was looking primarily for
17  Jamestown.
18     Q.    So you didn't review your collection
19  for anything having to do with Unigard?
20     A.    I did not.
21     Q.    So as you sit here now, you can't
22  say for sure you have Unigard policies?
23     A.    No, I can't tell you for sure.  I'm
24  almost certain that we do, but I can't tell
25  you that for sure.

Page 54

1
2      Q.    Have you ever seen a Jamestown
3  Mutual Insurance Company M&C policy?
4      A.    Well, I think I told you earlier I
5  had never seen a Jamestown insurance policy,
6  period.
7      Q.    Well, I asked you as of today, have
8  you ever seen a Jamestown Mutual Insurance
9  Company M&C policy?
10     A.    Oh, as of today?
11     Q.    Yeah.
12     A.    Well, we did have one exemplar
13  policy, and I can't remember whether it was
14  an M&C or an OL&T -- I mean, or a CGL.
15     Q.    Do you want to take a look?
16     A.    Yeah.
17     Q.    And just -- you're -- you're looking
18  at the exhibits to your report?
19     A.    I am.  I know it's mentioned in the
20  body of the report, so -- in the exemplar
21  section.
22     Q.    I see a reference on page 13 of
23  your report that, "The documentation I
24  reviewed includes a copy of a comprehensive
25  general liability policy" --

Page 55

1
2      A.    Right.
3      Q.    -- "CGL, issued by Jamestown Mutual
4  Insurance Company."
5      A.    That's right.  And it's a '62 -- a
6  '62 policy.  That's what I was thinking of.
7  And it is a CGL.  So the answer to your
8  question is that I don't believe that I have
9  ever seen a Jamestown M&C policy.
10     Q.    Have you seen a Unigard Insurance
11  Company M&C policy?
12     A.    I'm sure I have, but I don't recall
13  specifically.
14     Q.    Mr. Hughes, is it your opinion that
15  an M&C policy that doesn't have an
16  endorsement adding in products hazard coverage
17  does not afford coverage for products hazard
18  or product liability claims?
19     A.    As you have stated it, that's
20  correct.  I mean, if there's not some other
21  intervening issue that automatically would add
22  under certain circumstances products liability.
23  But, generally, you're correct, if you have
24  an unadorned M&C policy, you have to actually
25  endorse that policy to provide

Page 56

1
2  products-completed operations.
3      Q.    So without such an endorsement adding
4  in coverage for products hazard coverage, an
5  M&C  policy affords no coverage for product
6  liability claims?
7      A.    Correct.
8      Q.    And no coverage for asbestos products
9  bodily injury claims?
10     A.    If it's a products liability
11  exposure, that's correct.
12     Q.    Have you personally, as you sit here
13  today, ever seen a Jamestown Mutual Insurance
14  Company M&C policy endorsement adding in
15  coverage for products hazard?
16     A.    I have not.  And let me just step
17  back one step and make sure that -- that
18  I've given you the right answer.  The way
19  you structured your question assumed, I
20  think, that all asbestos liability exposures
21  is a products liability exposure, and that's
22  not correct.
23     Q.    I wasn't saying that.
24     A.    I know you weren't intending to say
25  that, but you did say that.  So I want to



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 57

1
2    make it clear that if the products liability
3    -- if the exposure -- the asbestos exposure
4    that caused the injury was an operations or
5    premises exposure, yeah, you'd have coverage
6    under an M&C policy.
7        Q.   Right.  But that's because an M&C
8    policy affords coverage for premises
9    operations but doesn't cover for product
10   liability coverage occurring away from the
11   premises; is that right?
12       A.   That -- if it's not been endorsed to
13   do so, that's correct.
14       Q.   And you can't say for sure that
15   Jamestown Mutual or Unigard used an
16   endorsement adding in product liability
17   coverage, can you?
18       A.   I can't say much of anything for
19   sure.  That's not the standard that -- that
20   I'm -- have to adhere to.  So you're
21   correct.
22       Q.   And you've never seen either company
23   use such an endorsement?
24       A.   No, I haven't.  I've never seen
25   Jamestown use any endorsement.

Page 58

1
2        Q.   I'm not so sure.  We'll get to that
3    in a second.
4        A.   I mean, the endorsement that we have
5    in this case, but prior to this case.
6        Q.   Right.
7            MR. KOTULA:  Can we take a short
8    break?
9            (Whereupon, break taken, 11:09 a.m.
10   to 11:19 a.m.)
11   BY-MR.KOTULA:
12       Q.   Mr. Hughes, in your work being
13   retained as a lost policy expert, is there
14   something called primary evidence?  Have you
15   used that term, primary evidence?
16       A.   There is.  But when I'm working in
17   lost policy cases, I don't have primary
18   evidence usually.
19       Q.   What is primary evidence?
20       A.   Well, it's a copy of the policy.
21       Q.   And if you have a part of a policy,
22   is that part of the policy primary evidence
23   of the policy?
24       A.   I guess that's really a legal
25   question.  So I can only give you my lay --

Page 59

1
2    lay opinion, but I think that -- I think
3    that's correct, that it would be.
4        Q.   And is -- in some cases, when you
5    have an actual piece of the policy, is that
6    better evidence sometimes than -- than
7    secondary evidence?
8            MR. BRENNAN:  Object to the form.
9        A.   Depends on what it is.  It depends
10   on what your secondary evidence is.  In some
11   cases, secondary evidence is -- is almost as
12   reliable as the actual copy of the policy.
13   So it just depends on what it is.
14   BY-MR.KOTULA:
15       Q.   Well, you don't believe that you'd
16   rather have secondary evidence than the
17   actual policy, do you?
18           MR. BRENNAN:  Object to the form.
19       A.   Once again, it depends on what the
20   secondary evidence is.  In a lot of cases I
21   have seen secondary evidence, which is an
22   actual copy of the policy itself, and all
23   you -- you don't have, let's say, for
24   instance, a signature page.  Now, is that
25   better than having the original policy?  No,

Page 60

1
2    it isn't.
3    BY-MR.KOTULA:
4        Q.   Sir, how many times have you been
5    retained to serve as an expert on lost
6    policy issues?
7        A.   I haven't counted lately, but I
8    think it's about 60 -- 60 times.
9        Q.   Give or take a few?
10       A.   Give or take a few.
11       Q.   And that's just lost policy, not
12   other issues?
13       A.   Right.  And -- and I think it's
14   probably good to clarify at this point what
15   I do actually do, because this generally
16   falls into a category that people call
17   insurance archaeology.  But what I do not do
18   is get -- put on a hardhat and go and look
19   in old, smelly basements for copies of
20   evidence.
21           What I do is I take the evidence
22   that has been discovered and do what is
23   better explained as reconstruction work; in
24   other words, taking what -- what have you
25   got and what can I tell you about whether


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 61

1
2    the policy existed and what the terms were.
3        Q.    So you don't dig the bones out, so
4    to speak, like, an archaeologist?
5        A.    I do not.
6        Q.    You leave that to others?
7        A.    That's correct.  Sometimes we find
8    things by accident, but that's really not our
9    primary concern.  We -- we leave that to
10   firms like Insurance Archaeology Group or
11   R.M. Fields.
12       Q.    So folks like Troy Belting, they
13   don't hire you to do footwork or legwork to
14   go to customers of theirs or to places where
15   maybe some secondary evidence might be found.
16   They rely on other -- other folks to do
17   that.  And then whatever they find, they
18   bring to you and they say:  What do you
19   make of this?
20       A.    Exactly.
21       Q.    Is that right?
22       A.    Yes.
23       Q.    Have your opinions on lost policy
24   ever been excluded because they were found by
25   a court to be unreliable?

Page 62

1
2        A.    I think in one case in -- in
3    Oklahoma my opinions were excluded, and I
4    don't know that you would say they were
5    unreliable.  What happened in that case was
6    I had rendered my opinions based upon the --
7    the documentation that had been presented to
8    me, and shortly after I gave the report to
9    the -- the counsel who retained me, he came
10   up with a bunch of additional information.
11   And so I had to revise my report to say
12   that more than likely, the form was either
13   Form A or Form B, which in Oklahoma was
14   almost exactly the same wording but it was a
15   different number.
16           And the judge said, well, you know,
17   we -- I think Mr. Hughes is speculating
18   entirely, and I'm not going to consider his
19   -- his opinions.  That's the only time I
20   know that it's been excluded.
21       Q.    And that's the Montello case in the
22   Western --
23       A.    You got it.
24       Q.    -- District of Oklahoma?
25       A.    You got it.

Page 63

1
2        Q.    Which was just affirmed about two
3    months ago by the Tenth Circuit Court of
4    Appeals?
5        A.    I didn't know that, but --
6        Q.    So is it your understanding that the
7    district court excluded your expert opinion
8    on lost policy and granted summary judgment
9    to the insurer?
10       A.    That's right.
11       Q.    And that was -- Montello was an
12   asbestos bodily injury case?
13       A.    That's correct.
14       Q.    And did it involve product liability
15   claims involving asbestos?
16       A.    You know, I don't remember.
17       Q.    Was your opinion also excluded in a
18   case called Trelleborg Automatic --
19   Automotive?
20       A.    I don't know.  I don't think so.
21   But if it was, I don't know about it.
22       Q.    In the Eastern District of Michigan?
23       A.    I remember Trelleborg, but I don't
24   remember it being excluded.
25       Q.    Okay.  It's my understanding it was.

Page 64

1
2    You gave lost policy opinions in that case
3    as well, and the district court in the
4    Eastern District of Michigan excluded your
5    expert opinions.
6        A.    You know, it could be and they just
7    didn't -- the attorneys didn't tell me.  I
8    don't know about that.
9        Q.    Do folks not -- attorneys who retain
10   you don't tell you that something happened
11   and your opinion --
12       A.    Sometimes they don't.
13       Q.    -- was restricted?
14       A.    Sometimes they don't.
15       Q.    They told you in Montello?
16       A.    Well, yes, as a matter of fact, they
17   -- they did.  And the truth of the matter
18   is, my opinions have not -- have only been
19   excluded in a very limited number of cases.
20       Q.    Just as a general proposition, you've
21   been retained as an expert witness on lost
22   policy issues, you've said by your own count,
23   approximately 60 times.  Do you know who
24   must prove up a policy that's missing or
25   lost?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 65

1
2          MR. BRENNAN:  Object to the form.
3     A.    Well, that, of course, is a legal
4     question, but I have a general idea that the
5     policyholder has a responsibility of proving
6     -- or has the burden to prove that the
7     policy existed and to prove at least some of
8     the terms and conditions.
9          And that last part is unclear to me
10    exactly what that means, but it's been
11    explained to me by a number of people,
12    including federal judges, that what it means
13    to them is that the policyholder has to
14    approve enough of the terms and conditions of
15    the policy to allow the Court or the trier
16    of fact to determine that the policy would
17    have, indeed, covered the claims at issue.
18    BY-MR.KOTULA:
19    **Q.    I'm not going to use the word that**
20    **the policyholder has the burden, because it**
21    **presumes or assumes that they were, in fact,**
22    **the policyholder.  In a lost policy case,**
23    **that's the issue in dispute.  But is it fair**
24    **to say that the party claiming coverage under**
25    **a lost or missing policy has the burden of**

Page 66

1
2     proving the policy?
3          MR. BRENNAN:  Object to the form.
4     A.    Once again, that's a -- that's a
5     legal question, but that is my understanding.
6     And I'm glad you clarified that because it's
7     not always the policyholder that's seeking
8     coverage under the policy.
9     BY-MR.KOTULA:
10    **Q.    Do you have an understanding of what**
11    **a party claiming coverage under a policy**
12    **that's lost or missing must prove?**
13         MR. BRENNAN:  Object to the form.
14    A.    Well, I thought I told you what my
15    understanding was.  They have to prove that
16    the policy, indeed, existed, and that they
17    have to prove a sufficient amount of the
18    terms and conditions of that policy that
19    would allow the trier of fact to make a
20    determination as to coverage.
21    BY-MR.KOTULA:
22    **Q.    If someone doesn't have a copy of**
23    **the alleged policy, what types of evidence**
24    **might a party claiming coverage under the**
25    **lost or missing policy rely upon?**

Page 67

1
2     A.    Well, you -- you often find that you
3     have a certain amount of physical evidence,
4     secondary evidence, which would include --
5     and I discuss this in my report,
6     correspondence by the various parties, such
7     as the agent or broker or the insurance
8     company or even other parties that --
9     inquiring about the coverage.
10         You often can find court records
11    that would mention the policy at issue and
12    describe certain of the coverages.  If you're
13    talking about a primary policy, you may find
14    that there are excess policies that were
15    contemporaneous with the policy that reference
16    certain parts of the policy, such as limits
17    of liability and policy dates and policy
18    numbers.  I think we've discussed that you
19    may find that you have an incomplete copy of
20    the policy, parts of the policy.
21         And then you may find that you have
22    anecdotal evidence when you have people that
23    were involved in dealing with the insurance
24    who can speak from their memory as to
25    whether the policy existed and what the

Page 68

1
2     coverage was, presuming, of course, they are
3     alive.  And I would include written anecdotal
4     evidence, if there is such a thing.  But
5     written discussions about the coverage in
6     that section -- in that segment.  Often
7     you'll find in archaic records various
8     correspondence between people who were dealing
9     with the coverage at the time.
10         That, generally, is what you're
11    talking about.
12    **Q.    I'm going to get into that in a**
13    **little more detail, but I just wanted to**
14    **elicit sort of a general understanding.**
15         **Can you tell us what the essential**
16    **terms of an insurance policy are that must**
17    **be shown?**
18         MR. BRENNAN:  Object to form.
19    A.    No, I can't.
20    BY-MR.KOTULA:
21    **Q.    Well, is it essential to know the**
22    **type of policy that may have been issued?**
23         MR. BRENNAN:  Object to form.
24    BY-MR.KOTULA:
25    **Q.    The type of coverage grant that may**



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 69

1
2     have been given?
3          MR. BRENNAN:  Object to form.
4       A.  Well, I think in terms of what is
5     essential is going to be determined by the
6     -- by the court that's involved.  And you --
7     you may -- as in the case of the Montello
8     case, that -- that judge decided that what
9     he wanted to see was every bit of the terms
10    and conditions of the policy and he didn't
11    want any equivocation as to what might be in
12    the policy.  And if you had to do that,
13    then he threw it all out.
14         On the other hand, you have certain
15    judges who are happy if they -- if they see
16    evidence of the date the policy was in
17    effect, the type of coverage that the policy
18    provided, and in most cases, the policy
19    limits.
20         Now, in cases where the only thing
21    at issue is the defense cost, policy limits
22    are immaterial, so you don't have to worry
23    about the policy limits.
24    BY-MR.KOTULA:
25      Q.  Now, in this case, it's my

Page 70

1
2     understanding Troy Belting is incurring both
3     defense costs and indemnity costs in
4     connection with underlying asbestos bodily
5     injury claims.  Is that your understanding as
6     well?
7       A.  Yes.  So we were talking about the
8     essential -- the essential terms.
9       Q.  Sure.
10      A.  And so I guess the last point that
11    I made was that policy limits may or may not
12    be essential terms, but certainly the -- the
13    general coverage grant is what does the
14    policy say that it covers.  And we're
15    talking now about the parts of the coverage
16    that are the burden of the person that's
17    asking for coverage, because it is my
18    understanding that if -- that it is the
19    insurer's responsibility to prove up any
20    limitations of coverage, such as exclusions
21    or limiting endorsements.
22      Q.  Right.  Now, does the M&C policy, if
23    it doesn't have an endorsement adding in
24    product liability coverage or product hazard
25    coverage, does it exclude product liability

Page 71

1
2     or product hazard coverage?
3          MR. BRENNAN:  Object to the form.
4       A.  You know, I -- I've looked at
5     thousands of them, and sitting here today, I
6     really can't tell you.  I don't remember
7     whether it actually excludes products
8     coverage.
9     BY-MR.KOTULA.
10      Q.  But either way, it's your testimony
11    and your opinion that an M&C policy that
12    isn't endorsed to add in coverage for product
13    liability or product hazard doesn't cover
14    product hazard or product liability claims?
15      A.  That's right.
16      Q.  All right.
17      A.  You know, in retrospect, I think --
18    I think it does exclude exposures to
19    products-completed operations.
20      Q.  So that's a standard exclusion in
21    the M&C policy?
22      A.  I believe that's right, yes.
23      Q.  Okay.  Mr. Hughes, have you ever
24    spoken with anyone at Troy Belting with
25    personal knowledge of insurance policies that

Page 72

1
2     are allegedly purchased for the 1949 to 1974
3     period?
4       A.  No.
5       Q.  Have you ever spoken with anyone at
6     Troy Belting that told you that they reviewed
7     any policies issued to Troy Belting from 1949
8     to 1974?
9       A.  No.
10      Q.  Have you ever spoken with anyone who
11    served as an insurance agent or a broker for
12    Troy Belting with personal knowledge of
13    insurance policies Troy Belting allegedly
14    purchased for the 1949 to 1974 period?
15      A.  No, I've not spoken with anybody.
16    All my information has come from
17    correspondence and testimony, et cetera.
18      Q.  So you haven't spoken with anyone
19    who served as an insurance agent or a broker
20    for Troy Belting who told you that they
21    reviewed any policies issued to Troy Belting
22    from 1949 to 1974?
23      A.  I have not.
24      Q.  And am I correct from what you've
25    just testified about, that you haven't spoken


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 73

1
2    with anybody who worked for Troy Belting in
3    the 1940s, 1950s, 1960s or 1970s?
4        A.    You are correct.
5        Q.    And you've never spoken with anyone
6    who was involved in purchasing insurance
7    policies for Troy Belting in those periods of
8    time?
9        A.    That's correct.
10            MR. KOTULA:  Mark these as Hughes
11    Exhibit-2, please.
12            (Whereupon, Exhibit Number-2 marked.)
13            MR. KOTULA:  Off the record.
14            (Whereupon, break taken, 11:37 a.m.
15    to 11:39 a.m.)
16    BY-MR.KOTULA:
17        Q.    I'll just state that the court
18    reporter has placed before you what she's
19    kindly marked as Hughes Exhibit-2 with
20    today's date in this case.
21            For the record, Hughes Exhibits-2 is
22    titled Expert Report of Robert N. Hughes in
23    the Northern District of Oklahoma.  So if I
24    said Western District, I correct myself.  It
25    was the Northern District of Oklahoma,

Page 74

1
2    federal court, in a case called Canal
3    Insurance Company vs. Montello, Inc.,
4    M-o-n-t-e-l-l-o.  And it is 54 pages,
5    including certain exhibits.
6        A.    Right.
7        Q.    Have you ever seen what we've marked
8    as Hughes Exhibit-2 in this matter?
9        A.    Sure.
10        Q.    Can you tell us what it is?
11        A.    It's my expert report in the Canal
12    Insurance Company v. Montello case.
13        Q.    And that's the case we were talking
14    about earlier?
15        A.    That's right.
16        Q.    I'm going to ask you to turn to
17    page 5 of your report.  At the very bottom,
18    it's the last sentence that continues over to
19    the next page with one word.  It says,
20    "Besides witness memory and testimony, this
21    evidence" -- and you're talking about
22    evidence other than actual policies or I
23    guess second -- what you would call secondary
24    evidence, right?
25        A.    Correct.

Page 75

1
2        Q.    It says, "Besides witness memory and
3    testimony, this evidence comes in various
4    forms, including related policies such as
5    those 'above' and 'below' the missing policy,
6    those issued before and after the missing
7    policy, and other documents referring or
8    relating to missing policies such as
9    correspondence and exemplar policies."
10            Did I read that right?
11        A.    You did.
12        Q.    And that -- is that still your
13    opinion?
14        A.    Sure.
15        Q.    So I think when you were giving me
16    a general statement, you mentioned that if --
17    if the missing policy was a primary policy,
18    that an excess policy above it could have
19    significance, correct?
20        A.    Correct.
21        Q.    I don't know if you in that general
22    discussion mentioned policies that may have
23    been issued before and after a missing
24    policy?
25        A.    I probably -- I think you're right,

Page 76

1
2    I probably did not.
3        Q.    But that's another fruitful area for
4    -- for someone in your line of work,
5    correct?
6        A.    Yes.  And I think in my report you
7    would find that reference under the -- the
8    patterns of practice section.
9        Q.    Can you explain the significance of
10    evidence of policies of above or below the
11    missing policy?
12        A.    The easiest -- yes.  The easiest is
13    the ones above because usually policies that
14    are written to apply in excess of the policy
15    at issue will reference some of the terms
16    and conditions of the underlying policy,
17    especially if you're talking about an
18    umbrella policy that sits on top of the
19    primary policy because it's going to almost
20    always list the primary policy, the terms --
21    term of the policy, the limits of the
22    policy, et cetera.  It may even contain some
23    notations about various coverages that are
24    provided by the underlying policy.
25            That diminishes a bit as you go up



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 77

1
2    the tower of coverage.  And when you get way
3    at the top, you have a policy that's simply
4    a following form excess that just says this
5    policy is 10 million excess of 10 million,
6    and it follows form to the underlying policy.
7        Q.    So you're talking about like
8    following form excess policies that are sort
9    of second or third or fourth or higher
10   layers?
11       A.    Exactly.  Exactly.
12       Now, as far as underlying policies
13   are concerned, those underlying policies may
14   contain information that's pertinent to the
15   missing excess policy search, most
16   importantly, the attachment point.  And in
17   most cases, excess policies at least provide
18   following form coverage to the underlying.
19   Even umbrella policies in their Section 1
20   almost always would provide following form
21   coverage.
22       So if you have the underlying
23   policy, that tells you a lot, if not
24   everything, about what's provided in the
25   following form excess policy.

Page 78

1
2        Q.    So if you have the umbrella policy
3    but you're missing the primary policy, let's
4    talk about that scenario for --
5        A.    Okay.
6        Q.    -- for the time being.  And let's
7    assume you have the whole umbrella policy.
8    If you have the whole umbrella policy, you
9    would expect you have a schedule of
10   underlying insurance?
11       A.    Exactly.
12       Q.    And that schedule would identify the
13   name of the underlying insurer who had the
14   primary policy, correct?
15       A.    Well, what's included in the schedule
16   of underlying varies between insurers.  But,
17   generally, you'll have at least the name of
18   the underlying -- well, that's not exactly
19   correct, because it depends a lot as to when
20   -- at what point in the negotiations for
21   coverage these policies were placed.
22       Because if it's a new umbrella, a
23   lot of times it would have been negotiated
24   for and agreed to and actually issued before
25   the primary is even in place.  So it will

Page 79

1
2    usually say to be -- to be advised or have
3    some reference in there that's not specific.
4        But if you presume that you're
5    having a -- let's say it's a renewal and
6    everybody knows what the underlying is, yes,
7    the -- the umbrella policy will normally list
8    the underlying as to what company provides
9    the coverage, as to where the umbrella
10   attaches in terms of limits of liability, the
11   term -- the policy term of the underlying,
12   those sort of things.
13       Q.    It also lists the type of coverage.
14   Who has, say, CGL coverage, it will -- in
15   the schedule of underlying insurance, an
16   umbrella policy can say primary CGL and give
17   the name of the insurer and so on, correct?
18       A.    It may say primary CGL and it may
19   not.  But, generally, there's an indication
20   that it will give you a good idea as to
21   what kind of coverage is being provided by
22   the underlying policy.
23       Q.    Let me ask you a more general
24   question.  Given -- I know how umbrella
25   policies work, but an umbrella policy can sit

Page 80

1
2    above several different policies, correct?
3    It can provide extra limits above a primary
4    CGL, an auto policy.  It can be even be
5    above employer's liability coverage?
6        A.    That's right.
7        MR. BRENNAN:  Object to the form.
8    BY-MR.KOTULA:
9        Q.    Right?  And so a schedule of
10   underlying insurance that says how that
11   umbrella policy -- what coverage it affords
12   might, say, break out the different coverages
13   it sits over?
14       A.    Well, that's exactly correct.  And
15   in large insured's, complicated and complex
16   insured's, that list, if it's complete --
17   which, frankly, it seldom is -- but if it's
18   complete, you can have a whole lot of
19   different kinds of coverages.  You might have
20   aircraft coverage.  You might have watercraft
21   coverage, et cetera, et cetera.
22       Q.    Errors -- errors and omissions,
23   possibly.  Although, the umbrella often
24   doesn't --
25       A.    That's correct.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 81

1
2      Q.   -- doesn't go over that.
3           But the schedule of underlying
4    insurance could go on for pages in an
5    umbrella policy?
6      A.   Well, in fact, it could, yes.
7      Q.   And if you're talking about a big
8    company, like an Exxon Mobile, you're going
9    to have a schedule of underlying insurance
10   that's going to be -- to be almost like a
11   phone book, potentially?
12     A.   Exactly.  Exactly.
13     Q.   Sometimes the umbrella policy can
14   reference a policy number in the underlying?
15     A.   Exactly.
16     Q.   Right?
17     A.   Absolutely, yes.
18     Q.   And that can be significant
19   information for someone in your line of work,
20   correct?
21     A.   Yes.  It's not always true that that
22   policy number and that policy that's
23   referenced in the schedule of underlying is
24   still in effect.  But, yes, that is --
25   that's important.  That's the reason that I

Page 82

1
2    said that part of the secondary evidence that
3    we consider important is policies that apply
4    in excess of the missing policy.
5      Q.   Right.  And you've offered an
6    opinion in this case that Jamestown Mutual
7    and Unigard issued policies -- primary
8    policies to Troy Belting from 1949 to 1974,
9    correct?
10     A.   Right.
11     Q.   Do you have any evidence or are you
12   aware of any evidence of policies above the
13   alleged Jamestown Mutual and Unigard policies
14   for that -- at any time from 1949 to 1974,
15   such as umbrella policies or excess policies?
16     A.   I don't think so.  Well, we have
17   the CNA policy that was in effect from
18   December 1st, '71 to '74.  And so --
19     Q.   Wait, you're looking at your Montello
20   opinion, I think --
21     A.   Oh, I'm sorry.
22     Q.   -- which we've marked as Hughes
23   Exhibit-2.
24     A.   That would have been nice, wouldn't
25   it?

Page 83

1
2      Q.   For you.
3           MS. YOUNG:  Not so much for me.
4    BY-MR.KOTULA:
5      Q.   I just want to be clear, I'm not
6    going to play a game where -- and I'm sure
7    Tim was noticing the same thing I was.  We
8    want -- we want to know what your -- your
9    opinions are in this case.
10     A.   Well, isn't that the way it works,
11   you hand me a document and it automatically
12   becomes evidence in this policy?  Just
13   kidding.
14          All right.  Let me take a quick
15   look here.
16          Right, the INA policy in this case
17   applies -- no, I don't have actually a copy
18   of the policies that were issued for
19   Jamestown, the excess policies during that
20   period that you indicated, '49 to '74.
21     Q.   So you don't -- in this case, you're
22   not aware of any evidence of policies, such
23   as umbrella or excess policies, above the
24   alleged missing Jamestown Mutual and Unigard
25   policies from 1949 to 1974, right?

Page 84

1
2      A.   I believe that's correct.
3      Q.   Yeah, it's not -- it's not a trick
4    question.  If it was in there, I wouldn't
5    have asked that question.  You know, you're
6    -- the record will just reflect Mr. Hughes
7    is reviewing his report.  You can take all
8    the time you would like to see if you have
9    -- if you see something different than what
10   you just testified to.
11     A.   No, I believe you completely.  I'm
12   just frustrated that I can't find it right
13   now.  Ah -- no, never mind.  You're right.
14   That's correct.
15     Q.   There is no evidence of any policies
16   above this missing gap of 1949 to 1974,
17   right?
18     A.   I think that's correct.
19     Q.   Okay.  And as we saw in your
20   Montello report, you said sometimes in the
21   lost policy case, you can have policies that
22   are issued before or after the missing
23   policy, right?
24     A.   Right.
25     Q.   So you actually have the policy



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

ACCURATE COURT REPORTING, INC.

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 85

2  issued before that -- that gap and you have
3  the policy after that gap --
4      A.   Exactly.
5      Q.   -- right?
6           And can you explain the significance
7  of that type of evidence?
8      A.   The significance, of course -- of
9  course, depends on what it is.  The most --
10 excuse me.  The most significant type would
11 be if those two policies were identical.
12 You've got --
13     Q.   The before and after?
14     A.   -- the one before and the one after,
15 and they're identical, that -- I mean, it's
16 pretty much a gut cinch that the one in
17 between would be the same.
18     Q.   Is that called the picket fence
19 argument?  Have you used that expression to
20 describe it, like a picket fence?
21     A.   No, I --
22     Q.   You've got the fence on one side of
23 the gap and you have the fence on the other
24 side and the limits are the same, and, you
25 know, you're just missing this one picket, so

Page 86

2  you say, well, probably was just like the
3  one before it and the one after it?
4           MR. BRENNAN:  Object to form.
5           MR. FOX:  Mike will be your expert.
6      A.   I don't -- I don't recall using
7  that, but would you release me to use it?
8  BY-MR.KOTULA:
9      Q.   I haven't trademarked it, sir.
10     A.   No, I -- you know, I have used the
11 term "bracketing" sometimes.  But I don't
12 remember using a picket fence reference.
13     Q.   So I could show you your testimony
14 from the Montello case -- or I'll just read
15 it to you, and you can tell me if you agree
16 with it.
17     A.   Okay.
18     Q.   If you want to see it, I'll put it
19 in front of you.
20     A.   I've got it right here.
21     Q.   No, no, your deposition testimony in
22 the case.
23     A.   Well, why don't you read it to me.
24 I trust you.
25     Q.   So you were asked --

Page 87

2           MR. BRENNAN:  Can I have a copy,
3  please?  Not that I don't trust you.  I
4  just want to follow along.
5      A.   And, actually, if you have a copy, I
6  would love to see it.
7  BY-MR.KOTULA:
8      Q.   No worries.  We'll mark it.
9           MR. KOTULA:  What are we up to, 3?
10          (Whereupon, Exhibit Number-3 marked.)
11     A.   Thank you.
12 BY-MR.KOTULA:
13     Q.   You're welcome.
14          MR. BRENNAN:  Where are you reading
15 from?
16 BY-MR.KOTULA:
17     Q.   So I'm looking at the bottom of page
18 91, and you were asked, line 22, "And what
19 is the significance, or can you explain to
20 me the significance of policies issued before
21 or after a missing policy?"
22          And you -- you testified in
23 Montello, in many cases, particularly if the
24 evidence that you have comes from the
25 underwriting files of the insurance carrier,

Page 88

2  the policy that was issued before the policy,
3  missing policy in question would have been
4  scratched up, which is a term that means you
5  would take the policy and write on it the
6  changes that would need to be made at
7  renewal and pass that on to the policy
8  issuing section.  So in many of these cases,
9  you have a scratched up copy of an expiring
10 policy that gives you an indication as to
11 what the terms and conditions of the renewal
12 policy were."
13          Do you see that?
14     A.   I do see that.  And I kind of
15 truncated my answer to your previous question
16 and hadn't quite gotten to this when I was
17 talking about it was important that you have
18 the before and after policies in there
19 exactly the same.  This is another good
20 example that if you have the renewal scratch
21 copy, it would give you an idea as to what
22 terms and conditions of that policy would
23 have been.
24     Q.   And then you go on to say on page
25 92 in the Montello case that we have just



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 89

1
2    marked as -- as Exhibit-3, "Now, as to the
3    policy that's issued chronologically after the
4    policy in question, one of -- those policies
5    will often have a reference on the
6    declarations page that it is a renewal of
7    and give you the policy number of the
8    previous policy."
9           And then we asked, "If it's
10   the same company, it might be a renewal?"
11          Answer, "If it's the same company,
12   yes.  Now, if it's not the same company,
13   rarely will -- you will find reference to
14   the previous policy from another company, but
15   that's not very often."
16          Do you see that?
17   A.   Yes, I do.
18   Q.   Stand by that testimony, too?
19   A.   Sure.  I sure do.
20   Q.   So if you have a policy before the
21   missing gap or you don't -- you can't find
22   policies and you have a policy after that
23   gap that are issued by the same insurer that
24   you think issued in the gap, those -- that
25   evidence can be quite significant, can it

Page 90

1
2    not?
3    A.   Absolutely.
4    Q.   Do you have any of that evidence in
5    this case as to the gap from 1949 to 1974?
6    A.   No.
7    Q.   So you don't have -- you're not
8    aware of any policies issued before 1949 that
9    were issued by Jamestown Mutual Insurance
10   Company or Unigard Insurance Company that
11   were issued to Troy Belting?
12   A.   I do not.
13   Q.   And you don't have any policy --
14   you're not aware of any policy issued by
15   Jamestown Mutual or Unigard starting in 1974
16   and continuing thereafter, are you?
17   A.   Depending on what the statement that
18   we rely on where they've said we had -- that
19   -- that Unigard provided the coverage from
20   1949 to 1974.  And if you presume that that
21   means that their coverage ended, I believe it
22   was in October of 1974, the documentation
23   that -- that we have, then if you're saying
24   do we have any evidence of their issuing a
25   policy after October of 1974, the answer is

Page 91

1
2    we do not.
3    Q.   Right.  That was my only question.
4    I wasn't asking about the -- the
5    correspondence with brokers.  I'll get into
6    that later.  I'm just simply asking you, do
7    you have any policy issued from Jamestown
8    Mutual Insurance Company or Unigard Insurance
9    Company that incepted in 1974 after this gap
10   period from 1949 to 1974 that's at issue?
11          MR. BRENNAN:  Objection.  And
12   referring to after October of '74, just for
13   clarity?
14          MR. KOTULA:  If that's the gap
15   period, yes.
16   A.   And, I'm sorry, what do you mean by
17   "gap period"?
18   BY-MR.KOTULA:
19   Q.   So we're talking about the period
20   from 1949 to 1974 when you opine that --
21   that Troy Belting doesn't have copies of any
22   of its primary insurance policies.
23   A.   Okay.  That's what you mean by
24   "gap"?
25   Q.   And that's the gap period.  And then

Page 92

1
2    I asked are -- you're not aware of any
3    evidence that Jamestown Mutual Insurance
4    Company or Unigard Insurance Company issued a
5    policy after that gap period?
6    A.   That's correct.
7    Q.   So you don't have -- in other words,
8    Troy Belting doesn't have a copy of an
9    insurance policy issued by either Jamestown
10   Mutual or Unigard before the gap period prior
11   to 1949 or after the gap period in 1974 and
12   thereafter?
13   A.   That's right.
14   Q.   So you don't have any evidence of
15   any policy above that gap period from 1949
16   to 1974, and you don't have any evidence
17   before or after the gap period of 1974 that
18   -- of the type that you sometimes have in a
19   lost policy case, right?
20   A.   Well, we have anecdotal evidence, and
21   we have the evidence that the -- that -- the
22   letters that we had that indicated that there
23   was coverage in that period of time.
24   Q.   Right, I wasn't asking about that.
25   I was asking about do you have policies



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 93

1
2    before and after or above, and I think
3    you've just testified you're not aware of any
4    policies before or after or above the gap
5    period from 1949 to 1974?
6        A.    That's right.
7        Q.    We'll get into the broker stuff.
8    Trust me.
9        A.    Okay.  Well, I mean, you -- in the
10   -- in the asking of your question, you left
11   out the before and after one time, and I
12   wanted to make sure we had an understanding.
13       Q.    I think I do.  I think it's clear.
14             Mr. Hughes, sometimes in a lost
15   policy case an insurer's use of policy
16   numbers or prefixes may be significant,
17   correct?
18       A.    Correct.
19       Q.    Can you explain the significance of
20   this type of evidence?
21       A.    Well, in some cases, insurers use
22   their policy numbering and prefixes to
23   identify certain aspects of the policy
24   itself.  For instance, there are -- there
25   are some insurance companies that use the --

Page 94

1
2    the alpha prefix C, the letter C, to
3    indicate that it's a third-party liability
4    policy.  Some companies even use the alpha
5    -- alpha prefix CGL that would clearly
6    indicate that it's a comprehensive general or
7    a commercial general liability policy.  So
8    that's often helpful.
9             MR. KOTULA:  Can we mark this as 4.
10            (Whereupon, Exhibit Number-4 marked.)
11   BY-MR.KOTULA:
12       Q.    I am showing you now what's been
13   marked as Hughes Exhibit-4.  It's pages 1,
14   98 and 99 of your oral deposition in the
15   Montello case.  And I'll refer you to page
16   98, line 21.  And the questioner is quoting
17   from your report, and says, "Now, in the
18   next paragraph it says, 'The practice pattern
19   of insurers can also be very enlightening
20   when trying to establish the terms and
21   conditions of missing policies.  For
22   instance, many insurers consistently use
23   policy numbers or prefixes to identify a
24   particular policy wording so that a person
25   familiar with this practice can often

Page 95

1
2    identify a particular policy wording simply
3    by examining the policy number.'"
4        Do you see that?
5        A.    I do.
6        Q.    And that was -- that was your
7    opinion in the Montello case, correct?
8        A.    Correct.
9        Q.    And it's -- it's not different from
10   what you've just told us, that a policy
11   prefix or a policy numbering system can --
12   can sometimes tell you something about the
13   type of coverage afforded by a policy, right?
14       A.    Correct.
15            (Whereupon, Exhibit Number-5 marked.)
16   BY-MR.KOTULA:
17       Q.    So I'm showing you now what the
18   court reporter has kindly marked as Hughes
19   Exhibit-5.
20            And for the record, Hughes Exhibit-5
21   is a one-page document, and it states at the
22   very top line, Nicoll & MacChesney,
23   N-i-c-o-l-l & M-a-c-C-h-e-s-n-e-y, Inc., and
24   then it states, "Amendment of Declarations
25   Items 4 and 5."  And below that it says,

Page 96

1
2    "(Manufacturing and contractors Liab. policy)."
3        Do you see that?
4        A.    I do.
5        Q.    Have you seen Exhibit-5 before?
6        A.    I have.
7        Q.    And do you see that there is a
8    reference to amending policy number in the
9    upper right-hand corner?
10       A.    Yes.
11       Q.    And what's that number?
12       A.    63-M29311.
13       Q.    Okay.  And this endorsement clearly
14   says, "Manufacturers & Contractors Liab,"
15   which I'll take to be the abbreviation for
16   liability, "Policy."
17       A.    And I agree with you.
18       Q.    Okay.
19       A.    And it does contain that, yes.
20       Q.    And there's nothing on the face of
21   Exhibit-5 that says that it pertains to a
22   CGL policy, is there?
23       A.    Not that I can see, no.
24       Q.    Okay.  In fact, it says the
25   opposite, it says M&C policy, correct?


ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 97

```
1
2       A.   Well, I don't know if that's the
3    opposite.  It says that it says an M&C
4    policy.
5       Q.   Right.
6            Now, in your report you talk about
7    having looked at a single Jamestown Mutual
8    Insurance Company CGL policy.  Do you recall
9    that?
10      A.   Yes.
11           MR. KOTULA:  Mark this as Exhibit-6.
12           (Whereupon, Exhibit Number-6 marked.)
13   BY-MR.KOTULA:
14      Q.   Sir, we have placed before you what
15   the court reporter has kindly marked as
16   Hughes Exhibit-6.
17           And I'll state for the record it is
18   a document titled, "Comprehensive General
19   Liability Policy, Jamestown Mutual Insurance
20   Company, Issued to Utica Radiator
21   Corporation."
22           And can you tell me, have you seen
23   this document?  Is this what you referred to
24   in your expert report?
25      A.   Yes.
```

Page 98

```
1
2       Q.   And can you tell me what the policy
3    number is that's referenced on this document?
4       A.   61-CGL7788.
5       Q.   All right.  So Exhibit-5 has a
6    policy number of 63-M29311, and right below
7    the title of the endorsement, it says in
8    parenthetical, "Manufacturers & Contractors
9    Liability Policy," right?
10      A.   Correct.
11      Q.   And Exhibit-6 is the comprehensive
12   general liability policy that you reviewed
13   from Jamestown Mutual, and it has a policy
14   number of 61-CGL7788, does it not?
15      A.   Yes, it does.
16      Q.   So is this an instance where the
17   policy numbering may reflect the type of
18   coverage afforded by the policy?
19      A.   It may very well be.
20      Q.   We're done with that exhibit.
21           Can you turn again to your expert
22   report in Montello?  I think we marked that
23   as Exhibit-2, did we not?
24      A.   Correct.
25      Q.   And if you turn to page 12 in that
```

Page 99

```
1
2    report --
3       A.   Okay.
4       Q.   Before I get to that, is it
5    sometimes the case that a policy number or a
6    policy prefix might indicate to you as a
7    lost policy expert the company that may have
8    issued the policy?
9       A.   Yes.
10      Q.   Can you explain that?
11      A.   I'm not sure what you mean.  The
12   fact is that there are companies who very
13   consistently used specific alpha prefixes to
14   their policy numbers, and those alpha -- I
15   never know how to say this.  But those alpha
16   portions of an alphanumeric policy number are
17   very consistent, and having seen a lot of
18   them over the years, it will tell me exactly
19   what type of policy it was.
20           And then in other cases -- I think
21   it's interesting that you talk about
22   Montello, because, as I recall, we had the
23   -- the issue as to whether it was an RDU or
24   an RDX.  But I think in just in  answer to
25   your question, yes, there are a lot of
```

Page 100

```
1
2    insurance companies who used prefixes that
3    were so specifically consistent, that if you
4    see the policy number, you know what kind of
5    policy it was.
6       Q.   For example, I've represented another
7    insurance company that's not in this case
8    that uses a certain policy prefix, and if
9    you saw that policy prefix, it would probably
10   tell you that it may be their policy.
11   Correct?
12      A.   Yes.  If it was indeed one of those
13   that -- that was unique to that company.
14   It's interesting that in this case we have
15   an RDU prefix, which I told you in my report
16   that I thought that the policy that was
17   referenced should have an RDU prefix, and in
18   the Montello report we're talking about a
19   different company that also used the RDU
20   prefix.  So it doesn't always -- it's not
21   always a perfect representation that that
22   would be that particular company.
23      Q.   I think it's the same company.  I'm
24   not going to do the questioning about the
25   RDU in specific.  I'm going to allow
```



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**ACCURATE**
COURT REPORTING, INC.

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 101

1
2    Continental's counsel to --
3       A.   Oh, you're right.
4       Q.   -- to get into that.  But it's the
5    same company or same family of companies.
6       A.   You're right, it is.
7       Q.   So is there something about CGL or M
8    prefixes in a policy number that is unique
9    to a company?
10           MR. BRENNAN:  Object to the form.
11      A.   No, I don't think so.
12   BY-MR.KOTULA:
13      Q.   So having a policy number with "CGL"
14   in it or "M" in it doesn't tell you it's a
15   -- it's a Jamestown Mutual or a -- or a
16   Unigard policy?
17      A.   No, it doesn't.
18           MR. KOTULA:  We have been going for
19   about another hour, so I'm going to suggest
20   we take a break now.
21           (Whereupon, break taken, 12:12 p.m.
22   to 12:24 p.m.)
23           MR. KOTULA:  We're back on the
24   record.  I think Tim wanted to make a
25   statement.

Page 102

1
2           MR. BRENNAN:  Just for the record, I
3    would like to discuss, if I may, very
4    briefly, Exhibit-6 from today's deposition,
5    which is a copy of the Jamestown Mutual
6    Insurance Company -- or purports to be a
7    copy of Jamestown Mutual Insurance Company's
8    policy issued to Utica Radiator Corporation.
9           Mr. Hughes has been asked a series
10   of questions about this exhibit.  I would
11   like to note for the record that it does not
12   appear that this is the copy of this policy
13   that was produced during discovery in this
14   action.  In particular, this copy has Bates
15   numbers on the bottom right-hand corner of
16   the policy that are ECRI followed by a Bates
17   number.
18           Based upon that and based upon a
19   review of the actual policy that's been
20   produced, it appears to me, as counsel that's
21   been involved in this case, that this is not
22   the exact copy of the policy that was
23   produced during discovery.  In fact, this
24   appears, based upon my limited opportunity to
25   review it, to contain unredacted portions of

Page 103

1
2    the policy that were not produced.  In
3    addition, it also seems to contain additional
4    pages that I do not believe were produced
5    during discovery.
6           As a result of the fact that these
7    weren't produced during discovery, Mr. Hughes
8    has never seen these -- this exact copy of
9    this policy prior to today.  And I just want
10   to assert that I object to the questioning
11   on this copy to the extent that some of
12   these pages and some of the information on
13   them I do not believe was produced in
14   discovery.
15           MR. KOTULA:  And all I'll say to
16   that is that we'll look into that.  I wasn't
17   counsel when this was produced in the case.
18   And as you know, our firm has -- has come
19   in as counsel for -- for Unigard and QBE
20   after fact discovery was completed.  So I --
21   I'll look into it, and I'll let you know
22   what we find.
23           MR. BRENNAN:  Okay.  And I will
24   look into it further, as well.  I just want
25   to put that on the record.  Obviously, I had

Page 104

1
2    only a very little amount of time to review
3    this.  And I don't have the full documents
4    that were produced to actually compare and
5    contrast, but I do not believe that all of
6    those pages and all of that information were
7    produced.
8    BY-MR.KOTULA:
9       Q.   I do think, Mr. Hughes, that
10   whatever you looked at in the form of CGL
11   policy issued by Jamestown Mutual Insurance
12   Company to Utica Radiator Corporation
13   contained the first page of Exhibit-6, which
14   is the page with the -- the exhibit stamp.
15   So whatever you had, you had that, and I
16   think that's what I asked you about.
17           MR. BRENNAN:  And I want to -- I
18   just want to note my objection that I even
19   believe that that page contained redactions.
20   While he might have it, it contained
21   redactions.  So we can compare and contrast
22   them at some point.  But just for the
23   record, I want to note that the I believe
24   the first page contained redactions.
25           MR. FOX:  It's not even -- I noted,



Nationwide Depositions, Hearings and Trials ● Conference Facilities
Videoconferencing ● Legal Video Services ● Exhibit Scanning
Transcript / Video Synchronization ● 24-7 Online Repository

**1.888.ACR.3335 ● 1.800.862.4206 (FAX)**
info@acrdepos.com ● www.acrdepos.com ● scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 105

1
2     Michael, when you marked Exhibit-5, that at
3     least my copy doesn't have any Bates numbers
4     at all.  Do you know why that is?
5           MR. KOTULA:  No, I don't.
6           THE WITNESS:  Doesn't have any what?
7           MR. FOX:  It's just lawyers.  Just
8     that there are no Bates numbers at the
9     bottom.
10          THE WITNESS:  Oh, there aren't.
11          MR. FOX:  It's really of no concern.
12    BY-MR.KOTULA:
13    Q.    If you have Exhibit-6 --
14    A.    I do.
15    Q.    -- if you could turn to the page
16    that has a Bates stamp ending in 16?
17          MR. BRENNAN:  You said 16?
18          MR. KOTULA:  Yes, sir.
19    BY-MR.KOTULA:
20    Q.    Do you have that before you?
21    A.    I do.  I have it, yes.
22    Q.    Okay.  And do you see right under
23    "Amendment of Declarations Item 3," in
24    parentheticals, it says "Comprehensive Gen.
25    Liab. Policy"?  Which I'll take to be an

Page 106

1
2     abbreviation for comprehensive general
3     liability policy.
4     A.    I do.
5     Q.    And contrast that with Exhibit-5,
6     which I think you have before you as well,
7     side by side with it, in the parenthetical
8     underneath the, "Amendment of Declarations
9     Items 4 & 5," it says, "(Manufacturers &
10    Contractors Liab. Policy)," which I'll take
11    to be manufacturers and contractors liability
12    policy?
13          MR. BRENNAN:  Hold on.  I just
14    didn't want to interrupt you.  That's why I
15    was holding my hand up.
16          The previous question, you indicated
17    that with respect to the numbering, you'll
18    take the CGL to mean comprehensive general
19    liability.  I'm going to object to that
20    portion of the question to the extent that
21    there is no evidence that that's what those
22    letters, in fact, stand for.
23          MR. KOTULA:  No, it says,
24    "Comprehensive and Liab."  I'm taking that as
25    an abbreviation for general and an

Page 107

1
2     abbreviation for liability in Exhibit-6.
3           MR. BRENNAN:  Fair enough.  I
4     misunderstood.
5     BY-MR.KOTULA:
6     Q.    So the -- they use different
7     nomenclature, correct?  One refers to a
8     comprehensive general liability policy, and
9     it's the one that has the CGL policy prefix.
10    And Exhibit-5 uses M, and it's the one that
11    says manufacturers and contractors liability
12    policy.  We looked at that before.  Do you
13    recall that?
14    A.    I do recall that.  I think it's
15    interesting that if you look at the ECRI
16    000016 page and compare it with the
17    Exhibit-5, the CGL policy apparently did not
18    have products liability in the beginning and
19    was added by endorsement, which is the 16
20    page.  And if you look at the -- the
21    schedules, you'll see that they're virtually
22    identical in terms of division of hazards.
23          So the fact is that if, indeed, the
24    policy that was represented as 63-M29311 was
25    a manufacturers and contractors policy, that

Page 108

1
2     doesn't mean that it absolutely did not have
3     products-completed operations coverage because
4     it was -- it was very easy to add that by
5     endorsement as exemplified by the page out of
6     the other Utica mutual policy which has been
7     described as Exhibit-6.
8           MR. BRENNAN:  And just, I want to
9     be clear that I want a continuing objection
10    to any questions that are asked about this
11    particular exhibit, for example, because I do
12    not believe -- this is one of the pages,
13    that as I look at it, I do not believe was
14    produced.  Obviously, I can't say that to a
15    hundred percent certainty as we sit right
16    here now, but I do not believe I have ever
17    seen this page before.
18          MR. KOTULA:  That's fine.  I'm
19    through with my questioning of that, in any
20    event, so --
21          MR. BRENNAN:  Just make sure --
22          MR. KOTULA:  -- that's fine.
23          MR. BRENNAN:  -- the record is clear
24    that this was a continuing objection to all
25    questions based upon this specific document



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 109

1
2    that is -- that we are particularly referring
3    to Exhibit-6.
4         MR. KOTULA:  You've got that.
5         MR. BRENNAN:  Thank you.
6    BY-MR.KOTULA:
7         Q.  So, again, looking at Exhibit-5,
8    products coverage could have been added, but
9    you have no evidence it was?
10        A.  I have no physical evidence that it
11   was, no.
12        Q.  All right.  So you referred to
13   broker correspondence, and I want to take a
14   look at that with you.
15             (Whereupon, Exhibit Number-7 marked.)
16   BY-MR.KOTULA:
17        Q.  Sir, I've placed before you -- bear
18   with me.
19             Sir, I placed before you what's been
20   marked as Hughes Exhibit-7.  Have you ever
21   seen Exhibit-7 before?
22        A.  I have.
23        Q.  For the record, Hughes Exhibit-7 is
24   a one-page letter dated November 16, 1977, on
25   letterhead from Nicoll, N-i-c-o-l-1, &

Page 110

1
2    MacChesney, M-a-c-C-h-e-s-n-e-y, Inc., to Mr.
3    Allen Decker at Troy Belting.  Do you see
4    that?
5         A.  I do.
6         Q.  All right.  Is this one of the
7    broker letters you were referring to?
8         A.  It is.  It's, I think, the first
9    one.
10        MR. KOTULA:  Mark that as 8, please.
11             (Whereupon, Exhibit Number-8 marked.)
12   BY-MR.KOTULA:
13        Q.  Sir, I placed before you what the
14   court reporter has kindly marked as Hughes
15   Exhibit-8.
16             For the record, that's also on
17   Nicoll & MacChesney, Inc., letterhead, a
18   letter -- one-page letter from Edward Nicoll
19   to Mr. Allen Decker at Troy Belting dated
20   December 15, 1978.
21             Have you seen this document before?
22        A.  I have.
23        Q.  Is this what you were referring to
24   as the broker correspondence?
25        A.  This is part of it, sure.

Page 111

1
2         Q.  Was there something else that you
3    were referring to?
4         A.  When you say I was referring to it,
5    are you talking about it in my report?
6         Q.  In your report and in your testimony
7    today you made reference to broker letters.
8         A.  I believe those are the two letters
9    that I referenced in my report, yes.
10        Q.  Okay.  So let me just ask you about
11   these two letters, Exhibits-7 and 8.
12        A.  Okay.
13        Q.  Do these letters provide any policy
14   numbers or policy prefixes for the alleged
15   Jamestown Mutual or Unigard policies issued
16   to Troy Belting?
17        A.  No, they don't.
18        Q.  Did they provide any specific policy
19   periods?
20        A.  No, they didn't provide any specific
21   policy periods, if by that question you mean
22   a designation of when a policy begins and
23   when it ends.
24        Q.  Yes.
25        A.  They did talk about a period of

Page 112

1
2    during which they believe there was coverage
3    provided.
4         Q.  A period of 25 years, roughly?
5         A.  Well, the first one was ten years.
6         Q.  Right.
7         A.  And which apparently was incorrect.
8         Q.  The second one goes to 25, correct?
9         A.  That's correct.
10        Q.  All right.  But they don't provide
11   any specific policy periods, like, annual
12   periods with specific dates, correct?
13        A.  No, they do not.
14        Q.  Do they provide any policy limits?
15        A.  No, they don't.
16        Q.  Do they tell us what type of policy
17   -- what type of liability policy was issued?
18        A.  No.
19        Q.  So we can't tell from these letters
20   whether it's CGL or M&C policies, correct?
21        MR. BRENNAN:  Object to the form.
22        A.  I don't recall.  Do we have the
23   letters to which they are responding?  Like,
24   for instance, the '77 letter says to Mr.
25   Decker, "Dear Allen, with reference to your



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 113

1
2      letter of November 16th," I think we do have
3      that -- that letter.  Do you have that?
4      And I don't know whether that letter
5      referenced anything specific about -- about
6      the policies.
7          MR. KOTULA:  Would you mark this as
8      Exhibit-9.
9          (Whereupon, Exhibit Number-9 marked.)
10     BY-MR.KOTULA:
11         Q.   We have placed before you what's
12     been marked as Hughes Exhibit-9.
13              For the record, it appears to be a
14     draft or an unsigned letter that isn't on
15     letterhead, may be a copy or something as
16     business may have been done back then, dated
17     November to 16, 1977, from Allen Decker at Troy
18     Belting to Mr. Edward Nicoll.
19              Is this the document you were -- you
20     were just discussing?
21         A.   Right.  And since I'm an old archaic
22     person, I can tell you that the way business
23     was done back then was usually by using
24     carbon paper instead of a facsimile copy.
25     So this probably was -- the reason there's

Page 114

1
2      no letterhead on it is it was a carbon copy
3      that's been copied.  But that's neither here
4      nor there.
5              The fact is that you're correct,
6      this does not contain any information about
7      policy limits.
8          Q.   Or the type of liability policy it
9      may have been?
10         A.   Right.  It still just talks about
11     liability insurance.
12         Q.   Right.
13         A.   You know, it doesn't specifically
14     say, but the -- the letter itself has to do
15     with the question of coverage for a wrongful
16     death caused by asbestos poisoning.  I've
17     never really heard it put that way.  But
18     that tells you that you're talking about some
19     kind of operational liability but not
20     specifically what kind of policy.
21         Q.   Right.  You can't tell, correct?
22         MR. BRENNAN:  Object to the form.
23         A.   Well, what do you -- I can't tell
24     what?
25     BY-MR.KOTULA:

Page 115

1
2          Q.   You can't tell what type of
3      liability policy they're referencing from
4      saying "liability policy"?
5          A.   Just from using the term "liability
6      policy"?
7          Q.   Yeah.
8          A.   No, you can't.
9          Q.   And none of these letters, 7 --
10     Exhibits-7, 8 or 9 say anything about policy
11     limits?
12         A.   That's right.
13         Q.   None of them say anything about the
14     policy terms?
15         A.   That's correct.
16         Q.   As you sit here today, do you know
17     if the author of the letter, Mr. Edward
18     Nicoll at Nicoll & MacChesney, if he had
19     actual policies in front of him when he
20     wrote this letter?
21         A.   I don't know.
22         Q.   Did the policies even exist when he
23     wrote the letter --
24         MR. BRENNAN:  Object to the form.
25     BY-MR.KOTULA:

Page 116

1
2          Q.   -- as a copy of the policy?
3          A.   I have no idea.
4          Q.   You don't know if he had an actual
5      hard copy of a policy available to him,
6      right?
7          A.   Well, now, when you say available to
8      him, I mean, he's the -- he's the broker.
9      You would think that he had a hard copy of
10     the policy available to him.  Or probably
11     more likely what he would have is a broker's
12     or agent's daily copy, which would be usually
13     everything except the jacket of the policy.
14     But we don't know for sure that he had --
15     that he had that.
16         Q.   That thing has never been found,
17     right, that type of document?
18         A.   No.  But what you asked was did he
19     have it when he wrote the pol -- wrote the
20     letter.
21         Q.   And you don't know?
22         A.   I don't know.
23         Q.   Right.  You can't say one way or
24     another whether he had it?
25         A.   No.


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 117

2    Q.   And it's clear he doesn't reference
3  anything that you could only get from looking
4  at the face of a policy, like, policy
5  number, policy term, policy limits, right?
6        MR. BRENNAN:  Object to the form.
7    A.   Well, he does give a specific date
8  beginning of July the 18th, 1949, and he
9  does give a specific ending date of October
10  3rd, 1974, which would be specific beginning
11  and ending dates of at least two policies.
12  BY-MR.KOTULA:
13    Q.   And the October date from 1974,
14  that's the inception date of an INA policy
15  or a Pacific Employers --
16    A.   That's right.
17    Q.   -- Insurance Company policy, right?
18    A.   That's correct.
19    Q.   Other than that, he doesn't provide
20  the type of information I just asked about,
21  right?
22        MR. BRENNAN:  Object to form.
23    A.   The type of information you asked
24  about, it being the terms and conditions of
25  the policy and the policy limits, et cetera?

Page 118

2  BY-MR.KOTULA:
3    Q.   Policy number, policy period, the
4  actual policy term.
5    A.   Well, you -- you, again, use the
6  term "policy period."  He talks about the
7  beginning, which was July 18th, 1949, and
8  ending, which was October 3rd, 1974.
9    Q.   That's it?
10    A.   Those are bits and pieces of a
11  policy period.  Other than that, no, that's
12  right.
13    Q.   Right.  And we don't know where he
14  got those dates from, right?
15    A.   No, we don't.
16    Q.   And we don't have any document that
17  contains those dates other than the Pacific
18  Employers policy with an inception date of
19  October 3, 1974?
20    A.   I believe that's correct.
21    Q.   Mr. Hughes, your expert report and
22  your opinions rely on specimen form CGL
23  policy documents to opine about the terms of
24  the alleged missing policies for the 1949 to
25  1974 gap period, right?

Page 119

2    A.   Right.
3    Q.   And these specimen forms, they don't
4  come from Jamestown Mutual or Unigard, do
5  they?
6    A.   No, they don't.
7    Q.   If we assume that the alleged
8  missing policies for the 1949 to 1974 period
9  were M&C policies, are the CGL specimen forms
10  relevant?
11        MR. BRENNAN:  Object to the form.
12    A.   Probably not.
13  BY-MR.KOTULA:
14    Q.   Thank you.
15        Do they tell us what the terms of
16  the missing M&C policies were?
17    A.   Well, to a person that's used to
18  working in insurance and works with both
19  sides of policies all the time, yes.  To
20  someone generally, no.
21    Q.   The specimen form of a CGL specimen
22  tells us what the terms of the M&C policies
23  that are missing?
24    A.   If the specimen CGL policy contains
25  premises and operations, et cetera, et

Page 120

2  cetera, you could say -- because the CGL
3  policy was designed to produce exactly the
4  same coverages that a person could construct
5  by adding the -- the monoline policies
6  together, so you could say that the CGL
7  policy would show you what the particular M&C
8  section would provide.  But other than that,
9  I mean, you couldn't -- I wouldn't use it to
10  say this tells us what the coverage was.
11    Q.   Right.  That was my question.
12        And even if we assume that those CGL
13  specimen forms that you attached in your
14  report were used and included in an alleged
15  policy issued by Jamestown Mutual or Unigard
16  during that time frame, do those specimen
17  forms constitute complete copies of a policy?
18        MR. BRENNAN:  Object to the form.
19    A.   They -- they constitute complete
20  copies of -- of the particular specimen
21  policy.  Now, the policy could be endorsed
22  to make certain changes to it.  However, we
23  need to keep in mind that this was New York,
24  and New York was the strictest state in
25  terms of requiring that the members of the



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 121

```
1
2    bureaus issue policies that were filed by
3    those bureaus in that -- in the state of New
4    York.
5         So when we look at a policy that we
6    know that Jamestown issued a specific type of
7    policy, then we can make reference to the
8    form that was filed generically in that state
9    to know what policy that it was -- policy
10   form it was that they issued.
11        (Whereupon, Exhibit Number-10 marked.)
12   BY-MR.KOTULA:
13        Q.  Sir, I am showing you now what the
14   court reporter has kindly marked as Hughes
15   Exhibit-10.
16        And I'll state for the record that
17   Hughes Exhibit-10 is portions of your oral
18   deposition given in the Trelleborg,
19   T-r-e-l-l-e-b-o-r-g, Automotive USA, Inc., vs.
20   Travelers Casualty & Surety Company of
21   America case in the Eastern District of
22   Michigan federal court.
23        Do you recall testifying as an
24   expert and providing an expert report in
25   Trelleborg?
```

Page 122

```
1
2         A.  I do.
3         Q.  And I'm going to refer you to page
4    87.
5         By the way, Exhibit-10 is portions,
6    as I said, of your deposition.  So it starts
7    with page 1, which is the cover page of the
8    transcript, and then it contains pages 64
9    through 66 and 86 through 88 and then 152
10   through 156.
11        And if you look at page 87, you
12   were asked at line 9, question, "You don't
13   know if, for example, Aetna used any sort of
14   manuscript policy forms or manuscript
15   endorsements as part of any policy allegedly
16   issued to Yale in that time period, correct?"
17        Answer, "I do not."
18        That was your testimony in that
19   case, right?
20        A.  Right.
21        Q.  And then you were asked at line 14,
22   "And then even if we assume for the sake of
23   argument that those specimen -- policy
24   specimen forms which are attached as
25   Exhibit-C to your expert report, were used
```

Page 123

```
1
2    and included in an alleged policy issued by
3    Aetna to Yale during that time period, does
4    that policy specimen form constitute a
5    complete copy of a policy?"
6         Answer, "No.  You would have to have
7    the declarations page and any endorsements."
8         Do you see that?
9         A.  I do.
10        Q.  That was your testimony in that
11   case, right?
12        A.  Yes, that's right.
13        Q.  So in order to constitute a complete
14   copy of a policy, a specimen form isn't
15   enough.  You would have to have the
16   declarations page and any endorsements,
17   correct?
18        A.  That's correct.
19        Q.  Are you aware of any lists of
20   endorsements that were used in any alleged
21   missing policy for the 1949 to 1974 gap
22   period?
23        A.  No, I'm not.
24        Q.  So -- and just so we're talking
25   about the same thing, do -- if you have an
```

Page 124

```
1
2    actual policy, whether it's a primary or an
3    umbrella -- well, let's deal with just the
4    primary.  Does the primary policy almost
5    always, if not always, contain an -- an
6    endorsement list?
7         MR. BRENNAN:  Object to the form.
8         A.  I would say the majority of the
9    times it would, yes.
10   BY-MR.KOTULA:
11        Q.  And policies -- policy endorsements,
12   they're often form endorsements and they have
13   form numbers, correct?
14        A.  Correct.
15        Q.  So they have unique identifiers in
16   many cases that the company knows what it's
17   referencing by putting that endorsement number
18   in the list of endorsements.  Is that true?
19        A.  Well, not only the company, but
20   especially if you're talking about a policy
21   that was issued in, like, the state of New
22   York, everybody who reads that would know
23   what those endorsements were.
24        Q.  Right.  So if you -- if you had a
25   policy list and a decla -- you know, an
```



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 125

```
1
2    endorsement list and a declaration page and
3    you knew what form was used, you could go
4    find all the different endorsements and
5    assemble the -- the complete policy, unless
6    there were some other change endorsements
7    added that you didn't get, right?
8       A.   You could -- you could assemble what
9    I would consider to be a complete policy.
10   As to whether what that -- whether the
11   insurance company would consider that to be a
12   complete policy is -- is questionable.  But
13   did you include the declarations page?
14      Q.   Yes, I did.
15      A.   Okay.  Yes, you -- and what about
16   policy jacket and the --
17      Q.   Yeah, I said the -- the form, the
18   coverage form and then the endorsement list
19   with the declarations page.
20      A.   Okay.  We -- it's easy to get
21   caught up in the semantics, but I -- I don't
22   use the term "form" to describe what you're
23   talking about.  I talk about it as the
24   "wordings," because when you're talking about
25   forms, you're talking about something
```

Page 126

```
1
2    completely different.  But I think we're on
3    the same page.
4          I'm just saying that if you have the
5    policy wordings, which would be the jacket
6    and the -- and the coverage grants, and the
7    declarations page and a list of all the
8    endorsements, if you were in a state like
9    New York, yes, you could reconstruct the
10   policy exactly.
11      Q.   Right.  But you don't have any --
12   you're not aware of any endorsement list for
13   this gap period from 1949 to 1974 for any
14   policy?
15      A.   No, I'm not.  And, of course, the
16   question always arises as to whether this
17   issue about endorsements falls within the
18   burden of proof of the policyholder.  If
19   you're talking about a policyholder who is
20   claiming additional coverages beyond what's
21   provided in the -- in the standard form,
22   yeah, I think the policyholder has the
23   responsibility to provide that.  If on the
24   other hand you're talking about the
25   policyholder having to prove that there were
```

Page 127

```
1
2    not any endorsements on it that limited
3    coverage, that's another -- that's another
4    story entirely.
5       Q.   Right.  So in the example you've
6    already testified about today, if there's an
7    M&C policy and it doesn't have -- you
8    started with the premise it doesn't have an
9    endorsement adding back product liability or
10   product hazard coverage, then the policyholder
11   or the -- the party claiming coverage would
12   have the burden of showing there was this
13   grant of -- additional grant of coverage for
14   product liability or product hazard coverage?
15      A.   That's right.
16           MR. KOTULA:  It's 12:55.  I think
17   now would be a good place to break for
18   lunch.
19           (Whereupon, break taken, 12:55 p.m.
20   to 1:34 p.m.)
21           (Whereupon, Exhibit Number-11 marked.)
22   BY-MR.KOTULA:
23      Q.   Mr. Hughes, insured's typically
24   increase their liability limits over time
25   rather than decrease them, correct?
```

Page 128

```
1
2       A.   Yes.  With one exception.  During
3    the period of when umbrellas were first
4    becoming to be introduced, insured's found
5    that they could decrease their primary
6    liability coverage and add an umbrella policy
7    on top of it, and so, as in this case, that
8    often happened.  But other than that -- and
9    if you considered the totality of the
10   coverage that would result from that, they'd
11   probably increase their coverage by adding an
12   umbrella.  So the answer to your question is
13   yes.
14      Q.   Right.  I mean, I could mark your
15   expert report from the Trelleborg case where
16   you said something similar.  I'm just going
17   to repeat it, and you can tell me if you
18   agree with it.  If Tim says:  No, hey, give
19   me it, I want it --
20           But in Trelleborg, on page 4 of your
21   expert report, you said, "After having
22   examined hundreds of insurance programs
23   similar to that of Yale, I know that, except
24   in cases where the insured purchased umbrella
25   coverage that permitted underlying limits
```


ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 129

1
2    lower than those being purchased at the time,
3    insured's typically increased their liability
4    limits over time rather than decreasing
5    them." And then you say, "In this case, we
6    know that the insured bought 100,000
7    accident/occurrence PD limits in the 1960s
8    and also in the 1970s after they purchased
9    an umbrella policy."
10    A.   Isn't that what I just said?
11    Q.   Yeah, I think so.  I think you're
12   agreeing with it, correct?
13    A.   I believe that's true.
14         MR. BRENNAN:  One second.  You don't
15   have to mark it.  Can I have a copy, just
16   since we read from it?  Thank you.
17         MR. KOTULA:  I don't have a problem
18   with that.
19   BY-MR.KOTULA:
20    Q.   Now, if you can pull out Exhibit-1,
21   which is your expert report.  It's the one
22   with the big binder clip.  Probably right
23   there.  And we're through with the other
24   exhibits for now, so you can slide those off
25   if you -- if it's easier for you.

Page 130

1
2         Now, I'm going to refer you, for
3    purposes of this questioning, to page 4 of
4    your expert report in this case, which has
5    been marked as Hughes Exhibit-1.
6    A.   Okay.
7    Q.   Now, you've opined that as to the
8    allegedly missing policies for the 1949 to
9    1974 gap period, that there's no evidence
10   that they had limits less than 500,000 each
11   year --
12    A.   Right.
13    Q.   -- right?
14         Let me ask you what evidence there
15   is that the allegedly missing policies for
16   that 1949 to 1974 gap period had limits the
17   entire period of 500,000.  You're not really
18   saying that, are you?
19    A.   No.  I'm saying that we know that
20   prior to October 1974, for some period of
21   time, they purchased $500,000 in limits.  We
22   don't have any evidence that there was any
23   period of time that they purchased less than
24   that.  So we don't know when that $500,000
25   arrived.  And, I mean, that's basically all

Page 131

1
2    I've said.
3    Q.   Right.  So it could be the case
4    that for the one year prior to October 3,
5    1974, Troy Belting had $500,000 in limits?
6    A.   It's possible.
7    Q.   And before that, they may have had
8    less?
9    A.   It's possible.
10    Q.   And the only basis for saying that
11   the policy prior to October 3, 1974, had
12   500,000 in limits is a reference in Troy
13   Belting's board of directors' minutes,
14   correct?  Single reference.
15    A.   Where they said that at the time of
16   the particular claim that they were talking
17   about, they only had limits of 500,000, and
18   so they recommended an increase in limits?
19   Is that the directors' minutes you're talking
20   about?
21    Q.   Yes, sir.
22    A.   That's correct.
23    Q.   And that was an accident that
24   happened in May of 1974, was it not?
25    A.   That's correct.

Page 132

1
2    Q.   So the only reference that exists to
3    what the limits may have been for that gap
4    period relate to a single policy period prior
5    to October 3, 1974, and it -- and it's
6    solely the -- the board of director minutes
7    for one date that say that, right?
8         MR. BRENNAN:  Object to the form.
9    A.   I believe that's correct.
10   BY-MR.KOTULA:
11    Q.   Okay.  I am going to show you now
12   what the court reporter has marked Hughes
13   Exhibit-11.
14         For the record, Hughes Exhibit-11 is
15   a one-page document.  It's a letter from
16   Arnold Jordan, vice president of Troy
17   Belting, to Mr. John Prestage,
18   P-r-e-s-t-a-g-e, at The Hartford, dated June
19   25, 2001.
20         Have you ever seen this document
21   before, sir?
22    A.   I think so, yes.  Excuse me.
23    Q.   And Mr. Jordan is providing
24   information to Mr. Prestage at Hartford in
25   response to a request, correct?


ACR ACCURATE COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 133

```
 1
 2      A.    That's what it says, "In response to
 3   your request."
 4      Q.    And this is now as of June 2001,
 5   Mr. Jordan says, and I'll quote, "Troy
 6   Belting & Supply Company does not retain
 7   insurance policies beyond the years that they
 8   are in force."
 9          Do you see that?
10      A.    I do.
11      Q.    And do you believe that information
12   to have been correct?
13      A.    I have no reason to believe that
14   it's not correct.
15      Q.    He then says, "I have attempted to
16   provide you with what information I can.
17   The following were carriers as best I can
18   determine."  And then he starts in the
19   1960s.  He has no information prior to the
20   1960s, correct?
21      A.    I presume so.  I mean, I don't know
22   whether he had any information or not.  He
23   -- he starts in the 1960s.
24      Q.    Right.  And for the 1960s, he
25   identifies one company, Firemen's Mutual
```

Page 134

```
 1
 2   (UAC), correct?
 3      A.    Right.
 4      Q.    Doesn't -- doesn't identify Jamestown
 5   Mutual Insurance Company or Unigard Insurance
 6   Company, does he?
 7      A.    Does not.
 8      Q.    And then 1970s, he says Unigard
 9   Insurance Group, correct?
10      A.    Correct.
11      Q.    And then 1970s, he says ACE USA?
12      A.    Right.
13      Q.    1980s, he says INA (Cigna)?
14      A.    Right.
15      Q.    Now, we know today, and perhaps in
16   2001, ACE and INA and Cigna were related
17   companies, correct?
18          MR. FOX:  Objection to form.
19      A.    We know -- we know that -- I think
20   we know today.  I don't -- I don't
21   know when those relationships arose without
22   checking.  I'd have to look it up.  I can't
23   remember all that stuff.
24   BY-MR.KOTULA:
25      Q.    Right.  Well, we know that Pacific
```

Page 135

```
 1
 2   Employers was an insurer in the 1970s at
 3   Troy Belting, correct?
 4      A.    Yes, we do.
 5      Q.    And that's now part of the ACE group
 6   of companies, is it not?
 7      A.    I believe that's correct.
 8      Q.    And INA is also part of the ACE
 9   group of companies, correct?
10      A.    That's right, yes.
11          MR. FOX:  Objection to form.
12   BY-MR.KOTULA:
13      Q.    And then it says 1980s, 1990s, The
14   Hartford; 1990s, Great American; 1990s,
15   Selective Insurance; 2000, Selective Insurance,
16   right?
17      A.    It's what it says.
18      Q.    Do you have any reason to doubt the
19   information that's set forth there?
20      A.    I don't have any reason to doubt it.
21   I don't -- I just -- I don't -- none of it
22   makes a lot of sense to me.  I don't -- I
23   don't know where he got his information or
24   what it means, particularly.
25      Q.    You discuss a concept in your report
```

Page 136

```
 1
 2   having to do with Occam's Razor?
 3      A.    Right.
 4      Q.    Can you tell us what Occam's Razor
 5   is?
 6      A.    As simply as I -- as I can, it's a
 7   -- it's a logic theorem that says when one
 8   is presented with a situation that presents
 9   the possibility of a varied number of
10   resolutions, that the simplest solution is
11   probably the correct solution.
12      Q.    Right.  And you discuss it in your
13   report, which is Hughes Exhibit-1, in
14   connection with the statement about the
15   broker letters, which we marked as Exhibits-7
16   and 8, correct?
17      A.    Correct.
18      Q.    And you assume the information, such
19   as it is that's in those exhibits, is
20   correct based on Occam's Razor?
21      A.    Well, it's only -- it's not correct
22   in one of them.  It is correct in another
23   one.  But the idea being that if -- Occam's
24   Razor, if you -- if you have a situation
25   where you have, say, three possible answers,
```



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

ACCURATE COURT REPORTING, INC.

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 137

1
2    one answer requires very little manipulation
3    to the facts, the second answer requires
4    tremendous manipulation to the facts, and the
5    third answer requires you to make complete
6    assumptions about situations that probably
7    couldn't exist, which one is the best?  It's
8    the simplest one that's the best answer.
9    And that's all it is.
10       Q.    Now, with Occam's Razor, you assume
11   that the information in Exhibit-8, which was
12   the second broker letter, was correct because
13   that's the simplest explanation?
14       A.    Well, also because it -- it
15   comported with pretty much what the rest of
16   the information that we had indicated.
17       Q.    But I'm just focusing on Occam's
18   Razor now.  You used Occam's Razor to say
19   that the simplest explanation is that he was
20   using correct information when he wrote that
21   letter.
22       A.    The simplest explanation is that he
23   -- yes, that's right.
24       Q.    And is there any reason to believe
25   that Occam's Razor wouldn't tell you that the

Page 138

1
2    information in Exhibit-11 is -- is correct?
3        A.    Well, no, there's -- there's not.
4    But -- no, there's not.
5        Q.    Now, does Exhibit-11 identify the
6    type of insurance policy; in other words, the
7    type of coverage that these policies or that
8    these companies issued to Troy Belting?
9        A.    It does not.
10       Q.    So like the other ones, it doesn't
11   tell us what type of coverage the policies
12   contain?
13       A.    It doesn't, no.
14       Q.    And it doesn't tell us anything
15   about actual policy periods, does it?
16       A.    It does not.
17       Q.    Just sort of tells us eras?
18       A.    Tells us what?
19       Q.    Eras, e-r-a-s.  The estimated time,
20   some sort of period of time.  1960s, 1970s,
21   that's an era.
22       A.    Oh, eras.  I thought you were saying
23   "errors" or "arrows."  I'm not sure.
24       Q.    I said e-r-a-s.
25             MR. FOX:  I didn't get it the first

Page 139

1
2    time either.
3              MR. KOTULA:  I spelled it.
4              MR. BRENNAN:  I didn't get it the
5    first time either.  You're a tricky one.
6        A.    I've got you, yes, indeed.
7    BY-MR.KOTULA:
8        Q.    I didn't think that was like saying
9    "two yutes," My Cousin Vinny.
10       A.    Of course, it's possible -- no,
11   never mind.
12       Q.    So it doesn't give us policy
13   periods?
14       A.    No, it doesn't.
15       Q.    Doesn't give us any policy numbers?
16       A.    It does not.
17       Q.    Doesn't give us any policy limits?
18       A.    It does not.
19             MR. KOTULA:  Let me mark this as
20   12.
21             (Whereupon, Exhibit Number-12 marked.)
22   BY-MR.KOTULA:
23       Q.    I am just going to state for the
24   record that Hughes Exhibit-11 is a -- for
25   want of a better word, something you've

Page 140

1
2    described as ledger entries --
3        A.    12.
4        Q.    Oh, I'm sorry.
5              MR. BRENNAN:  Exhibit-12.  You were
6    referring to the wrong exhibit.  That's what
7    he's correcting.
8              MR. KOTULA:  Thank you.  My bad.
9    BY-MR.KOTULA:
10       Q.    Hughes Exhibit-12, you've referred to
11   for want of a better word as Troy Belting
12   ledger entries; is that right?
13       A.    That's right.
14       Q.    And it has sort of a numbering
15   system.  It's somewhat hard to describe, but
16   it appears to be in the upper right-hand
17   corner, if you look at, say, the last page
18   of the document, it says page 114 of 114,
19   and if you flip backwards, it takes you to
20   page 59.  Starts at page 59.  You can't
21   really read 59.  You can't really read 60.
22   But if you go to the third page of the
23   exhibit, it says page 61 of 114 and so on.
24       A.    You're talking about the typed
25   numbers and not the page numbers that are in



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**ACCURATE**
ACR COURT REPORTING, INC.

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 141

1
2   bold?
3       Q.   In the actual ledger.  Yeah, because
4   I think --
5       A.   Okay.
6       Q.   -- the first page has a -- has a
7   big bold 42 in the upper left-hand corner,
8   and the last page has -- has a number that
9   it's cut off somewhat, but it looks like a
10  big, bold number 235 in the upper right-hand
11  corner.
12      A.   Yeah.  Just so you'll know, those
13  numbers that you see were probably preprinted
14  on the blank pages of this -- this was a
15  ledger book.  Seen hundreds of them.  And so
16  that's probably -- it has nothing to do with
17  what we're talking about.
18          All right.  Which page do you want
19  me to look at?
20      Q.   I'm just asking you, have you seen
21  this document before that's marked as
22  Exhibit-12?
23      A.   Yes, I have.
24      Q.   And you -- you rely on it to some
25  extent, correct?

Page 142

1
2       A.   To a certain extent, yes.
3       Q.   There are different headings on some
4   of these pages.  Like, the first page of
5   Exhibit-12 in cursive writing or script is
6   the word "Insurance," correct?
7       A.   Correct.
8       Q.   And the next one says, "New York
9   State Unemployment Insurance Tax."
10      A.   Right.
11      Q.   The next one says "Expense"?
12      A.   Right.
13      Q.   And so on, right?
14      A.   Right.
15      Q.   Two sheets have "Insurance" listed at
16  the top.  The one that's the first page,
17  which I'll refer to as page 59 of 114, and
18  page 104.
19      A.   Okay.
20      Q.   Do we agree?
21      A.   I agree.
22      Q.   Page 59 lists entries for the years
23  1952, 1953, 1954 and 1955.
24      A.   Correct.
25      Q.   Do you agree?

Page 143

1
2       A.   I agree.
3       Q.   And page 104 pertains to 1967?
4       A.   That's right.
5       Q.   Now, Jamestown Mutual does not appear
6   to be listed on any of these two insurance
7   pages; is that right?
8       A.   That's correct.
9       Q.   Now, page 59 lists entries, like,
10  Metropolitan from 1952 to 1955, right?
11      A.   Yes.
12      Q.   And page 104 lists entries, like,
13  Metropolitan, New England and so on, right?
14      A.   Yes.
15      Q.   Now, if you go to page 62 of
16  Exhibit-12, there's a reference -- and this
17  is the page titled "Expenses," correct?
18      A.   Correct.
19      Q.   Or "Expense."  I'm sorry.  Page 62
20  of 114 of Exhibit-12.
21      A.   Right.
22      Q.   It says "Expense."  And the letters
23  I-n-s is listed for the years 1952 through
24  -- let's see.  Is listed under May and July.
25  Do you see that?  No, I'm sorry.  Strike

Page 144

1
2   that.
3           Page 62, Jamestown M-u-t is listed
4   under May and July, separate and apart from
5   I-n-s.  Do you see that?
6       A.   I see that.
7       Q.   There's also an entry for 1955 to
8   "Edw J. Nicoll Ins," correct?
9       A.   I know that's true, but I can't find
10  it right now.  It's where -- in May?
11      Q.   1955.
12      A.   In May, did you say?
13      Q.   I didn't -- I didn't say.  I just
14  said it was -- there's an entry for --
15      A.   I see it.  It's that second line
16  there.  April?
17      Q.   And then Jamestown also appears with
18  "Edw J. Nicoll Ins" in 1962 to 1964 and
19  1965, and that's on pages 80 and 81 and 82
20  of Exhibit-12.
21      A.   Yes.
22      Q.   Now, do any of these entries provide
23  any policy numbers?
24      A.   They do not.
25      Q.   Do they provide the policy prefixes?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 145

1
2     A.   They do not.
3     Q.   Do they provide specific policy
4  periods?
5     A.   No.
6     Q.   Do they say what type of coverage?
7     A.   No.
8     Q.   Do they provide any policy limits?
9     A.   No.
10    Q.   And do they specify whether the
11  policy is workers' comp, automobile liability,
12  CGL or M&C?
13    A.   No, they don't.
14    Q.   We're done with that.
15         I want to -- sir, would you hand me
16  that exhibit?  I'd like to put that on it
17  instead of that.
18    A.   If you'll hand me the clip, I'll put
19  it on.  No extra charge.
20    Q.   Thank you.
21         Sir, you also refer to in your
22  report, which is Hughes Exhibit-1, to certain
23  expense account documents from Troy Belting.
24  Do you recall that?
25    A.   Yes.

Page 146

1
2         MR. KOTULA:  Would you mark that as
3  Exhibit-13.
4         (Whereupon, Exhibit Number-13 marked.)
5  BY-MR.KOTULA:
6     Q.   Sir, we've placed before you what
7  the court reporter has kindly marked as
8  Hughes Exhibit-13.
9         And for the record, it is a
10  multi-page document with -- bear with me --
11  it's two-page memos, if you will, for 1959,
12  1960, 1963, and 1964.  The first is dated
13  February 19th, 1960; the second February
14  20th, 1961; the third February 26th, 1964;
15  and the fourth, March 1st, 1965.
16         And the first page of Exhibit-13
17  says "1959," and under that, "Troy Belting &
18  Supply Co., Inc., Troy, New York."  The
19  second page at the top says, "1959," and
20  then beneath that after the name of the
21  company and the location, it says, "Expense
22  Account."  Do you see that?
23    A.   Yes.
24    Q.   Are you familiar with these
25  documents?  Did you review them?

Page 147

1
2     A.   Yes, I did.
3     Q.   And there is a reference under
4  "Credit," "E.J. Nicoll & Son, Jamestown
5  Mutual Insurance."
6         Do you see that?
7     A.   Yes.
8     Q.   And then it says $103.55?
9     A.   I see it.
10    Q.   Then if you go to the 1960 memo
11  that's part of this exhibit, also under
12  "Credit," there's a reference to E.J. Nicoll
13  & Son, Jamestown Mutual Insurance.
14    A.   Yes.
15    Q.   And there's a credit of $232.56,
16  correct?
17    A.   Yes.
18    Q.   If you go to 1963, the same thing,
19  there's a credit next to Edw. J. Nicoll &
20  Son, Jamestown Insurance, and this is
21  $486.74, right?
22    A.   Right.
23    Q.   And then the last one, under
24  "Credit," it says, "Jamestown and AMICA,"
25  A-M-I-C-A, "refund" and "insurance," $96.63,

Page 148

1
2  right?
3     A.   Right.
4     Q.   Now, do any of these references to
5  Jamestown provide any policy numbers or
6  policy prefixes for the alleged Jamestown
7  Mutual or Unigard policies?
8     A.   No, they don't.
9     Q.   Do they provide any specific policy
10  periods?
11    A.   No, they don't.
12    Q.   Do they provide any policy limit
13  information?
14    A.   No, they don't.
15    Q.   Do they identify the type of policy
16  that may have been issued?
17    A.   No, they don't.
18    Q.   So it could be workers' comp, could
19  be auto, could be CGL, could be M&C?
20    A.   Yes.
21    Q.   With workers' compensation insurance,
22  is it common for workers' comp insurers to
23  provide credits at the end of a policy year
24  to the policyholder?
25    A.   Well, not unless the policyholder had



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 149

1
2  paid a large deposit premium at the beginning
3  and then at the end of the policy, the
4  premium, the payroll audit resulted in a
5  credit.  And so in that case, yes, it was
6  common for that to occur.
7      Q.   Okay.  We're done with that.
8          MR. KOTULA:  Would you mark that as
9  14, please.
10         (Whereupon, Exhibit Number-14 marked.)
11 BY-MR.KOTULA:
12     Q.   Sir, we are showing you now what's
13 been marked as Hughes Exhibit-14.
14         For the record, Hughes Exhibit-14 is
15 a response by the State of New York Workers'
16 Compensation Board in Albany, New York, dated
17 August 25, 2009 to Mr. David Barcomb,
18 B-a-r-c-o-m-b, general manager of Troy Belting
19 & Supply Company.  And it states, "Please
20 accept the following in response to your
21 August 17, 2009, Freedom of Information Law
22 (FOIL) request in which you seek records that
23 identify the workers' compensation insurance
24 carriers of Troy Belting & Supply Co. between
25 1960 to 1972."

Page 150

1
2          Did I read that right?
3      A.   You did.
4      Q.   Have you reviewed this document?
5      A.   I have.
6      Q.   And the author, Patrick Cremo,
7  C-r-e-m-o, senior attorney and records access
8  officer with the Workers' Compensation Board
9  for the State of New York goes on to say in
10 the second paragraph, "I have determined,
11 based on my review of the employer cards
12 possessed by the board's Albany district
13 office, that Troy Belting & Supply Co.
14 maintained workers' compensation insurance with
15 Unigard Insurance Company on July 23, 1962,
16 and March 19, 1964."
17         And then he identifies others,
18 correct?
19     A.   He does.
20     Q.   Did I read that right?
21     A.   You did.
22     Q.   And he also states there's a carrier
23 three digit code conversion?
24     A.   Yes.
25     Q.   And that -- he attaches these cards?

Page 151

1
2      A.   Right.
3      Q.   And if you look at the code
4  conversion sheet, which is the third page of
5  the Exhibit-14 --
6      A.   Right.
7      Q.   -- if you look for 39, which is
8  actually page 2 of the code conversion sheet,
9  or page 4 of exhibit, at the top it says,
10 Unigard Insurance Co., Unigard Insurance Group
11 (Unigard JMSIN), and Unigard Mutual Insurance,
12 Co. (Seaton, S-e-a-t-o-n, Insurance Co.),
13 right?
14     A.   Right.
15     Q.   So if you look at the card that's
16 page 2 of Exhibit-14, with respect to a
17 particular claimant named William Cramer,
18 which is in the upper -- upper right-hand
19 corner of page 2 of Exhibit-14, the carrier
20 case number and code, the code 039 appears?
21     A.   Yes.
22     Q.   And that's also true for a Harold --
23 I can't make out if that's Dunham.  It looks
24 like it's Harold Dunham.  It's the card
25 right below Mr. Cramer's card.  Correct?

Page 152

1
2      A.   That's the -- yeah, I don't know
3  what it says either.
4      Q.   But it also has a 39?
5      A.   Right.
6      Q.   A 039, right?
7      A.   Yes.
8      Q.   So is it fair to say that -- that
9  Exhibit-14 demonstrates that Unigard or
10 Jamestown Mutual issued workers' compensation
11 insurance policies to Troy Belting & Supply
12 Company for those stated periods?
13     A.   Well, it certainly indicates that one
14 of the three Unigard policies that are listed
15 -- companies that are listed here provided
16 that.  I don't know whether this "JMSIN"
17 refers to Jamestown or not.
18     Q.   Right.  But it indicates it was a
19 workers' compensation policy relationship with
20 between Unigard or its predecessor and --
21     A.   Sure.
22     Q.   -- Troy Belting, correct?
23         MR. BRENNAN:  Objection.  Objection.
24 BY-MR.KOTULA:
25     Q.   You can answer.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 153

2    A.   It indicates, yes, that there --
3    that one of the Unigard companies was
4    providing workers' compensation insurance to
5    Troy Belting & Supply Company for this period
6    of time.
7    Q.   Thank you.  I'm done with that.
8         (Whereupon, Exhibit Number-15 marked.)
9    BY-MR.KOTULA:
10   Q.   We placed before you what the court
11   reporter has kindly marked Exhibit-15.
12   Exhibit-15 is a one-page document.  It states
13   it's a binder.  It has a case number at the
14   top, which I assume this was an exhibit for
15   something.  And under "Binder," it has Troy
16   Belting & Supply Co. as an insured, and it
17   refers to a location northwest, or N/W,
18   corner of Cohoes, C-o-h-o-e-s, and Elm
19   Street, Maplewood, and then it says Albany
20   County, New York.  And under that it says,
21   "Builders Risk," correct?
22   A.   Yes, it is.
23   Q.   Did you take a look at what we have
24   marked as Exhibit-15 in preparing your
25   opinions?

Page 154

2    A.   I don't -- I don't think so.
3    Q.   All right.  And the carrier that's
4    referenced in this is Atlantic Mutual; is
5    that right?
6    A.   Right.
7    Q.   In the "Company" column?
8    A.   Yes.
9    Q.   Says there's a binder signed 9/24/64?
10   A.   Yes.
11   Q.   And the agent that's listed is
12   Nicoll & MacChesney, Inc., correct?
13   A.   Yes.
14   Q.   You haven't reviewed this document
15   before?
16   A.   Not that I recall.
17   Q.   Does this indicate there was an
18   insuring relationship between Atlantic Mutual
19   and Troy Belting to you?
20   A.   Yes.
21   Q.   We're done with that.
22        (Whereupon, Exhibit Number-16 marked.)
23        MR. BRENNAN:  16 is that what we're
24   on?
25        MR. KOTULA:  Yes, sir.

Page 155

2    BY-MR.KOTULA:
3    Q.   Bear with me for a moment.
4         Sir, I have placed before you what
5    the court reporter has kindly marked as
6    Hughes Exhibit-16.
7         For the record, it is an insurance
8    policy document.  I'm not going to represent
9    that it's an entire policy.  And it states
10   -- the initials INA appear on it, and
11   there's a -- there's an X in the box for
12   PEIC, which I'll represent may be Pacific
13   Employers Insurance Company.  The named
14   insured listed on the declarations page,
15   which is page 1 of Exhibit-16, says, "Named
16   insured:  Troy Belting & Supply Co., Inc.,"
17   in Watervliet, New York.
18        MR. BRENNAN:  Watervliet.  And it's
19   Cohoes, too.
20        MR. KOTULA:  Off the record.
21        (Whereupon, off the record.)
22   BY-MR.KOTULA:
23   Q.   And this appears to be -- bear a
24   policy number of AGP135165 in the upper
25   right-hand corner of the first page for a

Page 156

2    policy period that covers from October 3,
3    1974, until canceled.  Did I read that
4    right?
5    A.   You -- you read that right, yes.
6    Q.   And did you review Exhibit-16 in
7    preparation of your report and opinions?
8    A.   I think I've seen this, yes.
9    Q.   All right.  And what does Exhibit-16
10   appear to be to you?
11   A.   Well, it's a package policy providing
12   both casualty coverages and property coverages
13   for Troy Belting & Supply Company.
14   Q.   And do you see in the upper
15   left-hand corner of the first page, there's
16   -- on the dec sheet, there's a box that's
17   sort of boilerplate or preprinted form, and
18   it says, "Renew or in lieu of"?  Might not
19   be able to read "of," but it says, "Renew or
20   in lieu," and then I think the next word is
21   "of."
22   A.   Right.
23   Q.   And then it says, "Rewrite,"
24   r-e-w-r-i-t-e, "AGP135161."
25   A.   Right.



ACR ACCURATE COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 157

1
2      Q.   Now, the policy number for this
3   policy, Exhibit-16, is AGP135165, right?
4      A.   Yes.
5           MR. FOX:  I am going to object --
6   I'm going to object to the form to these
7   questions.  The policy says what it says.  I
8   understand both the -- both Mr. Kotula and
9   the witness are doing their best -- their
10  level best to -- to read it, but the fact
11  remains, the policy says what it says.
12  BY-MR.KOTULA:
13     Q.   And there's limits of liability
14  language in the right-hand side of the first
15  page of the dec sheet, coverages A and B,
16  legal liability, and there's a preprinted
17  number on the former -- or a typed --
18  typewritten number, and it says, "300,000
19  Each Occurrence, 300,000 Aggregate," is there
20  not?
21     A.   The typewritten says that, yes.
22     Q.   And then I think you testified about
23  scratchings, where an underwriter will take
24  an existing policy and in handwriting cross
25  out information and supply new information.

Page 158

1
2   Is this the sort of thing, where the
3   handwriting over the limits of liability
4   here?
5      A.   I don't know.  I'll have to look.
6   It could be that.  I don't -- actually, what
7   I think it is, is that the policy was
8   actually endorsed to increase the limits to
9   $500,000.
10     Q.   There's an endorsement elsewhere in
11  Exhibit-16 --
12     A.   Yes.
13     Q.   -- that says --
14     A.   November 1, 1975.
15     Q.   Okay.  And that was -- that would
16  be more than a year after the inception date
17  of this policy of October 3, 1974, right?
18     A.   Yes.
19     Q.   All right.  Now, can you tell me
20  what the significance of the box on the dec
21  sheet in the upper left-hand portion of the
22  dec sheet that says in the box "Renew or in
23  lieu of," and it says, "Rewrite AGP135161,"
24  what's that -- what's the significance of
25  that, to your knowledge?

Page 159

1
2           MR. FOX:  Objection; form, lack of
3   foundation, beyond the scope.
4      A.   I don't know.  I mean, rewrite
5   usually means that it's a new policy written
6   to replace the previous policy, but I don't
7   know.
8   BY-MR.KOTULA:
9      Q.   For a previous policy period?
10     A.   Not necessarily.  Usually what it
11  means is to replace it with a new policy for
12  the same policy period.
13     Q.   Can it also be used to mean or
14  reference a previous policy period?
15          MR. FOX:  Objection; lack of
16  foundation --
17     A.   I don't --
18          MR. FOX:  -- and calls for
19  speculation.
20     A.   I don't --
21          THE WITNESS:  I'm sorry.  Excuse me.
22          MR. FOX:  Did you hear my objection?
23          Go ahead.
24     A.   What the term "rewrite" usually means
25  is that it's a new policy that's written to

Page 160

1
2   replace the entire -- in its entirety an
3   older policy.  If you're talking about a new
4   policy written at the cancellation date of an
5   old policy, usually up here it would say
6   "new."  This indicates that -- that this was
7   probably rewritten to replace a policy with
8   this policy number that had been previously
9   written.  I just don't know any more than
10  that.
11  BY-MR.KOTULA:
12     Q.   And when you said "this policy
13  number," you were pointing at the policy
14  number right next to the word "Rewrite" in
15  the upper left-hand corner of the dec sheet;
16  is that right?
17     A.   That's correct.  That's correct.
18     Q.   I just wanted the record to reflect
19  what you were doing.
20     A.   Whatever the policy number is.  It's
21  AGP13, something, 61.
22     Q.   Right.  I'm through with that
23  exhibit.
24          (Whereupon, Exhibit Number-17 marked.)
25  BY-MR.KOTULA:



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 161

**Q. Sir, I am showing you now what the court reporter has kindly marked as Exhibit-17, Hughes Exhibit-17, and it is a multi-page document, essentially, pages 1 to 6 of -- the bottom of the first page says 1 of 6, and the last page is 6 of 6. And there's a company name or logo, Insurance Archaeology Group, that appears on the first page, the cover page of this. And the heading of it, of the document says, "Troy Belting & Supply Co., Primary Liability Coverage, 1949 to 1984." Do you see that?**
A. I do.
**Q. Did I read that right?**
A. You did.
**Q. And have you seen this document before?**
A. I have.
**Q. And what do you understand this document to be?**
A. This is a document that was prepared by the Insurance Archaeology Group, which we know affectionately as AIG. And it was, in fact, prepared in the marvelous manner in

Page 162

which they usually prepare their -- prepare their documents, so that if you look at the right-hand side of the document in the right-hand column, in the first box, you see the correspondence from broker Nicoll & MacChesney dated 9/15/78.
**Q. Yes, sir.**
A. That was a link. So if you clicked on that link, the file containing all of those documents crops up.
**Q. Right.**
A. So this is a -- this is a document that was prepared by AIG at the behest of Troy Belting and provided to me to give me assistance in my work.
**Q. What I am going to do is I am going to do an old school popup for you, that if you look at the first policy period, which is 7/18/49 to 7/18/54, and then it has an asterisk, and the asterisk legend says, "Denotes information assumed," correct?**
A. Right. That's right.
**Q. And if you look at under "Source Detail" in the very far right column, for**

Page 163

policies from 1949 to 1954 attributed to Jamestown Mutual Insurance Company by Insurance Archaeology Group, it has one document, right? It says, "Correspondence from broker Nicoll & MacChesney dated 9/15/78"?
A. Well, that's not just one document. It's a group of documents. But, yeah, that's what it says.
**Q. And if you go to Exhibit-8, it's a letter from Nicoll & MacChesney that we looked at earlier dated September 15, 1978, right?**
A. How do you -- how do you know that's the only document that appears in this? I'm telling you that this "Correspondence from broker Nicoll & MacChesney dated 9/15/78" was a link. It was a link -- electronic link that you clicked on it, and it took you to the repository of the documents which they called "Correspondence." So maybe it was just that one document. I'm not sure.
**Q. Do you have -- do you have a**

Page 164

document with the links?
A. I do in my office, yeah.
MR. BRENNAN: I believe that's been produced.
BY-MR.KOTULA:
**Q. Okay. I'll represent that I believe that this is sourcing to one document and one document only for that box.**
A. Well, now that -- now that I see, instead of talk, look it says 9/15/78. So I think you're probably right.
**Q. And then if you look at others, they reference something in addition to the -- like, go to the next box --**
A. You're right.
**Q. -- for 7/18/54 to 7/18/55, it says the source detail is two documents, a handwritten ledger page and that 9/15/78 letter from Nicoll & MacChesney, which is Exhibit-8 -- Hughes Exhibit-8 to your deposition today, right?**
A. That's right.
**Q. And we looked at the ledger pages, right?**

Page 165

2      A.   We did.
3      Q.   And then if you keep going, '55 to
4  '59 -- by the way, all of these periods,
5  7/18/49 to 7/18/54, 7/18/54 to 7/18/55, and
6  7/18/55 to 7/18/59 they all bear that
7  asterisk that the legend says, "Denotes
8  information assumed," correct?
9      A.   That's right.
10     Q.   And so, again, the '49 to '54 period
11  sources to that one exhibit, Exhibit-8, that
12  one letter?
13     A.   Right.
14     Q.   Which we talked about.  The second
15  for '54 to '55 sources to that same
16  Exhibit-8 and the handwritten ledger page
17  that we looked at earlier today --
18     A.   Right.
19     Q.   -- correct?
20          And then for the period 1955 to
21  1959, it, again, sources to the Exhibit-8,
22  the one-page letter dated 9/15/78, and then
23  it refers to, "Expense account attached to
24  income tax reports 1958," which we just
25  looked at?

Page 166

2      A.   Can I interrupt you?
3      Q.   Sure.
4      A.   I'm going to save you a lot of time
5  and effort.  I didn't rely on this document.
6      Q.   No, no.  I'm just asking you --
7      A.   Well, you the --
8      Q.   -- to interpret --
9      A.   Well, I mean, this document is --
10  just for the information of the policyholder,
11  I used it to sort of as a checklist, but I
12  don't consider it information about the
13  policy periods as being determinative or
14  authoritative at all.
15     Q.   I understand that.
16     A.   Okay.
17     Q.   I appreciate that.
18     A.   Carry on.
19     Q.   And so we could go through every
20  entry.  I'm not going to do that in the
21  interest of time.  But you would agree with
22  me, that these entries refer to specific
23  things, such as Exhibit-8, expense account
24  documents that we looked at, and handwritten
25  ledger pages that we looked at, right?

Page 167

2      A.   Well, the ones -- yes, some of them
3  do.  I think there may be more than that,
4  but that's right, yes.  You know, there's a
5  letter, the Cigna letter in here and
6  correspondence from INA.
7      Q.   Where's -- which one is that?
8      A.   Look on page 5.  There's minutes of
9  the meetings, there's correspondence from INA,
10  correspondence from St. Paul.
11     Q.   All right.  Now, page 5 starts to
12  detail INA policies, correct?
13     A.   Correct.
14     Q.   So it doesn't apply to Jamestown
15  Mutual?
16     A.   Correct.  But you didn't -- you
17  didn't --
18     Q.   I didn't specify that.  I agree.  I
19  agree.
20          All right.  We're through with that
21  exhibit, sir.
22     A.   Excellent.
23          MR. KOTULA:  Just bear with me a
24  second.  I think we have been going about an
25  hour.  Let's take a quick break.

Page 168

2          (Whereupon, break taken, 2:31 p.m. to
3  2:39 p.m.)
4          (Whereupon, Exhibit Number-18 marked.)
5  BY-MR.KOTULA:
6      Q.   Mr. Hughes, I have placed before you
7  what the court reporter has kindly marked as
8  Hughes Exhibit-18.
9          For the record, Exhibit-18 is a
10  multi-page document which appears to be a
11  report with a -- with a set of attachments.
12  It looks like a three-page letter from Dale
13  Pager, D-a-l-e P-a-g-e-r, Esquire, president,
14  John R. Probst, P-r-o-b-s-t, Investigations,
15  Inc., in Loudonville, New York.  It's dated
16  August 15, 2011, and it's addressed to
17  Richard J. Miller, Jr., Morris & McVeigh,
18  LLP, in Albany, New York.  And the "re" line
19  is Troy Belting.
20          Have you seen this document before,
21  sir?
22     A.   No.
23     Q.   Never seen this document?
24     A.   No.
25     Q.   The first sentence of the letter



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 169

1
2    from Mr. Pager says, "You contacted our
3    office and requested that we undertake an
4    investigation on behalf of Troy Belting.  You
5    requested that we work in conjunction with
6    David Barcomb of Troy Belting to locate
7    liability coverage that Troy Belting may have
8    had for the years between 1960 and 1974."
9        Do you see that?
10   A.   Yes.
11   Q.   And if you notice, he states that he
12   searched court records.  Do you see that
13   bottom of page 1 of the letter and going
14   over to the top of page 2?
15   A.   Yes.
16   Q.   And said, "We searched Rensselaer
17   County Supreme/Civil Court for the years in
18   question.  We did not find any lawsuit where
19   Troy Belting would have been represented by a
20   liability insurance carrier.  During the
21   subject time we found no lawsuits which were
22   filed."
23       Do you see that?
24   A.   I do.
25   Q.   And then if you go to the top of

Page 170

1
2    page 2, "There was one judgment in Rensselaer
3    County against Troy Belting & Supply Co. in
4    favor of City National Bank of Detroit and
5    New York Job Development Authority.  This
6    judgment was from 12/22/78, which is outside
7    the time period in question."
8        I read that right?
9    A.   You did.
10   Q.   Then he goes on, "We determined that
11   Saratoga County Court files their lawsuits
12   for the time in question by plaintiff and
13   that" --
14       MR. KOTULA:  Is this supposed to be
15   Schenect- --
16       MR. BRENNAN:  Schenectady.
17       MR. KOTULA:  But it's spelled
18   "Schectady."
19       MR. BRENNAN:  Yeah, it's a typo.
20   It's Schenectady.
21   BY-MR.KOTULA:
22   Q.   -- "files theirs by the first
23   defendant in the action.  We did check
24   anyway but could not find any relevant
25   lawsuits."

Page 171

1
2        Again, I read that right?
3    A.   You did.
4    Q.   And then he says, "We did a search
5    of Albany County lawsuits for the time in
6    question.  We located three lawsuits in which
7    Troy Belting was a plaintiff and none of
8    which they were a defendant.  Since these
9    lawsuits were on behalf of Troy Belting for
10   what appeared to be monetary issues, they
11   should not be relevant."
12       And then he lists three index
13   numbers, court case numbers in New York, and
14   Troy Belting is shown as the plaintiff in
15   the, you know, Troy Belting versus the name
16   of three different defendants.  Did I read
17   that right?
18   A.   Yes.
19   Q.   And then he goes on, "We also did a
20   search of federal records and were able to
21   search a date rage of 7/23/52 through 5/6/11.
22   We found four lawsuits where Troy Belting was
23   named as a party, but the earliest lawsuit
24   was from the year 2002.  There was nothing
25   from the target time period."

Page 172

1
2        Do you see that?
3    A.   Yes.
4    Q.   All right.  So, essentially, he
5    didn't find any information that suggested
6    there was a policy, and he made some
7    suggestions at the end of his letter for
8    what more they could do to try to locate
9    policies?
10       MR. BRENNAN:  Object to the form.
11   BY-MR.KOTULA:
12   Q.   You can see that on the bottom of
13   page 2 where he offers suggestions?
14   A.   I see that.
15   Q.   So do you have any information that
16   prior to 1976, Troy Belting had any product
17   liability claims filed against it?
18       MR. BRENNAN:  Objection.
19   A.   Not that I recall.
20   BY-MR.KOTULA:
21   Q.   And that would be consistent with --
22   with Exhibit-18?
23   A.   I suppose.
24   Q.   In your report, you refer to a
25   matter that was filed against Troy Belting



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 173

1
2    and other parties captioned Nancy Daurio,
3    D-a-u-r-i-o, and filed in Rensselaer County.
4    Do you recall that?
5        A.   I do.
6        Q.   All right.  Have you ever seen a
7    complaint that was filed in the Daurio case?
8        A.   I don't recall.
9        Q.   Does that mean you don't know if you
10   saw a complaint?
11       A.   I don't know if I saw a complaint.
12       Q.   All right.  I'll represent that I'm
13   not aware of a copy of a complaint being
14   available or being exchanged in this case.
15           MR. BRENNAN:  Are you asking me?
16   BY-MR.KOTULA:
17       Q.   I'm representing that to you, that
18   it's my information, my best information that
19   no one has a copy of a complaint in the
20   Daurio case.
21       A.   Is that a -- is that a question or
22   a statement?
23       Q.   Have you in your work on this matter
24   seen a complaint?
25       A.   Sitting here this moment, I don't

Page 174

1    know.  I don't recall whether I have or not.
2        Q.   Do you reference any allegations from
3    a complaint in the Daurio case in your
4    expert report?
5        A.   I don't remember.  I'll have to
6    look.
7        Q.   Please.
8            MR. BRENNAN:  Are you referring
9    specifically to the complaint or from any
10   source?
11           MR. KOTULA:  The complaint.
12           MR. BRENNAN:  The complaint only?
13           MR. KOTULA:  Yes.
14           MR. BRENNAN:  Okay.
15       A.   (Reviews document.)
16           Now, apparently the information that
17   I had about that came from the minutes of
18   the directors' meetings.
19   BY-MR.KOTULA:
20       Q.   Right.  And it -- and, essentially,
21   there were two minutes that you referred to.
22   There was one that talked about there being
23   a summons filed in the -- by the Daurios,
24   and then there was another one saying that

Page 175

1
2    it had been settled out of court and -- for
3    $2,000.  Am I right?
4        A.   Well, those -- what's listed in the
5    report, yeah, I -- and I don't -- I'm not
6    sure exactly what -- what information was
7    contained in the January 18, '77, minutes
8    other than what I have said here.  But I
9    know that I read about that case and that
10   she got her hair caught in some machinery
11   and it pulled her hair out and part of her
12   scalp and all that.
13       Q.   You read that in the minutes of the
14   Troy Belting Company, correct?
15       A.   I suppose I did.
16       Q.   Please bear with me.
17           MR. KOTULA:  This will be 19.
18           (Whereupon, Exhibit Number-19 marked.)
19   BY-MR.KOTULA:
20       Q.   Sir, we have placed before you what
21   the court reporter has kindly marked Hughes
22   Exhibit-19.
23           For the record, Exhibit-19 is on
24   Troy Belting & Supply Company letterhead, and
25   it says, "Minutes of Directors Meeting,

Page 176

1
2    January 18, 1977," and it runs three pages.
3        A.   Yes.
4        Q.   Do you recall having reviewed
5    Exhibit-19?
6        A.   Yes, I do.  And on the second page
7    is a pretty -- a pretty good statement about
8    the -- about the matter, and that's where I
9    read that she caught her hair in the jack
10   shaft, which was not guarded.  It also says
11   that, "We have received a summons of suit."
12       Q.   Right.
13       A.   And I don't know how you have a
14   summons of suit if there was never a
15   complaint filed.
16       Q.   Yeah, if you see, it says, "We have
17   received a summons of suit dated 11/24/76."
18   And then if you continue down a few
19   sentences, it says, "Since no copy of the
20   complaint has actually been filed, we do not
21   know for sure why we are being sued."  And
22   then it gives some explanation from --
23   attributed to the investigator, correct?
24       A.   Right.
25       Q.   Are you familiar with something in



ACCURATE COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 177

2  -- you said you're not an attorney, right?
3     A.   I did say that.
4     Q.   And you're -- is it fair to say
5  you're not generally familiar with New York
6  state court practice?
7     A.   That's very fair to say.
8     Q.   Are you aware that there's something
9  in New York known as a summons with notice?
10    A.   No.
11    Q.   Where a party can file a summons
12  under the New York court rules without a
13  complaint?
14    A.   No, I didn't know that.
15    Q.   I'll represent to you as -- as a
16  New York attorney, that that is something
17  that goes on under the New York court rules,
18  and it's -- it's no secret to any of -- any
19  of the New York attorneys who appear in this
20  case that a plaintiff can often file a
21  summons with notice, which provides very
22  scant detail about what their dispute may be
23  with the named defendants in -- in the
24  caption of the summons, and they're not under
25  an obligation at that time to serve a

Page 178

2  complaint.
3          The complaint, and there are
4  provisions -- and I don't know what was done
5  back in 1977 or 1976 because I wasn't a
6  practicing attorney back then in New York,
7  but currently, if someone serves a summons
8  with notice, a party can make a demand for a
9  copy of the complaint, and then the plaintiff
10  has a certain period of time to supply a
11  complaint, to actually file it.
12         MR. BRENNAN:  Is that even a
13  question?  I'm going to have to object.
14  BY-MR.KOTULA:
15    Q.   I mean, even --
16         MR. BRENNAN:  And your testimony is
17  stricken since you weren't even an attorney
18  at the time and you admit it.
19  BY-MR.KOTULA:
20    Q.   Do you have any knowledge about
21  summons with notice?
22    A.   I certainly don't.
23    Q.   All right.  Are you familiar with --
24  generally, with rules about duty to defend?
25    A.   Whose rules?  Insurance companies'

Page 179

2  rules?
3     Q.   No.  Are you familiar with the way
4  courts approach duty to defend?
5     A.   No.
6     Q.   Are you aware that if a claim is
7  made and the allegations potentially are
8  covered, that an insurer may have a duty to
9  defend?
10    A.   I'm aware of that, yes.
11    Q.   And if the allegations are not
12  clear, an insurer may have a duty to defend
13  pending clarification of what the claims are
14  actually -- that are actually being
15  presented?
16    A.   Yes.
17    Q.   So if there was just a summons and
18  there was no complaint, an insurance company
19  may have had a duty to defend notwithstanding
20  that they may not have owed coverage for
21  that claim once the facts of the claim are
22  known?
23         MR. BRENNAN:  Object to the form.
24    A.   Is that a question?
25  BY-MR.KOTULA:

Page 180

2     Q.   Yeah.  Do you understand that?
3     A.   Well, I mean, that's a -- that's a
4  legal question.  And in light of what you
5  just told me, it appears that that could be
6  the case, but I don't know.
7     Q.   Okay.  And since you haven't seen
8  the complaint in the Daurio case, you don't
9  know what the allegations were apart from
10  what's stated here in Exhibit-19, correct?
11    A.   That's correct.
12         MR. BRENNAN:  Object to the form.
13         (Whereupon, Exhibit Number-20 marked.)
14  BY-MR.KOTULA:
15    Q.   Sir, we have placed before you what
16  the court reporter has kindly marked as
17  Hughes Exhibit-20, and it is minutes of the
18  directors meeting on Troy Belting & Supply
19  Company letterhead for January 19, 1982.  Do
20  you see that?
21    A.   I see it.
22    Q.   And are these minutes of the board
23  of directors meeting of Troy Belting that you
24  reviewed in preparing your report?
25    A.   They are.


Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com
ACCURATE COURT REPORTING, INC.

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 181

2      Q.   All right.  If you notice at the
3   bottom of page 1, the last full paragraph,
4   it states, "Allen E. Decker advised that the
5   suit for $2.5 million brought by L. Daurio
6   and John Daurio against Horton Mfg. Company
7   and Troy Belting & Supply Company has been
8   settled out of court.  Troy Belting's
9   insurance company, Unigard Insurance Company,
10  settled for $2,000."
11         Did I read that right?
12     A.   You did.
13     Q.   And aside from this document,
14  Exhibit-20, you have no information about
15  what's related in this paragraph, correct?
16     A.   That's correct.
17     Q.   You don't have another source for
18  it?
19     A.   No, I don't.
20     Q.   Now, am I correct, that Exhibit-19
21  at page 2 states that the Daurio case
22  relates to an accident on May 9th, 1974?
23     A.   Correct.
24     Q.   All right.  So is it fair to say
25  that the information that's contained in

Page 182

2   Exhibits-19 and 20 doesn't tell us anything
3   about the period before 1974?
4          MR. BRENNAN:  Object to the form.
5      A.   I think that's right.
6   BY-MR.KOTULA:
7      Q.   I want to refer you to page 6 of
8   your expert report in this case, which is
9   Exhibit-1.
10         In the first full paragraph, you
11  state, "In this case" -- it's the second
12  sentence -- "we know, for instance, that Troy
13  Belting & Supply Company was engaged in the
14  distribution of industrial supplies and
15  equipment, including power transmission
16  equipment and industrial rubber products."
17         Do you see that?
18     A.   I do.
19     Q.   What's the source of that?
20     A.   It's -- it's somewhere in this
21  documentation that -- that -- that says that.
22  I don't remember exactly where it is.
23     Q.   You say, "We also know, according to
24  the information on their letterhead and in
25  their correspondence, that they engaged in

Page 183

2   electric motor repair and rewinding."
3          Do you see that?
4      A.   Yes.
5      Q.   Do you understand that their work in
6   electric motor repair and rewinding came
7   after 1974?
8      A.   No.
9      Q.   All right.  Would that -- would that
10  be relevant to you if it did happen after
11  1974?
12     A.   Not really.  I -- I entered that
13  because I wanted to be thorough in describing
14  what they did, but it never occurred to me
15  that I had a timing problem there.
16     Q.   And the next sentence you say that,
17  "In addition to January 21, 1986, minutes,
18  described the formation of Division Number 3,
19  which was providing engineering and technical
20  services for electrical distribution equipment
21  and were also going to install electrical and
22  mechanical equipment."
23         Do you see that?
24     A.   Yes.
25     Q.   And isn't it fair to say from just

Page 184

2   reading that sentence, that that type of work
3   and operation was not something they were
4   doing before 1986, certainly not before 1974?
5      A.   Sure.
6      Q.   Then you say, "This information
7   assists greatly in the determination of the
8   character of the insurance program that was
9   purchased by Troy," correct?
10     A.   Yes.
11     Q.   So some of that information doesn't
12  actually shed light on what type of insurance
13  Troy may have bought prior to 1974?
14     A.   That's right.  But your client is
15  not the only insurance company in this case.
16     Q.   I appreciate that.  I just wanted to
17  be sure we were on the same page and I was
18  reading this correctly.
19     A.   That's right.
20     Q.   Now, you say, 1, "A significant
21  proportion of their business involved the
22  sale of industrial equipment.  It would not
23  be reasonable to presume that any company
24  could involve themselves in such a business
25  without having product liability coverage."



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 185

1
2          Did I read that right?
3     A.    You did.
4     Q.    And then you say, 2, "The sale of
5  power transmission equipment would most likely
6  be to contractors who would, without a doubt,
7  be required by their customers to provide
8  certificates of insurance evidencing at least
9  premises operations and products-completed
10 operations coverage with significant limits of
11 liability."
12         Did I read that right?
13    A.    Yes.
14    Q.    Have you seen any certificates of
15 insurance evidencing coverage for the gap
16 period from 1949 to 1974?
17    A.    No, I haven't.
18    Q.    And then 3, you say, "The
19 installation of electrical and mechanical
20 equipment would only have been possible if
21 Troy could have provided certificates of
22 insurance in their own name, evidencing the
23 existence of liability coverage for at least
24 the premises operations products and completed
25 operations coverage."

Page 186

1
2          Did read that right?
3     A.    You did.
4     Q.    And that's work that wasn't happening
5  before 1974, right?
6     A.    I don't know whether it was
7  happening before 1974 or not.
8     Q.    Well, the sentence that we read, "In
9  addition, the January 21, 1986, minutes
10 described the formation of Division Number 3,
11 which was providing engineering and technical
12 services for electrical distribution equipment
13 and were also going to install electrical and
14 mechanical equipment."
15         And you testified just a few minutes
16 ago that isn't relevant to the gap
17 period from 1949 to 1974 because that was
18 something new that they had gotten into, and
19 you said that that was information put in
20 the report relating to other carriers?
21         MR. BRENNAN:  Object to the form.
22    A.    Well, what I was telling you is that
23 before that, they were engaged in the
24 distribution of industrial supplies and
25 equipment, which included power transmission

Page 187

1
2  equipment and industrial rubber products.  I
3  don't know, sitting here today, whether that
4  included installation or not.
5  BY-MR.KOTULA:
6     Q.    All right.  If it didn't include
7  installation of electrical and mechanical
8  equipment prior to and including 1974, then
9  that wouldn't be relevant to the gap period
10 of 1949 to 1974, right?
11    A.    That's right.
12    Q.    So I want to focus on Item 1 on
13 page 6 of your report.  You say, "It would
14 not be reasonable to presume that any company
15 could involve themselves in such a business
16 without having product liability coverage."
17         Do you see that?
18    A.    I do.
19    Q.    Are you aware that the law of
20 product liability underwent a dramatic change
21 in the -- in the early 1970s in this
22 country?
23    A.    Yes.
24         MR. BRENNAN:  Object to the form.
25         THE WITNESS:  Sorry.

Page 188

1
2     A.    Yes.
3  BY-MR.KOTULA:
4     Q.    And are you aware that prior to
5  that, there wasn't a concept of strict
6  product liability in the United States?
7         MR. BRENNAN:  Object to the form.
8     A.    I know something about that.
9  BY-MR.KOTULA:
10    Q.    Okay.  And are you aware that the
11 State of New York, the high court in the
12 state of New York, which is the New York
13 court of appeals, in 1973, in the Codling,
14 C-o-d-l-i-n-g, vs. Paglia, P-a-g-l-i-a case,
15 1973, adopted strict product liability for
16 the first time in New York?
17         MR. BRENNAN:  Object to form.
18    A.    Am I aware of that?
19 BY-MR.KOTULA:
20    Q.    Yeah.
21    A.    Yes, I am.
22    Q.    All right.  And how are you aware
23 of that?
24    A.    Well, it's an issue that -- that one
25 needs to understand when -- or needed to


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 189

1
2      understand at the time when advising clients
3      about the purchase of product liability
4      insurance.  Not necessarily the fact of the
5      purchase of liability insurance, but the --
6      the amount of the limits that would need to
7      be purchased in order to -- in order to
8      protect the company from not only their own
9      individual exposures but also the exposures
10     that come to them through the application of
11     strict liability.
12        Q.   Right.  So prior to 1973 in New
13     York, companies like Troy Belting -- Troy
14     Belting didn't have -- didn't face strict
15     product liability exposure?
16           MR. BRENNAN:  Object to the form.
17     BY-MR.KOTULA:
18        Q.   You understood that?
19           MR. BRENNAN:  Object to the form;
20     beyond the scope of the expertise.
21        A.   I mean, if -- I -- I don't know
22     exactly when the strict liability law came
23     in.  If you're asking before that law if
24     companies in New York faced a strict
25     liability, I don't actually know the answer

Page 190

1
2      to that question.
3      BY-MR.KOTULA:
4         Q.   Okay.
5         A.   But I will tell you this, that the
6      -- the question of whether or not strict
7      liability applied never affected the -- the
8      decision of my clients as to whether to
9      purchase product liability coverage, because
10     most of them, especially companies that were
11     the size and character of Troy Belting, felt
12     that they couldn't afford to sustain a
13     product liability claim that arose out of
14     products that -- that they had that directly
15     caused injury to particularly members of the
16     public.
17        Q.   Now, Troy Belting was not one of
18     your clients when you were an insurance
19     agent?
20        A.   No, they were not.
21        Q.   And you don't have any information
22     that in the gap period from 1949 to 1974,
23     Troy Belting was concerned about product
24     liability claims, that it purchased product
25     liability coverage for that entire time?

Page 191

1
2           MR. BRENNAN:  Object to form.
3         A.   I don't have any specific information
4      about that particular period of time, but
5      when you read on into the -- to the -- as
6      time goes by and you read the -- the
7      directors' minutes, they were very concerned
8      about that.  Now, it may be that it was
9      because the doctrine of strict liability had
10     risen and that caused them to be concerned
11     about it.  But they -- they were a company
12     that was interested in their insurance
13     program and paid a lot of attention to it.
14     BY-MR.KOTULA:
15        Q.   Now, in 19 -- as I understand it,
16     the board of directors' minutes that we have
17     run from 1978 -- 1977 to through the 1980s.
18     Correct?
19           MR. BRENNAN:  Hold on.  Just for
20     the record, I would like to insert on the
21     record that all of the minutes were produced
22     and a site inspection.  To the extent that
23     that's what you have, that's what was
24     selected and requested specifically by counsel
25     at that time.  And I know you're new to the

Page 192

1
2      case, but I do want the record to reflect
3      that --
4           MR. KOTULA:  Sure.
5           MR. BRENNAN:  -- for accuracy.
6      BY-MR.KOTULA:
7         Q.   Are you aware of any board of
8      directors' minutes prior to 1977 that reflect
9      a concern about product liability exposures
10     to the company?
11        A.   No, I'm not.
12        Q.   Okay.  And are you aware that in
13     1975, the New York state legislature amended
14     the Uniform Commercial Code to adopt strict
15     product liability?
16           MR. BRENNAN:  Object to form.
17        A.   No.
18           MR. KOTULA:  Are we at 21?
19           (Whereupon, Exhibit Number-21 marked.)
20     BY-MR.KOTULA:
21        Q.   Sir, we have placed before you what
22     the court reporter has kindly marked Hughes
23     Exhibit-21.  It's a Nebraska Law Review
24     article by Roger Henderson, professor at the
25     University of Nebraska College of Law, 1971.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 193

1
2    And the title of the article is "Insurance
3    Protection for Products Liability and
4    Completed Operations, What Every Lawyer Should
5    Know."
6         Have you ever seen this document
7    before?
8    A.   No.
9    Q.   All right.  I'll represent to you
10   that Roger Henderson's article has been cited
11   by a number of courts around the country,
12   this very article.  And I don't know if
13   you've ever heard of a case from the New
14   Jersey Supreme Court, Weedo vs. Stone-E-Brick,
15   having to do with construction defects, your
16   work exclusion, and that sort of --
17   A.   No.
18   Q.   Okay.  1971, page 2 of the exhibit,
19   the first sentence, Mr. Henderson says,
20   "There have been many recent changes in the
21   field of tort law."
22        MR. BRENNAN:  Hold on.  Hold on.
23   Page 2 of -- just the second page of the --
24        MR. KOTULA:  Yeah, it's the very
25   first paragraph.  I'm not referring to the

Page 194

1
2    coverage but the actual first sentence of the
3    article.
4    A.   I notice, by the way, he's a good
5    University of Texas boy.
6    BY-MR.KOTULA:
7    Q.   Okay.  So you like him?
8    A.   I don't know.
9         MR. BRENNAN:  Object to form.
10   BY-MR.KOTULA:
11   Q.   You're inclined to like him.  Your
12   Texas is showing.
13        "There have been many recent changes
14   in the field of tort law but none as
15   personal and important to each member of our
16   society as the changes in tort liability
17   theories for injuries associated with products
18   and related services."
19        Do you see that?
20   A.   I do.
21   Q.   And you're familiar with this subject
22   just because of how it affected your clients,
23   correct?
24        MR. BRENNAN:  Object to the form.
25   What subject?

Page 195

1
2    A.   What subject?
3    BY-MR.KOTULA:
4    Q.   The changes, the recent changes in
5    the field of tort law regarding product
6    liability.  We talked about strict -- your
7    knowledge of the trend of strict product
8    liability?
9    A.   Yes, I'm familiar with those changes.
10   Q.   So if you go down to the next
11   paragraph on page 2 of the exhibit, he says,
12   "Certainly not every manufacturer that is
13   sued on a products liability theory is a
14   giant automobile manufacturer or chemical
15   company in a distant location.  There are
16   many small and medium-sized manufacturers, not
17   to mention wholesalers and retailers whether
18   in the form of sole proprietorships or
19   partnerships or corporations that are subject
20   to suits for products liability.  One wonders
21   how many of these entities are aware of the
22   extent of their exposure and whether they are
23   properly protected by insurance."
24        Do you see that?
25   A.   I do.

Page 196

1
2    Q.   And that's a fair observation by Mr.
3    Henderson, is it not?
4         MR. BRENNAN:  Objection.
5    A.   It would be a fair observation at
6    any time.
7    BY-MR.KOTULA:
8    Q.   Right.  Done with that exhibit.
9    A.   That was quick.
10   Q.   Sir, you also talk about a claim --
11   an asbestos claim involving a gentleman named
12   Pennell.  Do you recall that?
13   A.   Yes.  Pennell.
14   Q.   How do you spell it?
15   A.   I thought you said "Canal."
16   Q.   I said Pennell.
17   A.   Oh, I'm sorry.  You're right.
18   Q.   Maybe I -- I was not enunciating
19   correctly.
20   A.   No, I probably wasn't listening
21   correctly.
22   Q.   And what's your understanding of what
23   the Pennell case involved?
24   A.   Oh, I've actually forgotten.
25   Q.   Okay.  Do you understand it was an


ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 197

1
2    asbestos bodily injury case?
3        A.   I do understand that.
4        Q.   And do you know whether it was a
5    product exposure or a premises operations
6    exposure?
7        A.   I thought it was a products
8    exposure, but I'm not sure.
9        Q.   Because I think earlier in the day
10   you may have said something about it being a
11   premises operations exposure, and I just
12   wanted to know if you could clarify that.
13       A.   No, I -- well, I remember you --
14   you -- you had said something that I thought
15   needed correcting, which would -- I thought
16   you had said something that would indicate
17   the only asbestos exposure that you might
18   have would be products exposure, and I
19   corrected you to say, well, actually,
20   sometimes you'll have a premises and
21   operations exposure when you have an
22   installation situation, but I wasn't referring
23   to the Pennell case specifically.
24       Q.   Okay.  And is it your understanding
25   that -- that the Pennell case was defended

Page 198

1
2    entirely at the expense of Pacific Employers
3    Insurance Company?
4        A.   I think I knew that, yes.
5        Q.   And is it your understanding that
6    when the Pennell case was settled, Pacific
7    Employers Insurance Company paid the full
8    amount of the settlement on behalf of Troy
9    Belting?
10       A.   I believe that's correct.
11       Q.   Is it also your understanding that
12   no one asked Jamestown Mutual Insurance
13   Company or Unigard Insurance Company or QBE
14   Americas to pay any amount towards the
15   defense of the Pennell matter on behalf of
16   Troy Belting?
17            MR. BRENNAN:  Objection.
18       A.   I don't know whether that's true or
19   not.
20   BY-MR.KOTULA:
21       Q.   You can't say one way or the other?
22       A.   That's right.
23       Q.   And is it your understanding that no
24   one ever asked Jamestown Mutual Insurance
25   Company or Unigard Insurance Company or QBE

Page 199

1
2    Americas to pay any portion of the settlement
3    amount on behalf of Troy Belting?
4            MR. BRENNAN:  Objection.
5        A.   I don't know if that's true or not.
6    BY-MR.KOTULA:
7        Q.   Again, you don't know one way or the
8    other?
9        A.   I don't.
10       Q.   And do you believe that something
11   having to do with the Pennell matter reflects
12   that Jamestown Mutual Insurance Company or
13   Unigard Insurance Company issued a policy or
14   policies of insurance in the gap period from
15   1949 to 1974?
16       A.   Well, I believe that -- that there
17   -- there are things that they did and their
18   behavior at the time indicated to me they
19   were concerned that there was a potential --
20   potential for coverage, and that if they
21   thought they didn't have any coverage or they
22   never wrote coverage that would cover the
23   Pennell case, I would have expected them to
24   file a reservation of rights very early,
25   which they did not -- apparently, did not

Page 200

1
2    do.  I didn't see any denial of liability on
3    their part at all.  So just that was the
4    reason for my citing the Pennell case.
5        Q.   Now, you say you didn't see any
6    denial, correct?
7        A.   Correct.
8        Q.   But that doesn't mean that there
9    wasn't a denial?
10       A.   It doesn't necessarily mean that
11   there wasn't a denial, except that -- now,
12   I'm not handling the claims part of this
13   case.
14       Q.   So you're not offering an opinion
15   about that?
16       A.   Not about claims handling.  But I
17   did read -- oh, Lord, I'm going -- it's late
18   in the day.  I can't remember his --
19       Q.   Mr. O'Malley?
20       A.   No, no.  One of the claims people
21   in this -- Dickson, was it, or -- I'm not
22   sure.  But just a minute and I'll tell you.
23       Q.   Sure.
24       A.   Oh, Mr. Field.  Who seemed to me to
25   be very meticulous.  And, you know, I just



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 201

1
2    would have expected, that given the
3    circumstances, that if Unigard had felt like
4    they had absolutely no responsibility for
5    that -- for that case, they would have
6    immediately filed a reservation of rights or
7    issued a denial letter, rather than
8    monitoring the case for months and months and
9    -- and risking, I would think, the chance
10   that they might be drawn into it and
11   required to contribute defense costs and
12   maybe even indemnity costs.
13       Q.   But you're not aware of any evidence
14   that they ever did -- that they were ever
15   asked to contribute defense or indemnity
16   costs or that they ever did do so?
17       A.   No.
18       Q.   And are you testifying as an expert
19   that an insurance company that receives
20   notice of a claim is not supposed to conduct
21   an investigation --
22            MR. BRENNAN:  Objection.
23   BY-MR.KOTULA:
24       Q.   -- regarding that claim?
25       A.   No, I'm not.

Page 202

1
2        Q.   And you were surprised you didn't
3    see a disclaimer or a reservation of rights
4    letter from Unigard or Jamestown Mutual, but
5    you're not surprised that you don't see any
6    insurance policies for the entire gap period
7    from 1949 to 1974.  Why is that?
8            MR. BRENNAN:  Objection.
9        A.   Where did you get the idea I wasn't
10   surprised that we didn't see any insurance
11   coverage for the entire gap period?
12   BY-MR.KOTULA:
13       Q.   No, no.  You said you were surprised
14   that you didn't see a reservation of rights
15   letter or a disclaimer letter from Unigard
16   with respect to Pennell, but you were not
17   surprised that Troy Belting doesn't have any
18   actual insurance policies in the gap period
19   from 1949 to 1974.
20            MR. BRENNAN:  Objection.
21       A.   I mean, you're talking about apples
22   and oranges.  In the terms of the policies
23   themselves, we have information here that
24   Troy Belting, like many other policyholders,
25   very foolishly decided they were going to

Page 203

1
2    dispose of their insurance policies when they
3    had expired.
4        As a matter of fact, when I was in
5    the agency business, I wouldn't give my
6    clients their insurance policies.  I kept
7    them and gave them copies because I knew
8    they were liable to do that.  But -- so I --
9    I was not all that surprised to say -- to
10   see that there's not any policies available.
11   BY-MR.KOTULA:
12       Q.   That's what I was saying, you
13   weren't.
14       A.   But I am surprised to see that there
15   was not -- because the documentation that we
16   have on the Pennell claim is far more
17   contemporary than was policies all the way
18   back to 1949.  And also involved what I
19   thought was a rather meticulous claims
20   handling on the part of the -- I believe it
21   was Mr. Field who was involved in handling
22   the claims, and he seemed to me like he
23   dotted every "I" and crossed every "T."
24       Q.   But you're not offering an opinion
25   about the claims handling aspects?

Page 204

1
2        A.   Not other than the fact that it
3    would indicate to me that there was something
4    about the situation that made Unigard feel
5    that they had the potential for coverage,
6    that they had -- they had to conduct a very
7    meticulous investigation, which they did do,
8    and that they never posted a reservation of
9    rights letter.
10       Q.   And were never asked to pay
11   anything?
12            MR. BRENNAN:  Objection.
13       A.   Is that a question?
14   BY-MR.KOTULA:
15       Q.   Yes.
16       A.   Well, we have already agreed that I
17   don't know that they were ever asked to pay
18   anything.
19       Q.   Right.  And it wasn't just Troy
20   Belting that didn't retain copies of their
21   policies?
22       A.   No, it wasn't.
23       Q.   It was -- it was -- it was the
24   agent or the broker for Troy Belting also
25   didn't keep copies of the policies, right?



ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 205

1
2          MR. BRENNAN:  Objection.
3    BY-MR.KOTULA:
4      Q.   I mean, that's -- isn't that right?
5      A.   Well, I think that's correct.
6      Q.   And that may be even more surprising
7    than Troy Belting not keeping them.  But
8    these were -- you know, in the period you
9    say they were CGL policies.  There's evidence
10   that there may have been manufacturers and
11   contractors policy or policies.  But both of
12   those, as I understand it, would be written
13   on an occurrence basis, not a claims-made
14   basis.  Is that right?
15         MR. BRENNAN:  Objection.
16     A.   Well, nothing had been written on a
17   claims-made basis, but the policies -- the
18   early -- if they were, indeed, manufacturers
19   and contractors policies, it would have been
20   written on a cause-by-accident basis.
21   BY-MR.KOTULA:
22     Q.   Cause-by-accident or accident which
23   then at some point in time in the history of
24   insurance --
25     A.   1966.

Page 206

1
2      Q.   -- they became occurrence based,
3    which still defined occurrence as an
4    accident, including other things, correct?
5      A.   That's right.  1966.
6          MR. BRENNAN:  Objection.
7    BY-MR.KOTULA:
8      Q.   But whether it's a cause-by-accident
9    or an accident or an occurrence basis, if --
10   if something happens during that policy
11   period that results in bodily injury or
12   property damage, those policies could be
13   asked to respond, provided there's -- there's
14   a coverage grant for that, and occurrence is
15   part of that or caused-by-accident or
16   accident is part of that, isn't it?
17     A.   That's right.  And they're evergreen
18   in nature.
19     Q.   So although the policy period may
20   expire, if a claim isn't presented until much
21   later, it could still be covered under the
22   earlier policy, right?
23     A.   As long as the policy was triggered
24   and it was not excluded, that's right.
25     Q.   And had a grant of coverage that

Page 207

1
2    would extend to that?
3      A.   Well, that's why I said as long as
4    it was triggered, which would automatically
5    mean there was a grant of coverage.
6      Q.   If Pacific Employers Insurance Company
7    had paid all of the defense and all of the
8    indemnity for the Pennell matter, do you have
9    any information as to why they may have done
10   so?
11         MR. BRENNAN:  Objection.
12     A.   No, I don't.
13   BY-MR.KOTULA:
14     Q.   You haven't offered an opinion about
15   that, have you?
16     A.   No, I don't.
17         MR. KOTULA:  I have no further
18   questions at this time.
19            EXAMINATION
20   BY-MR.FOX:
21     Q.   Good afternoon, Mr. Hughes.  I
22   introduced myself earlier.  I'm Brian Fox.
23   I represent the plaintiff, Pacific Employers
24   Insurance Company, in this case.
25         Let me turn to your expert report in

Page 208

1
2    this case, Hughes Exhibit-1.  And if we can
3    turn to page 3, which is the opinions
4    section of your report, you -- am I correct,
5    you state in that -- that second paragraph
6    underneath "Opinions," "It is my professional
7    opinion that, with little doubt, Insurance
8    Company of North America, 'INA,' issued
9    Policy Number XBC-099288 to Troy Belting
10   effective 10/3/74, expiring 10/3/75."
11         Did I read that correctly?
12     A.   Yes, you did.
13     Q.   And that is your opinion; is that
14   right?
15     A.   Yes, it is.
16     Q.   Have -- have you ever seen that
17   allegedly missing policy?
18     A.   I don't think so, no.
19     Q.   Have you ever seen any portions of
20   that allegedly missing policy?
21     A.   I don't remember.  Let me look.
22         (Whereupon, reviews document.)
23         I don't think so.
24   BY-MR.FOX:
25     Q.   Have you ever seen any reference to



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 209

1
2      that allegedly missing policy in any court
3      records?
4          A.   No, I don't think so.
5          Q.   Have you ever seen any reference to
6      that allegedly missing policy in any other
7      insurance policy?
8          A.   I don't think so.
9          Q.   Let me -- let me turn to Exhibit-C
10     of your report.  And tell me when you've --
11     when you have it in front of you.
12         A.   I've got it.
13         Q.   Okay.  Exhibit-C, am I correct, is a
14     -- it's entitled, "Documents Reviewed and
15     Considered By Robert Hughes"?
16         A.   Yes.
17         Q.   Okay.  And you reviewed all of the
18     documents on Exhibit-C in -- in considering
19     and forming your opinions in this case; is
20     that correct?
21         A.   I did, yes, that's correct.
22         Q.   And was there anything that you
23     wanted to review that was not provided to
24     you as reflected on Exhibit-C?
25         A.   Other than complete copies of the

Page 210

1
2      missing policies?
3          Q.   Yes.
4          A.   No, not that I -- there wasn't
5      anything I asked for that I wasn't given.
6          Q.   Okay.  And let me turn to a couple
7      of the exhibits that Mr. Kotula introduced.
8              So first of all, am I correct, Mr.
9      Hughes, that you testified earlier that you
10     would expect a policy above or below a
11     missing policy to -- to list some information
12     about the missing policy?
13         A.   No.  I said I would -- would expect
14     an excess policy above the missing policy to
15     contain information about the missing policy.
16     I said that -- that often the policy below
17     the missing policy, if you were fortunate to
18     have this scratched-up copy for renewal,
19     would -- would tell you something about the
20     missing policy, but only a scratched copy of
21     the -- of the prior to policy would
22     indicate.
23         Q.   And Mr. Kotula showed you an excerpt
24     -- excerpt of your deposition from another
25     case in which you talked about policies above

Page 211

1
2      or below --
3          A.   Right.
4          Q.   -- the missing policy?
5          A.   Right.
6          Q.   Okay.  Let me -- let me ask you to
7      turn your attention to Exhibit -- Hughes
8      Exhibit-16 that Mr. Kotula put before you
9      this afternoon.
10         A.   I've got it.
11         Q.   And that's a -- the -- those are
12     documents relating to a Pacific Employers
13     policy; is that correct?
14         A.   That's right, the primary policy.
15         Q.   And I believe you testified in
16     response to one of Mr. Kotula's questions
17     concerning Exhibit-16, that you reviewed this
18     document in connection with this matter.
19     First of all, is that -- is that correct?
20         A.   Yes.
21         Q.   Could you indicate to me where on
22     Exhibit-C that's reflected?
23         A.   It's not specifically listed, but I
24     suspect that this was an exhibit -- or this
25     was in one of the sets of documents that are

Page 212

1
2      listed here generically, perhaps as an
3      exhibit to one of the other -- one of the
4      other depositions.  I'm not sure.  It's not
5      specifically listed, you're correct.
6          Q.   And it's -- it's your understanding
7      that if it is listed here in Exhibit-C in
8      some manner, it's because it was an exhibit
9      to one of the deposition transcripts that is
10     listed on Exhibit-C?
11         A.   Right.  Or because it was in one of
12     these documents from Troy Belting.  For
13     instance, the Pennell documents, I don't know
14     whether it was in either one of those.
15         Q.   So I'm -- just for terminology sake,
16     Mr. Hughes, I am going to -- I am going to
17     continue to refer to this -- the policy --
18     the allegedly missing policy -- INA allegedly
19     missing policy that you refer to in your
20     expert report, I'm just going to continue to
21     refer to that as the allegedly missing
22     policy.  Is that okay?
23         A.   That's fine.
24         Q.   Okay.  Is there any information at
25     all about the allegedly missing policy



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 213

1
2    anywhere in Exhibit-16?
3        A.   I doubt it.  I can look at every
4    page.  I don't think there is.
5        Q.   Okay.  And is it -- and am I
6    correct, that it's your understanding that
7    Exhibit-16 relates to a primary policy that
8    would be below the allegedly missing policy?
9    Is that right?
10       A.   Right.
11       Q.   Okay.  I'm done with 16.
12           Now, you testified as to one of Mr.
13   -- one of Mr. Kotula's questions that --
14   with respect to Hughes Exhibit-17.  So,
15   actually, let me ask you to get that in
16   front of you.  That was provided to you in
17   connection with this matter, correct?
18       A.   Yes.
19       Q.   And is that the document -- if
20   you're looking at Exhibit-C, if I can draw
21   your attention there, is that the document
22   referred to as the fifth document from the
23   bottom on Exhibit-C?
24       A.   Yes.
25       Q.   Okay.  And just for the record,

Page 214

1
2    Exhibit-17 is, what's listed on Exhibit-C,
3    just to use a shorthand description, a policy
4    chart prepared by Insurance Archaeology Group?
5        A.   Correct.
6        Q.   Okay.  Now, am I correct, that at
7    least according to Exhibit-17, Insurance
8    Archaeology Group was -- I know you more
9    colloquially refer to as AIG -- that
10   according to Exhibit-17, AIG does not agree
11   with you, that there is such an allegedly
12   missing INA policy?
13           MR. BRENNAN:  Object to the form.
14   BY-MR.FOX:
15       Q.   Right?
16           MR. BRENNAN:  Object to the form.
17           And just for the record, there is a
18   separate one that was produced in the same
19   package that refers to excess policies, so we
20   don't get up too far down the road to
21   nowhere.
22   BY-MR.FOX:
23       Q.   So just -- again, with respect to
24   Exhibit-17, and if it helps, it's a six-page
25   document, beginning on page 5, the -- it's

Page 215

1
2    mostly -- or exclusively, perhaps, Jamestown
3    are the first four pages.  So from page 5,
4    between that -- 5 and 6, or anywhere in the
5    document, but do you see any reference to
6    any alleged policy number -- I'm just reading
7    from your report now -- XBC099288 issued by
8    INA, or anyone else for that matter?
9        A.   In Exhibit-17?
10       Q.   Yes.
11           MR. BRENNAN:  Objection.
12       A.   No.
13   BY-MR.FOX:
14       Q.   Okay.  And Exhibit-17, just so the
15   record is clear, is the work product of AIG,
16   right?
17       A.   That's right.
18       Q.   Okay.  I'm finished with that
19   document.
20           What evidence do you regard there to
21   be of the allegedly missing INA policy?
22           MR. BRENNAN:  Objection.
23       A.   When you say "there," where?
24   BY-MR.FOX:
25       Q.   No, no.  So I'm done with -- with

Page 216

1
2    17, if you're still on that.
3           So just putting a fresh question to
4    you:  What evidence do you regard there to
5    be of the allegedly missing INA policy?
6           MR. BRENNAN:  Objection.
7        A.   There's a letter to -- from INA to
8    Troy Belting dated December 18, '78, which
9    stated that, "We also had excess policy
10   XBC-199288 in effect on 11/11/74 with limits
11   of $1 million."
12   BY-MR.FOX:
13       Q.   Okay.  Other than the December 18,
14   1978, letter that you just referred to, what,
15   if any, other evidence do you regard there
16   to be of this allegedly missing INA policy?
17       A.   Apparently, that's it.
18       Q.   Okay.  And your expert report
19   refers to a November 18, 1977, letter; is
20   that correct?  And one -- at least one of
21   the references is on page 3, footnote 2.
22       A.   Oh, okay.  On page 3, footnote?
23       Q.   On footnote 2, page 3.
24       A.   Oh, I'm sorry, yeah.
25       Q.   That's okay.  And --



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 217

1
2      A.   Right, there's the Allen Decker
3   letter of 1/18/77 and the Larry Holweger
4   letter of February 8, '78.
5      Q.   Okay.  So just to -- just to go
6   through them one by one.  So I think you
7   said 1/18/77, and I, actually, think there's
8   a -- shouldn't it be 11/18/77?
9      A.   11/18/77.
10      Q.   Okay.  And as to the other reference
11   in that footnote, I don't know that I can --
12   I think that may be specific to St. Paul.
13   So I --
14      A.   Oh, that's right.  That's right.
15      Q.   Okay.  So you've identified now two
16   letters, the December 18, 1978, letter and
17   the November 18, 1977, letter.  Other than
18   those two letters, do you regard there to be
19   any evidence of the missing -- sorry -- the
20   allegedly missing INA policy?
21      A.   Of the existence of the policy?
22      Q.   Well -- yeah.
23      A.   No, I don't.
24      Q.   Okay.  Now, there's been some
25   discussion of William Field.  You -- you

Page 218

1
2   testified just a short while ago that he
3   worked for INA, and you testified a short
4   while ago that you thought he dotted all the
5   Is and crossed all the Ts; is that --
6      A.   Right.  And we were talking about
7   him in the context of the Pennell matter,
8   which he was investigating on behalf of INA,
9   but also was keeping in constant contact with
10   Jamestown, with -- with Unigard.
11      Q.   Okay.  And is it fair to say that
12   Mr. Field -- actually, withdraw that.
13          Mr. Field was deposed in this case,
14   and you've reviewed the transcript of his
15   deposition and all the exhibits that
16   accompany that, right?
17      A.   I have.
18      Q.   Okay.  And that's the third listing
19   on Exhibit-C.  Is it -- is it fair to say
20   that Mr. Field was closer to the issue of
21   what policies INA may have issued than you
22   are?
23      A.   Sure.
24          MR. BRENNAN:  Objection.
25   BY-MR.FOX:

Page 219

1
2      Q.   Okay.  Did you see anything in your
3   review of Mr. Field's deposition transcript
4   that gave you any indication at all that the
5   allegedly missing INA policy existed?
6      A.   Not that I recall.
7      Q.   Okay.  Is there anything else on
8   Exhibit-C, other than what you have testified
9   to during my questioning of you, that leads
10   you to believe that the allegedly INA missing
11   policy existed?
12          MR. BRENNAN:  Objection.
13      A.   I don't think so.
14          MR. FOX:  I want to ask the court
15   reporter to mark as Exhibit-22 a copy of --
16   actually, 22 and 23, if you could do this at
17   once -- a copy of the two letters that you
18   just referred to, the first dated November
19   18, 1977, and the second dated December 18,
20   1978.
21          MS. YOUNG:  These?
22          MR. FOX:  This is my pile?
23          MS. YOUNG:  No, I was going to have
24   those marked, and he was kind enough to give
25   me his extras.  So you can mark those if

Page 220

1
2   you want.
3          MR. FOX:  Appreciate it.
4          Go off the record for a second.
5          (Whereupon, Exhibit Number-22 and
6   Number-23 marked.)
7          (Whereupon, break taken, 3:41 p.m. to
8   3:48 p.m.)
9   BY-MR.FOX:
10      Q.   We're back on.  We just took care
11   of some paperwork during the brief break.
12          So, Mr. Hughes, I have asked the
13   court reporter to hand you what has now been
14   -- two exhibits, two one-page exhibits of
15   which I've asked the court reporter to hand
16   to you, Exhibit-22, Hughes 22, which is dated
17   November 18, 1977, and Hughes 23, which is
18   dated December 18, 1978.
19          So -- and the Exhibit-22, Mr.
20   Hughes, that's -- that's written to Mr.
21   Field; is that correct?
22      A.   Correct.
23      Q.   And Exhibit-23, that's from Mr.
24   Field, right?
25      A.   Correct.


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 221

2    Q.   Okay.  And is there -- is there any
3  reference -- withdrawn.
4       Mr. Hughes, you've testified that as
5  indicated on Exhibit-C to your expert report,
6  that you reviewed the transcript of William
7  Field which -- with its exhibits.  Is there
8  any reference to Mr. Field's deposition
9  testimony in this case that you included in
10 your expert report?
11      MR. BRENNAN:  Object to form.
12      A.   I don't remember.  I don't think so.
13 BY-MR.FOX:
14      Q.   Okay.  I don't think so either.
15      And Mr. Field, during his deposition,
16 he said nothing about any excess coverage
17 allegedly issued by INA; is that correct?
18      MR. BRENNAN:  Object to form.
19      A.   Not that I recall.
20 BY-MR.FOX:
21      Q.   Okay.  Let me -- actually, keep the
22 -- Exhibit-23 in front of you, please.  And
23 if I could ask you to refer to page 8 of
24 your expert report.  And just read aloud,
25 please, the bottom sentence on page 8 of

Page 222

2  Exhibit-1, your expert report?
3       A.   Which -- which sentence?
4       Q.   The one all the way at the bottom
5  that begins with "INA."
6       A.   Oh.  "INA, in a letter Troy Belting
7  dated 12/18/78, stated, 'We also had excess
8  policy XBC199288 in effect on 11/11/74 with
9  limits of 1 million.'"
10      Q.   Okay.  Now, just -- I'm not trying
11 to trap you here, Mr. Hughes, but there is
12 an error in that -- in your expert report,
13 am I correct, in that it refers to a policy
14 number -- a policy with the number --
15      A.   Oh, yes, I'm sorry.
16      Q.   -- 199288, and you're referencing
17 Exhibit-23 in which the number is 09288?
18      A.   That's absolutely correct.
19      Q.   Okay.  And that's just a -- that's
20 just a minor mistake.
21      A.   Right.  Thank you.
22      Q.   Okay.  Let me ask you to turn your
23 attention to Exhibit-F of your expert report.
24 Let me just first ask you to -- well, let
25 me -- let's do it this way.

Page 223

2       Please take a look at page 15 of
3  your expert report, the very top.  You write
4  that, "I have attached redacted copies of
5  actual umbrella policies issued by INA, St.
6  Paul and Continental as Exhibit-F."  Is that
7  correct?
8       A.   Yes.
9       Q.   So I'm not going to ask you any
10 questions about St. Paul and Continental.  So
11 I would like to focus on the -- after the
12 cover sheet, which says "Exhibit-F," I want
13 to just focus on the first five pages.
14      A.   Okay.
15      Q.   Okay.  So with respect to the
16 portion of the expert report I just read to
17 you from the top of page 15, am I correct,
18 that this is -- this is what you attached as
19 a redacted copy of, just to use your
20 language, an actual umbrella policy issued by
21 INA; is that correct?
22      A.   Yes.
23      Q.   Okay.  How did you obtain that
24 portion of Exhibit-F?
25      A.   This is an actual policy from one of

Page 224

2  my clients that they provided to us with the
3  permission to use it on a redacted basis.
4       Q.   Okay.  And who is the client?
5       A.   I don't know.
6       MR. BRENNAN:  Objection.
7  BY-MR.FOX:
8       Q.   What type of business was that
9  client involved in?
10      A.   I don't know.
11      Q.   Was it, for example, an explosives
12 manufacturer?
13      A.   I have no idea.
14      Q.   It could have been, for all you
15 know, right?
16      A.   Could have been.
17      Q.   And what time period is the -- what
18 you -- what you have represented is an
19 actual umbrella policy issued by INA, what
20 time -- what time period is that?
21      A.   February 1, '71 to '72.
22      Q.   Okay.  And then that's a different
23 time period, isn't it, from when you say the
24 allegedly missing INA policy in this case was
25 issued?


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 225

```
1
2      A.   Yes, it is.
3      Q.   And that was -- in this case, that
4   was allegedly issued from October 3, 1974 to
5   October 3, 1975, right?
6      A.   Yes.
7      Q.   And -- and is it your belief that
8   -- excuse me -- because the -- what you have
9   represented as an umbrella policy issued by
10  INA that's attached to Exhibit-F, because
11  that's -- that has the XBC prefix and that,
12  according to you, the allegedly missing INA
13  policy also has an XBC prefix, that the
14  terms of the XBC allegedly missing policy in
15  this case would be identical to the -- the
16  terms and conditions in the -- in what's
17  Exhibit-F?
18     A.   In the preprinted form, yes.
19     Q.   Okay.  Is it -- is it your opinion
20  in this case that whenever INA issued an
21  insurance policy with the prefix XBC, that it
22  was in the exact form as in Exhibit-F?
23          MR. BRENNAN:  Objection.
24     A.   I don't know.  I wouldn't say
25  whenever.  If you're talking about the late
```

Page 226

```
1
2   '80s or 1990s, it may have been different.
3   I would have to check to see.  But as far
4   as this particular period of time is
5   concerned, I don't believe there was any from
6   the 19 -- the early 1970s to the latter part
7   of the 1970s in the -- in the structure of
8   the -- of the XBC forms.
9   BY-MR.FOX:
10     Q.   Do you consider yourself to be an
11  expert on INA policy forms?
12     A.   To a certain extent, yes.
13     Q.   Oh, okay.  What is that belief based
14  upon? Please tell me everything that that --
15  that that belief that you're an expert on
16  INA policy forms, tell me everything that's
17  based on.
18          MR. BRENNAN:  Objection.
19     A.   Well, to the extent that the -- that
20  the term "expert," as I understand it, means
21  that you have -- possess the knowledge that
22  is -- that is broader and in excess of that
23  of the general public, I've dealt with INA
24  excess policies now for 50 years, have sold
25  a lot of them, have consulted about a lot of
```

Page 227

```
1
2   them, and now I've testified about a lot of
3   them.  Probably hundreds of them.  And have
4   learned a great deal about them, sufficient
5   to that, I believe, I can testify as an
6   expert, and I think I've been qualified as
7   an expert on INA policies in dozens of
8   courts.
9   BY-MR.FOX:
10     Q.   You've testified about hundreds of
11  XBC policies?
12     A.   No, but I said dozens of them.  I
13  said I've dealt with hundreds of them over a
14  period of time, if not at least hundreds.
15     Q.   When did INA -- excuse me.  When
16  did INA begin?
17     A.   When did INA begin?
18     Q.   When did Insurance Company of North
19  America begin operating as an insurance
20  company?
21     A.   I have no idea sitting here.
22     Q.   Can you tell me what century?
23     A.   I'm sorry?
24     Q.   Can you tell me in what century it
25  began operating?
```

Page 228

```
1
2          MR. BRENNAN:  Objection.
3      A.   Not sitting here for this moment,
4   no.
5   BY-MR.FOX:
6      Q.   I mean, you don't know if it started
7   in the 18th Century or 19th Century or 20th
8   Century?
9      A.   No, I can't tell you today, no.
10     Q.   When did INA first issue a policy
11  with the XBC prefix?
12     A.   I don't know.
13     Q.   Can you tell me if it was in the
14  20th Century or the 19th Century?
15     A.   It would have likely been in the
16  20th Century because INA didn't begin issuing
17  umbrella policies until, oh, the 1950s.
18     Q.   It's -- do you consider what you --
19  excuse me -- what you attached as Exhibit-F
20  as a -- as an umbrella form?
21     A.   Yes.
22     Q.   And what is that based on?
23     A.   I'm sorry, what?
24     Q.   And what is that based on?  What is
25  that belief based on?
```



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 229

2      A.   Well, the structure of the policy.
3      Q.   In what way do you -- does the
4  structure of the policy lead you to believe
5  that it's an umbrella form?
6      A.   In the first place, the general
7  structure of the policy I know to be an INA
8  umbrella form; however, if you look at the
9  -- it's difficult to cite these.  The first
10  page, below the first line that says,
11  "Coverage A, Personal Injury Liability," if
12  you will scroll down to about -- a little
13  over halfway in that paragraph, it says, "If
14  limits of liability of the underlying
15  insurance are exhausted because of personal
16  injury, property damage or advertising
17  injury," well, there wouldn't be underlying
18  limits if it were not an umbrella policy.
19        And it also says that in the event
20  of the exhaustion of the underlying limits,
21  INA will have the right and duty to defend.
22  That's typical of an umbrella policy and not
23  an excess liability policy.
24      Q.   In your view, what -- what is an
25  umbrella policy?

Page 230

2      A.   An umbrella policy is an excess
3  liability policy that -- that provides limits
4  in excess of the underlying liability
5  policies and has the potential for providing
6  broader coverages than the underlying in
7  cases where there is coverage in the
8  underlying but not coverage -- sorry -- there
9  is coverage in the umbrella but not coverage
10  in the underlying.  And in that second case,
11  you have coverage either excess of the
12  exhausted limits or excess of the retained
13  limit, which is listed on the first page of
14  the policy.  In this case, $10,000.
15      Q.   You've -- you've stated -- you've
16  testified just a short while ago, I believe,
17  Mr. Hughes, that in your -- in your view,
18  the INA XBC policy form, it contained the
19  identical language until sometime -- year to
20  year until sometime in the 1980s.  Is that
21  right?
22        MR. BRENNAN:  Objection.
23      A.   I told you that I sitting here
24  today, that that was likely.  I can't tell
25  you that for sure.  I mean, I don't carry

Page 231

2  those things around in my head.
3  BY-MR.FOX:
4      Q.   But you do regard yourself to be an
5  expert?
6      A.   Absolutely.  But experts don't
7  necessarily carry all the information that
8  they're being asked to testify about around
9  in their heads.
10      Q.   Okay.  Well, will you be opining in
11  this case as to the -- the policy forms that
12  INA issued at various times?
13      A.   I don't think so.
14      Q.   Okay.  The policy language in the
15  INA XBC form that's attached to your Exhibit-
16  F, when did INA begin using this policy
17  form?
18        MR. BRENNAN:  Objection.
19      A.   It's my belief that they begin using
20  this policy form sometime around in the
21  1960s.
22        By the way, this policy, as you will
23  see, is entitled, "Excess Blanket Catastrophe
24  Liability Policy," which is why it has a
25  policy prefix "XBC."

Page 232

2  BY-MR.FOX:
3      Q.   Okay.  And Exhibit-F, with respect
4  to INA, that -- that's not a policy issued
5  to -- to Troy Belting, is it?
6      A.   No, it isn't.
7      Q.   Let me ask you to turn back to your
8  expert report and page 4 of that, please.
9  And let me know when you're there.
10      A.   Okay.
11      Q.   Are you there?
12      A.   Yeah.
13      Q.   Okay.  And one I want to first
14  direct your attention to in that final
15  paragraph -- and, again, I'm not interested
16  in the -- in the other carriers, that's why
17  I'm going to skip over them.
18        (As read:)  It is my professional
19  opinion, that without a doubt, the terms and
20  conditions of the excess liability policies
21  issue -- perhaps that should be "issued."
22      A.   It should.  Yes, it should.
23      Q.   -- to Troy Belting by -- I'm going
24  to skip over the others -- INA, provided
25  that the excess policy would at least follow



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 233

1
2    the terms and conditions of the underlying
3    policies.
4          I know there's more to the sentence,
5    but I'm going to stop it there.  Did I read
6    that correctly, acknowledging that I left the
7    other carriers out?
8    A.   Yes, you did.
9    Q.   Okay.  Is it your belief that the
10   allegedly missing INA policy -- I'm sorry.
11   Withdrawn.
12         And I showed you earlier, and Mr.
13   Kotula showed you before then, Exhibit-16,
14   which relates to a primary policy issued by
15   Pacific Employers during -- during that same
16   period of time.  Is that correct?
17   A.   You showed me that, did you say?
18   Q.   I showed it to you, the Exhibit-16?
19   A.   Yes.
20   Q.   Okay.  Is it -- is it your opinion
21   that the allegedly missing INA policy
22   followed the terms and conditions of
23   Exhibit-16?
24   A.   What I said in the report was that
25   it at least followed the terms and conditions

Page 234

1
2    of the underlying policies; in other words,
3    they would not be narrower than the
4    underlying policies.  And, yes, that is my
5    opinion.
6    Q.   And other than the -- the policy
7    form that's in Exhibit-F, what's the basis
8    for your belief that the allegedly missing
9    INA excess policy would at least follow the
10   terms of Exhibit-16?
11         MR. BRENNAN:  Objection.
12   BY-MR.FOX:
13   Q.   Terms and conditions.
14   A.   (Reviews document.)
15         If you look on the -- I'm sorry,
16   there's no Bates numbers on these pages.  It
17   would be the -- it would be the page
18   following the insuring agreement page.
19   Q.   So which exhibit are you on?
20   A.   I'm on the Exhibit-F with the
21   Pacific -- the INA sample.
22   Q.   Okay.  So you're -- you're going to
23   answer by referring me to Exhibit-F?
24   A.   Yeah.  Was your question as to why
25   I said that it would at least follow the --

Page 235

1
2    the terms and conditions of the underlying?
3    Q.   Right.  So I -- let me restate my
4    question, or at least what I intended my
5    question to be.
6          Other than referring to Exhibit-F --
7          MR. FOX:  Well, actually, would you
8    -- would you mind reading back my last
9    question?
10         THE WITNESS:  She'll whisper it
11   back.
12         COURT REPORTER:  "And other than the
13   -- the policy form that's in Exhibit-F,
14   what's the basis for your belief that the
15   allegedly missing INA excess policy would at
16   least follow the terms of Exhibit-16?"
17         THE WITNESS:  Sorry, I didn't
18   realize you said --
19   BY-MR.FOX:
20   Q.   That's okay.
21   A.   -- other than the Exhibit-F.
22   Q.   Is there -- is there anything other
23   than Exhibit-F, or does Exhibit-F provide
24   this whole basis?
25   A.   My experience from having my clients

Page 236

1
2    purchase these policies over the years,
3    there's -- there's no way we would have
4    allowed our clients to purchase an umbrella
5    policy which didn't at least follow form to
6    the underlying policies.  And I know that we
7    -- INA was one of our favorite companies.
8    We liked the coverage they provide, and
9    we liked the way they handled their claims.
10   Q.   Okay.  If you were placing coverage,
11   let's say in the 1970s, for an explosives
12   manufacturer and you were placing excessive
13   coverage, would you try to get -- would the
14   -- would the terms and conditions that you
15   would try to get for your client be any
16   different versus, say, a manufacturer of
17   widgets?
18         MR. BRENNAN:  Objection.
19   A.   Well, the way you structured your --
20   your question is would -- would it be what I
21   was trying to get for my client any
22   different?  No, it wouldn't be.
23         But, in fact, I think what you're
24   really referring to is would the availability
25   be different.  Could you buy the same excess



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 237

1
2    liability coverage for an explosives
3    manufacturing firm that you could for a
4    widget manufacturer, and the answer is
5    probably you could buy the same coverage in
6    terms of wording, policy wordings, but it
7    would have to attach at a lot higher point.
8         And as a matter of fact, one of our
9    clients for many years was Atlas, which was
10   one of the largest explosive manufacturing
11   firms in the country -- or in the world, and
12   they had their own captive insurance company
13   that wrote the first $5 million worth of
14   coverage because there was not any coverage
15   available to them in the general marketplace
16   for their primary coverage.
17        Is that what you were referring to?
18   BY-MR.FOX:
19   Q.   That's fine.  But if -- is it your
20   testimony that the -- actually, withdrawn.
21        Is it your testimony that the same
22   terms and conditions -- putting limits aside
23   for the moment -- the same terms and
24   conditions of excess coverage during the
25   1970s would have been available to an

Page 238

1
2    explosives manufacturer versus a manufacturer
3    of paperclips?
4         MR. BRENNAN:  Objection.
5    A.   Sure.  Except that the attachment
6    point would be different.
7         MR. FOX:  I have no further
8    questions at this time.
9         THE WITNESS:  Thank you.
10        EXAMINATION
11   BY-MS.YOUNG:
12   Q.   I'll try to be quick.  I represent
13   Continental, just so you know.
14        Going to page 3 of your report in
15   this action, Hughes Exhibit-1, on page 3 --
16   A.   Yes.
17   Q.   -- one of your opinions is that, "It
18   is my further professional opinion that, with
19   little doubt, Continental Casualty Company
20   issued Policy Number 293-38-68 for the period
21   from 1/21/77 to 11/1/78, and more likely than
22   not the actual policy number is RDU 2933868."
23        Now, flipping to page -- I guess
24   it's on page 7.  It starts with,
25   "Policyholder records."

Page 239

1
2    A.   Yes.
3    Q.   And then if you flip over to page
4    9, the last paragraph before "Insurance
5    Company/Agent Records," it says, "The November
6    18, 1977, letter from Troy Belting to INA
7    listed all of the excess policies, one of
8    which was the Continental policy."
9    A.   Right.
10   Q.   Was that November 18th, 1977, letter,
11   which, I think, has been marked as
12   Exhibit-22, was that the only form of -- was
13   that the only evidence that you have seen
14   that mentions this Continental -- this
15   alleged Continental excess policy?
16   A.   I think so.
17        MR. BRENNAN:  Objection.
18        THE WITNESS:  Sorry.  Excuse me.
19        MR. BRENNAN:  Go ahead.
20   A.   I think that's right.
21   BY-MS.YOUNG:
22   Q.   Okay.  And looking at Exhibit-22,
23   which is the letter dated November 18th,
24   1977, it's on -- it's authored by Allen E.
25   Decker, vice president of Troy Belting, and

Page 240

1
2    it's addressed to William Field at Insurance
3    Company of North America.  Do you know where
4    the information came from that's contained in
5    this letter?
6    A.   I do not.
7    Q.   Okay.  Did you ever have any
8    discussions with Allen Decker regarding the
9    substance of this letter?
10   A.   No.  I don't even know whether he's
11   alive or not.
12   Q.   Okay.  Have you ever had any
13   conversations with anyone at Troy Belting who
14   has personal knowledge of the existence of
15   this alleged Continental policy?
16   A.   I do not.  No, I haven't.
17   Q.   Have you ever had any conversations
18   with anyone at Troy Belting who -- whose
19   ever indicated that they have seen this
20   alleged Continental policy?
21   A.   No.
22   Q.   And have you, yourself, ever seen
23   the alleged Continental policy?
24   A.   No.
25   Q.   Okay.  So going back to your report,



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

ACCURATE
COURT REPORTING, INC.
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 241

1
2      on page 7, under "Policyholder Records," the
3      second sentence, "Also relevant are invoices,
4      coverage and renewal summaries, certificates
5      of insurance and other records in the
6      policyholder's possession that reference
7      insurance."
8              Did you happen to see any of these
9      kinds of documents that are referred to here
10     that mention the alleged Continental policy?
11     A.    No.  And I thought you had asked me
12     earlier if this letter was the only reference
13     that I had seen, and that is the only
14     reference I have seen.
15     Q.    Correct.  Great.
16             Okay.  Now, going to -- we're still
17     in your report.  Okay.  So on page 4 of
18     your report --
19     A.    Okay.
20     Q.    -- the last paragraph where you say
21     it's your professional opinion, without a
22     doubt, that the terms and conditions of the
23     excess liability policy, including the
24     Continental one, provided that the policy
25     would at least follow the terms and

Page 242

1
2      conditions of the underlying policies, do you
3      mean for that to include the duty to defend?
4      A.    Only if the underlying policies were
5      exhausted.
6      Q.    Okay.  So if -- I'll direct you now
7      to Exhibit-F of your report, specifically the
8      exemplar Continental policy.  Can you tell me
9      where, if anywhere, in this exemplar policy
10     it states that Continental would have a duty
11     to defend if the underlying insurance was
12     exhausted?
13     A.    Yes, it's in Section 2, Coverage B.
14     It would be the paragraph underneath the
15     listing of the lines of coverage where it
16     says, "The company, with respect to an
17     occurrence, not covered in whole or in part
18     by underlying insurance or to which there is
19     no other insurance in any way applicable,
20     shall have the right and duty to defend any
21     suit against the insured seeking damages on
22     account of such personal injury," et cetera.
23     Q.    I have lost you.  Coverage B, Number
24     2.  Is that the first sentence you're
25     looking at?

Page 243

1
2      A.    No.  If you look in the second
3      paragraph.  It's not really a new paragraph.
4      You see where it has in bold, "Personal
5      Injury, Property Damage"?
6      Q.    Correct.  Oh, okay.  The first full
7      sentence there?
8      A.    Right.  And it starts, "The company,
9      with respect to an occurrence not covered --
10     "
11     Q.    Okay.  So are you including -- so
12     where it says with respect to an -- to an
13     occurrence not covered in whole or in part
14     by underlying insurance or to which there's
15     no other insurance in any way applicable, do
16     you take that to mean that that includes
17     when underlying insurance is exhausted?
18     A.    Not in this particular paragraph.
19     Let me -- let me find that.
20             (Whereupon, reviews document.)
21             I take it back.  I think that does
22     -- that does include exhaustion.  In other
23     words, the terms -- the term "not covered in
24     whole or in part or to which there is no
25     other insurance in any way applicable," would

Page 244

1
2      have --
3      BY-MS.YOUNG:
4      Q.    You would state that -- you would
5      interpret that to mean --
6      A.    Exhaustion.
7      Q.    -- to include exhaustion?
8      A.    Right.
9      Q.    Okay.  Is it possible that that part
10     of your report could have been referencing
11     the INA or the St. Paul exemplar excess
12     policies that you were referring to?
13             MR. BRENNAN:  Objection.
14     A.    Is it possible?
15     BY-MS.YOUNG:
16     Q.    Right.  That your report was meant
17     -- that that portion of the report was meant
18     to speak to those policies?
19             MR. BRENNAN:  Which portion?
20     BY-MS.YOUNG:
21     Q.    The duty to defend in the event the
22     underlying insurance is exhausted?
23             MR. BRENNAN:  Referring to where?
24     I'm sorry, I'm just not looking --
25             MS. YOUNG:  On page 4, the last --



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 245

1
2       the last full sentence on page 4.
3              MR. BRENNAN:  Same objection, to
4       form.
5          A.   I don't believe it was intended to
6       -- to apply only to those two.
7       BY-MS.YOUNG:
8          Q.   Okay.  Now, looking at this exemplar
9       policy, where did you get that from?
10         A.   From my files.  It was a policy
11      that was purchased by one of my clients.
12         Q.   Okay.  Okay.  In your report, page
13      15 -- at the bottom of page 15 you say,
14      "During the relevant period of this report,
15      i.e. 1968 to 1974, CNA Financial operated a
16      number of companies that were capable of
17      issuing umbrella policies."
18             This -- but in -- it's been your
19      opinion that Continental issued a policy that
20      was in effect from January 21st, 1977 to
21      November 1st, 1978.
22             MR. BRENNAN:  If you want to ask
23      the question, I'm suggesting --
24             MS. YOUNG:  I'm sorry?
25             MR. BRENNAN:  If you want to ask a

Page 246

1
2       question, I suggest --
3              MS. YOUNG:  You mean the umbrella --
4              MR. BRENNAN:  -- that both sentences
5       should be read in conjunction.
6              MR. FOX:  Okay.  I've got you.
7       BY-MS.YOUNG:
8          Q.   So from '68 to '74, you're stating
9       that's the relevant period for this report?
10         A.   Well, that's a typographical error.
11         Q.   Okay.  That's what I was getting at.
12         A.   Sorry about that.
13         Q.   Now, you also refer to on page 16,
14      you refer to filings that are most pertinent
15      to this matter which are represented by
16      documents attached as Bates stamped
17      000122-000137.
18         A.   Right.
19         Q.   "These filings involve the A, B and
20      C iterations of CNA's umbrella excess
21      third-party liability policy form G-40240.
22      The form is characterized, among other
23      things, by the use of the prefix RDU and the
24      policy number."
25             Can you tell me if -- where these

Page 247

1
2       Bates-stamped documents that you -- that you
3       refer to, are they included in your report
4       as an exhibit?
5          A.   They certainly should have been.
6       Are they not here?
7          Q.   Not that I saw.
8          A.   My bad.
9          Q.   And so I want to ask you then to
10      look at your report in Montello, which was
11      marked as Exhibit-2.
12             MR. KOTULA:  I had the foresight to
13      mark this.
14         A.   Got it.
15      BY-MS.YOUNG:
16         Q.   Okay.  If you look at page 12 of
17      the Montello report --
18         A.   Right.
19         Q.   -- at the very top of the page, it
20      says, "CNA filings with Oklahoma State Board
21      dated August 5th, 1968, November 26, 1969,
22      and August 26, 1971, Bates stamped 000122 -
23      000137."
24         A.   Obviously, those are the forms.
25      They were supposed to have been attached to

Page 248

1
2       this report.
3          Q.   Okay.  So you were referring to
4       these Oklahoma filings with respect to your
5       report for this -- for the Troy Belting
6       matter?
7          A.   Those weren't only Oklahoma filings.
8       Those were filings that were made to all of
9       the states, but it so happened that this
10      particular case was an Oklahoma case.
11      Montello was an Oklahoma case.
12         Q.   Okay.
13         A.   And so in other words, the filings
14      were made with the -- the filings referred
15      to in the Montello report were made to the
16      Oklahoma board, but they were generic filings
17      that were made to all the states' regulatory
18      agencies.
19         Q.   Do you know that they were filed
20      with the State of New York?
21         A.   Well, that's an interesting question.
22      The State of New York walked across the
23      regulatory environment of the United States,
24      as far as insurance is concerned, like
25      gargantuan.  The State of New York took the



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 249

1
2     position that they would regulate insurance
3     and they would regulate insurance in such a
4     way that they would not only regulate
5     insurance in the State of New York but they
6     would also regulate insurance in all the
7     other states by saying that if you don't
8     practice insurance and do the -- in the way
9     that we require in New York, you will not be
10    able to write insurance in the State of New
11    York.
12         So what that caused was that the
13    insurance companies for a long period of time
14    had to have a company that would write
15    insurance in New York and companies that
16    would write insurance everywhere else.  So
17    that -- that changed, and I'm not exactly
18    sure when it clanged, but it did change.
19         But the fact is, that New York has
20    always had the tradition of very strong
21    regulatory requirements.  So if the filing
22    was made in New York, you can be guaranteed
23    that it was made -- the same filing was made
24    in virtually all the other states that
25    required prior approval.

Page 250

1
2         Q.   Okay.  Do you have any personal
3     knowledge as to whether those form -- these
4     forms were filed with the State of New York?
5              MR. BRENNAN:  Objection.
6         A.   I do not.
7     BY-MS.YOUNG:
8         Q.   Did you ever do any research or
9     investigation to determine whether these forms
10    were filed in New York?
11        A.   In New York?
12             MR. BRENNAN:  Objection.
13    BY-MS.YOUNG:
14        Q.   Correct.
15        A.   It's virtually impossible to do these
16    days because the State of New York has
17    expunged all their records back for a certain
18    period of time.  So they can't really tell
19    you whether a particular form was filed in
20    the state, at least the regulatory
21    authorities can't.  So you have to -- you
22    have to find that information in other
23    places.  And it's just -- you have to be
24    lucky enough to find a policy that uses a
25    form that was written in New York, et

Page 251

1
2     cetera.
3          But -- so, no, I don't have any --
4     any complete feedback from the State of New
5     York about these particular forms.
6         Q.   Okay.  How many exemplar CNA
7     policies do you have in your library?
8         A.   Gosh, I don't know.  Probably 50 or
9     60.
10        Q.   Are they all -- what kinds of
11    policies are they?  Are they all different?
12        A.   They're all liability policies, and
13    they're either primary policies or excess
14    policies.
15        Q.   Okay.  And do you know how many are
16    excess?
17        A.   Probably most of them because there's
18    really not any need to maintain exemplar
19    policies for the primary policies because
20    they were all standardized language.
21        Q.   Now, this particular exemplar policy
22    that's been included with your Troy Belting
23    report indicates that the policy period was
24    November 30th, 1969 to November 30th, 1972.
25    So that's about -- so that policy expired

Page 252

1
2     approximately five years prior to when you
3     contend that the alleged Continental policy
4     was issued.  Is there a reason why you use
5     an exemplar policy from a different policy
6     period?
7         A.   It's because it was available.  But
8     the policy terms in excess policies didn't
9     change to any great degree between 1966 and
10    1980.
11        Q.   Okay.  But they -- is it your
12    understanding that they did change?
13             MR. BRENNAN:  Objection.
14        A.   Some of them did.  I can't tell you
15    sitting here today which ones did and which
16    ones did not.
17    BY-MS.YOUNG:
18        Q.   Okay.  So you don't know whether the
19    Continental excess policies may or may not
20    have changed in some way?
21        A.   No.  Some insurance companies are
22    still using the same umbrella form that they
23    used for 50 years.  So -- or not 50 years
24    but since the 1950s.
25        Q.   And do you know if this exemplar --


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 253

1
2  do you know what state this exemplar policy
3  was issued in?
4      A.   Not sitting here today, no.
5      Q.   And do you know whether there were
6  any endorsements that were available that
7  would have limited or expanded coverage under
8  this exemplar policy?
9      A.   I'm sure there were.
10     Q.   There -- that are not included in
11  this particular policy?
12     A.   The policy or the exemplar?
13     Q.   The exemplar.
14     A.   No, I didn't include any endorsements
15  because we don't know what endorsements might
16  have been included in the -- in the Troy
17  Belting policy.
18     Q.   But there's a possibility that the
19  alleged Continental policy may have contained
20  endorsements if it existed?
21     A.   There's always that possibility.
22     Q.   And those endorsement may have
23  limited coverage, potentially?
24     A.   They may have.  It just all boils
25  down to who's -- who's responsible for

Page 254

1
2  proving that.
3      Q.   Okay.  Do you know if CNA used
4  other excess policy forms during this
5  particular time period, specifically 1977 to
6  1978?
7      A.   Yes, they did, but they weren't XBC
8  forms.
9      Q.   RDU?
10     A.   I mean, RDU -- RDU forms.  They had
11  -- they had RDX forms.
12     Q.   Okay.  What were the RDX forms?
13     A.   They were essentially straight
14  following form excess policies.
15     Q.   Okay.  And how do you know -- how
16  is it your opinion that the Continental
17  policy was more likely than not an RDU --
18  contained in RDU prefix as opposed to an RDX
19  prefix?
20     A.   Because, A, its positioning in the
21  tower of coverage for this particular
22  insured, and, B, because it wouldn't have --
23  it would not have been appropriate for Troy
24  Belting to purchase an RDX form at the -- at
25  the lower level.  That would have been a

Page 255

1
2  much higher excess limit policy, like, in
3  excess of $5 million.
4      Q.   The RDX form would have been?
5      A.   Right.
6      Q.   Do you know when -- is an RDU
7  prefix used for all types of excess policies?
8  Do you know?
9      A.   No, it's just the umbrella layer.
10  RDU -- Continental used the RDU prefix for
11  policies in the umbrella layer, policies that
12  sat in direct excess of the underlying
13  primaries.
14     Q.   And how is it -- was CNA the only
15  company that used the RDU prefix?  Do you
16  know?
17     A.   No, they weren't.  Other companies
18  used it but not in the same way that CNA
19  did.
20     Q.   And what was the difference that
21  other companies used it?
22     A.   Well, some other companies used RDU
23  as a prefix for their primary policies.  And
24  it's at least one other company.  I can't
25  remember who it was, but we run into it

Page 256

1
2  occasionally.
3      Q.   Do you know if the RDU prefix is
4  still being used by the CNA companies?
5      A.   I think it is, as a matter of fact.
6      Q.   Do you know when CNA began using the
7  RDU prefix?
8      A.   Not sitting here today.  I mean, we
9  have that information in our files.
10     Q.   Do you know when CNA started using
11  the RDX prefix?
12     A.   No.  I think it's about the same
13  time.
14          (Whereupon, Exhibit Number-24 marked.)
15  BY-MS.YOUNG:
16     Q.   How many pages did I give you?
17     A.   I'm going to dream about Montello
18  tonight.
19          MR. KOTULA:  Or Trelleborg.
20          THE WITNESS:  No, I didn't know
21  about Trelleborg.  I'll have to find out
22  about that.
23  BY-MS.YOUNG:
24     Q.   I just marked a couple of additional
25  pages from your deposition transcript in the


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 257

1
2      Montello case as Exhibit-24.  Let's see.
3           Okay.  So starting at the bottom of
4      page 41, you say, "Well, I don't know that
5      it couldn't have been something else
6      altogether because the RDU prefix was used by
7      Continental companies, it was used by
8      different Continental companies, and it was
9      used for various kinds of excess liability
10     policies."
11          What do you mean by that, "various
12     kinds of excess liability policies"?  It
13     continues from the bottom of page 41
14     continuing to the top of 42.
15     A.   I have no idea what I meant by
16     that.
17     Q.   And then you say, "Not always -- it
18     was used for primary umbrella policies and
19     for excess umbrella policies.  It was not
20     used by Continental companies for pure excess
21     or following form excess policies because
22     they used the prefix RDX."
23          So the RDU prefix was -- that was
24     used for both primary umbrella policies and
25     excess umbrella policies?

Page 258

1
2      A.   Yes, if they were umbrella policies.
3      Q.   Okay.
4      A.   Meaning that they provided not only
5      extensive coverage -- you're shaking your
6      head as if you --
7      Q.   No, go ahead.  I don't mean to cut
8      you off.
9      A.   Not only that they provided extended
10     limits on top of the underlying policies, but
11     they also provided terms and conditions that
12     were broader than the underlying policies,
13     which is the definition of an umbrella
14     policy.
15     Q.   And then the question was put to you
16     that, "It's not your testimony, sitting here
17     today, that these are the only two policy
18     types that were ever used with an RDU
19     prefix?"
20          And your answer was, "No, it is
21     not."
22          And then two questions down, "There
23     may be others; you just don't know?"
24          Answer, "Right."
25          So the exemplar policy that was

Page 259

1
2      attached as an exhibit to your report in the
3      Troy Belting matter, how do you know that
4      this exemplar policy represents the same type
5      of policy that Continental had issued to Troy
6      Belting?
7      A.   Well, I think you misinterpreted
8      something out of the Montello testimony.
9      What it says is, "Is it your testimony,
10     sitting here today, that these are the only
11     two policy types that were ever issued with
12     an RDU prefix?"
13          And I told you awhile ago that there
14     were other companies that used the RDU
15     prefix.  So the answer is that -- no, but
16     it doesn't mean that that's not the case as
17     far as it pertains to Continental.
18     Q.   Okay.  Now, on page 68 of your
19     testimony, at line 20 --
20     A.   Right.
21     Q.   -- you say, "The only thing I can
22     tell you is that I've seen a lot of RDU
23     policies, and I can tell you that some of
24     them are umbrella forms, like Exhibit-E, and
25     some of them are umbrella forms, like

Page 260

1
2      Exhibit-D."
3      A.   Right.
4      Q.   So looking at your report in
5      Montello at the Exhibits-D and E --
6      A.   I don't have that.  Do I have those
7      exhibits?
8      Q.   I believe so.  It's been marked as
9      Exhibit-2.
10     A.   I guess I do have those.
11     Q.   Yeah.
12          MR. KOTULA:  Yes, once again, I
13     thought ahead.
14     BY-MS.YOUNG:
15     Q.   So looking at Exhibits-D and E in
16     the Montello report, there are two different
17     types of excess umbrella policies that both
18     use the RDU prefix?
19     A.   There was slight differences between
20     the two.  And this first -- I apologize for
21     the -- the quality of the copy in the first
22     one.
23          The earlier one, which was GO --
24     G40240A, and the second one was G40241A, and
25     if you notice that the cover letter that was



ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 261

1
2      provided to the State Board of Oklahoma said
3      that the, "Changes from the earlier edition
4      are in the nature of corrections and
5      editorial changes.  Those that might be of
6      interest to you are changes in the persons
7      insured section, the addition of the
8      automobile definition, and the addition of
9      watercraft business to automobile business
10     under Definitions."
11            So those changes were so minor and
12     had -- really not pertinent at all to -- to
13     coverages.  I've always taken the position
14     that the forms are exactly the same.  The
15     coverage is certainly the same.
16        Q.   So you don't really see much of a
17     difference than between what was Exhibit-D
18     and Exhibit-E?
19        A.   Well, the differences are listed in
20     this letter to the State Board of Insurance
21     in Oklahoma City.  And I don't really know
22     whether G40241-A was filed in New York, as I
23     told you a while ago.
24        Q.   Right.
25        A.   But the difference in coverages is

Page 262

1
2      nil as it pertains to particularly this case.
3        Q.   But do you know if any of those
4      iterations of that form were filed in New
5      York?
6        A.   I don't know.
7        Q.   Okay.  And even -- even with the
8      RDU prefix, does that tell you what the
9      specific language in terms of the policy are?
10       A.   Well --
11       Q.   Could -- go ahead.  Sorry.
12       A.   Yes, it does.
13       Q.   So every form -- every policy issued
14     using the RDU prefix would have the same
15     policy language, terms and conditions?
16       A.   Except in Oklahoma, you might have
17     the RDU apply to the 41 iteration of the
18     policy.
19       Q.   Right.  But if --
20       A.   If you compared the two, there's no
21     difference in the coverage that would be
22     provided to these -- these claims.
23       Q.   Okay.  So if you look at your
24     deposition testimony in Montello on page 99
25     -- it should be the last page of Exhibit-24.

Page 263

1
2        A.   Page 99?
3        Q.   Yes.
4        A.   Of my --
5             MR. BRENNAN:  The deposition?
6             MR. KOTULA:  Deposition exhibit,
7      sorry.
8      BY-MS.YOUNG:
9        Q.   Yeah, Exhibit-24 that I just gave
10     you.
11       A.   Sorry.  I thought you were talking
12     about the report.  All right.
13       Q.   Okay.  So at line 17, you testified
14     that, "Consistent use of the prefix RDU is
15     very helpful.  I didn't say that you could
16     use it to identify a particular policy
17     wording."
18            And then on -- further down on line
19     22, you say, "You can't use RDU to identify
20     a particular policy wording.  What you can
21     do is use it to see that the policy is not
22     an RDX prefix policy."
23            So as you sit here today, do you
24     still contend that the RDU prefix would
25     provide you with sufficient information to

Page 264

1
2      know the terms of the specific policy?
3        A.   Yes, I do.  I don't know exactly
4      what the context of this is, but, yes, I do
5      contend that.
6        Q.   The context of your testimony?
7        A.   Of the Montello.
8        Q.   In Montello?
9        A.   Yeah.
10       Q.   Well, I'll represent to you that it
11     involved a missing --
12       A.   Oh, no, I'm sorry, I understand all
13     that.  I'm just -- I'm just saying that --
14     that notwithstanding that, the fact is you
15     can use the term "RDU" to determine -- to
16     determine -- the prefix to determine what
17     kind of policy it was.
18       Q.   What kind of policy, but not the
19     actual specific policy language of the policy
20     that is eventually issued to the insured?
21       A.   No, I think you can use it to do
22     that as well.
23       Q.   Okay.  But you wouldn't know whether
24     that policy also was issued with any
25     endorsements, correct?



TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 265

2    A.   That's right.
3    Q.   Okay.  So even if an RDU policy had
4  been issued and it contained the exact same
5  policy language as any other RDU policy
6  issued by Continental, you still wouldn't
7  know whether or not endorsements had been
8  attached that would have either limited or,
9  perhaps, expanded coverage?
10    A.   If you didn't have those
11  endorsements, that's right.  Or if you didn't
12  have a list of the endorsements.
13    Q.   Right.  So in this case, if you
14  don't have the actual policy, you wouldn't
15  know that?
16    A.   Correct.
17    Q.   Okay.
18        MS. YOUNG:  I think I'm done.  I
19  don't think I have anything further.
20        MR. KOTULA:  Anyone on the phone
21  have any questions?
22        MR. LEASURE:  None from Hartford.
23        MR. BEER:  None from us.
24        MR. BRENNAN:  That's it.  I have no
25  questions.

Page 266

2        MR. KOTULA:  All right.  Folks,
3  we're done.  We're going to hang up now.
4        (Whereupon, the deposition of ROBERT
5  NEAL HUGHES concluded at 4:49 p.m.)

Page 267

1
2              UNITED STATES DISTRICT COURT
3              NORTHERN DISTRICT OF NEW YORK
4
5  PACIFIC EMPLOYERS INSURANCE COMPANY,
6        Plaintiff,
7
8  -against-   Civil Action No.   1:11-CV-0912
9
10  TROY BELTING & SUPPLY COMPANY,
11  THE HARTFORD INSURANCE COMPANY
12  and ABC COMPANIES 1 THROUGH 20
13        Defendants.
14  _____
15  TROY BELTING & SUPPLY COMPANY,
16        Third-Party Plaintiff,
17
18  -against-
19
20  UNIGARD INSURANCE COMPANY,
21  QBE AMERICAS, INC., THE TRAVELERS COMPANIES,
22  INC., CONTINENTAL CASUALTY COMPANY, CNA
23  FINANCIAL CORPORATION, FIREMAN'S FUND INSURANCE
24  COMPANY, THE NORTHRIVER INSURANCE COMPANY,
25  CRUM & FORSTER HOLDINGS CORP., LIBERTY MUTUAL

Page 268

2  GROUP, INC., HARLEYSVILLE GROUP, INC.,
3  HARLEYSVILLE INSURANCE COMPANY, HARLEYSVILLE
4  INSURANCE COMPANY OF NEW YORK, and BERKSHIRE
5  MUTUAL INSURANCE GROUP,
6        Third-Party Defendants.
7
8              CERTIFICATE
9        DEPOSITION OF ROBERT NEAL HUGHES
10              JANUARY 6, 2016
11
12        I, CHRISTY R. SIEVERT, CSR, RPR, in
13  and for the State of Texas, hereby certify
14  to the following:
15        That the witness, ROBERT NEAL HUGHES,
16  was duly sworn by the officer and that the
17  transcript of the oral deposition is a true
18  record of the testimony given by the witness;
19        I further certify that the signature
20  of the deponent was requested by the deponent
21  or a party and is to be returned within 30
22  days from date of receipt of the transcript.
23  If returned, the attached Changes and
24  Signature Page contains any changes and the
25  reasons therefor;


ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

Page 269

1
2       I further certify that I am neither
3   counsel for, related to, nor employed by any
4   of the parties or attorneys in the action in
5   which this proceeding was taken, and further
6   that I am not financially or otherwise
7   interested in the outcome of the action.
8       Subscribed and sworn to on this the
9   18th day of January, 2016.
10
11
12
13           CHRISTY R. SIEVERT
14           CSR, RPR
15           Texas CSR 8172
16           Expiration Date:  12/31/2016
17
18
19
20
21
22
23
24
25

Page 270

1
2              CAPTION
3       The Deposition of ROBERT NEAL HUGHES,
4   taken in the matter, on the date, and at the
5   time and place set out on the title page
6   hereof.
7       It was requested that the Deposition
8   be taken by the reporter and that same be
9   reduced to typewritten form.
10      It was agreed by and between counsel
11  and the parties that the Deponent will read
12  and sign the transcript of said Deposition.
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23
24
25

Page 271

1
2              CERTIFICATE
3   STATE OF                    :
4   COUNTY/CITY OF              :
5       Before me, this day, personally
6   appeared, ROBERT NEAL HUGHES, who, being duly
7   sworn, states that the foregoing transcript
8   of his/her Deposition, taken in the matter,
9   on the date, and at the time and place set
10  out on the title page hereof, constitutes a
11  true and accurate transcript of said
12  Deposition.
13
14              ROBERT NEAL HUGHES
15  .
16      SUBSCRIBED and SWORN to before me this
17       day of            , 2015 in the
18  jurisdiction aforesaid.
19
20  My Commission Expires   Notary Public
21  .
22  .
23  .
24
25

Page 272

1
2  ..            ERRATA SHEET
3  .
4   RE:  Accurate Court Reporting, Inc.
5   Case Caption:  PACIFIC EMPLOYERS INSURANCE CO.
6   VS.  TROY BELTING & SUPPLY COMPANY, ET AL.
7  .
8   DEPONENT:  ROBERT NEAL HUGHES
9   DATE:  January 6, 2016
10
11  To the Reporter:
12  I have read the entire transcript of my
13  Deposition taken in the captioned matter or the
14  same has been read to me.  I request that the
15  following changes be entered upon the record for
16  the reasons indicated.  I have signed my name
17  to the Errata Sheet and the appropriate
18  Certificate and authorize you to attach both to
19  the original transcript.
20  .
21  _____
22  _____
23  _____
24  _____
25  _____



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

TELEPHONE DEPOSITION OF ROBERT NEAL HUGHES, JANAURY 6, 2016

```
                                            Page 273
 1
 2    _____
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22
23    SIGNATURE:_____DATE:_____
24              ROBERT NEAL HUGHES
25
```



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com