# EXHIBIT 4

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF NEW YORK
 2
     PACIFIC EMPLOYMENT INSURANCE  )
 3   COMPANY,                      )
                 Plaintiff,        )
 4                                 )
                                   )
 5   -against-                     )NO. 1:11-CV-0912(TJM/RFT)
                                   )
 6                                 )
     TROY BELTING & SUPPLY COMPANY,)
 7   THE HARTFORD INSURANCE COMPANY)
     AND ABC COMPANIES 1 THROUGH   )
 8   20,                           )
                                   )
 9           Defendants.           )
     _____
10
     TROY BELTING & SUPPLY COMPANY,)
11                                 )
         Third-Party Plaintiff,    )
12                                 )
                                   )
13   -against-                     )
                                   )
14   UNIGARD INSURANCE COMPANY,    )
     QBE AMERICAS, INC., THE       )
15   TRAVELERS COMPANIES, INC.,    )
     CNA FINANCIAL CORPORATION,    )
16   FIREMAN'S FUND INSURANCE      )
     COMPANY, THE NORTH RIVER      )
17   INSURANCE COMPANY, CRUM &     )
     FORSTER HOLDINGS CORP.,       )
18   LIBERTY MUTUAL GROUP, INC.,   )
     HARLEYSVILLE GROUP, INC.,     )
19   HARLEYSVILLE INSURANCE        )
     COMPANY, HARLEYSVILLE         )
20   INSURANCE COMPANY OF NEW YORK,)
     BERKSHIRE MUTUAL INSURANCE    )
21   GROUP,                        )
                                   )
22       Third-Party Defendants.   )
23       -------------------------------------------
                    ORAL DEPOSITION OF
24               JAMES E. O'MALLEY, JR.
                    JANUARY 26, 2016
25       -------------------------------------------
```

## Page 2

1       ORAL DEPOSITION OF JAMES E. O'MALLEY, JR.,

2   produced as a witness at the instance of the DEFENDANTS,

3   UNIGARD INSURANCE COMPANY AND QBE AMERICAS, INC., and duly

4   sworn, was taken in the above-styled and numbered cause on

5   the 26th day of January, 2016, from 10:15 a.m. to

6   4:15 p.m., before Kathryn R. Baker, CSR, RPR, in and for

7   the State of Texas, reported by machine shorthand, at the

8   offices of Hyatt Regency North Dallas, 701 East Campbell

9   Road, in the City of Richardson, State of Texas, pursuant

10  to the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 3

1           A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

    Mr. Brian Fox

4   SIEGAL & PARK LAW FIRM

    533 Fellowship Road

5   Suite 120

    Mt. Laurel, New Jersey 08054

6   856-380-8900

    brian.fox@mclolaw.com

7

8   FOR THE DEFENDANT/THIRD-PARTY PLAINTIFF, TROY BELTING &
    SUPPLY COMPANY AND THE WITNESS:

9   Mr. Timothy S. Brennan

    PHELAN, PHELAN & DANEK, LLP

10  300 Great Oaks Boulevard

    Suite 315

11  Albany, New York 12203

    518-640-6900

12  tim@ppdlawfirm.com

13

    FOR THE DEFENDANTS, UNIGARD INSURANCE COMPANY AND QBE

14  AMERICAS, INC.:

    Mr. Michael A. Kotula

15  RIVKIN RADLER, LLP

    926 RXR Plaza

16  Uniondale, New York 11556

    516-357-3000

17  michael.kotula@rivkin.com

18

    FOR THE DEFENDANTS, HARTFORD ACCIDENT & INDEMNITY COMPANY,

19  HARTFORD CASUALTY INSURANCE COMPANY AND HARTFORD INSURANCE
    COMPANY:

20  Mr. Charles E. Leasure, III

    SHIPMAN & GOODWIN, LLP

21  1875 K. Street NW

    Suite 600

22  Washington, D.C. 20006

    202-469-7750

23  cleasure@goodwin.com

24

25

## Page 4

1   FOR THE THIRD-PARTY DEFENDANTS, THE NORTH RIVER INSURANCE
    COMPANY AND CRUM & FORSTER HOLDING CORP.:

2   Ms. Carol Crummey

    O'CONNOR, O'CONNOR LAW FIRM

3   20 Corporate Woods Boulevard

    Albany, New York 12211

4   518-465-0400

    crummey@oobf.com

5   (Appearing telephonically)

6

    FOR THE THIRD-PARTY DEFENDANTS, HARLEYSVILLE GROUP, INC.,

7   HARLEYSVILLE INSURANCE COMPANY, HARLEYSVILLE INSURANCE
    COMPANY OF NEW YORK, AND BERKSHIRE MUTUAL INSURANCE GROUP:

8   Ms. Margriet A. Schaberg

    RIKER, DANZIG LAW FIRM

9   Headquarters Plaza

    One Speedwell Avenue

10  Post Office Box 1981

    Morristown, New Jersey 07962-1981

11  973-538-0800

    mschaberg@riker.com

12  (Appearing telephonically)

13

    FOR THE THIRD-PARTY DEFENDANT, CONTINENTAL CASUALTY

14  COMPANY:

    Ms. Joanna L. Young

15  CARROLL, MCNULTY LAW FIRM

    120 Mountain View Boulevard

16  Basking Ridge, New Jersey 07920

    908-848-6300

17  jyoung@cmk.com

    (Appearing telephonically)

18

19

20

21

22

23

24

25

## Page 5

1               INDEX

2   Appearances. . . . . . . . .          3

3   Stipulations . . . . . . . .          8

4   JAMES E. O'MALLEY, JR.

5      Examination by Mr. Kotula . . .       8

6      Examination by Mr. Leasure . . .    164

7      Examination by Mr. Fox . . .        209

8   Signature and Changes. . . . .        238

9   Reporter's Certification . . .        240

10

11          EXHIBITS

12  NO./DESCRIPTION                    PAGE

13  Exhibit 1........................      8

       Unigard Insurance Company's and QBE

14     Americas, Inc.'s Notice to Take Deposition

       of James E. O'Malley

15  Exhibit 2........................     37

       Expert Report

16  Exhibit 3........................     54

       Amendment of Declaration Items 4 & 5

17  Exhibit 4........................     57

       Comprehensive General Liability Policy for

18     Jamestown Mutual Insurance Company

    Exhibit 5........................     93

19     Deposition Excerpt of Michael Moran, Taken

       January 7, 2015

20  Exhibit 6........................     97

       November 16, 1977, Letter from Nicoll and

21     MacChesney, Inc., to Troy Belting & Supply
       Company

22  Exhibit 7........................     98

       September 15, 1978, Letter from Nicoll and

23     MacChesney, Inc., to Troy Belting & Supply
       Company

24  Exhibit 8........................    100

       January 3, 1978, Insurance Company of North

25     America Memo

2 (Pages 2 - 5)

Page 6

INDEX
(CONTINUED)
EXHIBITS

NO./DESCRIPTION                                    PAGE

Exhibit 9..................................... 102
6    Deposition Excerpt of Peter Ranalli, Taken
     June 23, 2015
7  Exhibit 10.................................. 110
     August 11, 1978, Letter from Unigard to
8    James L. Dixon
   Exhibit 11.................................. 111
9    August 21, 1978, Letter from Unigard to
     Mr. William R. Field
10 Exhibit 12.................................. 113
     Deposition Excerpt of William Field,
11   June 30, 2015
   Exhibit 13.................................. 120
12   Deposition Excerpt of Peter Ranalli, Taken
     June 23, 2015
13 Exhibit 14.................................. 123
     Rose M. Pennell vs. Johns Manville Sales Corp,
14   et al., Notice
   Exhibit 15.................................. 126
15   Appendix Five, United States Fidelity and
     Guaranty Company, et al, vs. SOCO WEST, Inc.,
16   et al.
   Exhibit 16.................................. 139
17   Trail Testimony Excerpt of Mr. O'Malley
   Exhibit 17.................................. 145
18   January 18, 1977, Minutes of Directors
     Meeting
19 Exhibit 18.................................. 149
     Affidavit of James E. O'Malley in Support of
20   Plaintiff's Argument on the Other Insurance
     Clause and in Opposition to Gluf Underwriters
21   Insurance Company's Motion for Rule 11
     Sanctions
22 Exhibit 19.................................. 151
     1194 WL 16067272 (C.A.5)(Appellate Brief)
23 Exhibit 20.................................. 180
     Commercial General Liability Coverage and
24   Declaration
25

Page 7

1    REQUESTED DOCUMENTS/INFORMATION
2              (NONE)
3
4         CERTIFIED QUESTIONS
5              (NONE)

Page 8

PROCEEDINGS

1         P R O C E E D I N G S
2         THE REPORTER:  Any agreements?
3         MR. BRENNAN:  Usual stipulations.  We'd
4  like to review and sign.
5         JAMES E. O'MALLEY, JR.,
6  having been first duly sworn, testified as follows:
7              EXAMINATION
8  BY MR. KOTULA:
9    Q.  Good morning, Mr. O'Malley.
10   A.  Morning.
11   Q.  I represent the Defendants Unigard Insurance
12 Company and QBE Americas, Inc., in this case brought by
13 Troy Belting.
14       Would you be kind enough to state your full
15 name for the record for us.
16   A.  James Edward O'Malley, Junior.
17       MR. KOTULA:  Let's mark that as O'Malley
18 Exhibit 1.
19       (Exhibit 1 marked.)
20   Q.  (BY MR. KOTULA)  Sir, we placed before you what
21 the court reporter has kindly marked as O'Malley Exhibit
22 1.
23       MR. KOTULA:  For the record, it is Unigard
24 Insurance Company and QBE Americas' notice to take
25 deposition of James O'Malley.  It's dated December 4, 2005

Page 9

1  (sic).
2    Q.  (BY MR. KOTULA)  Have you ever seen this
3  document before?
4    A.  I think so.  It's been a while.
5    Q.  Are you appearing today to give deposition
6  testimony pursuant to this deposition notice?
7    A.  Yes.
8    Q.  You were asked to produce, at the time of your
9  deposition, all books, records, and papers in your
10 custody, possession, or control that may be relevant to
11 the issues discussed in your expert report and any
12 materials you reviewed in preparing your report or in
13 forming your opinions.
14       Do you understand that?
15   A.  Yes.
16   Q.  And have you brought something for us here
17 today?
18       MR. BRENNAN:  It's on disk.
19   A.  Yes.
20       MR. BRENNAN:  For the record, he has it on
21 disk; it's all digital.  The list is the list that's in
22 his report.
23       MR. KOTULA:  Is that something that I could
24 have?
25       MR. BRENNAN:  Can he have that, or do we

3 (Pages 6 - 9)

1 need to make a copy?

2       THE WITNESS:  I guess he can have it.  I

3 don't know.  It's got the --

4       MR. BRENNAN:  Can I make a copy and mail it

5 out tomorrow morning?  Fair enough?

6       MR. KOTULA:  Yep.

7   Q.  (BY MR. KOTULA)  Are your billing statements on

8 that disk, sir?

9   A.  No.

10   Q.  All right.  Are your billing -- let me start --

11 by whom are you currently employed?

12   A.  I'm an independent contractor, and I'm

13 associated with Robert Hughes Associates in Richardson.

14   Q.  And Richardson is here in Texas, right?

15   A.  Yes.  You're in Richardson right now.

16   Q.  Thank you.  And what's the nature of your

17 relationship or association with Robert Hughes Associates?

18   A.  I'm an associate there.  I just office there and

19 do work out of the Robert Hughes Associates offices.

20   Q.  And how long have you worked with Robert Hughes?

21   A.  About 25 years now.  I think it was 1991 or

22 something like that.

23   Q.  So you've been associated with Robert Hughes

24 since about 1991?

25   A.  Yes.

1   Q.  Do you know, are your billing statements

2 combined with Mr. Hughes' billing statements that go to

3 Troy Belting or its counsel?

4   A.  You know, I don't know, because I don't really

5 see the billing statements.  I give them, you know, a

6 record of what I've done, and then they produce it and

7 send it on.  I suspect that it might be, but I don't know.

8   Q.  You've never seen any of your billing

9 statements?

10   A.  Yeah, I have seen some of them, but I haven't

11 seen -- I haven't seen any in this particular case.

12   Q.  You haven't seen any in this matter --

13   A.  No.

14   Q.  -- or this employment by Troy Belting?

15   A.  No.

16   Q.  Do you understand that Mr. Robert Hughes has

17 also offered expert opinions in this matter on behalf of

18 Troy Belting?

19   A.  Yes.

20   Q.  Have you read his report?

21   A.  No.

22   Q.  Have you read his deposition transcript in this

23 matter?

24   A.  No.

25   Q.  Is there a division of labor between you and

1 Mr. Hughes as to what Mr. Hughes was to opine on and what

2 you were to opine on?

3   A.  Yes.

4   Q.  What's that division?

5   A.  Well, I was to opine on claims handling, and I

6 don't know what -- I don't really know what Bob Hughes'

7 role is.  I haven't discussed it with him at all.

8   Q.  You haven't?

9   A.  No.  I mean, I knew he was doing it, but I did

10 not go into any detail at all.

11   Q.  In connection with your offering of opinions on

12 claims handling, that's basically the nature of your

13 assignment here?

14   A.  Yes.

15   Q.  In that regard, did you review all of the

16 evidence of alleged policies that Troy Belting alleges

17 were issued by Jamestown Mutual Insurance Company or

18 Unigard Insurance Company?

19       MR. BRENNAN:  Objection.

20   A.  I did not see any of those policies.

21   Q.  (BY MR. KOTULA)  Right.  So let me -- that

22 wasn't quite the question I was asking.

23       But let me ask you:  To your knowledge,

24 does Troy Belting have copies of any of its insurance

25 policies that were issued to it prior to 1974?

1       MR. BRENNAN:  Objection.

2   A.  Not that I'm aware of, no.

3   Q.  (BY MR. KOTULA)  So you haven't reviewed any

4 insurance policies that were issued to Troy Belting by

5 anyone prior to 1974; is that right?

6   A.  That's right.

7   Q.  And can we agree that an insurance policy is

8 primary evidence of the policy itself?

9       MR. BRENNAN:  Objection.

10   A.  Well, that's primary evidence, yes.  There's

11 secondary evidence as well, of course.

12   Q.  (BY MR. KOTULA)  Right.  And I'll get to that.

13   A.  Yeah.

14   Q.  But the primary evidence of the policy is the

15 policy itself, correct?

16   A.  Yes.

17   Q.  And is the policy itself the best evidence of

18 what the agreements of the insurance company were?

19       MR. BRENNAN:  Objection; asked and

20 answered.

21   A.  Well, obviously, it is the evidence.  But, I

22 mean, it can be reconstructed through other secondary

23 evidence.

24   Q.  (BY MR. KOTULA)  Right.  But is it the best

25 evidence?

4 (Pages 10 - 13)

Page 14

1          MR. BRENNAN:  Objection.
2    A.  Of course.
3    Q.  (BY MR. KOTULA)  So Troy doesn't have any of
4  the policies prior to 1974, as far as you know, right?
5          MR. BRENNAN:  Objection.
6    A.  As far as I know, no.
7    Q.  (BY MR. KOTULA)  Now, have you testified as a
8  lost policy expert before?
9    A.  No, I don't think I've ever had any testimony
10  about that.  And, you know, I've been in over 300 cases,
11  and I -- you know, it's possible that there was some
12  somewhere, and I had some testimony about it, but I don't
13  recall any.
14    Q.  So you don't recall ever having been retained to
15  serve as a lost policy expert?
16    A.  No.
17    Q.  And have you been retained as a lost policy
18  expert in this case?
19          MR. BRENNAN:  Object to form.
20    A.  No.
21    Q.  (BY MR. KOTULA)  Okay.  Have you been asked to
22  opine about what secondary evidence there is of alleged
23  policies that may have been issued to Troy Belting?
24          MR. BRENNAN:  Objection.  You have his
25  report.

Page 15

1    A.  Well, I've looked at the secondary evidence and,
2  you know, what was involved as far as correspondence and
3  that sort of thing.
4    Q.  (BY MR. KOTULA)  Okay.  Can you broadly
5  describe for us the secondary evidence that you looked at?
6    A.  Of course.  Are you talking about Unigard; is
7  that who you're referring to?
8    Q.  About any missing policies or alleged policies
9  that Troy alleges were issued to it prior to 1974.
10          MR. BRENNAN:  Objection.
11    A.  The secondary evidence that I saw was, of
12  course, correspondence between the agent and Unigard and
13  Pacific Employers, basically.
14          MR. KOTULA:  Could you read that back?
15          (The requested portion was read.)
16    A.  There were also -- I'm sorry.  There's also some
17  archeology people that have put together a chart that
18  shows Jamestown and Unigard.
19    Q.  (BY MR. KOTULA)  And you looked at that?
20    A.  Yes.  I looked at the chart, yes.
21    Q.  Did you look at ledger entries?
22    A.  Yes.
23    Q.  Did you look at expense account documents?
24    A.  I don't recall expense account documents.  There
25  may have been.  I looked at hundreds of documents in this

Page 16

1  case.  So, I mean, I don't know that I can describe each
2  particular one.
3    Q.  Are you offering opinions in this matter on the
4  basis of secondary evidence apart from claims
5  correspondence?
6          MR. BRENNAN:  Object to the form.
7    A.  Well, I mean, that's basically what I looked at
8  was, you know, the claims correspondence and the
9  correspondence from the agency and, you know, saying that
10  they had -- in particular, Unigard and Jamestown, they had
11  coverage prior to that period of time, '74.
12    Q.  (BY MR. KOTULA)  So what I'm trying to get at
13  is:  Are you going to rely on secondary evidence besides
14  this claims correspondence from either a broker or an
15  agent and Pacific Employers and Unigard?
16          MR. BRENNAN:  Object to the form.  He's got
17  a list of the documents he's considered, and it's been
18  provided to counsel.  It's not a memory test.
19    Q.  (BY MR. KOTULA)  You can answer.
20    A.  Yeah.  Everything that I looked at, ledgers, you
21  know, and the chart and everything, that's all part of my
22  opinion.
23    Q.  You're relying on all of that?
24    A.  All of that, yes.
25    Q.  Are you aware of any evidence in this case that

Page 17

1  documents that Jamestown Mutual Insurance Company issued a
2  comprehensive general liability policy to Troy Belting?
3    A.  Well, only by the secondary evidence.  I see
4  that they were interested in the asbestos claims in the
5  Pennell file.  And, obviously, they would have had some
6  kind of a liability policy, and they would have been
7  interested in getting the pleadings, getting the medical.
8    Q.  Aside from the correspondence regarding the
9  Pennell file, are you aware of any evidence that Jamestown
10  Mutual issued a comprehensive general liability policy to
11  Troy Belting at any time?
12          MR. BRENNAN:  Object to form.
13    A.  That's all I have is the secondary evidence.
14    Q.  (BY MR. KOTULA)  And strictly the claims
15  correspondence regarding the Pennell claim; is that right?
16          MR. BRENNAN:  Objection as to form.
17    A.  That's right.  And, also, I think there's a --
18  there was a claim that was -- I can't remember the lady's
19  name.  Her hair was caught in a pulley or something like
20  that.
21    Q.  (BY MR. KOTULA)  Is that the Dario case?
22    A.  I believe that was the name of it.
23    Q.  So aside from the Pennell and Dario claims
24  correspondence, are you aware of any evidence that
25  Jamestown Mutual Insurance Company issued a comprehensive

5 (Pages 14 - 17)

Page 18

1 general liability policy to Troy Belting?

2    A.  No, that's -- that's --

3        MR. BRENNAN: Objection, form.

4    A.  My opinion is formed by the secondary evidence

5 that I saw in the claims files and correspondence.

6    Q.  (BY MR. KOTULA)  To your knowledge, is there

7 any evidence of any policy number of any alleged Jamestown

8 Mutual Insurance Company policy issued to Troy Belting?

9    A.  I think there was an indication of a policy

10 number, but I think people couldn't trace it down.  I

11 can't recall whether it was Jamestown or Unigard's.

12    Q.  Do you know, does Troy Belting allege that

13 Jamestown Mutual issued policies to Troy Belting, or does

14 it allege that Unigard issued policies to Troy Belting?

15        MR. BRENNAN: Objection.

16    A.  Well, I think that it was initially Jamestown.

17 At what point, I don't know, that Unigard came on.  I

18 think that they apparently are in that area somewhere.

19 I'm not aware of the exact policy period.  But it's my

20 understanding that Unigard bought Jamestown and took over

21 all of their liabilities.

22    Q.  (BY MR. KOTULA)  What's your understanding

23 about what Troy Belting alleges who was the issuing

24 company of these alleged policies?

25    A.  My understanding, it was Jamestown.

Page 19

1    Q.  So it's Troy Belting's allegation that Jamestown

2 Mutual, and not Unigard Insurance Company, issued policies

3 that are alleged in this case?

4        MR. BRENNAN: Objection.

5    A.  What I'm saying is that there may have been --

6 at the tail end of that period, there may have been a

7 Unigard policy itself.  I don't recall it specifically.

8    Q.  (BY MR. KOTULA)  Are you aware of any evidence

9 that Unigard itself issued a policy; not as Jamestown, but

10 as Unigard?

11    A.  No.

12        MR. BRENNAN: Objection, form.

13    A.  Other than what the secondary evidence might

14 show as far as who was on it at that time.  I think there

15 was a period of time that, I think, they were on it.  I

16 can't recall specifically, though, what policy period.

17    Q.  (BY MR. KOTULA)  Is there any secondary

18 evidence that Unigard Insurance Company itself, and not as

19 a successor to Jamestown Mutual Insurance Company, issued

20 any policy to Troy Belting?

21        MR. BRENNAN: Objection.

22    A.  Well, the only thing is, is they were

23 corresponding back and forth to Pacific Employers through

24 Unigard, and Unigard corresponds.  So I have to assume

25 that either they were taking it to Jamestown or they had

Page 20

1 one on their own.  So, I mean, that's all I can go by.

2    Q.  (BY MR. KOTULA)  And you don't have any other

3 information about that, right?

4    A.  No.

5    Q.  So if Unigard was a successor to Jamestown

6 Mutual, then Unigard would be corresponding with respect

7 to claims under alleged Jamestown Mutual policies,

8 correct?

9        MR. BRENNAN: Objection.

10    A.  Yes.

11    Q.  (BY MR. KOTULA)  And that wouldn't indicate

12 that Unigard Insurance Company itself issued any policy to

13 Troy Belting, right?

14        MR. BRENNAN: Objection.

15    A.  No, not specifically.  My only recollection is

16 there's something about a policy period in there that

17 Unigard was on.  I might be mistaken.  It doesn't matter

18 if they take over Jamestown; it's the same thing.  So

19 whether they had a policy or didn't have a policy,

20 Jamestown and Unigard are the same.

21    Q.  (BY MR. KOTULA)  Well, since Troy Belting is

22 alleging that it's entitled to coverage under 25 years of

23 missing policies that it doesn't have to show in support

24 of its claim, I think we need to be precise as to names of

25 companies that are alleged to have issued policies and

Page 21

1 names of companies that are associated with secondary

2 evidence.

3       So I understand your statement that, from a

4 legal standpoint, Unigard might be a successor to any

5 liabilities of Jamestown Mutual.

6    A.  Yeah.

7    Q.  But I would ask that we differentiate and be

8 specific about which company specifically was associated

9 with secondary evidence.

10    A.  Yeah.

11        MR. BRENNAN: Objection.

12    A.  The only thing I can tell you is that I thought

13 I saw something either on the archeology printout or

14 somewhere that Unigard was in a policy period.  I might be

15 mistaken; I don't know.

16    Q.  (BY MR. KOTULA)  And that's the only thing you

17 can think of is --

18    A.  That's the only thing I can think of right now,

19 yes.

20    Q.  -- is an Insurance Archaeology Group document?

21    A.  Yeah.

22    Q.  Is that right?

23    A.  Yes.

24        MR. BRENNAN: Objection.

25    Q.  (BY MR. KOTULA)  Are you aware of any secondary

6 (Pages 18 - 21)

Page 22

1 evidence that exists that indicates what policy limits
2 were in place from 1949 to 1974 under alleged missing
3 policies?
4         MR. BRENNAN:  Objection; beyond the scope.
5    A.  No, I do not.
6    Q.  (BY MR. KOTULA)  And are you aware of any
7 secondary evidence that relates to alleged policy periods
8 of alleged missing policies from 1949 to 1974?
9         MR. BRENNAN:  Objection.
10   A.  Only by the Archaeology printout on the chart
11 that there were different policy periods, is the only
12 thing I recall.
13   Q.  (BY MR. KOTULA)  And as I recall, that document
14 had asterisks next to all of the policy periods for
15 Jamestown Mutual, and said that those were assumed dates;
16 did it not?
17        MR. BRENNAN:  Objection.
18   A.  Yes, it did.
19   Q.  (BY MR. KOTULA)  So that document itself
20 pointed out that that was a fiction, correct?
21        MR. BRENNAN:  Objection.
22   A.  Pointed out that it was a fiction?
23   Q.  (BY MR. KOTULA)  Yes, sir.
24   A.  No.  I don't think it's a fiction, no.
25   Q.  An assumed date means they don't have evidence

Page 23

1 of it; does it not?
2         MR. BRENNAN:  Objection.
3    A.  May not have hard evidence of it, but they had
4 some evidence of it or they wouldn't have had it down
5 there.
6    Q.  (BY MR. KOTULA)  Do you know what evidence they
7 had?
8         MR. BRENNAN:  Objection.
9    A.  I didn't go through all the Archaeology files.
10 I mean, it was that thick (indicating).
11   Q.  (BY MR. KOTULA)  Didn't the document say what
12 the source evidence was in a separate column?  Didn't the
13 insurance Archaeology document you're thinking of source
14 it?
15   A.  I think it did, yes.
16   Q.  Okay.  So whatever source documents were
17 indicated, that's your understanding of what the basis for
18 that is, right?
19   A.  Yes.
20   Q.  And you're not aware of anything besides that?
21        MR. BRENNAN:  Objection.
22   A.  No.
23   Q.  (BY MR. KOTULA)  Can you explain the
24 circumstances of how you were retained as an expert by
25 Troy Belting & Supply Company in this case?

Page 24

1    A.  Well, I was -- I suspect -- I think Bob Hughes
2 recommended me to Tim Brennan's firm.  And they called me
3 and asked me if I would be interested in looking at it.  I
4 think that's how, initially, I was involved in it.
5    Q.  Did you enter into a separate signed agreement with
6 Troy Belting or its attorneys?
7    A.  I don't enter into signed agreements; that's
8 Robert Hughes Associates that does that.  I'm not sure
9 whether they did a separate one or not.
10   Q.  Is it your belief that there is a written
11 agreement regarding your retention as an expert by Troy
12 Belting or its attorneys in this case?
13   A.  I suspect there is.  I mean, there's some
14 agreement.  I don't know if it's written or not.
15   Q.  Can you tell us, once you were recommended to
16 serve as an expert on behalf of Troy Belting, what, if
17 anything, you did next?
18   A.  Well, they sent me some documents, and I
19 reviewed depositions and documents that were sent to me.
20   Q.  Who sent you documents?
21   A.  Tim Brennan's firm.
22   Q.  And Tim Brennan is representing you here today
23 as counsel, correct?
24   A.  Yes.
25   Q.  And he represents Troy Belting, to your

Page 25

1 understanding, correct?
2    A.  Yes.
3    Q.  So Tim Brennan and his firm sent you documents
4 to review in connection with your retention as an expert?
5    A.  Yes.
6    Q.  And what did he send you?
7    A.  Several depositions in the Pennell case and some
8 documents on the Archaeology people.
9    Q.  That's Insurance Archaeology Group?
10   A.  Yes.
11   Q.  And he sent you correspondence from the Pennell
12 case?
13   A.  Yeah, the Pennell case.
14   Q.  Do you recall which depositions you reviewed?
15   A.  I can't remember all of them, but Ranalli and
16 Fields and Barcum and several others, but I don't have
17 them on the tip of my tongue.
18   Q.  Did you personally review those depositions?
19   A.  Pardon me?
20   Q.  Did you personally review the depositions?
21   A.  Oh, yeah.
22   Q.  And the exhibits?
23   A.  Oh, yes.
24   Q.  Did you make any written product from your
25 review of those depositions?

7 (Pages 22 - 25)

Page 26

1    A.  Well, I made the report that I made.
2    Q.  Other than your expert report, did you make any
3 other written product?
4    A.  No.
5    Q.  Or notes?
6    A.  No.
7    Q.  Did you also review all the exhibits to the
8 depositions?
9    A.  Pardon me?
10    Q.  Did you review all the deposition exhibits as
11 well?
12    A.  Yes.
13    Q.  Did you meet with anyone to discuss your
14 retention?
15    A.  Visited with Tim over the phone, and that's
16 about all.
17    Q.  And when did you visit with Tim on the phone?
18    A.  Sometime after I had gotten the depositions; I'm
19 not quite sure when that was.  I left for Lima, Peru, in
20 the first -- right after -- just before Christmas, and I
21 had talked to him at that time, just before Christmas.
22    Q.  Just before Christmas of 2015?
23    A.  Right.
24    Q.  So sometime in December of 2015, you spoke with
25 Tim?

Page 27

1    A.  Yeah.
2    Q.  Did you speak with Tim in preparing your expert
3 report?
4    A.  No, not necessarily.  I mean, I talked to him
5 about what I was going to do, but I didn't -- what I was
6 going to say.
7    Q.  So you spoke with him --
8    A.  Yeah, I told him --
9    Q.  -- about what you were going to opine about --
10    A.  Yeah.
11    Q.  -- in your report --
12    A.  Right.
13    Q.  -- prior to issuing the report, correct?
14    A.  Yes.
15    Q.  And then this call you had with Tim in December
16 of 2015, was that in connection with preparing the report
17 or was that in connection with preparing for a deposition
18 in this case?
19    A.  No, I think the report was -- what was -- I
20 can't remember what the time -- it was September.  Yeah,
21 it was September.
22    Q.  So what was the purpose of the call in December
23 of 2015?
24    A.  Just to tell him -- actually, they had set the
25 deposition on the 7th of January, which I wasn't going to

Page 28

1 be here.  And I talked to him sometime in December to tell
2 him that I wasn't going to be here.  We basically talked
3 about the case and about my report and so forth.  And I
4 probably talked to him more than one time.
5    Q.  How long did you speak to him?
6    A.  I don't know.  15 minutes, maybe.  I don't
7 remember.
8    Q.  It was a brief call?
9    A.  Pardon me?
10    Q.  It was a brief call?
11    A.  Well, at that time, yes.  I'm not saying that
12 was the only time I've talked to him.  I mean, I talked to
13 him before the report and after he received the report and
14 that sort of thing, but briefly about what it was about
15 and that sort of thing.
16    Q.  And what, if anything, did you do to prepare for
17 your deposition today?
18    A.  I went back through all the depositions and the
19 exhibits, spoke with Tim some.
20    Q.  Did you meet with Tim?
21    A.  No.  Because of the -- we had decided to meet
22 yesterday, but because he couldn't get out of the airport,
23 we did it over the phone.
24    Q.  And how long did you speak with him over the
25 phone?

Page 29

1    A.  Well, one of our associates had passed away at
2 Robert Hughes Associates, and we had a funeral yesterday
3 as well.  So I talked to Tim about an hour in the morning,
4 something like that, and probably an hour-and-a-half or
5 something in the afternoon.
6    Q.  This was yesterday?
7    A.  Yes.
8    Q.  Sir, are you an attorney?
9    A.  No.
10    Q.  Did you go to law school?
11    A.  Yes.
12    Q.  For how long?
13    A.  One year.
14    Q.  Did you receive a law degree?
15    A.  No.
16    Q.  Why did you not complete law school?
17        MR. BRENNAN:  Objection.
18    A.  Well --
19        THE WITNESS:  Did you say something?
20        MR. BRENNAN:  No, go ahead.  I said
21 "objection."
22        Go ahead.
23    A.  Well, I had gotten married, and I really needed
24 a job, so I went to work for Northwestern Mutual Insurance
25 Company, who later became Unigard.  And I was married, and

8 (Pages 26 - 29)

1 we were having children.
2    Q. (BY MR. KOTULA)  So do I understand your
3 testimony correctly that you have never served as a lost
4 policy expert in your entire career?
5         MR. BRENNAN:  Objection.
6    A. I don't recall that.  I mean, as a -- it might
7 have been a side thing somewhere, but I never have done it
8 as primary.
9    Q. (BY MR. KOTULA)  Have you ever been an
10 underwriter?
11    A. I was in charge of the underwriting department,
12 but I was not a desk underwriter.
13    Q. And has a court ever recognized you as a lost
14 policy expert, to your knowledge?
15    A. Not that I -- no.
16    Q. Do you have an understanding about who has the
17 burden of proving a lost or missing policy?
18         MR. BRENNAN:  Objection.
19    A. Well, I think it's a team effort as to, you
20 know, who the carrier might be, the agent, and the
21 policyholder.
22    Q. (BY MR. KOTULA)  So, wait.  Who has the burden
23 of proving --
24    A. I think it's a team effort to find out how...
25    Q. And who's part of that team?

1    A. Well, you have the policyholder; you have the
2 agent; you have the insurance carrier.
3         MR. BRENNAN:  I think you guys are on a
4 different page, Mike.
5    Q. (BY MR. KOTULA)  So I'm not going to call a
6 party a policyholder, because that assumes the conclusion
7 of the dispute.  In other words, if there's a dispute over
8 whether a policy was issued to them, calling them a
9 policyholder assumes that there was, in fact, a policy.
10 So I'm going to refer to that entity as the party claiming
11 coverage.
12         Will you understand me when I say -- refer
13 to them as the party claiming coverage?
14    A. Yeah.  Or Troy Belting; whatever you want to
15 say.  I don't know.  Whatever.
16    Q. Let's refer to someone who's seeking coverage
17 under a lost or missing policy as the party seeking
18 coverage, okay?
19    A. Okay.
20    Q. Do you have an understanding that a party
21 seeking coverage under a lost or missing policy has the
22 burden of proving that policy?
23         MR. BRENNAN:  Objection.
24    A. Well, certainly, they are involved in it.
25 There's other people involved in it as well; the agency

1 and the carrier that they're alleging has the policy.
2    Q. (BY MR. KOTULA)  Is it your opinion that the
3 insurance agent of a party claiming coverage under a lost
4 or missing policy has the burden of proving the existence
5 and the terms of the lost or missing policy?
6         MR. BRENNAN:  Objection.
7    A. Well, he's one of the partners in the thing.  I
8 mean, he has -- obviously, he's got records.
9    Q. (BY MR. KOTULA)  And is it your testimony and
10 opinion that the alleged insurance company that issued the
11 lost or missing policy has the burden of proving the
12 existence and the terms of the missing policy?
13         MR. BRENNAN:  Objection.
14    A. They're one of the parties that needs to look at
15 their own records, certainly, when there's an allegation.
16    Q. (BY MR. KOTULA)  So is that a yes?
17         MR. BRENNAN:  Objection.
18    A. Yes.
19    Q. (BY MR. KOTULA)  So it's your belief that a
20 number of parties have the burden of proving the existence
21 and terms of a lost or missing insurance policy, and they
22 include the party seeking coverage, the insurance agent,
23 and the insurance company that allegedly issued the
24 policy?
25         MR. BRENNAN:  Object to the form.

1    A. Yeah.  I think it's a combination of those
2 people that need to look and see whether there is coverage
3 if there's an allegation by the policyholder that there is
4 some coverage, yes.  All of those people need to be
5 involved.
6    Q. (BY MR. KOTULA)  Do you know, in a court of
7 law, who the Court places the burden of proving the
8 existence of the terms of an alleged or missing policy
9 upon?
10         MR. BRENNAN:  Objection.
11    A. No.  I'm not a lawyer.  I don't know who they
12 are or are not.
13    Q. (BY MR. KOTULA)  You don't know that?
14    A. No.
15    Q. So you don't know any standards that may apply
16 to proving a lost or missing policy?
17         MR. BRENNAN:  Objection.
18    A. No.  I don't have that legal -- it wasn't my --
19 it wasn't my role in this case.
20    Q. (BY MR. KOTULA)  Do you know whether courts
21 require a party claiming coverage to prove a lost or
22 missing policy by clear and convincing evidence or a
23 preponderance of the evidence?
24         MR. BRENNAN:  Objection.
25    A. No, I don't know that.  I don't know what the

9 (Pages 30 - 33)

Page 34

1 legal standard is. All I know is what I see in the
2 Pennell file, particularly, that Unigard certainly had a
3 role, and it appears obvious that they had coverage at
4 some point.
5    Q. (BY MR. KOTULA) Okay. We'll get to that.
6 That wasn't my question, but we'll get to that.
7        Do you have an understanding that a party
8 seeking coverage under a lost or missing policy has a
9 burden to demonstrate that the policy existed?
10        MR. BRENNAN: Objection.
11    A. They're one of the ones. Like I said before, I
12 mean, obviously, they tried to demonstrate. They tried to
13 demonstrate through their ledgers, through their agent,
14 through anything that they could reconstruct, yes.
15    Q. (BY MR. KOTULA) Okay. I'm not asking about
16 Troy now; I'm asking just a general question.
17    A. Oh.
18    Q. So you believe that a party seeking coverage has
19 a role -- I think is what you said -- as part of a team
20 effort in proving the existence of an alleged lost or
21 missing policy, correct?
22        MR. BRENNAN: Objection.
23    A. Yes.
24    Q. (BY MR. KOTULA) But you also believe that that
25 party's insurance agent has a role as part of a team

Page 35

1 effort in proving the existence of a lost or missing
2 policy?
3        MR. BRENNAN: Objection.
4    A. Certainly, they have -- you know, they should be
5 helpful in providing that information, if they have it.
6 Which, in this particular case, they did.
7    Q. (BY MR. KOTULA) And you also believe that an
8 insurance company that is alleged to have issued a lost or
9 missing policy has a role to play, as part of a team
10 effort, in proving the existence of an alleged lost or
11 missing policy?
12        MR. BRENNAN: Objection.
13    A. Yes. They need to go back through their
14 records.
15    Q. (BY MR. KOTULA) And you don't know whether
16 courts agree with what you just testified about as to who
17 has the burden of proving the existence of an alleged lost
18 or missing policy --
19        MR. BRENNAN: Objection.
20    Q. (BY MR. KOTULA) -- correct?
21    A. I don't know the legal standard on that, no.
22 What I'm saying is, from my review of the documents, it's
23 very obvious that Unigard had some liability coverage and
24 that they should -- they were on the policy, either
25 through their own or through Jamestown.

Page 36

1    Q. Okay. Again, that wasn't an answer to my
2 question. I was asking a general question, not about Troy
3 Belting. We will get to Troy Belting. But that's -- you
4 didn't answer my question, is all I'm saying. I was
5 asking you a general question.
6        MR. BRENNAN: Do you want to read back the
7 question?
8        THE WITNESS: Please.
9        (The requested portion was read.)
10    Q. (BY MR. KOTULA) That was my question. It was
11 a general question, not about Troy Belting.
12    A. I thought I said "no," but I went on to tell...
13    Q. After you said "no," you weren't answering my
14 question is all I'm saying.
15    A. Okay.
16        MR. BRENNAN: Objection.
17        MR. KOTULA: So I move to strike that.
18    Q. (BY MR. KOTULA) Do you know who has the burden
19 of proving the terms of an alleged lost or missing policy?
20        MR. BRENNAN: Objection.
21    A. Well, again, you know, whatever -- if it's a --
22 in this particular case, and that's the only one I'm
23 familiar with, obviously, if it's -- there's evidence that
24 there's liability coverage and then there's a
25 comprehensive general liability coverage, I mean, it's

Page 37

1 pretty evident what the terms are going to be.
2    Q. (BY MR. KOTULA) Okay. I wasn't asking about
3 this case; I was asking as a general proposition.
4        Are you aware of which party has the burden
5 of proving the alleged terms of a lost or missing policy?
6        MR. BRENNAN: Objection.
7    A. Well, obviously, the primary one would be the
8 policyholder, or the alleged policyholder, as you said.
9 But as I also reiterated, it's a team effort between the
10 policyholder, what the agent said he wrote, and what the
11 alleged -- or what the insurance carrier has.
12    Q. (BY MR. KOTULA) And you don't know whether a
13 court agrees with that as the proper legal standard in a
14 court of law, right?
15        MR. BRENNAN: Objection.
16    A. I don't know the legal standard to that, no.
17    Q. (BY MR. KOTULA) Okay.
18        MR. KOTULA: Mark that as Exhibit 2.
19        (Exhibit 2 marked.)
20        MR. KOTULA: For the record, Exhibit 2
21 is an October 1, 2015, correspondence from Marta Bruner,
22 administrative assistant to Mr. Timothy Brennan,
23 at Phelan, Phelan & Danek, LLP, attaching a
24 September 30, 2015, letter report from James O'Malley,
25 Junior, to Timothy Brennan in the matter of Pacific

10 (Pages 34 - 37)

1 Employers Insurance Company vs. Troy Belting & Supply
2 Company.
3    Q.   (BY MR. KOTULA)  Have you ever seen Exhibit 2,
4 sir?
5    A.   This is my report?
6    Q.   Yes, it is.
7    A.   Yes, I have.
8    Q.   And does it appear to you to be a true and
9 complete copy of your expert report in this matter?
10    A.   It appears to be, yes.
11    Q.   In offering your opinions about whether
12 Jamestown Mutual or Unigard Insurance Company issued lost
13 or missing policies to Troy Belting, did you consider
14 whether the evidence in this case meets a clear and
15 convincing evidence standard?
16        MR. BRENNAN:  Objection.
17    A.   To me, it did, yes.
18    Q.   (BY MR. KOTULA)  Did you consider that in
19 forming your opinion?
20    A.   Of course.  I looked at the information,
21 documents.  Very obvious that they had liability
22 insurance.
23    Q.   (BY MR. KOTULA)  Okay.  What's "liability
24 insurance"?
25    A.   What do you mean?

1    Q.   What is it?  You just used the phrase --
2    A.   It's an agreement.  It's a policy that has an
3 insuring agreement that agrees to protect the policyholder
4 from any claims made against it, generally.  I mean,
5 that's it generally.
6    Q.   And is there only one type of liability
7 insurance policy?
8    A.   No.
9    Q.   What types of liability insurance policies are
10 there, to your knowledge?
11    A.   Automobile liability; there's comprehensive
12 general liability; there's -- I don't know.  There's
13 several.
14    Q.   Any others that you can think of?
15    A.   There's manufacturers and contractors.
16    Q.   Any others?
17    A.   Not off the top of my head.  I mean, I can't
18 think of any right now.  There's personal liability;
19 there's umbrellas, and all kinds of stuff.
20    Q.   Have you ever heard of an owners, landlords, and
21 tenants policy, or an OLT policy?
22    A.   Yes.
23    Q.   And a manufacturers and contractors liability
24 policy, is that also known as an M&C policy?
25    A.   Known as what?

1    Q.   An M&C policy.
2    A.   Yes.
3    Q.   And those are all forms of liability policies,
4 correct?
5    A.   Yes.
6    Q.   If someone says they have a liability insurance
7 policy, do you know which kind of liability insurance
8 policy they have?
9    A.   Not unless they tell me, no.
10    Q.   It could be any of those, correct?
11    A.   It could be.
12    Q.   And if someone says they have liability
13 insurance coverage, is that another way of saying that
14 they have a liability insurance policy?
15    A.   I would think so, yes.
16        MR. BRENNAN:  Objection.
17    Q.   (BY MR. KOTULA)  Now, referring you to Exhibit
18 2, which is your expert report in this case, do you have
19 any opinions in this matter that have not been set forth
20 in O'Malley Exhibit 2, your expert report?
21    A.   No.
22    Q.   So you're not going to offer any opinions that
23 aren't already set forth somewhere in your expert report
24 that we've marked as Exhibit 2, correct?
25        MR. BRENNAN:  Objection.

1    A.   Unless I am asked to, and given additional
2 documentation, no, that's what I'm -- that's what I intend
3 to testify about.
4    Q.   (BY MR. KOTULA)  Have you been given any
5 additional fact information or documents since you issued
6 this report September 30, 2015, in this case?
7    A.   No.
8    Q.   And that's true as to anybody?  No one of any
9 sort has given you any additional fact information or
10 documents, correct?
11    A.   No.
12    Q.   So no one has?
13    A.   No.  No, they haven't.
14    Q.   Sometimes --
15    A.   Okay.
16    Q.   -- you say "no," and it's not clear that we're
17 agreeing.
18        You're agreeing with me, you haven't
19 received any additional fact information or documents
20 prior to -- after September 30th, right?
21    A.   Right.
22        MR. FOX:  When there's a good chance, can
23 we take a quick break?
24        MR. KOTULA:  Sure.  We can take a break
25 right now.

11 (Pages 38 - 41)

Page 42

1           (Recess in the proceedings from 11:00 to
2       11:06 a.m.)
3    Q.   (BY MR. KOTULA)  Sir, we're back on the record.
4    Can you tell us approximately how much time
5    you spent reviewing materials and preparing your opinions
6    in your expert report in this matter?
7    A.   Up to this review here, about 40 to 50 hours;
8    something like that, 60 hours.  I don't know what it's
9    been the last three or fours days; I've been kind of
10   looking at stuff.
11   Q.   So 50, 60 hours, you think?
12   A.   Yeah.
13   Q.   And you're being compensated at the rate of $400
14   per hour; is that right?
15   A.   Yes.
16   Q.   If you could turn in Exhibit 2 to Exhibit B.
17   A.   (Witness complies.)
18   Q.   And it's titled, Documents Reviewed.
19        Do you have that?
20   A.   Yeah.
21   Q.   And so you set forth different materials that
22   you reviewed in connection with preparing this report,
23   correct?
24   A.   Yes.
25   Q.   Did you review any materials other than or in

Page 43

1    addition to those that are set forth on this exhibit?
2    A.   No, that was plenty.  No.
3    Q.   Does Robert Hughes Associates have a library
4    with insurance materials?
5    A.   Yes.
6    Q.   Did you use or refer to the library in
7    connection with preparing your report?
8    A.   Not in this report, no.
9    Q.   Okay.  And does the Robert Hughes Associates
10   library contain a policy or insurance policy bank?
11   A.   Yeah, I think they have committed it to disks
12   now; I'm not sure.
13   Q.   If I told you that Mr. Hughes testified that he
14   has 6,000 or so insurance policies on file in his library,
15   would that be consistent with your understanding?
16   A.   Yeah, I don't know.  It could very well be.  I
17   mean, I know that they have thousands, but I don't know
18   how many.
19   Q.   Did you check the policy library for policies
20   that may have been issued by Jamestown Mutual or Unigard
21   Insurance Company to other parties?
22   A.   No.
23   Q.   So you don't know what that would indicate,
24   correct?
25   A.   Pardon me?

Page 44

1    Q.   You don't know what that would show?
2    A.   What would show?
3    Q.   If you did a search of the --
4    A.   No.
5    Q.   -- policy, you don't know if Robert Hughes
6    Associates has any policies that may have been issued by
7    Jamestown Mutual or Unigard Insurance Company to parties
8    other than Troy Belting?
9    A.   No.
10   Q.   Do you know, is there a cost difference between
11   purchasing an M&C policy, or manufacturers and contractors
12   liability policy, and a CGL, or comprehensive general
13   liability or commercial general liability policy?
14        MR. BRENNAN:  Objection.
15   A.   A cost difference premium-wise?
16   Q.   (BY MR. KOTULA)  Yes, sir.
17   A.   I have no -- it would really depend upon who
18   you're insuring.  I have no idea.  I've never rated any of
19   them, so I wouldn't know.
20   Q.   So you don't know if an M&C policy would be
21   cheaper than a CGL policy?
22        MR. BRENNAN:  Objection.
23   A.   It would all depend upon who you're insuring and
24   how much -- what kind of products they have and that sort
25   of thing.  I mean...

Page 45

1    Q.   (BY MR. KOTULA)  Do you have an understanding
2    whether a standard M&C policy on its own affords coverage
3    for product liability claims?
4        MR. BRENNAN:  Objection.
5    A.   As completed and products coverage, if you buy
6    it, yes.
7    Q.   (BY MR. KOTULA)  Do you have an understanding
8    that that's afforded on a rider or an endorsement basis?
9        MR. BRENNAN:  Objection.
10   A.   Normally.
11   Q.   (BY MR. KOTULA)  And if an M&C policy doesn't
12   have that rider added to it, does the M&C policy afford
13   coverage for product liability claims?
14        MR. BRENNAN:  Objection.
15   A.   Well, no, not if it doesn't have it.
16   Q.   (BY MR. KOTULA)  So a standard M&C policy on
17   its own doesn't afford coverage for product liability
18   claims, correct?
19   A.   I have never seen an M&C policy that did not
20   have a products liability policy, completed operations and
21   products liability.  But, I mean, obviously, if you didn't
22   buy it, you didn't buy it.
23   Q.   Right.  Have you, in your life, ever seen a
24   Jamestown Mutual Insurance Company policy?
25   A.   I don't think so.  I don't think so.

12 (Pages 42 - 45)

Page 46

1    Q.   And subset of that probably has to be true, but
2    I'll ask it:  Have you ever seen a Jamestown Mutual
3    Insurance Company M&C policy?
4    A.   No.
5    Q.   And have you ever seen a Jamestown Mutual
6    Insurance Company CGL policy?
7         MR. BRENNAN:  Objection.
8    A.   No.
9    Q.   (BY MR. KOTULA)   In your background working in
10   the insurance industry and as an insurance consultant,
11   have you become aware that customers often make decisions
12   about purchasing insurance based on price or cost?
13        MR. BRENNAN:  Objection.
14   A.   What was the first part of that question?  I'm
15   not quite sure what you're asking.
16        MR. KOTULA:  Can you read back?
17   A.   Am I aware that they make decisions on policies
18   based on price?
19   Q.   (BY MR. KOTULA)   Yes, sir.
20        MR. BRENNAN:  Objection.
21   A.   I guess that's pretty obvious.  But, I mean, I
22   don't -- I'm not -- you know, I don't have any awareness
23   of that at all.
24   Q.   (BY MR. KOTULA)   But you think it's obvious
25   that it's true?

Page 47

1         MR. BRENNAN:  Objection.
2    A.   Well, it's obvious from the standpoint that they
3    ask an agent to, you know, shop around and give them the
4    best quote they can from different carriers.
5    Q.   (BY MR. KOTULA)   In your experience working in
6    the insurance industry and as an insurance consultant,
7    have you ever placed policies of insurance for customers,
8    policyholders?
9    A.   As an agent, you mean?
10   Q.   Yes, sir.
11   A.   I was in charge of an agency with Union Standard
12   Insurance Company.  I did not place them.  I was president
13   of the corporation, but had underwriters that did that,
14   and I only passed upon large accounts.
15   Q.   Is your experience as an insurance consultant
16   limited to testifying as an expert or serving as an
17   expert?
18        MR. BRENNAN:  Objection.
19   A.   No, I have done other work.
20   Q.   (BY MR. KOTULA)   What else have you done as an
21   insurance consultant?
22   A.   I've done audits on the self-insurers.  I have
23   done some work for some carriers regarding their claim
24   activity.  I have done some work regarding compensation
25   for officers by people, whether they were getting more

Page 48

1    money by holding companies and so forth.  I've done a lot
2    of different things -- excuse me -- besides claims.
3    Q.   Can you be more specific in providing details
4    about your work for insurance companies with claims
5    activity, as you described it; what does that entail?
6    A.   Well, just I went in -- myself and another
7    fella, we went in several times in the past and looked at
8    the -- some of the claims handling that they were doing,
9    or they had given it to somebody else to do, and wanted to
10   know whether we thought that it was proper or whether --
11   actually, we were looking at reserves and seeing if the
12   reserves were proper.
13   Q.   Was it a claims handling audit?
14   A.   Part of it was.  Yeah, part of it was.
15   Q.   And for what company?
16   A.   Travelers was one of them.  I think we did some
17   compensation for Liberty Mutual.  I don't know.  There
18   were, you know, several.
19   Q.   Is it fair to say you've never assisted a
20   policyholder in purchasing a policy of insurance from
21   Jamestown Mutual Insurance Company?
22   A.   No, I have not.
23   Q.   Have you ever assisted a policyholder in
24   purchasing an insurance policy from Unigard Insurance?
25   A.   Assisted a policyholder?  No.

Page 49

1    Q.   Have you personally, as you sit here today, ever
2    seen a Jamestown Mutual Insurance Company M&C policy
3    endorsement adding in coverage for products hazard?
4         MR. BRENNAN:  Objection.
5    A.   Well, I think there was an independent
6    contractor photocopy I saw in one of the exhibits.
7    Q.   (BY MR. KOTULA)   Right.  But did that
8    endorsement add in products coverage to an M&C policy?
9    A.   I think it was just independent contractors.
10   Q.   All right.  So if you can answer my question.
11   A.   No, I have not.
12   Q.   Okay, thank you.
13        Sir, can you tell us the types -- and this
14   is in general; not about Troy Belting.
15        But in general, from your experience, can
16   you tell us the types of secondary evidence that can be
17   used to attempt to prove up a lost or missing policy?
18        MR. BRENNAN:  Objection.
19   A.   Well, obviously, expense reports from a
20   policyholder that shows that they paid insurance.  There's
21   agents' files that indicate that they had coverages at
22   certain times through certain carriers.  There's
23   correspondence that's generated between policyholders and
24   insurance carriers and agents.  There's several different
25   things.  Claims -- when you find claim files that have

13 (Pages 46 - 49)

Page 50

1 coverage information in them.
2 Q. (BY MR. KOTULA) Is that -- have you exhausted
3 your knowledge of secondary evidence?
4 A. Oh, yeah, from what I can think of right now. I
5 mean, you know...
6 MR. BRENNAN: Objection.
7 Q. (BY MR. KOTULA) Mr. Hughes testified that
8 secondary evidence can include actual policies issued by
9 the alleged insurer in the gap period where there are
10 missing policies that were issued before the gap period or
11 after the gap period.
12 Are you aware that that's a form of
13 secondary evidence that's used by parties seeking
14 coverage?
15 MR. BRENNAN: Objection.
16 A. I don't understand. Say that one more time.
17 Let me -- let me -- I didn't quite follow you.
18 Q. (BY MR. KOTULA) Mr. Hughes testified that one
19 form of secondary evidence that he's familiar with is
20 actual insurance policies that a party has issued by the
21 insurer that allegedly issued policies in a gap period,
22 but where the actual policies were issued before that gap
23 period and after that gap period.
24 Are you aware that is a form of secondary
25 evidence?

Page 51

1 MR. BRENNAN: Objection.
2 A. I would have to -- you know, it sounds like it
3 would be. But, you know, I'm not testifying regarding a
4 lost policy. So, I mean -- that sounds reasonable to me.
5 Q. (BY MR. KOTULA) Do you know if Troy Belting
6 has any actual policies in its possession issued by
7 Jamestown Mutual or Unigard Insurance before the period of
8 1949 to 1974 or after that period?
9 A. No, I'm not aware of that.
10 MR. BRENNAN: Object to the form. After?
11 Q. (BY MR. KOTULA) I'll unpack it.
12 Are you aware whether Troy Belting has any
13 actual policies issued by Jamestown Mutual or Unigard
14 Insurance Company before 1949 that were issued by
15 Jamestown Mutual or Unigard?
16 A. No, I'm not aware of that.
17 MR. BRENNAN: Objection.
18 Q. (BY MR. KOTULA) And are you aware of any
19 evidence that Troy Belting has any actual policies issued
20 by Jamestown Mutual or Unigard Insurance Company after the
21 gap period ending in 1974?
22 MR. BRENNAN: Objection.
23 A. I'm not aware of that.
24 Q. (BY MR. KOTULA) Mr. Hughes testified that
25 another form of secondary evidence can be actual umbrella

Page 52

1 or excess policies above missing policies in a gap period.
2 Do you have any understanding that that can
3 be secondary evidence?
4 A. Obviously, it would be, yes.
5 MR. BRENNAN: Objection.
6 A. Because most excess carriers have some -- could
7 be.
8 Q. (BY MR. KOTULA) Do you know if Troy Belting
9 has any umbrella or excess policies above the gap period
10 from 1949 to 1974?
11 MR. BRENNAN: Objection.
12 A. No, I don't.
13 Q. (BY MR. KOTULA) Is it your understanding that
14 they don't have any policies like that?
15 MR. BRENNAN: Objection.
16 A. That's my understanding, yes.
17 Q. (BY MR. KOTULA) And the same, it's your
18 understanding that Troy Belting doesn't have any actual
19 policies before the gap period in 1949 or after that
20 period ending in 1974?
21 MR. BRENNAN: Objection. Are you referring
22 to the Pacific ones, too? I think I'm getting confused.
23 Q. (BY MR. KOTULA) Issued by Jamestown or
24 Unigard.
25 MR. BRENNAN: I just want to be clear.

Page 53

1 A. I'm not aware of that, no.
2 Q. (BY MR. KOTULA) So it's your understanding
3 that Troy Belting doesn't have such things, right?
4 MR. BRENNAN: Objection.
5 A. It's my understanding, yes.
6 Q. (BY MR. KOTULA) Now, Mr. Hughes also testified
7 that secondary evidence can include having notations of
8 policy numbers and policy prefixes and that that can
9 constitute secondary evidence.
10 Do you understand how that can constitute
11 secondary evidence?
12 MR. BRENNAN: Objection.
13 A. Certainly could be, yes; I would think so.
14 Q. (BY MR. KOTULA) Mr. Hughes testified that
15 sometimes a policy number or policy prefix can identify an
16 insurer for that missing policy, the identity of that
17 insurer.
18 Do you understand that?
19 A. Yes.
20 MR. BRENNAN: Objection.
21 Q. (BY MR. KOTULA) And he also testified that
22 that policy number or policy prefix can identify the type
23 of liability policy that may have been issued in that gap
24 period.
25 Do you understand that?

14 (Pages 50 - 53)

1          MR. BRENNAN:  Objection.
2     A.  Yes.
3     Q.  (BY MR. KOTULA)  Does Troy Belting have any
4  evidence of policy numbers or policy prefixes that
5  indicate that -- the type of liability coverage that may
6  have existed in the gap period from 1949 to 1974?
7          MR. BRENNAN:  Objection.
8     A.  I thought there was a policy number, but I'm not
9  aware if they have it.
10    Q.  (BY MR. KOTULA)  Okay.  If I told you that
11 there's one page of something purporting to be an
12 endorsement to a manufacturers and contractors liability
13 policy issued to Troy Belting by Jamestown Mutual
14 Insurance Company, do you have any awareness of that?
15    A.  Yes.
16    Q.  And do you know that that document lists a
17 policy number that has a letter "M" on it?
18         MR. BRENNAN:  Objection.
19    A.  I didn't -- they could have.  You'd have to show
20 it to me.
21         MR. KOTULA:  Off the record.
22         (Recess in the proceedings from 11:25 to
23         11:25 a.m.)
24         (Exhibit 3 marked.)
25    Q.  (BY MR. KOTULA)  Sir, placed before you now is

1  what the court reporter has kindly marked as O'Malley
2  Exhibit 3.
3          Have you ever seen O'Malley Exhibit 3
4  before?
5     A.  Yes.
6          MR. KOTULA:  And just for the record, this
7  was previously marked as Hughes Exhibit 5.  And it's a
8  one-page document entitled, Amendment of Declaration,
9  Items 4 and 5.  And there's a type-printed name, Troy
10 Belting & Supply Company, towards the top.  And it says
11 it's issued by Jamestown Mutual Insurance Company of
12 Jamestown, New York, this 15th day of September 1964.
13    Q.  (BY MR. KOTULA)  Do you see that?
14    A.  I'm trying to --
15    Q.  It's at the very bottom of the page.
16    A.  Oh.  Okay.
17    Q.  You see that?
18    A.  Yeah.
19    Q.  And do you see there's a box in the upper
20 right-hand corner, and the preprinted form says, Amending
21 Policy Number?  Do you see that?
22    A.  Yes.
23    Q.  And then the policy number is 63-M 29311,
24 correct?
25    A.  Yes.

1     Q.  And at the top of the page, under Amendment of
2  Declarations, Items 4 and 5, beneath that, what does it
3  say in parentheticals?
4     A.  Are you talking about manufacturers and
5  contractors liability policy?
6     Q.  Yes, sir.
7     A.  Yeah.
8     Q.  That's what it says, right?
9     A.  Right.
10    Q.  So this purports to be an amendment to a
11 manufacturers and contractors liability policy; does it
12 not?
13    A.  Yes.
14    Q.  And the policy number shown has an "M" in it,
15 correct?
16    A.  Yes.
17    Q.  Are you aware that some insurance companies use
18 the initial "M" in manufacturers and contractors, or M&C,
19 policies?
20    A.  No, I'm not aware of that.
21         MR. BRENNAN:  Objection.
22    Q.  (BY MR. KOTULA)  Mr. Hughes testified that he
23 was aware of that.
24         Do you have any reason to dispute
25 Mr. Hughes?

1          MR. BRENNAN:  Objection.
2     A.  No.
3          (Exhibit 4 marked.)
4          (Discussion held off the record 11:28 to
5          11:29 a.m.)
6          MR. BRENNAN:  This is -- what's been marked
7  -- Exhibit 4 is a document that we discussed a little bit
8  at Mr. Hughes' deposition.  As I indicated at that
9  deposition, I had not seen anything about a redacted and
10 less complete copy, I believe, of this particular policy.
11 So I just wanted to raise that issue and assert that
12 objection for the record to questions pertaining to this
13 now unredacted version with, I believe, a few more pages
14 than what was provided previously.
15          With that, you can go ahead.
16    Q.  (BY MR. KOTULA)  Okay.  Sir, have you ever seen
17 this document which we've marked as Exhibit 4?
18         MR. KOTULA:  For the record, it's titled,
19 Comprehensive General Liability Policy Jamestown Mutual
20 Insurance Company Issued to Utica Radiator Corporation.
21         MR. BRENNAN:  Note my objection in my
22 previous qualification, but go ahead.
23         MR. KOTULA:  You can have a continuing
24 objection.
25         MR. BRENNAN:  You just asked him if he ever

1 saw this before, and that's what I'm objecting to.

2　A.　I've never seen this, no.

3　Q.　(BY MR. KOTULA)　Okay.　Have you ever seen any

4 part of this?

5　A.　Not that I recall.

6　　　　(Witness reviews document.)

7　Q.　I'm just going to refer you to the very first

8 page, which is, I believe, referred to as a declarations

9 page.

10　　　　Or, in this case, it might be a window of

11 part of the policy that shows through a jacket cover,

12 right?

13　A.　Are you talking about the first page here?

14　Q.　Yes, sir.

15　A.　Yeah.

16　Q.　Do you see -- this purports to have been issued

17 by Jamestown Mutual Insurance Company, correct?

18　A.　Yes.

19　Q.　And it states it's a comprehensive general

20 liability policy?

21　A.　Yes.

22　Q.　And do you see the policy number that's

23 indicated contains -- it says policy number 61-CGL 7788?

24　A.　Yes, I see that.

25　Q.　And you see that a comprehensive general

1 liability policy issued by Jamestown Mutual Insurance

2 Company has the initials "CGL" in the policy number,

3 correct?

4　　　　MR. BRENNAN:　Objection.

5　A.　Right.

6　Q.　(BY MR. KOTULA)　All right.　Mr. Hughes was

7 asked if the initial "M" on Exhibit 3 (indicating) and the

8 initials "CGL" in the policy number on Exhibit 4 denote

9 the type of liability policy.　And he said, It may well.

10　　　　Do you have any reason to dispute that?

11　　　　MR. BRENNAN:　Objection.

12　A.　No.

13　Q.　(BY MR. KOTULA)　All right.　Are you aware,

14 aside from Exhibit 3, whether Troy Belting has any

15 secondary evidence whatsoever with policy numbers or

16 policy prefixes for the gap period from 1949 to 1974?

17　　　　MR. BRENNAN:　Objection.

18　A.　I'm not aware of any, no.

19　Q.　(BY MR. KOTULA)　And so none of the ledger

20 entries contain any reference of policy numbers; do they?

21　A.　No.

22　Q.　And none of the ledger entries contain any

23 policy prefixes such as "M" or "CGL," correct?

24　　　　MR. BRENNAN:　Objection.

25　A.　No, not that I saw.

1　Q.　(BY MR. KOTULA)　And there's an expense account

2 document that says "Jamestown" in a few places.

3　　　　Do you recall that?

4　A.　Somewhat, yes.　I think I do, but I don't

5 remember what it said.

6　Q.　All right.　Do you have -- are you aware of

7 anything in the expense account documents that indicates a

8 policy number or a policy prefix for the policies

9 allegedly issued from 1949 to 1974 by Jamestown Mutual?

10　　　　MR. BRENNAN:　Objection.

11　A.　No.

12　Q.　(BY MR. KOTULA)　You can answer.

13　A.　Pardon me?

14　Q.　You can answer.

15　A.　I said no.

16　Q.　I wanted to make sure it was on the record?

17　　　　So to summarize where we are, it's your

18 understanding Troy Belting doesn't have copies of any of

19 the liability policies that may have been issued to it up

20 to 1974, correct?

21　　　　MR. BRENNAN:　Objection.

22　A.　That's my understanding, yes.

23　Q.　(BY MR. KOTULA)　That Troy Belting doesn't have

24 any actual policies issued by Jamestown Mutual or Unigard

25 before 1949 or in 1974, at the end of that gap period?

1　　　　MR. BRENNAN:　Objection.

2　A.　No.

3　Q.　(BY MR. KOTULA)　And further, Troy Belting

4 doesn't have any umbrella or excess policies for the

5 period of 1949 to 1974 over that gap period?

6　　　　MR. BRENNAN:　Objection.

7　A.　Not that I saw.

8　Q.　(BY MR. KOTULA)　And further, it's also true

9 that Troy Belting doesn't have any evidence, aside from

10 Exhibit 3, of any policy numbers for policies allegedly

11 issued by Jamestown Mutual or Unigard Insurance Company

12 from 1949 to 1974?

13　　　　MR. BRENNAN:　Objection.

14　A.　Not that I'm aware of.

15　Q.　(BY MR. KOTULA)　In fact, aside from Exhibit 3,

16 Troy Belting doesn't have any document that indicates the

17 type of liability policy that was issued to it by

18 Jamestown Mutual or Unigard, allegedly, for the gap period

19 from 1949 to 1974, correct?

20　　　　MR. BRENNAN:　Objection.

21　A.　No.

22　Q.　(BY MR. KOTULA)　And by "no," you mean, yes,

23 that is correct, correct?

24　　　　MR. BRENNAN:　Objection.

25　Q.　(BY MR. KOTULA)　Am I right?

16 (Pages 58 - 61)

1    A.  Yeah.  What was the question again?  This is the
2  only evidence that they have.
3    Q.  Right.  And you're referring to Exhibit 3?
4    A.  Right.
5    Q.  So sometimes when someone says "no," and the
6  question says "there isn't anything," and you say "no,"
7  it's not always clear that you're agreeing with the
8  statement.
9        You're agreeing -- you're agreeing that my
10  statement was correct?
11    A.  Yes.
12        MR. BRENNAN:  Objection.  I don't even know
13  what we're talking about anymore.  I mean it in the nicest
14  way possible.
15    Q.  (BY MR. KOTULA)  We can read it back, if you'd
16  like.
17    A.  No.
18    Q.  You're satisfied you know what I'm talking
19  about?
20    A.  Yes.
21    Q.  Thank you.
22        Mr. O'Malley, did you do any searching for
23  documents or secondary evidence in connection with your
24  opinions on Troy Belting?
25    A.  No.

1        MR. BRENNAN:  Objection.
2    Q.  (BY MR. KOTULA)  So is it a fair statement that
3  in your retention by Troy Belting as an expert in this
4  matter that you relied solely on Mr. Brennan and his law
5  firm to provide you with documents and materials for you
6  to review?
7    A.  Yes.
8    Q.  And so you didn't do any of your own legwork to
9  contact anyone else to see what documents may exist?
10    A.  No.
11    Q.  You didn't do any sort of archaeological
12  searches for business records or claims documents or
13  anything else, for that matter, right?
14    A.  No.
15    Q.  Mr. O'Malley, have you ever spoken with anyone
16  at Troy Belting with personal knowledge of insurance
17  policies that were allegedly purchased for the 1949 to
18  1974 gap period?
19    A.  No.
20        MR. BRENNAN:  Objection.
21    Q.  (BY MR. KOTULA)  Have you ever spoken with
22  anyone at Troy Belting that told you that they reviewed
23  any policies issued to Troy Belting from -- for that 1949
24  to 1974 gap period?
25    A.  No.

1    Q.  Have you ever spoken with anyone who served as
2  an insurance agent or broker on behalf of Troy Belting
3  with personal knowledge of insurance policies Troy Belting
4  allegedly purchased for the 1949 to 1974 gap period?
5    A.  No.
6    Q.  So you haven't spoken with anyone who served as
7  an insurance agent or a broker for Troy Belting who told
8  you that they reviewed any insurance policies issued to
9  Troy Belting for the 1949 to 1974 gap period?
10    A.  No.
11        MR. BRENNAN:  Objection.
12    Q.  (BY MR. KOTULA)  Am I correct from your
13  testimony that you haven't spoken with anyone who worked
14  for Troy Belting in the 1940s, 1950s, 1960s or 1970s?
15    A.  No.
16    Q.  I am correct?
17    A.  You are correct, yes.
18    Q.  Thank you.
19    A.  You are correct.
20        MR. BRENNAN:  Easier that way.  Now I
21  follow you.
22        MR. KOTULA:  I'll try to do that faster.
23    Q.  (BY MR. KOTULA)  And you've never spoken with
24  anyone who was involved in purchasing insurance policies
25  for Troy Belting in those periods of time?

1    A.  No, I haven't.
2    Q.  Just bear with me.
3        So I'm going to refer you to your expert
4  report, which we've marked as Exhibit 2.
5    A.  Yeah.
6    Q.  Should be there under the --
7    A.  Yeah.
8    Q.  -- other exhibits.
9        You state in your report that you began
10  your professional career in 1958 as a claims
11  representative with Unigard Insurance Company in Tulsa,
12  Oklahoma.
13        Do you see that?
14    A.  Yes.
15    Q.  And can you tell us what Unigard's business was
16  at that time?
17    A.  Actually, the company's name was Northwestern
18  Mutual Insurance Company and Northwest Casualty.  They
19  were involved in all kinds of liability insurance and
20  property insurance.
21    Q.  And did --
22    A.  I was a multiline adjustor.
23    Q.  Did the Northwest companies change their name at
24  some point in time?
25    A.  It was my understanding -- while I was there, it

1 was my understanding Northwestern Mutual Life Insurance
2 Company brought some kind of a suit against Northwestern
3 Mutual Insurance Company because they thought they had the
4 name first.  So Northwestern Mutual Insurance Company went
5 to a consultant, Ruth Allen, and they came up with Unigard
6 as the new name.
7     Q.  And the new name was Unigard Insurance Company?
8     A.  Yeah.
9     Q.  And do you know when that name was taken?
10    A.  Late '60s or early '70s; I can't recall exactly.
11    Q.  Is it your understanding that at some point in
12 time, Unigard Insurance Company had some relationship with
13 Jamestown Mutual Insurance Company?
14    A.  Yes.
15    Q.  What's your understanding of that?
16    A.  Well, my understanding was that they -- I'm not
17 sure of the process where they -- but they -- I think they
18 converted Jamestown Mutual to a stock company, and then
19 purchased the stock.  I don't know if that's exactly
20 right.  But, anyway, they assumed the business from
21 Jamestown.
22    Q.  Do you know when that happened?
23    A.  Again, late '60s, early '70s; something like
24 that.  I'm not sure.  And I'm not sure that was the
25 process.

1     Q.  And how long did you work at Unigard?
2     A.  17 years.
3     Q.  And when did you leave Unigard?
4     A.  I didn't leave them.  Unigard became financially
5 strapped and had to get rid of their -- a lot of their
6 premiums throughout the country.  And they sold the
7 southwestern business to Berkley Corporation, who changed
8 the name and bought Unigard Security, which was the Texas
9 company for Unigard; domestic company, Unigard Security.
10 And Berkley Corporation bought Unigard Security, along
11 with business throughout six, seven, or eight states,
12 maybe; I can't recall.  And changed the name Unigard
13 Security to Union Standard Insurance Company.
14         And at that time, they asked me to be vice
15 president of claims.
16    Q.  And when was that?
17    A.  That was 1975.
18    Q.  In your work at Unigard Insurance Company,
19 before it was essentially acquired by W.R. Berkley
20 Corp. -- that unit was acquired by W.R. Berkley Corp. in
21 1975, did you ever have any connection with Jamestown
22 Mutual Insurance Company?
23    A.  No, I did not.
24    Q.  Did you ever handle claims for Jamestown Mutual
25 Insurance Company?

1     A.  Not that I recall, no.
2     Q.  Who was the issuing company that issued
3 insurance policies that you handled claims under while you
4 were at Unigard Insurance Company?
5     A.  Unigard -- well, both; Northwestern Mutual
6 Insurance Company and Northwestern Casualty, which was
7 their two companies, and Unigard, which assumed -- which
8 changed the name.
9     Q.  So at some point in time, did Unigard begin
10 issuing policies on its own paper?
11    A.  Yes.
12    Q.  And when was that?
13    A.  Late '60s, early '70s; I don't recall.  I was
14 here in Dallas at the time, but I don't recall when it
15 was.
16    Q.  And the claims that you were handling in your
17 career at Unigard up until 1975, were those claims largely
18 from the Oklahoma/Texas area?
19    A.  Before, yes -- well, the southwestern part of
20 it.  They had Colorado, New Mexico, Arkansas, Louisiana,
21 several other states.
22    Q.  Did you handle claims from New York?
23    A.  No.
24    Q.  Was that handled by a different unit in the
25 company?

1     A.  Unigard had claims offices in New York.
2     Q.  So it was handled by that unit?
3     A.  Yes.
4     Q.  So is it fair to say you were with Union
5 Standard Insurance Company from 1975 until 1990?
6     A.  Yes.
7     Q.  And then what happened in 1990?
8     A.  I left and went as an independent consultant and
9 expert witness.
10    Q.  Now, your report says that you resigned as
11 president and CEO of Union Standard.
12         Were you asked to resign?
13    A.  Yes.  We had a conflict as to whether or not --
14 they had asked me to move to Connecticut to be in charge
15 of all the regional companies.  At that time, I had a son
16 who was not very well, and we were having treatment here.
17 And I turned that down.  Then they asked me to go to
18 Nebraska to take over one of their companies, Union
19 Insurance Company, that was in trouble, and I declined to
20 do that as well.
21         So I kind of lost favor with them.  So they
22 asked me to resign.  So I left.
23    Q.  Okay.  I'm going to refer you to your summary of
24 facts on page 2 of Exhibit 2.
25         Do you have that in front of you?

18 (Pages 66 - 69)

Page 70

1    A.   Page 2?
2    Q.   Yes, sir.
3    A.   Oh.
4    Q.   Do you have that in front of you?
5    A.   Right.
6    Q.   You describe in your summary of facts in
7    paragraph 1, second sentence: Troy Belting is a provider
8    of maintenance, repair, and operation services, including
9    parts and supplies.
10        Do you see that?
11   A.   Yes.
12   Q.   At what point in time was that true?
13   A.   You know, I don't know the process.  I know
14   atone time, they did some manufacturing.  And then at
15   the -- in the other part, they did some enhancement of
16   other products that were brought in to them.  And I don't
17   know the exact dates on all that.
18   Q.   Okay.  Is it your understanding Troy Belting was
19   a distributor of products that were manufactured by other
20   companies?
21   A.   At one point, yes.
22   Q.   All right.  Is it your understanding that
23   they've always been a distributor of parts that were
24   manufactured by other companies?
25   A.   Could be.  I didn't -- you know, I don't really

Page 71

1    know what all their business was.  I did know that they
2    had -- at one time, were manufacturers.  And then later,
3    they became just enhancements of other people's property,
4    distributors of other people's business -- property.
5    Q.   Do you have knowledge of at what point in time
6    Troy Belting got involved in different operations and
7    practices?
8    A.   No, I don't.
9    Q.   So you're not going to testify that Troy Belting
10   was always maintaining, repairing, and providing operation
11   services for its entire corporate history?
12        MR. BRENNAN:  Objection.
13   A.   Because I don't know the entire corporate
14   history, I would not.
15   Q.   (BY MR. KOTULA)  You're not saying that from
16   1949 to 1974, they were doing all of that, right?
17        MR. BRENNAN:  Objection.
18   A.   It's my understanding they were doing that.  I
19   mean, I don't know how much of each maintenance or repair
20   or operation services they were doing at each time.  No, I
21   don't know that.
22   Q.   (BY MR. KOTULA)  In fact, can you cite us to a
23   single document or exhibit that supports that Troy Belting
24   was doing all of those things from 1949 to 1974?
25        MR. BRENNAN:  Objection.

Page 72

1    A.   Can I cite a document?  No.
2    Q.   (BY MR. KOTULA)  A single source --
3        MR. BRENNAN:  Objection.
4    Q.   (BY MR. KOTULA)  -- multiple sources?
5    A.   Well, some of the depositions may have mentioned
6    it.  But I didn't -- you know, at that point, I didn't
7    know that it was that important.  I didn't make very much
8    note of that.  I think there were other people who
9    indicated what they were doing, but I didn't think that
10   was anything that I needed to remember or try to
11   memorialize.
12   Q.   Did you review any deposition testimony of
13   anyone who worked for Troy Belting during the period of
14   1949 to 1974?
15        MR. BRENNAN:  Objection.
16   A.   I don't recall.
17   Q.   (BY MR. KOTULA)  If I told you that none of the
18   depositions that you list on your Exhibit B to your expert
19   report are of persons who were employed at Troy Belting
20   during that period, would you have any reason to disagree?
21   A.   That they were not?
22   Q.   They were not during the period of 1949 to 1974.
23   A.   No, I would not disagree.
24   Q.   In fact, for example, Mr. Barcum didn't start
25   working with Troy Belting until sometime in the 2000s.

Page 73

1    A.   Correct.
2    Q.   You understand that, right?
3    A.   Yes.
4    Q.   I'm going to refer you to paragraph 6 in your
5    summary of facts on page 2 of Exhibit 2.
6        Do you have that?
7    A.   Yes.
8    Q.   You say:  Hartford and PEIC has been defending
9    these lawsuits from approximately 1995 to the present.
10        Do you see that?
11   A.   Yes.
12   Q.   Is it your understanding that Hartford and/or
13   PEIC were defending lawsuits against Troy Belting going
14   back into the late 1970s?
15   A.   Yes.
16   Q.   So you didn't mean by saying "1995" to be --
17        MR. BRENNAN:  Objection.
18   Q.   (BY MR. KOTULA)  -- the beginning date that
19   those companies began defending Troy Belting; did you?
20        MR. BRENNAN:  Objection.
21   A.   No.
22   Q.   (BY MR. KOTULA)  On page 3, paragraph 13 of
23   your report -- do you have it in front of you?
24   A.   Yes.
25   Q.   You state:  On several occasions, Troy Belting

19 (Pages 70 - 73)

Page 74

1 or its agents requested that PEIC and Hartford help it
2 investigate its older insurance carriers and help it
3 preserve its rights under older insurance policies.
4         Do you see that?
5   A.   Yes.
6   Q.   All right.  What's your evidence to support that
7 statement?
8   A.   I think that was in Barcum's deposition I saw
9 that.
10   Q.   Again, I think you just testified that he didn't
11 begin working for Troy Belting until sometime in the
12 2000s; was that right?
13   A.   Right.
14   Q.   Did he have any knowledge about efforts before
15 he joined the company?
16         MR. BRENNAN:  Objection.
17   A.   Well, I think he was trying to find out -- I
18 mean, when he came on and -- he was trying to get up to
19 date and trying to get them to defend them on these cases.
20   Q.   (BY MR. KOTULA)  But that was sometime in the
21 2000s, correct?
22   A.   Right.
23         MR. BRENNAN:  Objection.
24   Q.   (BY MR. KOTULA)  Mr. Barcum wasn't with Troy
25 Belting before that; was he?

Page 75

1   A.   No.
2         MR. BRENNAN:  Objection.
3   Q.   (BY MR. KOTULA)  So he wasn't doing anything to
4 help Troy Belting before he joined the company; was he?
5         MR. BRENNAN:  Objection.
6   A.   No.
7   Q.   (BY MR. KOTULA)  Is there any other basis for
8 that statement, besides what you just referred to?
9   A.   Well, I think there was some other depositions
10 that were taken -- and I'm not quite sure -- I can't name
11 them off the top of my head -- that indicated that they
12 had tried to do that.
13   Q.   Who did?
14   A.   Troy Belting.
15   Q.   Troy Belting?
16   A.   You said -- are you on 13?
17   Q.   Yes, sir.
18   A.   Yeah.
19   Q.   You stopped in your answer, so I didn't hear you
20 finish.
21   A.   No, I'm saying -- I mean, I can't recall all of
22 the depositions -- that I recall off the top of my head,
23 but there were other depositions that indicated to me that
24 they had tried to request Hartford and Pacific Employers
25 investigate these older carriers.  And I think that

Page 76

1 probably came on when they were trying to get some pro
2 rata money from them.
3   Q.   Do you know when that began?
4   A.   Not exactly, no.  I think 2009, I think, when it
5 became pretty hot.
6   Q.   And that's when Troy Belting began asking PEIC
7 and Hartford to help it investigate older insurance
8 carriers?
9         MR. BRENNAN:  Objection, form.
10   A.   Right.  I think so.  I think that's correct.
11   Q.   (BY MR. KOTULA)  Okay.  And you say:  PEIC and
12 Hartford declined to perform these functions.
13         Do you see that?
14   A.   Right.
15   Q.   What's your basis for that statement?
16   A.   I didn't see any evidence where they were going
17 back and trying to find these policies for them.
18   Q.   Okay.
19   A.   And on the other -- on those multiple asbestos
20 cases that they had, they had never tried to place Unigard
21 on notice on any of them.
22   Q.   What's your basis for that?
23   A.   The evidence -- there wasn't any evidence that
24 they had.
25   Q.   So it's your understanding that Jamestown Mutual

Page 77

1 and Unigard Insurance Company had never been placed on
2 notice of these asbestos claims against Troy Belting?
3         MR. BRENNAN:  Objection.
4   A.   That's not what I said.  I said -- what I said
5 was -- you were talking about Pacific Employers and
6 Hartford.  And I said they had never placed anybody on
7 notice, except they did Unigard in the Pennell case.  But
8 after that, I didn't see any evidence they placed anybody
9 on notice of any coverage.
10   Q.   (BY MR. KOTULA)  Do you -- are you aware of
11 evidence that Troy Belting asked PEIC or Hartford to place
12 other insurance carriers on notice?
13         MR. BRENNAN:  Objection.
14   A.   Other than the depositions that I looked at, I
15 can't recall a specific case.
16   Q.   (BY MR. KOTULA)  Did you see any documents
17 where Troy Belting asked either PEIC or Hartford to place
18 other carriers on notice?
19         MR. BRENNAN:  Objection.
20   A.   No, I don't recall.  I don't recall right now.
21   Q.   (BY MR. KOTULA)  To your knowledge, in the
22 insurance industry, does a company -- does an insurance
23 company give notice of claims to other insurers when it
24 hasn't been asked specifically by the policyholder to do
25 so?

20 (Pages 74 - 77)

Page 78

1   A.  Sure.

2   Q.  You don't think it's the prerogative of the

3   policyholder to determine who to put on notice of claims?

4       MR. BRENNAN:  Objection.

5   A.  I mean, it's a team effort, both of them.  I

6   mean, obviously, they're going to try to get other

7   carriers in there if it's concurrent coverage or if they

8   think that they don't have all the coverage.  They put

9   them on notice all the time.

10  Q.  (BY MR. KOTULA)  Paragraph 14, you say:

11  Various records obtained during discovery established that

12  both PEIC and Hartford were aware of evidence establishing

13  that Troy Belting was insured by Unigard Insurance and/or

14  its predecessor, Jamestown Mutual Insurance, hereinafter

15  Unigard/Jamestown, from July 18, 1949, to October 3, 1974.

16      Do you see that?

17  A.  Yes.

18  Q.  What are those records?  I'd like you to

19  identify them for me.

20  A.  Well, the agent said that they were; Nicoll &

21  MacChesney, whatever their name is.  They were involved in

22  the Pennell case for several months, and correspondence

23  back and forth asking for information.  It's my belief and

24  opinion that they were doing that to find out whether or

25  not the manifestation date was going to be within their

Page 79

1   policy period.

2   Q.  Who was doing that to see --

3   A.  Unigard.

4   Q.  Unigard was doing what?

5   A.  Asking for documents from Pacific Employers.

6   Q.  All right.  So when you say various records

7   obtained during discovery established that both PEIC and

8   Hartford were aware of evidence establishing that Troy

9   Belting was insured by Unigard Insurance and/or its

10  predecessor, Jamestown Mutual Insurance, from

11  July 18, 1949, to October 3, 1974, you're referring to a

12  few of these broker letters by Nicoll & MacChesney; is

13  that right?

14  A.  Well --

15      MR. BRENNAN:  Objection.

16  A.  No, no, no, no.  Well, they were also involved

17  in, of course, correspondence with Unigard.  Ranalli went

18  over and came back, and has a memo in the file that said

19  that Unigard had coverage.

20  Q.  (BY MR. KOTULA)  Yeah.  And did you review his

21  deposition?

22  A.  Yes.

23  Q.  Did he say that he reviewed insurance policies?

24  A.  No.

25  Q.  Did he say that he looked at any documents to

Page 80

1   support that?

2   A.  I don't recall him saying that, no.

3   Q.  Did he say that he had a recollection of

4   anything that happened in that meeting?

5   A.  It was pretty well documented that he said that

6   Unigard had the coverage.  I mean, obviously, he looked at

7   something.  He didn't make it up.  He said:  Whatever I

8   wrote is true.

9   Q.  We're going to look at his deposition testimony.

10      But isn't it fair to say that when he was

11  deposed, he had no present recollection of what happened

12  in connection with that?

13  A.  At the time he was deposed?

14  Q.  Yes, sir.

15  A.  No, he did not.

16  Q.  He did not have any present recollection,

17  correct?

18  A.  No, he said he didn't.  He said that was a long

19  time ago.

20  Q.  Right.  He didn't --

21  A.  But there were documents in the file that show

22  he went over there and talked to the agent and said that

23  Unigard had coverage.  I mean, that's all I can go by is

24  what the documents say.

25  Q.  We'll look at that.

Page 81

1       Is there anything else that you include,

2   besides the broker letters -- the few broker letters and

3   Mr. Ranalli's memo to his file?

4   A.  Well, PEIC was corresponding with Unigard.

5   Q.  Anything else?

6       MR. BRENNAN:  Objection.

7   A.  I can't recall off the top of my head.  But the

8   agent said that he had put Unigard on notice.

9   Q.  (BY MR. KOTULA)  And the agent was Nicoll &

10  MacChesney?

11  A.  Right.

12  Q.  And they were the agent of Troy Belting?

13  A.  Right.

14  Q.  And you -- it's your testimony that Nicoll &

15  MacChesney told PEIC that they had put Unigard on notice?

16      MR. BRENNAN:  Objection.  That's not what

17  he said.

18  A.  It's my testimony that there's a memo in the

19  file that the agent said, We have notified Unigard of

20  these claims, or something to that effect.

21  Q.  (BY MR. KOTULA)  Who did that memo go to?

22      MR. BRENNAN:  Objection.

23  A.  It went to Troy Belting, I think.

24  Q.  (BY MR. KOTULA)  No one else?

25  A.  I don't recall.

21 (Pages 78 - 81)

Page 82

1    Q.  Paragraph 18 of your report, you say:  At the
2  conclusion of this investigation by PEIC, PEIC's claim
3  handlers sent correspondence and had communications with
4  Unigard Insurance Company regarding the Pennell claim.
5          Do you see that?
6    A.  Yes.
7    Q.  And did you read PEIC's claims handler's
8  deposition?
9    A.  Which one?
10   Q.  William Fields.
11   A.  Yes.
12   Q.  Is that who you're referring to?
13   A.  Yes.
14   Q.  Did you read his deposition?
15   A.  Yes.
16   Q.  And so you're aware that he testified that
17 Unigard's response in correspondence with him indicated
18 that they didn't know what coverage they may have had to
19 Troy Belting?
20        MR. BRENNAN:  Objection.
21   A.  I think there was a letter there from them,
22 Unigard, saying it wasn't material or something, because I
23 guess he figured that it wasn't -- the manifestation date
24 wasn't within their policy period, so they weren't
25 forthcoming with any information.

Page 83

1    Q.  (BY MR. KOTULA)  But you understand Mr. Fields
2  testified in his deposition that he took Unigard's
3  correspondence to him to mean that they didn't know what
4  type of coverage they may have issued?
5          MR. BRENNAN:  Objection.  I'm going to
6  object to the extent --
7    A.  I don't recall that.
8          MR BRENNAN:  -- that it's not his
9  testimony.
10   Q.  (BY MR. KOTULA)  We'll look at it.
11   A.  Sure.
12   Q.  We'll look at it.
13   A.  I think we should.
14   Q.  Can you turn to page 5 of your report.
15   A.  (Witness complies.)
16   Q.  About halfway down the page, you state -- and
17 I'm just going to quote:  It is my opinion that PEIC and
18 Hartford's conduct in this regard violated claims
19 standards and has impaired Troy Belting's ability to prove
20 the existence of these older policies and its ability to
21 otherwise obtain coverage from those policies, unquote.
22        Did I read that right?
23   A.  Yes.
24   Q.  So what's the basis for your statement that PEIC
25 and Hartford's conduct violated claims standards?

Page 84

1    A.  Well, just like I say, in their failing to
2  follow up on the information that they had in the Pennell
3  file, particularly.  They wait until 2009 to put them on
4  notice of some pro rata, when they've been handling claims
5  for 20 or 30 years and had an opportunity at that
6  particular time -- a better opportunity to find out who,
7  if anybody, preceded them.
8    Q.  Is there anything else?
9    A.  No, that's it.
10   Q.  That's what you're saying?
11   A.  That's what I'm saying.
12   Q.  You say that this conduct has impaired Troy
13 Belting's ability to prove the existence of these older
14 policies.
15        Do you see that?
16   A.  Yeah.
17   Q.  And what are you saying there?
18   A.  Just what I just said.  I mean, they had --
19 they've been handling these claims for 20 to 30 years,
20 and, at that point, they could have had better
21 opportunities to find out who was involved before them
22 than Troy Belting has in 2009.  And that -- by not doing
23 that, by not following up on that information, it
24 certainly compromised Troy Belting in trying to establish
25 coverage beyond their --

Page 85

1    Q.  Go ahead.
2    A.  -- beyond that period of the '74 period.
3    Q.  So it's your opinion that Troy Belting's ability
4  to prove the existence of policies in the 1949 to 1974 gap
5  period has been impaired?
6    A.  That's correct.
7    Q.  And by that, you mean, Troy Belting doesn't have
8  the type of evidence to prove those policies that they
9  might have had if they had -- if other things had
10 happened; is that what you're saying?
11        MR. BRENNAN:  Objection.
12   A.  It would have been very easy for them 30 years
13 ago to find that out, as opposed to 2009.
14   Q.  (BY MR. KOTULA)  But is it fair to say it's
15 your opinion that Troy Belting's quantum of evidence of
16 what policies were allegedly issued to it in the 1949 to
17 1974 gap period was reduced by this conduct?
18   A.  That's correct.
19   Q.  And so that seems to recognize that the quantum
20 of evidence isn't what it could be.
21        MR. BRENNAN:  Objection.
22   Q.  (BY MR. KOTULA)  Does it not?
23        MR. BRENNAN:  Objection.
24   A.  Well, obviously, if PEIC and Hartford had, at
25 the time, gone back and -- to Unigard, they might have had

22 (Pages 82 - 85)

1 the primary policies. I don't know. Who knows?

2 Q. (BY MR. KOTULA) But as we sit here now, we

3 know Troy Belting doesn't have any actual policies from

4 1949 to 1974, right?

5 MR. BRENNAN: Objection; asked and

6 answered.

7 A. That's my understanding, yes.

8 Q. (BY MR. KOTULA) They don't have any evidence

9 of policy numbers, aside from that one Exhibit 3 we looked

10 at?

11 MR. BRENNAN: Objection.

12 A. Okay.

13 Q. (BY MR. KOTULA) Right?

14 A. Uh-huh.

15 Q. Yes?

16 A. Yes.

17 Q. They don't have any evidence of the type of

18 liability policy that was issued, apart from Exhibit 3

19 that we looked at?

20 A. Exhibit 3 also said at the bottom, liability.

21 Q. Right. M&C policy liability, right?

22 A. Yeah.

23 Q. But they don't have anything besides that as to

24 the type of liability, right?

25 MR. BRENNAN: Objection.

1 A. Not that I'm aware of.

2 Q. (BY MR. KOTULA) They don't have any evidence

3 of policy limits --

4 MR. BRENNAN: Objection.

5 Q. (BY MR. KOTULA) -- as we sit here now, right?

6 MR. BRENNAN: Objection.

7 A. Right.

8 Q. (BY MR. KOTULA) They don't have any evidence

9 of policy periods, as we sit here now?

10 MR. BRENNAN: Objection.

11 A. Yeah.

12 Q. (BY MR. KOTULA) Right?

13 A. Yes.

14 Q. You said you haven't served as a lost policy

15 expert.

16 Do you have an understanding that there are

17 cases where parties seeking coverage have better evidence

18 than Troy Belting has here?

19 MR. BRENNAN: Objection.

20 A. Well, I'm sure there are. I mean, how would I

21 know? I mean, there's -- thousands of those go on each

22 day, each year.

23 Q. (BY MR. KOTULA) You say in the middle of page

24 5, in that same paragraph we were just looking at: In

25 failing to act upon information in their own files or to

1 otherwise investigate Troy Belting's earlier carriers,

2 PEIC and Hartford has hampered Troy Belting's rights

3 against these policies.

4 Do you see that?

5 A. That's correct.

6 Q. How have PEIC and Hartford hampered Troy

7 Belting's rights against these rights, in your opinion?

8 A. By not having -- not doing the things they

9 should have done at the time by good claims practices and

10 finding out who the other carriers are, they've hampered

11 Troy Belting's right to get in on the policy information.

12 If they had done that 30 years ago, there wouldn't be much

13 of a controversy now.

14 MR. KOTULA: This might be a good time for

15 us to take a --

16 THE WITNESS: Pardon me?

17 MR. KOTULA: Good time to take a

18 five-minute break.

19 (Recess in the proceedings from 12:10 to

20 12:19 p.m.)

21 Q. (BY MR. KOTULA) Sir, you've expressed the

22 opinion in your report at page 5 that PEIC and Hartford

23 had a duty to search for insurance history and prior

24 insurers of Troy Belting before their tenure. And I would

25 --

1 A. What paragraph are you on? I'm sorry.

2 Q. No, I'm just taking about page 5 generally.

3 A. Oh, okay.

4 Q. It's the tenor of your opinion, is it not, that

5 PEIC and Hartford had a duty that they violated to search

6 for insurance history and do an investigation of insurance

7 history to find out who was on -- an insurer of Troy

8 Belting before that, right?

9 A. Yes.

10 Q. That's your opinion?

11 A. Yes.

12 Q. And is there some policy provision that you

13 maintain obligates them to do that?

14 A. Yes.

15 Q. And what provision in their insurance policy

16 obligates them to do that?

17 A. The insuring agreement.

18 Q. And go ahead and tell me --

19 A. Duty to defend. And their duty to defend the

20 policyholder encompasses whatever it takes to get them as

21 much coverage as they can, if there's coverage available,

22 and whatever it needs, be it excess insurance or

23 concurrent insurance, previous insurance; whatever. It's

24 their duty, in my estimation.

25 And also it's a claim -- it's simply a

23 (Pages 86 - 89)

1 claim -- a prerogative that you have to do that.  You have
2 to -- as a claims adjustor, you have to adjust and see who
3 was on the claims -- see who might be on a claim, and
4 notify them, notify your policyholder.  And that's in your
5 duty to defend.  You have to do whatever you have to do to
6 get all that information.  That's what I think.
7          The insurance agreement certainly gives the
8 policy defense rights.  And in that, the carrier has to do
9 whatever is necessary to find whatever coverage he can for
10 the insured, if he's going to defend him, right?  He's
11 going to see if there's any excess carrier, any concurrent
12 coverage; whatever.
13     Q.   Okay.  Are you complete with your answer?
14     A.   Yes.
15     Q.   I didn't want to cut you off.
16     A.   Okay.
17     Q.   It was a little longer than some of your other
18 answers.  I'm not editorializing, but I just didn't want
19 to step in when you were in mid-thought.  And I know you
20 were ruminating at some point there.
21     A.   Yeah.
22     Q.   So are you aware of any court of law in the
23 United States agreeing with what you just said?
24          MR. BRENNAN:  Objection.
25     A.   I'm not aware of any legal decisions, no.

1     Q.   (BY MR. KOTULA)  Okay.  And is it your
2 understanding that PEIC and Hartford defended Troy Belting
3 against all of the asbestos claims that were presented to
4 them?
5          MR. BRENNAN:  Objection.
6     A.   It's my understanding they did, yes.
7     Q.   (BY MR. KOTULA)  Did they ask Troy Belting to
8 pay anything at the time?
9     A.   Which time?
10    Q.   When they were defending them.
11         MR. BRENNAN:  Objection.
12    A.   What period of time are you talking about?
13    Q.   (BY MR. KOTULA)  At any period of time.
14    A.   Well, they had in 2009.
15         MR. LEASURE:  Objection.
16    Q.   (BY MR. KOTULA)  Before 2009, did they ask Troy
17 Belting to pay anything for that defense?
18         MR. LEASURE:  Objection, form.
19         MR. BRENNAN:  Objection.
20    A.   No, not that I'm aware of.
21         THE REPORTER:  When they're making their
22 objections, if you could just hold off for just one second
23 so I can get all of it.
24         MR. KOTULA:  She has to type everything.
25         MR. BRENNAN:  Take a breath when you hear

1 us.
2          THE REPORTER:  Sorry.
3          MR. KOTULA:  She's just asking for the
4 courtesy of a pause.
5          THE REPORTER:  Thank you.
6          THE WITNESS:  Sorry.
7     Q.   (BY MR. KOTULA)  We all want this transcript to
8 be a proper reading of what took place.  So that's what
9 that's -- it's a good thing.
10    A.   That's what it is.
11    Q.   We want to know what your opinions are, and we
12 want to know what they're based on so when this day is
13 over, we can go back and look at them; all right?
14    A.   Right.
15    Q.   It's your interpretation of the duty to defend
16 language in the insuring agreement that PEIC and Hartford
17 have a duty to not only defend the lawsuit, but to look
18 for other coverages.
19         The words themselves don't say that, you
20 would agree, right?
21         MR. BRENNAN:  Objection.
22    A.   Right.
23    Q.   (BY MR. KOTULA)  Okay.  Now, you indicated in
24 Exhibit B to your expert report that you reviewed the
25 deposition transcript of Michael Moran.

1     A.   Yes.
2     Q.   Do you understand that?
3     A.   Yes.
4     Q.   And Mr. Moran was an office manager at Troy
5 Belting at some period of time --
6     A.   Yes.
7     Q.   -- is that right?
8     A.   Yes.
9     Q.   Now, do you understand he testified that Troy
10 Belting didn't keep its insurance policies?
11    A.   Yes.
12    Q.   In fact, we can mark --
13         (Exhibit 5 marked.)
14    Q.   (BY MR. KOTULA)  Showing you now what's been
15 marked as O'Malley Exhibit 5.  It is the cover page from
16 Mr. Moran's deposition and page 191 of his deposition.
17         Do you see that?
18    A.   Yes.
19    Q.   And he was asked the question:  Do you know
20 whether Troy has copies of any of the Jamestown Mutual
21 Insurance policies allegedly issued to it?
22         Answer:  I don't believe so.
23         Do you know who at Troy would know whether
24 Troy has such copies of such policies?
25         No.

1          Question:  If Troy had copies of such
2  policies, where would they be?
3          Answer:  That's a good question, indeed,
4  unquote.
5          Did I read that right?
6     A.  Yes.
7     Q.  So you understood Troy doesn't have copies of
8  any of its policies after the policies expired, right?
9     A.  That's what he said.  I guess this goes
10  together.
11     Q.  Now, Mr. Hughes was asked at his deposition if
12  he ever learned whether the broker maintained copies of
13  insurance policies issued to Troy Belting.  And he
14  testified that he didn't believe the broker kept the
15  policies after the expiration dates either.
16          MR. BRENNAN:  Objection.
17     Q.  (BY MR. KOTULA)  Do you have any information
18  about that?
19     A.  No, I don't.
20     Q.  Do you have any reason to dispute Mr. Hughes?
21     A.  No.
22     Q.  What do you think about the practice of a broker
23  or an agent discarding insurance policies after the
24  expiration date of the policy term?
25          MR. BRENNAN:  Objection.

1     A.  What do I think about it?
2     Q.  (BY MR. KOTULA)  Do you have any opinions about
3  it?
4     A.  Yes.
5     Q.  What are your opinions?
6     A.  I think he should have kept them.  They all
7  should keep them.  I think these long-tail claims that
8  have come out about pollution and asbestos is a good point
9  as to why they should have.
10     Q.  Now, at some point in time, M&C policies were
11  coverages triggered on a cause-by-accident basis.
12          Do you understand that?
13     A.  Yes.
14     Q.  And then later perhaps on an occurrence basis?
15     A.  Yes.
16     Q.  Are you familiar with that?
17     A.  Yes.
18     Q.  And does that mean that these policies could
19  respond to claims that would be considered covered claims
20  even after the policies had expired, as long as something
21  happened during the policy period to trigger coverage?
22     A.  On which ones?
23     Q.  The cause-by-accident or the occurrence policy.
24          MR. BRENNAN:  Objection.
25     A.  The occurrence policy, definitely.  I'm not sure

1  about the other.
2     Q.  (BY MR. KOTULA)  What's the question about
3  caused-by-accident policies?
4     A.  Well, I really don't know.  I don't know.  I
5  can't tell you that.
6     Q.  But it's your opinion -- go ahead.
7     A.  It's -- it's always been interpreted as -- as an
8  occurrence.  But in the earlier -- in some of the earlier
9  policies, they weren't.
10     Q.  So it's your understanding that, even though a
11  policy may -- a liability policy may expire, if it's on an
12  occurrence basis, for example, that it may still respond
13  even for claims that are received after the policies
14  expired?
15          MR. BRENNAN:  Objection.
16     A.  Oh, of course, yes.
17     Q.  (BY MR. KOTULA)  So it's not a good idea for
18  Troy Belting or its agent or broker to not keep copies of
19  those policies after the expiration; is it?
20          MR. BRENNAN:  Objection.
21     A.  I think this lawsuit proves that; doesn't it?
22          MR. BRENNAN:  Can I have five minutes to
23  make a call?  Can I have five minutes to make a call?  I
24  just thought of something I need to take care of.  Another
25  five-minute break real quick?

1          MR. KOTULA:  Unrelated to this?
2          MR. BRENNAN:  Unrelated to this.
3          MR. KOTULA:  Sure.
4          MR. BRENNAN:  Completely unrelated to this.
5          (Recess in the proceedings from 12:29 to
6          12:43 p.m.)
7          (Exhibit 6 marked.)
8     Q.  (BY MR. KOTULA)  Sir, we've placed before you
9  what the court reporter has marked as Exhibit 6.  Exhibit
10  6 was previously marked as Hughes Exhibit 7.  And it's a
11  November 16, 1977, letter from Edward Nicoll, Nicoll &
12  MacChesney, to Mr. Allen Decker at Troy Belting.
13          Yeah, I think I said November 16, 1977.
14          Have you ever seen this document before?
15     A.  Yes.
16     Q.  And the letter states that the carrier of the
17  liability coverage for the past 10-year period prior to
18  July 8, 1976, was the Jamestown Mutual Insurance Company,
19  paren, Unigard Insurance Company, end paren, unquote,
20  right?
21     A.  Yes.
22     Q.  And can you tell from the reference to liability
23  coverage what type of liability policy he's referring to?
24          MR. BRENNAN:  Objection.
25     A.  In this letter?  No.

25 (Pages 94 - 97)

Page 98

1    Q.  (BY MR. KOTULA)  Okay.  And it's fair to say,
2  sir, that Troy Belting does not currently allege that
3  Jamestown Mutual issued an insurance policy up to
4  July 8, 1976, correct?
5    A.  I don't think that's -- I think it was cut off
6  before that period.
7    Q.  Right.  It's currently Troy Belting's claim that
8  Jamestown Mutual issued policies up to October 1974,
9  right?
10   A.  Yes.
11   Q.  So this date isn't even correct, right?
12   A.  If that's true, then this is not right.
13   Q.  Right.
14       (Exhibit 7 marked.)
15   Q.  (BY MR. KOTULA)  Showing you now what the court
16 reporter has marked as Exhibit 7.  It was previously
17 marked as Hughes Exhibit 8.  And it's a letter dated
18 September 15, 1978, from Edward Nicoll, Nicoll &
19 MacChesney, to Mr. Allen Decker.
20       Do you see that?
21   A.  Yes.
22   Q.  Have you seen this document before?
23   A.  Yes, I have.
24   Q.  All right.  And now he states:  Our records show
25 that the Jamestown Mutual Insurance Company, paren,

Page 99

1  Unigard Insurance Company, provided coverage from
2  July 18, 1949, to October 3, 1974, at which time the
3  policy was cancelled.
4       Correct?
5    A.  Yes.
6    Q.  And then he says:  Our records do not show the
7  extent of coverage, unquote.
8       Right?
9    A.  Yes.
10   Q.  Do you know what he means by that?
11   A.  No, I don't know -- I don't.
12   Q.  Can you tell from reading this letter the type
13 of coverage that he's saying Jamestown Mutual Insurance
14 Company provided?
15       MR. BRENNAN:  Objection.
16   A.  Well, not without, I guess, referencing the
17 September 14th, 1978, letter from Troy -- from Allen
18 Decker.
19   Q.  (BY MR. KOTULA)  And you don't know if that
20 letter actually says the type of policy or type of
21 liability policy that it may have been or not, right?
22   A.  The Troy Belting letter --
23   Q.  Yeah.
24   A.  -- from Allen Decker?
25   Q.  Uh-huh.

Page 100

1    A.  No, I don't.  I'm just saying it could say who
2  has -- did Jamestown have your liability in comprehensive
3  -- I mean, I don't know what it said.
4    Q.  I'll represent to you it doesn't say that
5  Jamestown has the comprehensive general liability.
6       MR. BRENNAN:  Objection.
7    A.  All right.
8    Q.  (BY MR. KOTULA)  So can you tell from this what
9  type of liability policy they had?
10   A.  No.
11   Q.  Okay.
12       (Exhibit 8 marked.)
13   Q.  (BY MR. KOTULA)  Sir, showing you now what the
14 court reporter has kindly marked as O'Malley Exhibit 8.
15       MR. KOTULA:  For the record, it's a
16 one-page document on insurance company, North America,
17 form paper, dated January 3, 1978, and it's signed by
18 Peter Ranalli.  It has a Bates stamp of PEIC-013412.
19   Q.  (BY MR. KOTULA)  Have you ever seen this
20 document before?
21   A.  Yes.
22   Q.  Is this a document you testified about earlier,
23 a note that Mr. Ranalli made about meeting with Nicoll &
24 MacChesney?
25   A.  Yes.

Page 101

1    Q.  All right.  And it says, quote:  I met with
2  insurance agent, Nicoll & MacChesney.
3       Right; that's the first line?
4    A.  Right.
5    Q.  Does he say who he met with?
6    A.  Pardon me?
7    Q.  Does he say which person he met with there?
8    A.  No, he didn't say that.
9    Q.  Okay.  He says:  Their records indicate that a
10 policy for Troy Belting & Supply was originally effective
11 on -- I can't tell if that's January 1949 or -- it looks
12 like Jan 1949.
13       Is that how you read that?
14   A.  I don't know whether it's June or January; I'm
15 not sure.
16   Q.  By Jamestown Mutual.
17       All right.  Did I read that line right?
18   A.  Right.
19   Q.  Does he say that he looked at the records?
20   A.  He didn't say it here.
21   Q.  He uses the word "indicate," right?
22   A.  I would assume that you looked at the records,
23 if you're going to say "the records indicate."
24   Q.  Does he say that he looked at the records?
25   A.  No, he didn't say that.  Didn't say it like

26 (Pages 98 - 101)

Page 102

1 that, no.
2    Q.  Right.  Doesn't say he examined the records?
3    A.  No.
4    Q.  This could be that the broker told him the
5 records indicate something, right?
6    A.  Well, if he's --
7         MR. BRENNAN:  Objection.
8    A.  It could say that.  It could say that, yes.  Of
9 course, it could say that.  It also -- probably, if he's
10 over at the agency, why wouldn't he say -- why wouldn't he
11 say, Let me look at them; let me see them?
12    Q.  (BY MR. KOTULA)  Okay.  Doesn't say he did --
13    A.  Doesn't say he did.
14    Q.  -- right?
15    A.  He says "the records indicate," so, I mean, he
16 obviously had some -- looked at them.
17    Q.  I don't believe he says anywhere in this
18 document that he looked at them.
19         Do you see words that say, I reviewed -- I
20 reviewed their records?
21         MR. BRENNAN:  Objection.
22    A.  No.  It just says "their records indicate."
23         (Exhibit 9 marked.)
24    Q.  (BY MR. KOTULA)  Sir, we've placed before you
25 now what the court reporter has kindly marked as O'Malley

Page 103

1 Exhibit 9.
2         MR. KOTULA:  For the record, it's a cover
3 page of the deposition of Peter Ranalli, R-A-N-A-L-L-I,
4 in this case.  And it is portions of, so pages 1 to 2,
5 pages 31 to 37, pages 41 to 46, and pages 92 to 94.
6    Q.  (BY MR. KOTULA)  You reviewed Mr. Ranalli's
7 deposition in preparation of your expert report, correct?
8    A.  Yes, I have.
9    Q.  All right.  Now, if you'll look at the top of
10 page 31 of his deposition -- are you there?
11    A.  Yes.
12    Q.  He's referring to the document with the Bates
13 stamp 13412, which we just marked as O'Malley Exhibit 8,
14 correct?
15    A.  Yes.
16    Q.  And he's asked at line 12 on page 31:  Do you
17 recognize that document?
18         Answer:  I have no recollection of the
19 document, but it is my handwriting.  It is my signature
20 dated January 3rd, 1978.
21         Right?
22    A.  Right.
23    Q.  Page 32, line 8.
24         Question:  Just to be clear, do you recall
25 ever meeting with Nicoll & MacChesney?

Page 104

1         Answer:  I have no recollection of meeting
2 with them.
3         12:  After reading this report, does it
4 refresh your recollection in any way of a meeting with
5 Nicoll & MacChesney?
6         Answer:  No recollection whatsoever,
7 unquote.
8         Did I read that right?
9    A.  That's right.
10    Q.  Page 34, line 14.  He's reading from his memo,
11 which was O'Malley Exhibit 8.
12         I met with insurance agent, Nicoll &
13 MacChesney.  Their records indicate that a policy for Troy
14 Belting & Supply was originally effective on January 1949
15 by Jamestown Mutual.  Unigard later bought out Jamestown
16 and had a policy until cancellation on November 1st, 1974.
17 Only carrier on record.  Signed, Peter Ranalli.
18         Did I read that right?
19    A.  Yes.
20    Q.  Question:  So this indicates at a meeting
21 with the insurance agent, there were some records
22 available -- question at the top of 35 -- is that fair to
23 say?
24         Answer:  It is fair to say.  It says what
25 it says.

Page 105

1         Question:  Well, you wrote "their records
2 indicate."  Do you see that sentence?
3         Answer:  Yes.
4         THE REPORTER:  You've got to slow down.
5         MR. KOTULA:  Sorry.
6    Q.  (BY MR. KOTULA)  Do you know whether you would
7 have written that unless you had reviewed records?
8         Answer:  I have no recollection.
9         Did I read that right?
10    A.  Right.
11    Q.  Do you know if you would have used that language
12 without reviewing records?
13         Answer:  No recollection.
14         Question:  As you sit here today, do you
15 know whether you reviewed any records while you were at
16 Nicoll & MacChesney that indicated that Jamestown Mutual
17 or Unigard were a carrier for Troy Belting?
18         Answer:  I have no recollection of my
19 meeting with Nicoll & MacChesney.  I can only say that in
20 over 30 years, I have never lied on a report.
21         Right?
22    A.  Right.
23    Q.  So then, question at the bottom of page 35:
24         So based upon your custom and practice and
25 in reviewing these records, do you know whether there were

27 (Pages 102 - 105)

1 any records available to you at that time that indicated
2 that Jamestown Mutual or Unigard were an insurer for Troy
3 Belting?
4         Answer:  This says -- this report says the
5 records indicate there was a policy for Troy Belting with
6 Jamestown.  I can't say anything more about that.
7         Did I read that right?
8   A.  Right.
9   Q.  Page 37, line 18.
10         Mr. Ranalli was asked:  Do you recall ever
11 having any meetings with anyone from Troy Belting
12 regarding their prior coverage history?
13         Answer:  I have no recollection of any
14 meetings with Troy Belting.
15         Page 41, line 17.
16         Let's refer you quickly back to Exhibit 2,
17 if you don't mind.  And I know you indicated that you
18 didn't have any recollection of that meeting, but just for
19 clarity, do you recall who you met with at Nicoll &
20 MacChesney?
21         Answer:  My report says I met with
22 insurance agent.  I can say nothing further about whom I
23 met with.
24         Question:  Did you know an Edward Nicoll?
25 Have you ever met him?

1         Answer:  I have no recollection of meeting
2 him, although it is possible he may have been the person I
3 spoke with.
4         Have you ever met a Robert or Bob
5 MacChesney?
6         Answer:  The same reply again as I just
7 said with Nicoll.
8         Then he was asked on page 42:  Would you
9 have a custom and practice regarding the types of records
10 you would be looking to review when going to an insurance
11 agent to investigate coverage history?
12         Answer:  The answer to that is, it would
13 depend on the nature of the case and the facts, and, you
14 know, I would adjust myself accordingly.
15         He continues:  I can't give you one flat
16 answer, but I would probably ask for the history of the
17 coverages, the names of the carriers, the effective dates.
18         43:  Would it have also been your custom
19 and practice to ask for records regarding those matters?
20         Answer:  It would depend on the case.
21         Question:  With respect to an asbestos
22 case, did you ever investigate insurance coverages in an
23 asbestos case?
24         Answer:  I did so few asbestos --
25 asbestosis cases that I would probably have to say no.

1         Did I read that right?
2   A.  Yeah.  I'm -- I'm...
3   Q.  Just yes or no?
4   A.  Yes, yes.  I'm just trying to keep up with you
5 here.
6   Q.  Would you have had a custom and practice
7 regarding the types of records you would ask from an
8 insurance agent to review in investigating coverage in an
9 asbestos case?
10         Answer:  The answer I gave a moment ago
11 would probably apply to that as well.
12         And then page 44, line 4.
13         Answer:  I don't know if I would say I had
14 a custom and practice.  I would act in the appropriate
15 manner given the facts of the case.
16         Question:  And do you know during the time
17 that you were at Nicoll & MacChesney investigating the
18 coverages on behalf of Troy Belting, whether you ever
19 reviewed any policies issued by Jamestown or Unigard?
20         Answer:  I have no recollection of what
21 happened at that meeting.
22         Do you know whether you ever personally
23 communicated with anybody at Unigard regarding Troy
24 Belting?
25         Answer:  No recollection.

1         Do you know whether you ever personally
2 communicated with anybody at Jamestown Mutual Insurance
3 regarding Troy Belting?
4         Answer:  No recollection.
5         I read that right, correct?
6   A.  Yes.
7   Q.  So on page 94, Mr. Ranalli is asked, line 12:
8 But, specifically, was this -- were the records -- meaning
9 the records that he said indicate --
10   A.  Which line are you on?
11   Q.  Line 12.
12         But, specifically, was this -- were the
13 records written notes, were they policies themselves, or
14 --
15         Answer:  I have no idea.
16         Question:  -- were they declaration pages?
17         Answer:  No recollection whatever.
18         Question:  Were they letters?
19         Answer:  I can't tell you.
20         Do you see that?
21   A.  Yes.
22   Q.  I read that right, correct?
23   A.  Right.
24   Q.  So Mr. Ranalli can't tell us that he looked at
25 policies or anything else for that matter; he can't say

Page 110

1 what he looked at in this deposition; isn't that right?
2         MR. BRENNAN: Objection.
3    A. When was this deposition taken? 2015; you're
4 talking about 30 years later. I doubt very seriously if
5 he can recall all that.
6    Q. (BY MR. KOTULA) Do you know whether Unigard
7 was given an opportunity to speak about what evidence
8 there were of policies they may have issued before then?
9         MR. BRENNAN: Objection. Before when?
10   A. What do you mean "were they given an
11 opportunity"?
12   Q. (BY MR. KOTULA) Well, you're pointing out that
13 Mr. Ranalli didn't remember these things in 2015.
14   A. No, you pointed it out. Yes.
15   Q. Right. But what evidence are you aware of that
16 somebody presented any of this to Unigard or Jamestown
17 Mutual and asked them to look at it?
18        MR. BRENNAN: Objection. I mean, what --
19   A. Well, from the exhibits I saw in the Field's
20 deposition, they were corresponding with Unigard.
21        (Exhibit 10 marked.)
22   Q. (BY MR. KOTULA) Showing you now what the court
23 reporter has kindly placed before you and marked as
24 O'Malley Exhibit 10. It's an August 11, 1978, letter from
25 Mr. Field to Unigard.

Page 111

1         Have you seen this document before, sir?
2    A. Yes.
3    Q. All right. And in addition to enclosing a copy
4 of a bill of particulars and an attorney letter, Mr. Field
5 asks: Would you kindly advise me of the dates and history
6 of your coverage on this risk? I understand you had it
7 for at least 10 years prior to our policy. Do you know
8 who preceded your company?
9         Right?
10   A. Yes.
11   Q. I read that correctly?
12   A. Yes.
13   Q. Is this what you're referring to as
14 correspondence Mr. Field had?
15   A. That's some of it, yes.
16        (Exhibit 11 marked.)
17   Q. (BY MR. KOTULA) Sir, I've placed before you
18 what the court reporter has kindly marked as O'Malley
19 Exhibit 11.
20        MR. KOTULA: For the record, it's an
21 August 21, 1978, letter from James Dixon at Unigard
22 Insurance Group to Mr. William Field at Insurance Company
23 of North America?
24   Q. (BY MR. KOTULA) Have you seen this document
25 before, sir?

Page 112

1    A. Yes.
2    Q. Is this one of the letters you were talking
3 about in terms of correspondence that Mr. Field exchanged
4 with Mr. Dixon?
5    A. Yes.
6    Q. Mr. Dixon states, quote: The agent's records
7 indicate that our coverage goes back through Jamestown
8 Mutual to July 18, 1949, although I cannot see that this
9 is material. Going back beyond recent years, there are no
10 memoranda to indicate precisely what the coverage was. We
11 don't know who may have preceded Jamestown.
12        Did I read that right?
13   A. Right.
14   Q. Mr. Dixon didn't say that Unigard had records
15 indicating that Jamestown had coverage; did he?
16        MR. BRENNAN: Objection.
17   A. In this letter?
18   Q. (BY MR. KOTULA) Yes.
19   A. No.
20   Q. He said that the agent had records?
21   A. Right.
22   Q. He doesn't even say he saw those records?
23        MR. BRENNAN: Objection.
24   A. Right. But he doesn't think they're material
25 anyway. So -- but it's funny, though, he asked for any

Page 113

1 medical reports that you -- when received. Why would he
2 want those?
3    Q. (BY MR. KOTULA) Well, we'll get into that in a
4 second.
5        (Exhibit 12 marked.)
6    Q. (BY MR. KOTULA) Sir, we've placed before you
7 what the court reporter has kindly marked as O'Malley
8 Exhibit 12.
9         MR. KOTULA: And Exhibit 12 is a transcript
10 in this case of the deposition of William Field, and it
11 includes the first pages. And then in mini-script form,
12 or the four-pages-to-a-page form, it has page 73 to 76,
13 173 to 176, 177 to 180, and 181 to 184.
14        I could have probably done that in a better
15 way, but we know what it is for the record.
16        MR. BRENNAN: Yep.
17   Q. (BY MR. KOTULA) So you reviewed Mr. Field's
18 deposition transcript, right?
19   A. Yes.
20   Q. And I'm going to refer you to the top of page
21 73, line 1. And Mr. Field is being asked about what we've
22 marked as O'Malley Exhibit 11.
23        He says: It says the agent's records
24 indicate --
25   A. 12?

29 (Pages 110 - 113)

Page 114

1   Q.  Well, you're in -- you're in 12.
2   A.  I'm sorry.
3   Q.  But he's referring in his testimony to what
4  we've marked as Exhibit 11, the letter from Mr. Dixon at
5  Unigard, right?
6   A.  Right.
7   Q.  And he says:  It says -- meaning the document --
8  quote, the agent's records indicate that our coverage goes
9  back through Jamestown Mutual to July 18, 1949, although,
10  I cannot see that this is material.  Going back beyond
11  recent years, there are no memoranda to indicate precisely
12  what the coverage was.  We don't know who may have
13  preceded Jamestown.
14          So he was shown that language.  And on page
15  76, in the bottom of the same page you're looking at, he
16  was -- he provided the following answer, line 10:  It says
17  that Jamestown Mutual had the coverage from July 18, 1949,
18  but they didn't know what the coverage was and they don't
19  know who preceded Jamestown.  That's about what it says.
20          Question:  Based upon the reading of that
21  paragraph, do you have an understanding one way or another
22  as to whether Jamestown issued coverage to Troy Belting?
23          Answer:  They had coverage, but they don't
24  know what it was, apparently, unquote.
25          Did I read that right?

Page 115

1   A.  Right.
2   Q.  So Mr. Field, what he made of Mr. Dixon's letter
3  was that they had issued policies, but they don't know
4  what kind of policies issued, correct?
5          MR. BRENNAN:  Objection.
6   A.  No.  He said they had coverage, but they don't
7  know exactly what it was.
8   Q.  (BY MR. KOTULA)  Isn't that the same thing?
9          MR. BRENNAN:  Objection.
10   A.  Not policy, no.
11   Q.  (BY MR. KOTULA)  Well, if you say you have
12  coverage, isn't -- aren't you saying you have a policy?
13   A.  Yes.  That's what he said is --
14   Q.  I asked you early on in the deposition, If you
15  have -- someone says they have liability coverage, isn't
16  that the same as saying they have a liability policy?
17   A.  Right.
18   Q.  And can you tell what type of liability policy
19  they have if they say they have liability coverage?
20          And you said, No.
21   A.  That's correct.
22   Q.  If they say they have a liability policy, can
23  you tell what type of liability policy?
24          And you said, No.
25   A.  Right.

Page 116

1   Q.  Correct?  Mr. Field is saying that his reading
2  of Mr. Dixon's letter is that they have coverage, meaning,
3  they issued policy or policies, but they don't know what
4  it is; they don't know what type?
5          MR. BRENNAN:  Objection.
6   Q.  (BY MR. KOTULA)  Isn't that what he's saying?
7          MR. BRENNAN:  Objection.
8   A.  Doesn't know what type of liability?
9   Q.  (BY MR. KOTULA)  Yes, sir.
10   A.  Yeah, but I don't know -- that's not exactly
11  what he said.  But he says they -- they had coverage, but
12  they don't know what it is, apparently.
13   Q.  And that's the same as saying they had policies,
14  but they don't know what they are?
15          MR. BRENNAN:  Objection.
16   A.  All right.
17   Q.  (BY MR. KOTULA)  Right?
18   A.  You have to have a policy to have coverage.  But
19  I'm just saying that's not what -- you said he had a
20  policy.  He didn't say he had a policy; he said he had
21  coverage.
22   Q.  I said, In effect, he is saying they had -- they
23  were saying they had policies, but they don't know what
24  type of policies they have?
25   A.  That's --

Page 117

1          MR. BRENNAN:  Objection.
2   A.  -- that's what he said, yes.
3   Q.  (BY MR. KOTULA)  Yeah.  If you'll turn to page
4  179.
5   A.  (Witness complies.)
6   Q.  Actually, look at page 180, line 3.
7          Mr. Field was asked:  Did you ever see a
8  Unigard insurance policy for Troy Belting?
9          Answer:  No.
10          Line 7:  Did you ever see a Jamestown
11  insurance policy for Troy Belting?
12          Answer:  No.
13          You saw that; you understand Mr. Field has
14  never seen a policy, right?
15   A.  Right.
16   Q.  Now, there's reference to the Pennell case.
17          You've referred to it in your report,
18  correct?
19   A.  Yes.
20   Q.  And in your testimony today?
21   A.  Right.
22   Q.  And Pennell was an asbestos bodily injury case,
23  correct?
24   A.  Yes.
25   Q.  And is it your understanding that Pacific

30 (Pages 114 - 117)

Page 118

1 Employers Insurance Company defended Troy Belting in the
2 Pennell matter?
3      A.  Yes.
4      Q.  And did they fully defend Troy Belting in that
5 matter?
6      A.  Yes.
7      Q.  Did they pay all of the defense in that matter?
8      A.  Yes.
9      Q.  And is it your understanding that Pacific
10 Employers also reached a settlement on behalf of Troy
11 Belting in the Pennell matter?
12     A.  Yes.
13     Q.  And is it your understanding that Pacific
14 Employers paid the entire amount of the settlement that
15 was due on behalf of Troy Belting?
16     A.  Yes.
17     Q.  No one else paid any part of that settlement?
18         MR. BRENNAN:  Objection.
19     A.  No.
20     Q.  (BY MR. KOTULA)  I'm going to refer you to
21 Exhibit 12 at page 175.  It's at the bottom on the left
22 side.
23     A.  Which page; I'm sorry?
24         MR. BRENNAN:  175.
25     Q.  (BY MR. KOTULA)  Page 175.

Page 119

1      A.  All right.
2      Q.  And Mr. Field was asked:  Would INA pay on a
3 claim for which they had no coverage?
4         That's line 6.
5         Line 8:  No.
6         So the fact that Jamestown and Unigard did
7 not pay on the Pennell case, is that significant to you as
8 a claims professional?
9         Answer:  It's significant to me, but I
10 don't have any idea what the reason was.
11        Question:  Does that suggest to you that
12 perhaps Jamestown and Unigard did not cover that
13 particular claim?
14        Answer:  There would be a question, yeah,
15 unquote.
16        Did I read that right?
17     A.  Yes.
18     Q.  And then he says -- he's asked at line 21:
19 Could that be one of the reasons that Jamestown and
20 Unigard did not pay, because they didn't cover the claim;
21 is that one reason that's possible?
22        Top of line -- page 176, line 1.
23        Answer:  Yes.
24        Did I read that right?
25     A.  Yes.

Page 120

1      Q.  So Mr. Field said that one reason Jamestown and
2 Unigard may not have paid anything for Pennell is they
3 didn't have coverage, right?
4      A.  That's one possible reason, yes.
5         (Exhibit 13 marked.)
6      Q.  (BY MR. KOTULA)  Sir, we're placing before you
7 what the court reporter has kindly marked as O'Malley
8 Exhibit 13.  It's portions of the deposition of Peter
9 Ranalli.  We looked at some other portions a moment ago.
10        MR. KOTULA:  For the record, this is pages
11 1 to 2 for the cover page and appearances, and then pages
12 48 to 49 and 97 to 98.
13     Q.  (BY MR. KOTULA)  You reviewed Mr. Ranalli's
14 deposition, I think you've already testified, correct?
15     A.  Yes.
16     Q.  Page 48, line 12.
17        Question:  Would you, in circumstances
18 where there was a denial of coverage, request to review
19 workers' comp testimony?
20        Answer:  If it was pertinent to the case at
21 hand.
22        Question:  If there was no coverage
23 available, would you assign a claim number?
24        Answer:  Yes.
25        Question:  Would that be called a dummy

Page 121

1 claim number, or was there a name for it?
2         Answer:  No.  It would be -- everything we
3 handled -- it says "as a claim" -- is assigned a claim
4 number.
5         Page 49, line 3.
6         Question:  Was that true at INA?
7         Answer:  Yes.
8         Question:  Everything had a claim number?
9         Answer:  Yes.
10        Question:  Even if there was a
11 determination that there was no available coverage?
12        Answer:  That is correct.
13        Do you see that?
14     A.  Yes.
15     Q.  And that was Mr. Ranalli's testimony in this
16 case, right?
17     A.  Okay.
18     Q.  You agree with that, right; that's his
19 testimony?
20     A.  That's what he said, yes.
21     Q.  Now, page 97, line 9, Mr. Ranalli was asked:
22 Was there ever a time that you were notified by another
23 carrier that the carrier was putting INA on notice that
24 they felt INA supplied some or all of the coverage for a
25 particular claim?

31 (Pages 118 - 121)

Page 122

1          Answer:  It is possible.
2          Question:  If that were to happen, would
3 you open a claim file or a number?
4          Answer:  Most likely, yes.
5          Question:  Would you investigate to see
6 whether it was true that, in fact, INA provided coverage?
7          Answer:  Yes.
8          Question:  Would you ask for information
9 from the one who was putting you on notice?
10          Answer:  Yes.
11          Would you also ask for information perhaps
12 about the underlying claim?
13          Yes.
14          Do you see that?
15     A.  Right.
16     Q.  Is it your opinion that when Unigard received
17 notice of the Pennell matter, it shouldn't have opened up
18 a claim?
19          MR. BRENNAN:  Objection.
20     A.  I don't know what their practice is, whether
21 they dummy claim or open up a claim.  You're talking about
22 INA here.
23     Q.  (BY MR. KOTULA)  No, I'm just asking you now
24 about Unigard.
25          Is it your opinion that Unigard, when it

Page 123

1 received notice of the Pennell matter, that it shouldn't
2 have opened up a claim file?
3     A.  It shouldn't have opened one?  You mean, would
4 they have; is that what you're asking me?
5     Q.  No.  I'm saying, is it your opinion that they
6 should not have opened a claim file?
7          MR. BRENNAN:  Objection.
8     A.  It's my opinion that they should have opened a
9 claim file.
10     Q.  (BY MR. KOTULA)  Okay.  They should have?
11     A.  Yeah.
12     Q.  And it's also your opinion then that they should
13 have assigned a claim number to that claim file, correct?
14          MR. BRENNAN:  Objection.
15     A.  Normally, they do, but some people don't.  Some
16 people have dummy files that don't have claim numbers.
17     Q.  (BY MR. KOTULA)  Is it your opinion that
18 Unigard should have conducted an investigation?
19     A.  They were.  They were asking Pacific Employers
20 about all this stuff.
21     Q.  Right.
22     A.  Complaint, bill of particulars, any comp, any
23 medical.
24     Q.  Now, I want to show you what's --
25          (Exhibit 14 marked.)

Page 124

1     Q.  (BY MR. KOTULA)  I'm showing you now --
2          MR. BRENNAN:  14?
3          MR. KOTULA:  Yes.
4     Q.  (BY MR. KOTULA)  -- what we've marked as
5 O'Malley Exhibit 14.
6          MR. KOTULA:  And for the record, it is a
7 summons with notice in the matter of Rose M. Pennell
8 against Johns-Manville Sales Corp., et al.
9     Q.  (BY MR. KOTULA)  Have you ever seen this
10 document before, sir?
11     A.  I don't recall seeing it.  I might have seen it,
12 but I don't recall seeing it.
13     Q.  Do you know what a summons with notice is under
14 New York court practice?
15     A.  It says, You're -- you hereby have to answer to
16 the complaint -- no.  I mean, I don't know exactly what
17 that means.
18     Q.  Are you aware that, in New York, an action could
19 be commenced with the filing of merely a summons and with
20 no complaint being filed?
21          MR. BRENNAN:  Objection.
22     A.  It's my understanding in reading this document,
23 yeah.
24     Q.  (BY MR. KOTULA)  Just from reading this
25 document --

Page 125

1     A.  Not this document.
2     Q.  -- and nothing else?
3     A.  Just what I gathered from reading the other
4 documents and so forth.
5     Q.  Okay.  So you understand that the Pennell case
6 was commenced with merely a summons being filed?
7     A.  Okay.
8     Q.  Yes?
9          MR. BRENNAN:  Objection.
10     Q.  (BY MR. KOTULA)  You do understand that?
11     A.  No, I did not understand that.  But I understand
12 that now, yes.
13     Q.  There's no complaint at this point in time,
14 right?
15     A.  Right.
16          MR. BRENNAN:  At what point in time?
17          MR. KOTULA:  The time Exhibit 14 was filed.
18          MR. BRENNAN:  You're talking July 8, 1976?
19          MR. KOTULA:  Yes, sir.
20          MR. BRENNAN:  Okay.  I just want to make
21 sure we're all on the same page.
22          MR. KOTULA:  I'm not going to give any more
23 testimony, but...
24          MR. BRENNAN:  Just want to make sure.  Hey,
25 we want a good record, right?

32 (Pages 122 - 125)

Page 126

1  Q. (BY MR. KOTULA)  When Exhibit 14 was filed with
2  the court, and then served on Troy Belting, there was no
3  complaint commencing that action.
4      Do you understand that now?
5  A. Yes.
6  Q. So there were no allegations to go look at in a
7  complaint?
8  A. Apparently not, no.
9  Q. Okay.  Now, if a suit is commenced with a
10 summons with notice like this, does the insurer have a
11 duty to investigate if it's been put on notice of this?
12     MR. BRENNAN:  Objection.
13 A. Does the insured?
14 Q. (BY MR. KOTULA)  The insurer that's been put on
15 notice of a summons with notice, does it have a duty to
16 investigate it?
17 A. Well, of course they would have a duty to
18 investigate.
19     (Exhibit 15 marked.)
20 Q. (BY MR. KOTULA)  I'm showing you now what we've
21 marked as O'Malley Exhibit 15.  It is an expert report of
22 James E. O'Malley, Junior, in a case captioned, United
23 States Fidelity & Guaranty Company versus Soco West, Inc.
24 It's dated September 2, 2005.  And it appears with a 2005
25 Westlaw 6578723 reference in the District Court -- US

Page 127

1  District Court of Montana.
2      Are you familiar with what we've marked now
3  as O'Malley Exhibit 15?
4  A. No.  It doesn't ring a bell to me at all.
5  Q. All right.  Did you ever provide an expert
6  report in a matter titled, USF&G versus Soco West, in
7  Montana?
8  A. It looks like I did, but I don't recall it.
9  Q. I'm going to refer you to paragraph 15 in your
10 report that we've marked now as Exhibit 15.  Let me know
11 when you have it.
12 A. Okay.
13 Q. You state, quote:  Over the past years, both
14 USF&G and Continental have denied coverage to Soco on the
15 purported basis that a number of the policies they sold to
16 Dyce, D-Y-C-E, are missing.  In my opinion, USF&G and
17 Continental have failed to conduct a prompt and thorough
18 investigation for documents and information relating to
19 the existence and terms of those policies.
20     Did I read that right?
21 A. Right.
22 Q. So in a lost policy case, when an insurer is put
23 on notice of a claim, and they don't have copies of the
24 policies that they're alleged to have issued to a party
25 seeking coverage, they have a duty to conduct a thorough

Page 128

1  investigation to try to determine if they have -- if they
2  issued policies --
3  A. Right.
4  Q. -- and what those terms were of those policies,
5  correct?
6  A. Right.
7  Q. So you don't deny that Unigard, when it was
8  placed on notice of the Pennell matter, had a duty to
9  conduct a thorough investigation into whether it issued
10 policies and what the terms of those policies may be?
11 A. Well, no -- yes, they do.  I mean, they were
12 placed on -- if they had no liability insurance, whether
13 it was through M&C or comprehensive general liability, why
14 would they care what the medical is, what the bill of
15 particulars says, or anything else?
16     I've handled claims long enough to know
17 that if somebody put me on notice of that, and I looked
18 and said, We don't -- all we've got is a workers'
19 compensation claim; they're wanting something else, I'd
20 write them back and say, Well, thanks a lot, but we don't
21 have any coverage for this.
22     So, obviously, they must have had coverage
23 for it or they wouldn't have continued the correspondence.
24     MR. KOTULA:  I'm going to move to strike
25 that answer, and ask the question be read back.  And you

Page 129

1  can answer the question I asked, because, with all due
2  respect, I don't think that -- I think you may have
3  misapprehended the question.
4      MR. BRENNAN:  I don't think he did.
5      MR. KOTULA:  I don't think you were
6  answering the question that I asked.  So I would like it
7  read back, and then I'd like you to consider an answer to
8  that question.
9      (The requested portion was read.)
10 A. What was the first part; you don't deny?  What
11 did you say?
12 Q. (BY MR. KOTULA)  You don't deny that Unigard
13 had a duty to conduct a thorough investigation?
14     MR. BRENNAN:  Objection.
15 A. Yes, I think they do have a duty to --
16 Q. (BY MR. KOTULA)  Right.  You're agreeing they
17 have -- they have to conduct a thorough investigation?
18 A. Right.
19     MR. BRENNAN:  Objection.
20 Q. (BY MR. KOTULA)  So they can't just simply say,
21 We're not going to do an investigation?  We don't have --
22     THE REPORTER:  Hold on.
23     (Pause in the proceedings from 1:26 to
24     1:41 p.m.)
25 Q. (BY MR. KOTULA)  So I'm just picking up.

33 (Pages 126 - 129)

Page 130

1        We don't have any policies, question mark?
2        MR. BRENNAN:  Can you just read the full
3   question, because now that didn't make sense to me.  Just
4   read the full question back.
5        MR. KOTULA:  I wasn't finished with the
6   question, so I needed the ending --
7        MR. BRENNAN:  If she could read it from
8   start to the end now that you just -- I'm sorry to be a
9   pain, but my recollection of the start didn't fit the end,
10  so I'm confused, and I don't want to be.
11       (Recorded portion played back due to
12         technical difficulties.)
13       MR. BRENNAN:  Objection.  And I just wanted
14  to object, because we started talking about objection --
15  excuse me; investigations into policies and the existence
16  of policies, and I want to make sure that we're talking
17  about the same thing, whether we're talking about
18  investigations of the underlying claims or investigations
19  of whether the policies exist in the first instance.
20       With that being said, you can answer the
21  question if you understand which one was meant.
22  Q.  (BY MR. KOTULA)  You can answer.
23       MR. BRENNAN:  Go ahead; you can answer.
24  A.  I'm sorry; what was the question?  I've lost it.
25  Q.  (BY MR. KOTULA)  I'm just going to repeat it.

Page 131

1   A.  Yes.
2        MR. KOTULA:  And you have a continuing
3   objection.
4        MR. BRENNAN:  Thank you very much.
5   Q.  (BY MR. KOTULA)  So an insurance company can't
6   just say, We're not going to do an investigation of the
7   claim, because we don't have any policies --
8        MR. BRENNAN:  Objection.
9   Q.  (BY MR. KOTULA)  -- right?
10  A.  I didn't say that.
11  Q.  So what you're saying is, Unigard got notice of
12  the Pennell claim, and they couldn't find any policies;
13  Troy Belting didn't have any policies.
14       And is it your opinion that Unigard had no
15  duty to conduct a thorough investigation as to whether
16  there was any evidence they issued policies?
17       MR. BRENNAN:  Objection.
18  A.  No, that's not what I'm saying.  I'm saying that
19  the documents that I reviewed and the correspondence I
20  reviewed to Unigard, Unigard had a policy, a comprehensive
21  general liability policy, or they would not have continued
22  to ask for workers' comp information, amended complaint;
23  other things.
24       What they would have done would say, Well,
25  look, this is outside of our policy period, and so we're

Page 132

1   not going to continue it, if they had no policy.  Or if
2   they had no policy, they would have said, We don't have a
3   general liability policy; we don't need to communicate
4   with you anymore.
5   Q.  (BY MR. KOTULA)  Well, that's not what
6   Mr. Ranalli said he would do at INA; is it?
7   A.  What, for instance?
8   Q.  We looked at his deposition testimony, and he
9   said that even if he didn't have evidence that INA issued
10  a policy, he would conduct an investigation, and he would
11  ask for information about the claim.
12       MR. BRENNAN:  Objection, form.
13       MR. FOX:  Objection.
14  A.  He might have said that, but I don't think
15  that's what Unigard was thinking at the time.  Unigard had
16  a policy, or they wouldn't have been corresponding with
17  Mr. Field, asking these things.
18  Q.  (BY MR. KOTULA)  So you think Unigard had an
19  actual policy?
20  A.  I believe Unigard had a comprehensive general
21  liability policy or an M&C policy that covered liability
22  -- that covered completed operations and products.
23  Q.  You think that Unigard had in its hand an actual
24  insurance policy, with the forms of an insurance policy,
25  issued to Troy Belting?

Page 133

1        MR. BRENNAN:  Objection.
2   A.  Yes.
3   Q.  (BY MR. KOTULA)  What's your basis for saying
4   that?
5   A.  Because of the correspondence back and forth
6   that they were wanting the information.  Why would they
7   want -- why would they want all of this information if
8   they didn't have Troy Belting as a policyholder; what good
9   would it do them?
10  Q.  If they had a policy, why wouldn't they simply
11  say in one of the many letters, We have a policy?
12  A.  Well --
13  Q.  Are you aware of any correspondence from Unigard
14  or Jamestown Mutual saying, We have a policy that covers
15  comprehensive general liability or CGL insurance?
16  A.  No, they didn't say that.
17       MR. BRENNAN:  Objection.
18  Q.  (BY MR. KOTULA)  Are you aware of any document
19  where anyone from Unigard or Jamestown Mutual says, We
20  have a policy?
21       MR. BRENNAN:  Objection.
22  A.  No, I didn't say that.  I'm telling you, my
23  opinion is based upon the correspondence back and forth
24  that went on for weeks and months.  Why would they
25  continue to correspond weeks later after they were

34 (Pages 130 - 133)

Page 134

1  notified of this if they didn't have a comprehensive
2  liability policy or an M&C that covered products and
3  completed operations?
4      The reason is, they were waiting to see
5  whether or not this -- because at that time, manifestation
6  was the thing that everybody lived by.  And they were
7  hoping, and they were right, that the manifestation was
8  outside of their policy limits, outside of their policy
9  period.
10     Q.  (BY MR. KOTULA)  Are you aware of any evidence
11 that Unigard or Jamestown had an actual policy that one of
12 them had issued to Troy Belting?
13     MR. BRENNAN:  Objection.
14     A.  I don't have the actual policy.  I'm giving my
15 opinion based upon what I see in the file -- in the
16 Pennell file.
17     Q.  (BY MR. KOTULA)  Right.  Are you aware of
18 anybody at any company saying, Jamestown or Unigard has in
19 hand a policy of insurance issued to Troy Belting?
20     A.  Well, nobody said that in those words, no.
21     Q.  Is it your opinion that they did?
22     MR. BRENNAN:  Objection.
23     A.  I said nobody said that in those words, no.
24     Q.  (BY MR. KOTULA)  No, but is it your opinion
25 that someone had an actual copy of the insurance policy

Page 135

1  that's missing that had been issued to Troy Belting?
2      MR. BRENNAN:  Objection.
3      A.  That's my opinion, yes.
4      Q.  (BY MR. KOTULA)  And what's your basis for
5  that?
6      A.  Well, we just went through that.  On the
7  correspondence that they keep asking William Field --
8      MR. FOX:  Objection to form.  Excuse me.
9      Q.  (BY MR. KOTULA)  You can answer.
10     A.  -- William Field for information.  And the long
11 period of time that I've been in the claims business, I
12 had more to do than just correspond with people about
13 supposed coverage.  If I didn't have any coverage, I'd go
14 on to something else, and I'm sure they would have, too.
15     Q.  Did anybody ask Unigard or Jamestown to pay
16 anything for the defense of Pennell at any time?
17     A.  No, because they found the manifestation date
18 outside their policy period.
19     Q.  That's not what I asked.
20         I asked you:  Did anybody at any time ask
21 Unigard or Jamestown Mutual to pay anything for the
22 defense cost of Troy Belting in the Pennell case?
23     MR. BRENNAN:  Objection; asked and
24 answered.
25     MR. FOX:  Objection, form.

Page 136

1      A.  That's what I said; I said, No.
2      Q.  (BY MR. KOTULA)  Yes or no?
3      A.  I said, No, because --
4      Q.  See, your "because" is not responsive to my
5  question.
6          I just asked you:  Did anybody ask them;
7  yes or no?
8      MR. BRENNAN:  Objection; asked and
9  answered.
10     Q.  (BY MR. KOTULA)  And you said, "No"?
11     A.  That's right.
12     Q.  But then you gave your opinion about why the
13 answer was no.  I didn't ask for that.
14     MR. BRENNAN:  Objection.
15     A.  It wasn't my opinion; it's a fact that the
16 manifestation date was outside anybody else's policy
17 period.
18     Q.  (BY MR. KOTULA)  And at that point in time,
19 hadn't INA lost on its position that a manifestation
20 trigger applied in asbestos cases in the District Court in
21 48 Insulations?
22     MR. FOX:  Objection to form.  Lack of
23 foundation.  Calls for speculation.
24     MR. BRENNAN:  What he said; objection.
25     A.  I don't know what you're saying; I'm sorry.

Page 137

1      Q.  (BY MR. KOTULA)  Are you familiar with the 48
2  Insulations coverage case?
3      A.  The one that caused the pro rata?
4      Q.  The one that went exposure trigger and pro rata
5  time on risk allocation?
6      MR. BRENNAN:  Objection.
7      MR. FOX:  Objection.
8      A.  I'm not familiar with it.  I know what happened.
9      Q.  (BY MR. KOTULA)  Are you aware that the caption
10 of that case is, Insurance Company of North America versus
11 48 Insulations?
12     MR. FOX:  Objection to form.
13     MR. BRENNAN:  Objection.
14     A.  No, I didn't know that.
15     Q.  (BY MR. KOTULA)  That's INA?
16     A.  Right.
17     MR. BRENNAN:  Objection.
18     Q.  (BY MR. KOTULA)  Are you aware that at that
19 point in time in 1978, the federal court in 48 Insulations
20 rejected INA's position for a manifestation trigger and
21 adopted an exposure trigger saying all policies in effect
22 while someone was exposed to asbestos were triggered?
23     MR. FOX:  Objection to form.
24     MR. BRENNAN:  Objection.
25     Q.  (BY MR. KOTULA)  You can answer.

35 (Pages 134 - 137)

1    A.  Yes.
2    Q.  All right.  So you're saying INA wasn't asking
3  for money, because they were going off of a manifestation
4  trigger, but that same manifestation trigger had been
5  rejected in 48 Insulations?
6        MR. BRENNAN:  Objection.
7        MR. FOX:  Objection, form.
8    A.  I'm going by what their own people said --
9  Barbara Shumaker said, We're going to go with this date,
10  and it's -- whatever it was, as the manifestation.  That's
11  what she said.  She was an INA employee.
12    Q.  (BY MR. KOTULA)  Well, isn't it a fact that no
13  one ever asked Unigard or Jamestown to pay one cent for
14  the defense of Pennell at any time?
15    A.  Is that a fact?
16        MR. BRENNAN:  Objection.
17    Q.  (BY MR. KOTULA)  Yes.
18    A.  Yes.
19    Q.  And isn't it a fact that no one ever asked
20  Unigard or Jamestown to pay one cent for the settlement of
21  the Pennell claim?
22        MR. BRENNAN:  Objection; asked and
23  answered.
24    A.  That's correct.
25        MR. KOTULA:  Off the record.

1        (Recess in the proceedings from 1:51 to
2        2:01 p.m.)
3        (Exhibit 16 marked.)
4    Q.  (BY MR. KOTULA)  I'm showing you now what we
5  have marked as O'Malley Exhibit 16.
6        MR. KOTULA:  For the record, it's a
7  two-page document in the matter of Roberts versus Printup,
8  P-R-I-N-T-U-P, in the Federal District Court for Kansas.
9  And it's the transcript of the trial testimony of James
10  O'Malley, dated October 11, 2007.
11    Q.  (BY MR. KOTULA)  Were you involved in a case
12  called Roberts versus Printup?
13    A.  Yes, I was.
14    Q.  And what was your role in that case?
15    A.  I was an expert for -- wait a minute.  This has
16  got -- it doesn't have the carrier on here.  I can't
17  remember the name of the carrier.
18    Q.  Okay.
19    A.  Well, anyway, whatever.
20    Q.  What do you remember about the case?
21    A.  It was an automobile case, but I can't remember
22  exactly what happened.  I think this is about 10 years ago
23  or so.
24    Q.  So on the second page of Exhibit 16 --
25    A.  Yeah.

1    Q.  -- you were asked:  If it is determined that a
2  claim should be denied, then does the insurance company
3  have an obligation to provide to claimant a reasonable
4  explanation for the basis of the denial?
5        Answer:  Yes.
6        Question:  And that is generally provided
7  to the claimant in writing?
8        Answer:  Most of the time.  Sometimes it's
9  orally, unquote.
10        Did I read that right?
11    A.  That's correct.
12    Q.  So a denial of coverage can be provided orally
13  as well, correct?
14    A.  Yes.
15    Q.  And that was your testimony in the Roberts case
16  in federal court?
17    A.  Yeah.  In this automobile case, yes.
18    Q.  Now, you opined that the fact that you don't see
19  a written disclaimer of coverage from Unigard means that
20  they didn't disclaim coverage, right?
21    A.  That's my opinion, yes.
22        MR. BRENNAN:  Objection.
23    Q.  (BY MR. KOTULA)  Yet you testified just now
24  that a disclaimer could be given orally, correct?
25    A.  Yes.  That was an automobile case that had to do

1  with a claimant that was in the car, as I remember.
2    Q.  And somehow you're not surprised that Troy
3  Belting can't find 25 years of primary policies from 1949
4  to 1974, but you have some surprise that a disclaimer
5  can't be found from Unigard from 1977 or 1978, if one
6  existed --
7        MR. BRENNAN:  Objection.
8    Q.  (BY MR. KOTULA)  -- is that right?
9    A.  That's their business is disclaimers or
10  acceptance of coverage; Unigard or any insurance carrier.
11    Q.  But Troy Belting is saying that they were
12  covered in primary policies issued by Jamestown Mutual for
13  a 25-year period, and they have no documentation, and
14  their broker has no documentation to show a policy issued
15  by Jamestown, right?
16        MR. FOX:  Objection.
17        MR. BRENNAN:  Objection.
18    A.  I don't know that the broker didn't have it.
19    Q.  (BY MR. KOTULA)  Well, Mr. Hughes testified as
20  an expert that the broker discarded the policies after
21  they expired.
22        I asked you:  Do you have any reason to
23  dispute Mr. Hughes?
24        MR. BRENNAN:  Objection.
25    A.  If he said that, then he knows that.  I mean, I

36 (Pages 138 - 141)

1 don't know that from -- other than testimony that's his,
2 because the agent kept saying that they were covered by
3 Unigard, so they'd been put on notice.
4      Q.  (BY MR. KOTULA)  It's just interesting that
5 you're willing to overlook that nobody kept copies of the
6 policies for a 25-year period that are alleged to have
7 been issued, but you think the fact that no one can
8 produce a copy of a disclaimer letter or denial letter is
9 somehow surprising.
10         Why is that?
11         MR. BRENNAN:  Objection.
12     A.  Unigard is in the insurance business.  They know
13 what they should be doing.  It's a disclaimer; if they're
14 not going to pay for it, say, You know, we don't have any
15 coverage; I'm sorry.
16         Now, what does that have to do with a
17 policyholder discarding his coverage?  I mean, I don't
18 understand the connection there.
19     Q.  (BY MR. KOTULA)  Let me ask you this:  Is it
20 your understanding that if an insurer did not issue a
21 policy to a party seeking coverage, didn't have one, but
22 it doesn't deny coverage, that it now owes coverage under
23 a policy that never existed?
24         MR. BRENNAN:  Objection.
25     A.  I didn't say it would owe it.  It would be an

1 indication -- I mean, what I'm saying in here is it's a
2 very good indication that they had coverage.
3      Q.  (BY MR. KOTULA)  Let me give you a
4 hypothetical.  An insurer doesn't have a policy that they
5 ever issued to the party seeking coverage, okay?
6      A.  You said "insurer" or "insured"?
7      Q.  An insurer never issued a policy to this
8 particular party seeking coverage.  Accept that as true.
9 It's a hypothetical, okay?
10     A.  Okay.
11     Q.  They never issued a policy to them.  But they
12 don't issue a disclaimer or denial of coverage saying, We
13 didn't issue a policy.
14         Is it your opinion that that insurer had
15 coverage simply because they didn't issue a disclaimer?
16         MR. BRENNAN:  Objection.
17     A.  In that hypothetical, no.
18     Q.  (BY MR. KOTULA)  And that's because I asked you
19 to assume that they didn't issue a policy, right?
20     A.  Right.
21     Q.  But if I hadn't said that, you would say, The
22 fact that they didn't issue a disclaimer is proof that
23 they issued a policy?
24         MR. BRENNAN:  Objection.
25     A.  I said that the fact that they continued to ask

1 for information, Unigard to INA, in my estimation, is a
2 fact that they have coverage; they have a liability
3 policy.
4      Q.  (BY MR. KOTULA)  Does -- if an insurance
5 company never issued a policy to a particular party,
6 through waiver, can it be responsible to -- as if it had
7 issued a policy of insurance to them?
8         MR. BRENNAN:  Objection.
9      A.  I'm not a legal expert.  My claims expert would
10 say, no, but I have no idea.
11     Q.  (BY MR. KOTULA)  You testified earlier about
12 the Dario case.
13         Do you recall that?
14     A.  Yes.
15     Q.  And have you ever seen a complaint in the Dario
16 case?
17     A.  I don't know if I saw the complaint or not.  I
18 think I saw a summary of something.
19     Q.  If you told you that no one has a copy of the
20 complaint in Dario, would that be consistent with your
21 information?
22         MR. BRENNAN:  Objection.
23     A.  It could be.  I saw some information about it; I
24 don't know if it was on the complaint or not.  I think it
25 was in a -- where Troy Belting -- meetings or something

1 like that I saw.
2      Q.  (BY MR. KOTULA)  Yeah.  I'm going to ask you
3 about that.
4         So is it your understanding that the only
5 evidence about what claims were being made in the Dario
6 case is found in a discussion of the Dario case in the
7 Troy Belting board of directors meeting minutes?
8         MR. BRENNAN:  Objection.
9      A.  There might be other places, you know, but I
10 recall that one.
11     Q.  (BY MR. KOTULA)  Do you recall anything else,
12 anywhere else?
13     A.  I said there might be others, but I don't recall
14 -- I do recall that.
15     Q.  You can't point me to anything, other than that
16 discussion in a board of directors meeting minutes, right?
17         MR. BRENNAN:  Objection; asked and
18 answered.
19     A.  No.
20     Q.  (BY MR. KOTULA)  And from that discussion --
21 and we can take a look at it in the board of directors
22 meeting minutes -- it says that a summons was served, but
23 that they don't have a complaint.
24         Do you recall that?
25     A.  No.

37 (Pages 142 - 145)

1        (Exhibit 17 marked.)
2        Q.   (BY MR. KOTULA)  Sir, we've placed before you
3   what the court reporter has kindly marked as O'Malley
4   Exhibit 17.
5              MR. KOTULA:  For the record, it's a
6   January 18, 1977, board of directors meeting minutes.
7   It's previously marked as Hughes Exhibit 19.  It's a
8   three-page document.
9        Q.   (BY MR. KOTULA)  Is this the document you were
10  referring to where you gleaned information about the
11  claim?
12       A.   Yes, I think it is.
13       Q.   And do you see where it says in the first
14  sentence in the first full paragraph on page 2 of that
15  exhibit --
16       A.   Yes.
17       Q.   -- A.E. Decker reported that we have received a
18  summons of suit, dated 11/24/76?
19       A.   Yes.
20       Q.   And then if you go down several lines in that
21  paragraph and right along the left margin, the sentence
22  begins, quote:  Since no copy of the complaint has
23  actually been filed, we do not know for sure why we are
24  being sued, unquote.
25              Did I read that right?  (Indicating.)

1        Since no copy --
2        A.   Oh, yeah.  Okay.
3        Q.   Did I read that right?
4        A.   Right.
5        Q.   So we talked before about New York court
6   practice and summons with notice.
7              Do you recall that?
8        A.   Yes.
9        Q.   So if Dario's suit had been commenced with a
10  summons with notice, and they didn't have a complaint -- I
11  asked you about the summons with notice in the Pennell
12  case; if insurers might have a duty to defend, based on
13  vague allegations and a summons with notice.
14             And you said -- and you correct me if I'm
15  wrong -- an insurer could have a duty to defend, because
16  that summons with notice is the commencement of a suit,
17  and an insurer has a duty to defend if there's any
18  potential for coverage under the policies; is that right?
19             MR. BRENNAN:  Objection.
20       A.   I did say that, yes.  There's also other
21  evidence in there -- and I don't know where it is -- about
22  what the suit was about later on, because they said that
23  she got her hair caught in a pulley or something.
24       Q.   (BY MR. KOTULA)  I believe there's some
25  extrinsic statement, extrinsic to the complaint and

1   extrinsic to the summons, right here in this document, in
2   that paragraph.
3        A.   Okay.
4        Q.   Feel free to take a look at it.
5        A.   The same exhibit?
6        Q.   That same page 2, Exhibit 17.
7        A.   Okay.
8        Q.   Let me know when you've had a chance to look at
9   it.
10       A.   (Witness reviews document.)
11             Yeah, okay.
12       Q.   Are you aware that under New York law, an
13  insurer is not permitted to deny a duty to defend based on
14  extrinsic evidence that it learns outside of the pleadings
15  in a lawsuit?
16             MR. BRENNAN:  Objection.
17       A.   No, I'm not aware of that.  I'm not a legal
18  expert.
19       Q.   (BY MR. KOTULA)  So if that's the case, then
20  finding out something about the claim that's in extrinsic
21  evidence doesn't take away from an insurer's potential
22  duty to defend a claim that's vague and ambiguous; does
23  it?
24             MR. BRENNAN:  Objection.
25       A.   Probably not, no.

1        Q.   (BY MR. KOTULA)  Now, in another board of
2   directors meeting minutes, Troy Belting recites that the
3   Dario case was settled for Troy Belting with a payment of
4   $2,000.
5              Do you recall seeing that?
6        A.   Yes.
7              (Exhibit 18 marked.)
8        Q.   (BY MR. KOTULA)  I'm showing you now what the
9   court reporter has marked as O'Malley Exhibit 18.
10             MR. KOTULA:  For the record, Exhibit 18 is
11  an affidavit of James E. O'Malley in a matter titled,
12  National Electrical Manufacturers Association against
13  Century Indemnity Company, in 1997.
14       A.   Good lord.
15       Q.   (BY MR. KOTULA)  Have you seen this document,
16  sir?
17       A.   I don't know.  I haven't seen it for 18 years, I
18  guess.
19       Q.   All right.  And it has a Westlaw reference of
20  1997, Westlaw 33795171, in the Eastern District of
21  Virginia.
22             Do you see that?
23       A.   Yes.
24       Q.   All right.  I want to refer you to page 3 of
25  your affidavit.

38 (Pages 146 - 149)

Page 150

1         And in paragraph 17, numbered 17, I would
2 say -- the second sentence begins, quote:  The generally
3 accepted understanding in the insurance industry is that
4 the policyholder is entitled to a defense under the
5 insurance policy until the insurance company can prove
6 that none of the allegations against the policyholder
7 raise any possibility for coverage under the insurance
8 policy, unquote.
9         Did I read that right?
10 A.  Right.
11 Q.  Is that your opinion?
12 A.  Yes.
13 Q.  If you could turn to page 7 of your affidavit.
14 A.  (Witness complies.)
15 Q.  I'm going to refer you to paragraph number 49.
16 You state in the second sentence, again, quote:  If
17 there's any question about --
18 A.  Excuse me; where are you quoting from?
19 Q.  Paragraph 49.
20 A.  Okay.
21 Q.  About two-thirds of the way down.
22 A.  Okay.
23 Q.  Quote:  If there's any question about whether
24 coverage applies, the insurance company must continue to
25 defend until such time as it is conclusively determined in

Page 151

1 a court or other legal proceeding that there is no
2 coverage for any of the allegations against the
3 policyholder, unquote.
4         That was your opinion, right?
5 A.  Right.
6 Q.  That's your opinion now, right?
7 A.  Right.
8         (Exhibit 19 marked.)
9 Q.  (BY MR. KOTULA)  We're showing you now what the
10 court reporter has kindly marked as O'Malley Exhibit 19.
11         MR. KOTULA:  For the record, Exhibit 19 is
12 a brief in the United States Court of Appeals for the
13 Fifth Circuit, in a case called, General Accident
14 Insurance Company against Employers National Insurance
15 Corporation, in 1994.
16         Were you ever retained, sir, on behalf of
17 Employers National Insurance Corporation in a dispute with
18 other carriers?
19 A.  It looks like I was.  I don't remember it.
20 That's been 20 years ago or so.
21 Q.  There's a Westlaw reference on this document,
22 1994, Westlaw 16067272 --
23 A.  Okay.
24 Q.  -- in the Fifth Circuit.
25 A.  All right.

Page 152

1 Q.  If you could turn to page 24, sir.
2 A.  (Witness complies.)
3 Q.  Do you have that?
4 A.  Yes.
5 Q.  I'm going to refer you to the part about a third
6 of the way down the page that says:  Employers called
7 James Edward O'Malley, Junior, as a witness, and he
8 testified as follows.
9         Do you see that?
10 A.  Right.
11 Q.  And paragraph 5, beneath that, it says that you
12 testified as a witness that, quote, The purpose of a good
13 claims manual is to make an adjustor, whether he likes it
14 or not, focus on things that have nothing to do with the
15 lawsuit itself, but which are commonly known within the
16 insurance industry as, quote, business decisions, unquote.
17         Do you see that?
18 A.  Right.
19 Q.  What do you mean there by "business decisions"?
20 A.  I don't really know.  I guess it's --
21         MR. BRENNAN:  Take a minute to review that
22 thing.
23         THE WITNESS:  Huh?
24         MR. BRENNAN:  Take your time and review it.
25 A.  I suspect it might be that -- I mean, it's been

Page 153

1 20 years ago.  I have no idea what I was talking about.  I
2 don't even know what kind of a case it is.
3         MR. BRENNAN:  Take your time and refresh
4 yourself.  You can read the whole thing, if you need to.
5         THE WITNESS:  I don't want to read the
6 whole thing.
7         (Witness reviews document.)
8 A.  You know, I don't recall -- I mean, without --
9 like I said, this thing is 20 years old.
10 Q.  (BY MR. KOTULA)  The claims people are supposed
11 to take into account business decisions?
12 A.  Pardon me?
13 Q.  Claims people are supposed to take into account
14 business decisions?
15 A.  That's apparently what I said, yes.
16 Q.  Do you agree that insurance companies should
17 consider making nuisance value settlements when the
18 opportunity arises and it's appropriate?
19 A.  It could be yes, yes, depending upon if they have
20 coverage.
21 Q.  And do you have an opinion about whether -- if
22 an insurance company is defending vague allegations,
23 whether a nuisance value settlement makes sense, to cut
24 off that defense, even if it turns out they may not have
25 coverage?

39 (Pages 150 - 153)

Page 154

1         MR. BRENNAN:  Objection.
2     A.  Well, if I don't have liability insurance, and
3 somebody makes a claim against my policyholder that
4 involves liability insurance, I don't make a -- any kind
5 of a settlement just because it's easy to make or to get
6 rid of.  If I have a workers' compensation case or
7 something -- I mean, why would I do that?  There's no
8 reason to do that.
9         Now, you're talking about -- what you said
10 was "vague allegations."  Now, that's a different story as
11 to whether you make a small settlement or something.  I'm
12 talking about not having or having a liability policy.
13     Q.  (BY MR. KOTULA)  Let's say you have an M&C
14 policy.  Let's call it a hypothetical.  You have an M&C
15 policy that you issued as an insurance company, and the
16 allegations are so vague, they're not clear whether it's a
17 premises or operations claim that could be covered under
18 the M&C coverage, or it's a products claim.
19         Would it be appropriate to make a nuisance
20 value settlement and cut off the defense obligation at
21 that point?
22         MR. BRENNAN:  Objection.
23     A.  You know, that's a hypothetical.  I'd have to
24 have more facts; what kind of a case you're talking about;
25 how much money is involved.

Page 155

1     Q.  (BY MR. KOTULA)  Say the person claimed damages
2 of $2-and-a-half million.
3         MR. BRENNAN:  Objection.
4     Q.  (BY MR. KOTULA)  You could settle it for
5 $2,000.
6     A.  Again, I'd have to have more facts.
7     Q.  What other facts?
8     A.  Well, I'd have to know about what happened.
9     Q.  You have a summons with notice that has no
10 allegations.
11         MR. BRENNAN:  Objection; asked and
12 answered.  He's answered this question now four different
13 times.  He says it depends.
14         Go ahead.
15     A.  I mean, you'd have to have more information than
16 that just to have -- just to go pay $2,000 for a case that
17 you don't even know whether you have liability or whether
18 you have any coverage.  I've never done that.
19     Q.  (BY MR. KOTULA)  I asked you a hypothetical; to
20 assume that the insurer has an M&C policy, and they're
21 defending a summons with notice that has no allegations
22 like you'd find in a complaint.
23         And would it be an appropriate nuisance
24 value settlement to pay $2,000 to settle a claim for
25 $2-and-a-half million?

Page 156

1         MR. BRENNAN:  Objection.  This is now the
2 fourth or the fifth time that you've asked the exact same
3 question.
4         MR. KOTULA:  If you want to make an
5 objection -- can you refrain from testifying, sir?
6         MR. BRENNAN:  I am not testifying.  You're
7 asking the same question four or five times.  We're not
8 going to tire the witness out to try to get the answer
9 that you want.  He's given you the answer.
10     Q.  (BY MR. KOTULA)  You can answer.
11     A.  Yes.  I would have to have more information to
12 know about that before I would make any kind of a nuisance
13 settlement.
14     Q.  Right.  And I asked you, What more information?
15 And you haven't told me.
16     A.  Facts, coverage, you know.
17     Q.  I gave you -- in the hypothetical, I gave you
18 the assumption that you are to assume that the insurer
19 issued an M&C policy.
20         MR. BRENNAN:  Objection; asked and
21 answered.
22     Q.  (BY MR. KOTULA)  What other details do you need
23 to know?
24     A.  I don't know what the facts of the case are.  I
25 mean, why would I give a $2,000 settlement on a $2 million

Page 157

1 allegation that I don't know anything about?  I mean, I
2 have no idea what you're talking about.  People don't do
3 that in the insurance business, that I know of.
4         They make nuisance settlements sometimes
5 because of other things.  But if they don't have any
6 coverage, if they don't have any liability, they don't
7 just say, Oh, we don't want to pay -- we don't want to
8 defend this because we don't have any coverage.  They let
9 the policyholder know, You don't have coverage for this.
10     Q.  So you're saying that if the allegations of a
11 complaint are vague and ambiguous, that -- and the insurer
12 can't tell the true nature of what is being claimed, and
13 they're not allowed to consider extrinsic facts that they
14 may know of, which aren't set forth in allegations in a
15 pleading, that the insurer cannot defend the policyholder.
16         Is that your position?
17         MR. BRENNAN:  Objection.
18     A.  I didn't say that.  You said "nuisance
19 settlement."  You're talking about nuisance settlement.
20     Q.  (BY MR. KOTULA)  So if an insurer is defending
21 under that circumstance, is it obligated to continue to
22 pay for defense when it could settle the case for a small
23 sum?
24         MR. BRENNAN:  Objection.
25     A.  I think it's obligated to make a determination

40 (Pages 154 - 157)

1  what the complaint is, what the bill of particulars are in
2  New York, before they make any kind of a settlement.
3      Q.  (BY MR. KOTULA)  So it can't factor in business
4  decisions?
5      A.  Sure, it could.
6          MR. BRENNAN:  Objection.
7      A.  But it doesn't necessarily mean that you would.
8      Q.  (BY MR. KOTULA)  Have you ever factored in
9  business decisions in settling a claim?
10     A.  Not in that kind of a situation.  I might have
11  -- not that -- I really don't recall.  I can't recall.
12     Q.  Are you aware of any evidence that Troy Belting
13  had been named in a product liability lawsuit prior to
14  1976?
15     A.  I don't recall knowing anything about that or
16  not.  I don't remember.
17     Q.  If I told you that there isn't any evidence in
18  this case that's been exchanged that Troy Belting has been
19  named in a product liability lawsuit prior to one filed in
20  1976, would you have any information to disagree with
21  that?
22     A.  No.
23     Q.  Do I understand you correctly, sir, that it's
24  your opinion that because Unigard investigated the Pennell
25  case, but you can't find a disclaimer or denial of

1  coverage by them, that you believe that proves that they
2  issued comprehensive general liability coverage to Troy
3  Belting?
4          MR. BRENNAN:  Objection.
5      A.  It's my opinion that they have -- that they have
6  comprehensive general liability insurance or an M&C that
7  covers that incident because of the fact that this wasn't
8  a two or three -- this thing went on for weeks, and he
9  kept writing back, Dixon, or whatever his name is.  You
10  know, Do you got any -- do you got any medical?  He writes
11  saying, No medical yet.  Do you have a bill of
12  particulars?  No bill of particulars yet.
13     Q.  (BY MR. KOTULA)  And you think --
14     A.  I think by that period of time that he would
15  have an idea that, They don't have any liability coverage;
16  why do I keep writing this guy for?  I mean, this wasn't a
17  10-day deal.  This went on for weeks that he kept asking
18  him.
19     Q.  And you believe that proves that Unigard or
20  Jamestown Mutual issued 25 years of primary comprehensive
21  general liability policies to Troy Belting?
22         MR. BRENNAN:  Objection.
23     A.  It's my opinion that they had liability
24  policies, yes.
25     Q.  (BY MR. KOTULA)  You believe that proves that?

1          MR. BRENNAN:  Objection.
2      A.  I believe it's a very good assumption that they
3  did have.
4      Q.  (BY MR. KOTULA)  So you're making an
5  assumption?
6      A.  Well, I believe that they did have, or they
7  wouldn't have been acting like that.
8      Q.  Yet there isn't a single piece of secondary
9  evidence that has a policy number, other than the one page
10  we marked as Exhibit 3 from an M&C policy, right?
11         MR. BRENNAN:  Objection.
12     A.  And the fact that you settled the claim on the
13  gal that got her hair cut -- caught in a pulley or
14  whatever.
15     Q.  (BY MR. KOTULA)  In May of 1974?
16     A.  Whatever.
17     Q.  So you admit they have no policy numbers --
18         MR. BRENNAN:  Objection.
19     Q.  (BY MR. KOTULA)  -- aside from Exhibit 3, which
20  has an "M" policy number, right?
21     A.  That's correct.
22     Q.  There's no evidence of policy limits --
23         MR. BRENNAN:  Objection.
24     Q.  (BY MR. KOTULA)  -- for the whole 25-year gap
25  period, right?

1          MR. BRENNAN:  Objection.
2      A.  None that I saw.
3      Q.  (BY MR. KOTULA)  There's no evidence of policy
4  periods for that whole 25-year gap period, right?
5      A.  Other than what the agent said and what the
6  insurance archaeological people came up with.
7      Q.  Which they said they were assuming the dates,
8  right?
9      A.  Right.
10         MR. BRENNAN:  Objection.
11     Q.  (BY MR. KOTULA)  And the agent's dates kind of
12  moved around a little bit; didn't they?
13     A.  Yeah.  Well, what he did was, he looked at the
14  policy, and it was through '76, but it had been cancelled
15  pro rata back to '74 or whatever the date was.
16     Q.  You mean, looked at the Pacific Employers
17  policy?
18     A.  I think it was a Unigard policy -- let's see;
19  the Jamestown policy -- one of them was the pro rata
20  cancelled, and I think it was Jamestown, I believe, and
21  that's why he -- that's why he changed his -- I might have
22  that wrong.
23     Q.  I'm just going to show you what's previously
24  been marked as Hughes Exhibit 16.  It's my only copy.
25  It's the Pacific Employers policy commencing in 1974.

41 (Pages 158 - 161)

Page 162

1        Is that the policy you're thinking of?
2     A.   Now, let's go back to the -- let's go back to
3  the exhibit that has the agent's correspondence on it.  I
4  don't recall which one it was.
5     Q.   There's a few of them.
6     A.   Well, we have one where he was talking about --
7  which had contradictory --
8        MR. LEASURE:  6 and 7.
9        THE WITNESS:  What is it?
10        MR. BRENNAN:  6 and 7, I guess.
11     A.   Yeah.  6 -- 6, he says it was prior to July
12  the 8th, 1976.  And then in Exhibit 7, he says that
13  it's -- provided coverage from July 18th, '49, to
14  October 3rd, '74.  And I think in my -- well, what he did,
15  he had a pro rata cancellation there, and then wrote INA
16  from that point forward.
17     Q.   (BY MR. KOTULA)  I would suggest to you that's
18  entirely speculation, because you don't have a single
19  document that establishes that or provides support for
20  that; do you?
21     A.   No.
22        MR. BRENNAN:  Objection.
23     Q.   (BY MR. KOTULA)  And --
24     A.   But it certainly cancelled.
25     Q.   And, by the way, didn't they get the

Page 163

1  October 3, 1974, date from what was previously marked as
2  Hughes 16, the Pacific Employers policy which incepts on
3  that date?
4        MR. BRENNAN:  Objection.
5     Q.   (BY MR. KOTULA)  Isn't that where that date
6  came from?
7        MR. BRENNAN:  Objection.
8     A.   Well, yeah, but that's -- but they didn't come
9  then, unless they cancelled the Unigard policy.
10     Q.   (BY MR. KOTULA)  And then we have Mr. Ranalli's
11  memo, that says the broker's records indicate there was a
12  policy from Jamestown effective on January 1949, but
13  Exhibit 7 says July 18, 1949.
14        Two different dates, right (indicating)?
15     A.   May I see that?
16     Q.   (Attorney hands witness document.)
17     A.   (Witness reviews document.)
18        Two different dates, right.
19     Q.   All right.  And in all of the secondary
20  evidence, whether it be ledger entries, expense account
21  documents, the broker letters, nowhere does it say the
22  type of liability coverage, right?
23        MR. BRENNAN:  Objection.
24     A.   Other than what we talked about on the M&C.
25     Q.   (BY MR. KOTULA)  Right.  And nowhere does it

Page 164

1  have policy limits?
2     A.   No.
3        MR. BRENNAN:  Objection.
4     Q.   (BY MR. KOTULA)  And nowhere does it have
5  policy periods or policy prefixes that would say "M" or
6  "CGL," right?
7        MR. BRENNAN:  Objection.
8     A.   Other than the M&C policy, the amendment.
9        MR. KOTULA:  I have no further questions
10  for you.  Other folks may.
11        THE WITNESS:  Can I go home?
12        MR. KOTULA:  Other folks may.
13        (Recess in the proceedings from 2:35 to
14        2:42 p.m.)
15           EXAMINATION
16  BY MR. LEASURE:
17     Q.   Good afternoon, Mr. O'Malley.  My name is
18  Charles Leasure, from the law firm of Shipman & Goodman.
19  I represent The Hartford Accident & Indemnity Company,
20  Hartford Casualty Insurance Company, and The Hartford
21  Insurance Company of the Midwest in this case.
22     A.   Okay.
23     Q.   I want to ask you a couple of questions in
24  follow up to what Mr. Kotula asked you earlier today, and
25  specifically about the opinions that are contained in your

Page 165

1  report that, I believe, was marked today as Exhibit 2.
2        And, specifically, I want to ask you a
3  little bit about your opinions in this case with respect
4  to the duties and obligations that you say are due from
5  Pacific Employers, PEIC, and from Hartford to Troy
6  Belting.
7        Is that okay?
8     A.   Yes.
9        (Pause in the proceedings from 2:44 to
10        2:45 p.m.)
11     Q.   (BY MR. LEASURE)  And so in that vein, I want
12  to ask you a couple of questions about your earlier
13  testimony about your report.  And, hopefully, we can cut
14  this short and turn it over to Mr. Fox to ask his
15  questions so we can get you out of here before the seven
16  hours are up for our deposition today.
17        Just as a housekeeping matter, you are
18  appearing here today pursuant to subpoenas that were
19  issued by the parties; is that correct?
20     A.   Yes.
21     Q.   And are you aware that subpoenas were issued by
22  more than one insurance company in this case requesting
23  your appearance today?
24     A.   Probably.  I don't know if I saw all three of
25  them or not.  I've been gone for almost a month.

42 (Pages 162 - 165)

Page 166

1    Q.   Okay.  So if I told you that Hartford issued a
2 subpoena requesting your testimony, that would not be
3 unusual?
4    A.   No.
5    Q.   Okay.  Would you say that an insurance policy is
6 a contract?
7    A.   Pardon me?
8    Q.   Would you say that an insurance policy is a
9 contract?
10    A.   Yes.
11    Q.   And would you say that the parties to that
12 contract would be the policyholder on the one hand and the
13 insurance company issuing the policy on the other hand?
14    A.   Yes.
15    Q.   Okay.  And earlier today, and also in your
16 report, you state that certain duties that you believe are
17 due to the policyholder from an insurance company are
18 contained in insurance contracts; is that fair?
19    A.   Yes.
20    Q.   And if I asked you to look at your report, which
21 we've marked as Exhibit 2, if you look at page 4, the very
22 first sentence of your opinion states:  Claims handling
23 entails the fulfillment of the insurance company's
24 promises to its insured as stated in the insurance policy.
25        Did I read that correctly?

Page 167

1    A.   Yes.
2    Q.   And that's your opinion?
3    A.   Yes.
4    Q.   And so you believe that the claims handling
5 duties that flow from an insurance company to its
6 policyholder are contained in the insurance policy?
7    A.   Yes.
8    Q.   I'd also like to ask you to take a quick
9 look -- I believe, we've previously reviewed it, which is
10 Exhibit B to your report.  It's the "documents reviewed"
11 section.
12    A.   I just saw it here a minute ago.
13        MR. BRENNAN:  It's tricky.
14    Q.   (BY MR. KOTULA)   And you have Exhibit B in
15 front of you?
16    A.   Yes.
17    Q.   And those are the documents you reviewed --
18    A.   Right.
19    Q.   -- before your testimony today?
20    A.   Yes.
21    Q.   And you testified that you didn't review any
22 other or additional documents since the time that you
23 prepared this report?
24    A.   No.
25    Q.   So, for instance, you didn't review Mr. Heinze'

Page 168

1 deposition testimony in this case?
2    A.   Not before this, no.
3    Q.   Have you --
4    A.   I'm sorry; yes, I did.
5    Q.   You reviewed his deposition testimony?
6    A.   Yes, I did.
7    Q.   Did you review anybody else's deposition?
8    A.   No, I don't think so.
9    Q.   Did you review any other documents, other than
10 what are listed on this?
11    A.   No.
12    Q.   But you did review Mr. Heinze' deposition?
13    A.   Right.
14    Q.   When did you do that?
15    A.   Right after I got back.  I got back about the
16 12th, and whenever -- shortly thereafter -- a week --
17 whatever -- a week or so after it was taken; I don't know.
18    Q.   Okay.  How did you get his deposition testimony?
19    A.   From Mr. Brennan.
20    Q.   And did you have occasion to speak with
21 Mr. Brennan about that testimony?
22    A.   Yes.
23    Q.   Okay.  When did you speak with Mr. Brennan about
24 that?
25    A.   I guess last Friday or so; I'm not quite sure.

Page 169

1    Q.   Okay.  Is there anything else that you reviewed
2 that's not listed on Exhibit B?
3    A.   Not that I can recall.
4    Q.   Do you recall reviewing the exhibits that were
5 attached to Mr. Heinze' deposition?
6    A.   Yes.
7    Q.   Which exhibits do you recall reviewing?
8    A.   All of them.
9    Q.   And are there any exhibits attached to
10 Mr. Heinze' deposition that aren't here on Exhibit B?
11    A.   There could have been some that are duplicates;
12 I'm not sure.
13    Q.   Okay.  And I don't see any insurers' policies
14 listed here on Exhibit B.
15        Did you review any specific insurance
16 policies in preparation for this report that you issued on
17 September 30th?
18    A.   No.
19    Q.   Did you review any insurance policies that were
20 issued to Troy Belting after the time that you issued this
21 report?
22    A.   No.
23    Q.   Did you review any of the insurance policies
24 that were attached to Mr. Heinze' deposition?
25    A.   I might have; I can't recall.

43 (Pages 166 - 169)

Page 170

1  Q. Okay. But you don't recall if you reviewed them
2 or not?
3  A. No, I don't.
4  Q. And you hadn't reviewed --
5  A. I reviewed them all. I mean, I reviewed
6 everything there, but I don't remember specifically the
7 policy, though.
8  Q. Okay. And you didn't review any insurance
9 policies prior to the time that you issued this report on
10 September 30th of 2015?
11      MR. BRENNAN: Objection.
12  A. No.
13  Q. (BY MR. LEASURE) So if I turn back to page 4
14 of your report that says that claims handling entails the
15 fulfillment of the insurance --
16      THE REPORTER: You're going to have to read
17 slower than that.
18      MR. LEASURE: Sorry.
19  Q. (BY MR. LEASURE) -- claims handling entails
20 the fulfillment of the insurance company's promises to its
21 insured as stated in the insurance policy, that's a
22 general statement of what your opinion is of the duties
23 that flow between the parties?
24  A. Where are you; I'm sorry?
25  Q. The first line of your opinions on page 4 of

Page 171

1 Exhibit 2.
2  A. Okay. What were you asking me; that first
3 sentence?
4  Q. I'm asking about that first sentence, yes.
5      That's a general statement of your opinion,
6 and it's not based on a review any particular policy?
7  A. That's just based on my experience.
8  Q. Okay. But it's not based on the language that's
9 contained in, for instance, The Hartford policy issued to
10 Troy Belting?
11  A. No.
12  Q. And it's not based on, say, information
13 contained in a Pacific Employers policy that would have
14 been issued to Troy Belting?
15  A. No.
16  Q. But you do say that the promises are contained
17 in the insurance policy; is that right?
18  A. Yes.
19  Q. Let me ask you about the next sentence. It
20 says: When handling a claim on behalf of an insured, the
21 claim staff of an insurance carrier must do everything
22 possible to protect the interests of the insured in
23 defending against loss related to the claim.
24      Did I read that correctly?
25  A. Yes.

Page 172

1  Q. In this particular case, which involves asbestos
2 bodily injury claims by Troy Belting -- or against Troy
3 Belting, you are aware and you did testify that Troy
4 Belting's defense is being covered 100 percent for these
5 asbestos bodily injury claims; is that right?
6  A. Yes.
7  Q. Are you aware of Troy Belting paying any
8 indemnity payments or settlements or judgments --
9  A. Yes.
10  Q. -- to any of the asbestos bodily injury claims?
11  A. Yes.
12  Q. Troy Belting is paying them?
13  A. Pardon me?
14  Q. You're aware that Troy Belting is paying them,
15 or are you aware that their insurance companies are paying
16 them?
17  A. Insurance companies paid them.
18  Q. Okay. So if you had an asbestos bodily injury
19 claim, and you were defended by your insurance company
20 fully, and your insurance company paid the judgment or the
21 settlement fully, would you say that they are doing
22 everything possible to protect the interest of the insured
23 in defending against the loss related to that claim?
24  A. Well, not in this particular case. We're
25 talking about the possibilities of going back pro rata

Page 173

1 to -- and collecting some money from Troy Belting. So at
2 the time that they were doing the investigation and doing
3 the defense, they should have been looking into other
4 carriers, particularly Jamestown and Unigard, if they
5 intended to come forward in the next 30 years and try and
6 get some money from Troy Belting. So I don't think they
7 were doing everything.
8  Q. Okay. But they were doing everything to defend
9 their policyholder for those claims.
10      You're not alleging that there's any bad
11 faith or undue claims handling practices here with respect
12 to defending the underlying policies, are you, in the
13 claim?
14  A. Not in the actual defense of the policies -- I
15 mean, the actual defense of the claims. I'm talking about
16 the fact that they didn't go back and try to find out
17 about other policies when they had an opportunity 30 years
18 ago.
19  Q. Well, when they had an opportunity 30 years ago,
20 they certainly did, right? We just spent about six hours
21 looking over exhibits that reference the Pennell claim and
22 the correspondence from 1976, 1977, 1978.
23      That was, obviously, an investigation into
24 prior insurance coverage; was it not?
25  A. Yes.

44 (Pages 170 - 173)

Page 174

1  Q.  Okay.
2  A.  Some.
3  Q.  So they did, right?
4      Are you aware of any other prior coverage?
5      MR. BRENNAN:  Objection.
6  Q.  (BY MR. LEASURE)  Are you aware of any gaps in
7  insurance from 1974 to 1977 to the present?
8  A.  No.
9  Q.  So they would be investigating that very same
10 coverage block that we looked at in the earlier exhibits,
11 correct?
12 A.  Well, yeah, sure.
13 Q.  Right.  And they were doing that in the 1970s,
14 right?
15 A.  Yeah.
16 Q.  Which was at -- near or at the time of the
17 alleged gap in insurance coverage, right?
18 A.  What I'm saying and what I had said and what I
19 intend to opine on is the fact that in 1977, in 1978, if
20 they had intended, like he indicated, that there's going
21 to be a pro rata distribution from any gaps that the
22 policyholder might have as far as coverage, they should
23 have been, in my estimation, trying to find out harder if
24 there is any coverage and who has it and what's the -- and
25 what's the limited liability on those coverages.

Page 175

1  Q.  And you're saying they should have done that in
2  1977?
3      MR. BRENNAN:  Objection.
4  A.  Well, sure.  You just said that INA was coming
5  down -- came down with that decision that said, you know,
6  we'll go back -- not manifestation, but in pro rata, when
7  you were first exposed to the asbestos.
8  Q.  (BY MR. LEASURE)  Right.  But in this case, the
9  Pennell case, which is the first one we know about, and
10 every other case that we know about, the insurance
11 companies paid everything, right?
12 A.  They paid it up to this point, yes.
13 Q.  Right.
14 A.  But now they're asking -- it's my understanding
15 they're asking for some reimbursement from the
16 policyholder on gaps in the coverage or at least beyond
17 Pacific Employers.
18 Q.  Right.  But to your knowledge, has Troy Belting
19 paid for any of those gaps?
20 A.  Not at this point, that I know of.
21 Q.  So how are they harmed in the defense of those
22 particular claims?
23 A.  By asking for it.  I mean, you have a lawsuit
24 right now asking for it.
25 Q.  Right.  But what does that have to do with the

Page 176

1  underlying claims that have been paid for 100 percent
2  defense and indemnity?
3  A.  Those are not the ones that it involved?
4  Q.  Well, I'm asking you:  What harm happened in the
5  defense of the underlying claims?  They're being paid for
6  100 percent, correct?
7  A.  They were paid for 100 percent at the time.
8  It's my understanding in this lawsuit that Hartford and
9  Pacific Employers are going back and trying to get Troy
10 Belting to pay the time before '74, or whatever it was.
11 It might be in some of those cases.
12 Q.  And that's right.  And that's because PEIC and
13 Hartford believe they've paid too much or they've
14 overpaid.
15      Is that a fair characterization of what's
16 happening there?
17 A.  They paid too much or they --
18 Q.  Well, they think they paid more than their fair
19 share; is that accurate?  Is that how you would understand
20 the lawsuit?
21 A.  Yes.  I mean, they think that there should be
22 contribution from the policyholder or from some other
23 carrier.
24 Q.  Right.  And so that would benefit PEIC or
25 Hartford, right, because they think they've paid too much?

Page 177

1  A.  Yes.
2  Q.  Right.  But Troy Belting hasn't paid too much;
3  have they?  They haven't paid anything.
4  A.  Not at this point, no.
5  Q.  Okay.  The second paragraph of your opinion says
6  that:  There's a duty by the carrier to advise the insured
7  in a timely manner that it intends to seek recovery
8  against either the insured or other insurance carriers
9  that issued policies to that insured.
10     Do you see that in the second paragraph?
11 Q.  Under "Opinion"?
12 Q.  Yes.
13 A.  The duty includes the duties -- is that what
14 you're saying?
15 Q.  Yes.
16 A.  Yeah, it's one of -- I'm sorry; go ahead and
17 read it again.
18 Q.  Yeah.  Well, I'm just asking if I read it
19 correctly.  You can go ahead and read the first sentence.
20 I just have a couple of quick questions about it.
21 A.  (Witness reviews document.)
22     Okay.
23 Q.  That duty that you reference there in that
24 sentence, is that derived from the insurance policy?
25 A.  Well, only from the standpoint that, like I said

45 (Pages 174 - 177)

Page 178

1 earlier, if you're going to defend them and then you're
2 going to ask for some money back, you should, at some
3 point, tell them when you're going to do that or if you're
4 going to do that.  This is -- my understanding, some of
5 these are 20, 25 years old that they're asking them to
6 come back and pay for a pro rata share.
7     Q.  I'm asking you if the duty to advise the insured
8 that it intends to seek recovery against either the
9 insured or other insurance carriers, is that language
10 included in the policy anywhere?
11     A.  Not there, no.
12     Q.  Okay.
13     A.  No.
14     Q.  All right.  Earlier Mr. Kotula asked you about
15 point 13 in your report on the summary of facts, page 3.
16     A.  Yes.
17     Q.  Do you see that, paragraph 13?
18     A.  Yes.
19     Q.  And you state:  On several occasions, Troy
20 Belting or its agents requested that PEIC and Hartford
21 help it investigate its older insurance carriers and help
22 it preserve its rights under older insurance policies.
23         Do you see that?
24     A.  Right.
25     Q.  And when is that?

Page 179

1     A.  Well, I don't think it's actually until 2009,
2 when they started making noise about getting money back
3 for them, that they asked for that kind of information --
4 for that help.  That's my understanding.
5     Q.  Okay.  And you go on to say that PEIC and
6 Hartford declined to perform those functions?
7     A.  They've never done it.
8     Q.  All right.  And never placed Unigard/Jamestown
9 on notice of any of the underlying asbestos claims.
10         Do you see that?
11     A.  Yes.
12     Q.  Can you point to any policy provisions in either
13 a PEIC or a Hartford insurance policy that would require
14 PEIC and Hartford to investigate older insurance carriers?
15     A.  Well, if the circumstances are like they are
16 now, where Hartford and PEIC is asking the policyholder to
17 contribute money for past claims that they've defended and
18 settled, then certainly it is within the defense clause of
19 the insuring agreement that they should have told them at
20 that time or go back and find out at that time if there is
21 any other insurance.
22     Q.  And you say that's within the insurance
23 clause -- insuring clause of the policy?
24     A.  Insuring agreement.
25     Q.  All right.

Page 180

1     A.  And under the defense clause, I think they have
2 an obligation.
3     Q.  Okay.  Why don't we mark the policy, and you can
4 kind of tell me what you're talking about.
5         (Exhibit 20 marked.)
6         MR. KOTULA:  Off the record.
7         (Pause in the proceedings from 3:00 to
8          3:01 p.m.)
9     Q.  (BY MR. LEASURE)  Mr. O'Malley, we've marked as
10 Exhibit 20, The Hartford policy issued to Troy that's for
11 the policy period 1992 to 1993.
12     A.  Okay.
13     Q.  Have you had a chance to at least take a quick
14 look at that policy?
15     A.  Okay.
16     Q.  And can you tell me where the duty to defend is
17 contained in that policy; what page?  If you look at the
18 bottom of the document, it will have a Bates number.
19     A.  I'm looking right now.
20     Q.  Okay.
21     A.  Insuring agreement.
22     Q.  Right.  On the bottom right-hand side, is there
23 a number?
24     A.  0474.
25     Q.  Okay.  Can you tell me where the duty to defend

Page 181

1 is contained on that page?
2     A.  Well, it says, We will have the right and duty
3 to defend, right there in the insuring agreement.
4     Q.  Right.  Let me read it to you.
5         It says, We have the right and duty to
6 defend any suit seeking those damages.
7     A.  Right.
8     Q.  We may, at our discretion, investigate any
9 occurrence and settle any claim or suit that may result.
10     A.  Right.
11     Q.  Okay.  And it's your opinion that that is the
12 language that would require, for instance in this case,
13 Hartford to search for and notice other insurance
14 companies of potential coverage?
15     A.  Well, notice them only because -- yeah.  Sure,
16 it would, for two reasons.  The defense clause -- of
17 course, the insuring agreement is to protect the
18 policyholder.  And to protect the policyholder, if you
19 have a suit, you defend them.  If you're defending them,
20 you want to find out whether there's other insurance
21 available, any concurrent insurance, any excess insurance,
22 any insurance that might happen before you or whatever.
23         But this is not only for the policyholder;
24 this is also for Hartford and Pacific Employers.  As an
25 adjustor, you want to make sure that your company is not

46 (Pages 178 - 181)

Page 182

1 paying something they shouldn't be paying.
2    Q.  Well, that's right.  And that would be -- you've
3 testified to -- you know, I'll shorthand it -- but good
4 and generally-accepted claims handling practices, right?
5    A.  Right.
6    Q.  Right.  And that's because, in this case, if you
7 went and searched for other insurance that might
8 potentially pay for the same claim, that's going to
9 benefit an insurance company that is otherwise paying 100
10 percent of the claim; right?
11    A.  Right.
12    Q.  And that's what we've have here.  We have
13 insurance companies paying 100 percent of the claim.  And
14 it would be in the insurance companies' interest to find
15 additional or other insurance, correct?
16    A.  That's correct.
17    Q.  Now, if you look at --
18       MR. FOX:  What's the Bates number, please?
19       MR. LEASURE:  474.
20    A.  If they do that, then, of course, they're
21 penalizing the policyholder.
22    Q.  (BY MR. LEASURE)  They're not penalizing the
23 policyholder in this particular case, though, are they,
24 because 100 percent of the defense and indemnity have been
25 paid for?

Page 183

1       MR. BRENNAN:  Objection.
2    A.  As far as I can see, certainly they're trying to
3 get part of that back.
4    Q.  (BY MR. LEASURE)  Right.  But that doesn't have
5 anything to do with the defense in the case, which is what
6 this clause says, right?
7       MR. BRENNAN:  Objection.
8    A.  It's my opinion that that defense also extends
9 to what we just talked about, pulling together additional
10 coverages.
11    Q.  (BY MR. LEASURE)  Okay.  And it does say that,
12 that the insurance company may investigate at our
13 discretion, correct?
14    A.  Right.
15    Q.  So it's the insurance company's choice whether
16 to do that or not?
17    A.  Yes.
18    Q.  If you move further down, you'll see that there
19 is a -- there's a "but" and then there's a 1 and a 2
20 clause.  And I'd like to read this other paragraph to you
21 right there.  It says --
22    A.  Which one?
23    Q.  If you keep moving on, underneath the Duty to
24 Defend, Insuring Agreement 1A, then there's a 1 and a 2.
25       And you see underneath 2, it says:  No

Page 184

1 other obligation or liability to pay sums or perform acts
2 or services is covered, unless explicitly provided for
3 under supplementary payments coverages A and B.
4       Is that right?
5    A.  Right.
6    Q.  So at least in this policy, it says specifically
7 that there's no other obligation or liability to perform
8 acts or services, unless it's in A and B, right?
9    A.  To pay sums or perform acts or services.
10    Q.  Sure.
11    A.  Okay.
12    Q.  Right.
13    A.  Okay.
14    Q.  So, in other words, there's no other obligation
15 in this clause requiring an insurance company to search
16 for and notice other insurance companies of a potential
17 claim; is there?
18       MR. BRENNAN:  Objection.
19    Q.  (BY MR. LEASURE)  It's not listed there?
20       It doesn't say that, right?
21       MR. BRENNAN:  Objection.
22    A.  Well, I think you've got to go back to the 1A,
23 and then it says -- this says "no other obligation."  And
24 1A already talks about defense, which I'm saying expanded
25 -- which is including -- which includes the carriers

Page 185

1 looking for other insurance.
2    Q.  (BY MR. LEASURE)  Okay.
3    A.  And this says "no other obligation."
4    Q.  Okay.  Maybe that's where I misunderstood you.
5       You believe that the defense of a claim
6 that is covered under a CGL policy includes the duty and
7 the obligation to search for and notice other carriers of
8 a potential claim?
9       MR. BRENNAN:  Objection.
10    A.  That's correct.
11    Q.  (BY MR. LEASURE)  And you think that the
12 language right here in the duty to defend that we just
13 looked at, for instance, in this 1992 policy, is what
14 requires that?
15    A.  Yes.
16    Q.  And it's the duty of an insurance company to do
17 that?
18    A.  In defending the policyholder in the full -- the
19 best they can, because it's for their -- as well as their
20 own -- it's for the policyholder as well as for the
21 insurance carrier.
22    Q.  Well, I don't have any doubt that it's for the
23 insurance company's benefit if they can find somebody else
24 to pay for it; no question.
25       But this policy is not the policy that's

47 (Pages 182 - 185)

Page 186

1 issued by the insurance company, for instance, with
2 another insurance company; is it?
3    A. No.
4         MR. BRENNAN: Objection.
5    Q. (BY MR. LEASURE) We talked about it earlier,
6 right; it's a contract between, in this case, Troy Belting
7 and Hartford, right?
8    A. Yeah.
9    Q. So we're not contracting with other insurance
10 companies; are we?
11    A. No. You're being paid a premium to defend the
12 policyholder in suits, and that defense includes looking
13 for other policies, putting other carriers on notice,
14 looking for excess, and that sort of thing.
15    Q. But you're not aware of anything that says that
16 in the policy; this policy or any other policy?
17         MR. BRENNAN: Objection.
18    A. Other than the fact that you have a duty to
19 defend. And that's part of the defense, in my estimation.
20    Q. (BY MR. LEASURE) Are you aware of any court
21 case in any state in the United States that tells that?
22         MR. BRENNAN: Objection.
23    A. No, I'm not aware.
24    Q. (BY MR. LEASURE) Earlier, you talked about
25 that obligation to look for and notice carriers as a team

Page 187

1 effort.
2         Do you remember that testimony?
3    A. No, I don't -- wait. Say it again, please.
4 I'm sorry.
5    Q. You used the term "team effort" once or twice.
6 And I believe that you were using it with reference to
7 locating and noticing insurance companies of a claim.
8    A. Yes.
9    Q. And so the team effort would include the
10 policyholder; is that correct?
11    A. Yes.
12    Q. And it would include an agent or a broker?
13    A. Right.
14    Q. And it would include an insurance company as
15 well?
16    A. Yes.
17    Q. Is there anybody else that you include in that
18 team effort?
19    A. I think that would probably be it.
20    Q. In this case, we've looked at a series of
21 documents from Nicoll & MacChesney.
22         Do you recall those documents or remember
23 the name of that insurance company, that insurance
24 brokerage?
25    A. Yes.

Page 188

1    Q. Now, they are an insurance agent; is that right?
2    A. Yes.
3    Q. And they are Troy Belting's insurance agent; is
4 that right?
5    A. Yes.
6    Q. And so for purposes of communicating with or
7 placing insurance with or from insurance companies, would
8 you expect Troy Belting to go through their agent for
9 those purposes?
10         MR. BRENNAN: Objection.
11    A. To find insurance?
12    Q. (BY MR. LEASURE) Yes.
13    A. Yes.
14    Q. And so Nicoll & MacChesney would be Troy
15 Belting's agent?
16    A. Right.
17    Q. And so for purposes of coordinating with or
18 communicating with insurance companies, Troy Belting would
19 do that through its broker?
20    A. Say that again; I'm sorry.
21    Q. Troy Belting would communicate with insurance
22 companies through its agent; is that correct?
23    A. Yes.
24    Q. And Nicoll & MacChesney would be that agent?
25    A. Right.

Page 189

1    Q. All right. So you would expect that if an
2 insurance company was dealing with Nicoll & MacChesney
3 regarding policies issued to Troy Belting, that Nicoll &
4 MacChesney could speak for Troy Belting as its agent --
5         MR. BRENNAN: Objection.
6    Q. (BY MR. LEASURE) -- at least for purposes of
7 the insurance?
8         MR. BRENNAN: Objection.
9    A. They should be able to.
10    Q. (BY MR. LEASURE) And we did look at a couple
11 of documents earlier that referenced a search for
12 insurance policies.
13         Do you remember those documents?
14    A. Right.
15    Q. And do you remember that Nicoll & MacChesney was
16 involved in those, at least in the inquiries and in the
17 searches?
18    A. Yes.
19    Q. Do you remember that we also had documented
20 testimony to the effect that -- when a Pacific Employers
21 or INA employee went to Nicoll & MacChesney to look for
22 documents and materials?
23    A. Yes.
24    Q. And so would you expect that the employee from
25 PEIC or INA was going to Nicoll & MacChesney to look for

48 (Pages 186 - 189)

Page 190

1 Troy Belting materials?
2    A.  Yes.
3    Q.  And you expect that Nicoll & MacChesney would
4 have Troy Belting insurance-related materials?
5    A.  I would think so, yes.
6    Q.  Right.  And Nicoll & MacChesney was operating on
7 behalf of Troy Belting?
8    A.  Well, they were operating -- purchasing
9 insurance for them, yes.
10    Q.  Okay.
11    A.  Through them.
12    Q.  And you would expect that, for purposes, for
13 instance, of claims notification, that anything that
14 Nicoll & MacChesney did would be on behalf of Troy
15 Belting?
16    A.  Anything they did, yes.
17    Q.  Right.  So if they had information or knowledge
18 about a particular claim at Nicoll & MacChesney, they
19 would have had that information from or through Troy
20 Belting?
21         MR. BRENNAN:  Objection.
22    A.  I don't understand the question.
23    Q.  (BY MR. LEASURE)  Would Nicoll & MacChesney go
24 out and have claim information about Troy Belting that it
25 got anywhere, except from Troy Belting?

Page 191

1    A.  Any claim information?
2         MR. BRENNAN:  Objection.
3    Q.  (BY MR. LEASURE)  Claim information.
4    A.  Not that I know of.  I mean, they would...
5    Q.  Nicoll & MacChesney would then notify the
6 insurance companies that it thought would be on the risk
7 of a particular claim; is that right?
8    A.  That's correct.
9    Q.  So the agent would be the one who would put the
10 insurance companies on notice of a claim?
11         MR. BRENNAN:  Objection.
12    A.  Anybody can put the insurance company on -- the
13 other carriers on it; the policyholder, the agent, or one
14 of the other carriers.
15    Q.  (BY MR. LEASURE)  Okay.  But the obligation to
16 give notice is contained in insurance policies; is that
17 right?
18    A.  That's correct.
19    Q.  And that obligation is the policyholder's
20 obligation, correct?
21    A.  That's correct.
22    Q.  So when you talk about notice and it could come
23 from anywhere, you're talking about constructive notice or
24 just knowledge of a claim; is that right?
25    A.  Right.

Page 192

1    Q.  You're not talking about the specific notice
2 requirements that are in the policy?
3    A.  No.
4    Q.  Because that's the policyholder's duty?
5    A.  Or the agent.  I mean, the reality is that the
6 agent is the one.  And the agent says that it put Unigard
7 and everybody else on notice.
8    Q.  Right.  That's what I'm asking.  Okay.
9         And I'm not sure I understood your earlier
10 testimony, but I do have some notes that I'd like to ask
11 you about, and that is:  It is your opinion and you have
12 in your report that you believe that PEIC and Hartford
13 violated claims standards to Troy Belting; is that your
14 testimony?
15    A.  Which -- which one are you talking about?
16    Q.  Well, I'm looking at notes, and I believe you
17 said that they violated their duties --
18    A.  I think --
19    Q.  That's certainly in your conclusion.
20         PEIC and Hartford violated their duties to
21 Troy Belting by seeking contribution; is that what you
22 state?  It's in your conclusion on page 6.
23    A.  Page 6?
24    Q.  Yeah, in your conclusion.
25    A.  Yeah, that's what I said.

Page 193

1    Q.  Okay.
2    A.  Without taking the necessary steps to
3 investigate previous insurance --
4    Q.  Okay.  What I want to -- what I want to ask you
5 is:  Is that sentence -- does that conclusion and that
6 opinion that what you want to render in this case, are you
7 making that for all time, for instance, from 1949 to the
8 present?  I'm trying to pin you down for when you believe
9 that PEIC and Hartford violated their duties to Troy
10 Belting.
11         MR. BRENNAN:  Objection.
12    Q.  (BY MR. LEASURE)  Right?
13    A.  Yeah.
14    Q.  Because we have already discussed the fact that
15 100 percent of the defense and 100 percent of the
16 indemnity are being covered for the underlying asbestos
17 claims, right?
18         MR. BRENNAN:  Objection.
19    A.  It's been covered at this point, yes.
20    Q.  (BY MR. LEASURE)  Right.  Okay.  So when did
21 they violate their duties?
22    A.  When they -- well, when they started asking for
23 the pro rata on the cases that they settled and the cases
24 they defended.
25    Q.  Okay.

49 (Pages 190 - 193)

Page 194

1   A. And my -- my opinion says that if they knew that
2 this was going to happen, which they should have, 20, 30
3 years ago, they should have been going back and seeing who
4 the carriers are and trying to make some determination as
5 to who the insurance carrier was before they came on.
6   Q. Right. And we know they did that at least in
7 1977 with the Pennell file, right?
8   A. Well, they made an attempt to, but we didn't get
9 any information on it.
10   Q. And they asked Troy Belting to help in that
11 information -- the gathering of that information at the
12 time, correct?
13   A. Yes.
14   Q. And they asked -- Troy Belting's agent at Nicoll
15 & MacChesney was involved in the search, correct?
16   A. Yes.
17   Q. And Unigard was involved in the search, right?
18   A. I don't know. They didn't say. I mean, they --
19   Q. Well, you know that -- you know Unigard at least
20 received correspondence and had inquiries about the
21 coverage, correct?
22   A. That's correct.
23   Q. So somebody at least asked Unigard if they
24 issued policies?
25   A. Well, they were put on notice apparently by the

Page 195

1 agent, they said.
2   Q. Okay.
3   A. And the response was, We don't think it's
4 material.
5   Q. Right. Okay. But they did investigate the
6 prior coverages, right?
7   A. I don't know that --
8   Q. Troy Belting did, right?
9       MR. BRENNAN: Objection. When are you
10 talking about?
11       MR. LEASURE: 1977.
12   Q. (BY MR. LEASURE)  You're saying that PEIC and
13 Hartford violated their duties without taking the
14 necessary steps to investigate Troy Belting's previous
15 insurance carriers.
16       And I want to know who that is or when that
17 is, and is it anything different than what they were doing
18 in 1977?
19   A. Yeah, of course, it is. Now it's 30 years
20 later, 20 years later, they're trying to -- in 2009, they
21 were asking Troy Belting to make a contribution. Now, if
22 they would have done that work back 20, 30 years ago, they
23 might have had the information and would not have put Troy
24 Belting on notice for any pro rata share.
25       But I'm saying that this is old stuff.

Page 196

1 They should have done this back 25 or 30 years ago. And
2 you said -- you said, Well, they did.
3       Well, they didn't, because they don't have
4 the information.
5   Q. But you think they might have the information
6 better in 2009 than they did in 1977?
7   A. No, they would not.
8   Q. Okay. And I guess what I would like you to tell
9 me is, are you saying that they're violating their duties
10 in 2009 by asking for an indemnification or an allocation
11 pursuant to New York law?
12       MR. BRENNAN: Objection.
13   A. Yes, because -- well, they're asking for it
14 because they didn't do the right thing; they didn't have
15 the right claim practices in place at the time of '74/'75,
16 whenever this Pennell case came up. That's when they
17 should have gone back, and that's when they should have
18 established. They waited 25, 30 years, and decided, Hey,
19 there's some uncovered places here that we need to find
20 out from Troy Belting because we don't know who it was
21 before us. And the reason we don't know who it was before
22 us is because we didn't look into it enough.
23   Q. Well, let me ask you this question on behalf of
24 Hartford: Hartford wasn't asked to look into that in 1976
25 or 1977; were they?

Page 197

1   A. No.
2   Q. And Hartford was not in any kind of a
3 contractual relationship with Troy Belting at the time;
4 were they?
5   A. No.
6   Q. But Nicoll & MacChesney was Troy Belting's
7 broker at the time, right?
8   A. Yes.
9   Q. And they did look into this issue, right?
10   A. They said they did. They said they put Unigard
11 on notice.
12   Q. And they also put Pacific Employers on notice,
13 right?
14   A. Yes.
15   Q. And Pacific Employers looked for the prior
16 insurance coverage as well; didn't they?
17   A. Well, I don't know how much. I mean, they
18 apparently didn't get the information.
19   Q. Well, they looked, though?
20   A. I don't know.
21   Q. Well, you saw the exhibits that were entered, to
22 that realm, correct?
23   A. Well, I didn't see where they found any
24 information on it, though.
25   Q. Well, you were asked a series of questions about

50 (Pages 194 - 197)

Page 198

1 Mr. Ranalli's activities at his deposition.
2       Do you remember that?
3    A.  Right.
4    Q.  You remember that handwritten exhibit?
5    A.  Right.
6    Q.  And the testimony that he went and looked -- and
7 went to Nicoll & MacChesney to search for any indication
8 that there might be policies?
9    A.  Yeah.
10    Q.  What other kind of an investigation do you think
11 he should have made?
12    A.  He should have had the policy numbers and the
13 policy periods.
14    Q.  Policy numbers and policy periods for an
15 insurance company that was not his own?
16    A.  Pardon me?
17    Q.  You're telling me Ranalli should have had
18 insurance company policy numbers; for what insurance
19 company?
20    A.  For Unigard or whoever was behind him.
21    Q.  You're telling me that to search for other
22 insurance policies, that an employee of INA or Pacific
23 Employers should have insurance policy numbers of a
24 different insurance company?
25    A.  What was he there for?

Page 199

1    Q.  Well, how is he going to get the information;
2 who's going to give it to him?
3    A.  The insured -- I mean, the agent.
4    Q.  And the agent is Troy Belting's agent, right?
5    A.  Right.
6    Q.  Right.  And so you don't know if he gave the guy
7 from Pacific Employers any information with respect to
8 policy numbers?
9    A.  He didn't write it down if he did.
10    Q.  And that's what I'm asking.
11    A.  I'm saying --
12    Q.  What other investigation would you like him to
13 make?
14    A.  Pardon me?
15    Q.  What other investigation would you think should
16 be made?
17    A.  He should have made the investigation who were
18 the prior carriers, who they were, and what was -- what
19 was the policy periods, and how much the limited
20 liabilities were.
21    Q.  Okay.  And he did that, right?  He did that.  He
22 got that information from Troy Belting themselves and from
23 the brokers; did he not?
24    A.  Got what information?
25    Q.  Who the prior carrier was.

Page 200

1    A.  Yeah.  But he didn't get the policy periods, and
2 he didn't get the limited liabilities.
3    Q.  No, nobody has that information.
4       That's the basis of your dispute with
5 Unigard, right?
6    A.  Right.
7    Q.  But what I'm asking is:  What should an
8 insurance company do who knows they issued policies?
9 They're going to be in a position to gather information
10 that Troy Belting and his agent doesn't have or can't give
11 them?
12    A.  Who?  Who are you talking about now?
13    Q.  I'm talking about any other insurance company
14 that you say has a duty or an obligation to look for,
15 search, and notice other insurance companies of a
16 particular claim.
17    A.  Yeah.
18    Q.  You think that that person has better
19 information than Troy Belting does about his own insurance
20 policy?
21       MR. BRENNAN:  Objection.
22    A.  He doesn't at the time he starts the search,
23 but --
24    Q.  (BY MR. LEASURE)  No.  And he doesn't have the
25 same information that the broker has either, right?

Page 201

1    A.  But he went to the broker; he should have found
2 out.
3    Q.  But what if the broker didn't have it, because
4 you testified -- or you saw some testimony earlier about
5 the broker claiming that it destroyed its policies and
6 information, right?
7    A.  Right.
8    Q.  And I'm not -- I didn't review all the materials
9 that you reviewed in preparation for this deposition, but
10 you did review ledger entries and other things, right?
11    A.  Yes.
12    Q.  And Mr. Kotula asked you about the secondary
13 evidence, right?
14    A.  Yeah.
15    Q.  Right.  And none of that secondary evidence
16 shows any policy numbers or policy premium information or
17 anything of the like, right?
18       MR. BRENNAN:  Objection.
19    A.  No, it did not.
20    Q.  (BY MR. LEASURE)  And they looked for it at the
21 time, right?
22    A.  I don't know if they did or not.
23    Q.  Okay.
24    A.  What I'm saying is, 30 years later, you come to
25 Troy Belting and ask them for a pro rata share of claims

51 (Pages 198 - 201)

Page 202

1 that you have been settling over the last 25, 30 years.
2 I'm saying a good claims practices would have been at the
3 time when you go to the agent and either he has the
4 information or has an opportunity to go back and find the
5 information then; not 30 years, not 2009, but 1974, 1976.
6   Q.   Do you know if Troy Belting is still receiving
7 bodily injury claims for asbestos?
8   A.   Do I know that?
9   Q.   Yes.
10   A.   I don't know that.
11   Q.   Do you know what the spread of years are?  For
12 instance, assuming that the Pennell claim was the first
13 claim, 1976 or 1977, do you have any idea when the last
14 claim was made against Troy Belting?
15   A.   No.
16   Q.   Are you suggesting that an insurance company
17 that issued a policy in 1977 should have known at the time
18 that it wanted to share the risk with an insurance policy
19 that was issued in 1989 or 1992?
20       MR. BRENNAN:  Objection.
21   A.   I don't follow that at all.  What I'm saying --
22 what I said -- what -- that they had an opportunity at
23 that time to find out what the policies were, a better
24 opportunity to find out policy number, limits, policy
25 periods in 1977 than they did in 2009, and they've been

Page 203

1 going all along here settling these claims and defending
2 them.
3   Q.   (BY MR. LEASURE)  That's right.  No question
4 that they would have a better chance of finding insurance
5 program and policy information in 1977 than they would in,
6 for instance, 2001 or 2009; is that correct?
7       MR. BRENNAN:  Objection.
8   A.   That's right.
9   Q.   (BY MR. LEASURE)  Okay.  And so it's your
10 testimony, it's your opinion that good claims handling
11 practices in 1977 would have been to do some further
12 additional different investigation than what was done by
13 Pacific Employers in this case?
14   A.   Yes.
15       MR. BRENNAN:  Objection.
16   Q.   (BY MR. LEASURE)  And it's your opinion that it
17 was their duty to notice those carriers of any potential
18 claims?
19   A.   It's their duty to find out if there's any
20 additional coverage, because they're defending their
21 policyholder, and that's part of the defense, is to find
22 out whether their excess -- they put excess people on
23 notice.  And they should have made a determination about
24 Unigard.  They had Unigard there, and they should have
25 been able to get some more information from them, or at

Page 204

1 least try.
2   Q.   Okay.  But they should get some more information
3 for their own purposes if they want to share a loss,
4 because you already testified that the notice obligation
5 of an insurance policy is the policyholder's obligation to
6 notice insurance companies, right?
7       MR. BRENNAN:  Objection.
8   A.   That's right.
9   Q.   (BY MR. LEASURE)  Okay.
10   A.   That's primary.  But anybody can be -- I've been
11 noticed by claimants and everybody else on --
12   Q.   You're using the word "notice."
13       You've been made aware of a claim, right?
14 You're not noticed under the terms of an insurance policy.
15 You're not using those interchangeably; are you?
16       THE REPORTER:  Can you slow down just a
17 bit?
18       MR. LEASURE:  Okay.  Sorry.
19   A.   There's no way I can avoid saying that I wasn't
20 put on notice.  If a claimant sends a letter to me through
21 an attorney and says, You owe us $1 million for whatever
22 kind of claim, I can't say, Well, I didn't get notice from
23 the policyholder, so I'm not going to do anything about
24 it.
25   Q.   (BY MR. LEASURE)  No.  But in that case, it was

Page 205

1 an insure -- it was a lawyer --
2   A.   Sometimes it is.
3   Q.   -- on behalf of the policyholder, right; that
4 was your example?
5   A.   Not on behalf of a policyholder, but on behalf
6 of a claimant.
7   Q.   Okay.  Who had a policy written by you?
8   A.   No.  You're saying that the only primary is that
9 notice is from the policyholder.  And I'm saying you get
10 notices from everybody.  You get notices from claimants;
11 you get notices from attorneys; you get notices from the
12 agents; you get notices from the policyholder.  I mean,
13 there's all kinds of -- you can't ignore them and say,
14 Well, wait a minute.  We didn't get notice from the
15 policyholder, although you got notice from an attorney
16 over here that a claimant is injured.
17   Q.   Are you going to testify here or offer an
18 opinion about what a late notice argument would be?
19   A.   Late notice?  No.
20   Q.   Yeah.  In other words, that I didn't get notice.
21       Is anybody in this case arguing that they
22 didn't get notice of the claim?
23   A.   Not that I'm aware of.
24   Q.   And that's what you're talking about.  You're
25 talking about notice of the claim, right?  You're not

52 (Pages 202 - 205)

Page 206

1 talking about an obligation of an insurance company to
2 notice another insurance company of a claim?
3        You're not saying that's in the policy
4 anywhere; are you?
5    A.  I'm saying that if you have notice of a claim
6 from anywhere, from the policyholder, from the agent, or
7 from the claimant, then you have an obligation to make an
8 investigation and see whether or not you should place
9 other carriers, excess carriers, on notice or other people
10 before you, particularly when you're talking about
11 long-tail cases.
12    Q.  Right.  And you say that that's contained in the
13 duty to defend; that's where it's -- that's where it is in
14 the policy?
15        MR. BRENNAN:  Objection.
16    A.  Of course.
17        MR. LEASURE:  Let's take five minutes.
18        (Recess in the proceedings from 3:25 to
19        3:34 p.m.)
20    Q.  (BY MR. LEASURE)  Mr. O'Malley, I just have a
21 couple of more questions.  I'm going to turn it over to
22 Mr. Fox, and, hopefully -- hopefully, be done.  I can't
23 guarantee that I won't come back with a question or two.
24        But let me direct your attention to page 5
25 of your report, which is Exhibit 2.

Page 207

1    A.  Okay.
2    Q.  And in the third paragraph that says "beyond
3 this," do you see that?
4    A.  Yeah.
5    Q.  It says:  Beyond this, PEIC and Hartford both
6 refuse to investigate the insurance history or to take any
7 steps necessary -- pardon me.  Let me back up and start
8 over; I misread.
9        Beyond this, PEIC and Hartford both refuse
10 to investigate the insurance history or to take any steps
11 to preserve Troy Belting's rights against any such
12 carriers, despite Troy Belting's repeated requests.
13        Do you see that?
14    A.  Yes.
15    Q.  Okay.  And it's your opinion that Hartford and
16 PEIC refused to the investigate insurance history in this
17 case?
18    A.  What I saw of the depositions of Barcum and some
19 of the others that they had asked.
20    Q.  Okay.  But you're not referring, for instance,
21 to the investigation that was undertaken during the
22 Pennell claim that we looked at before?
23    A.  Well, I don't think I'm referring specifically
24 to Pennell, no.
25    Q.  Are you referring to any specific time that PEIC

Page 208

1 and Hartford refused to investigate the insurance history?
2 When is that?
3    A.  Well, from the time of that Pennell claim up to
4 2009 or whatever for the pro rata share is.
5    Q.  Okay.  And you go on to say that they refused,
6 despite Troy Belting's repeated requests?
7    A.  Yes.
8    Q.  And what are you referring to there?
9    A.  The depositions I read -- I can't think --
10 Barcum particularly, I think.
11    Q.  And what did Mr. Barcum say?
12    A.  That he had made requests that they do that;
13 make some -- make some inquiries and make some
14 investigation into the other carriers.
15    Q.  And when did he do that?
16    A.  I don't know.  Right after he was noticed that
17 he needed -- was going to pay for it.
18    Q.  Okay.  So 2009 or so?
19    A.  Yeah.  After, yeah.
20    Q.  Okay.
21        MR. LEASURE:  I don't have any further
22 questions at this time.  I'm going to turn it over to
23 Mr. Fox.  I may be back for a question or two.
24        (Discussion held off the record 3:37 to
25        3:37 p.m.)

Page 209

1        (Examination was concluded at 3:37 p.m.,
2        and Examination began.
3        EXAMINATION
4 BY MR. FOX:
5    Q.  Okay.  Good afternoon, Mr. O'Malley.  I'm Brian
6 Fox; we met earlier.  I represent the Plaintiff, Pacific
7 Employers Insurance Company, in this case.
8        I'll be asking you some questions, okay?
9    A.  All right.
10    Q.  Do you know who Bernd Heinze is, also known as
11 Bernie Heinze?
12    A.  Oh, you mean the expert?  Yes, yes.
13    Q.  And who is Mr. Heinze?
14    A.  Pardon me?
15    Q.  Who is he, to your knowledge?
16    A.  He was an expert employed by Hartford and PEIC
17 and maybe Unigard.
18        MR. KOTULA:  Nope.
19    Q.  (BY MR. FOX)  Right.  He was retained -- just
20 to be clear on the record, he was retained only on behalf
21 of Pacific Employers Insurance Company and Hartford.
22        And by the way, is it correct that if I say
23 Pacific Employers or PEIC, you'll know -- or you use those
24 terms, you'll know that they're interchangable terms for
25 purposes of this deposition, right?

53 (Pages 206 - 209)

1   A.  Right.
2   Q.  Okay.  Had you heard of Mr. Heinze before your
3 work on this case?
4   A.  No, I had not.
5   Q.  Okay.  You testified a little while ago that you
6 read Mr. Heinze' deposition testimony.
7       Did you read his expert report issued in
8 this case?
9   A.  Yeah, I read it.  Not conversant with it.
10   Q.  And -- and why did you read it?
11   A.  Because it was attached to his deposition.
12   Q.  Okay.  And why did you read his deposition?
13   A.  Because it was sent to me, and because it was in
14 opposition to what I was saying, or most of it.
15   Q.  So it was sent to you by counsel, Mr. Brennan,
16 or someone from his office?
17   A.  Yes.
18   Q.  Okay.  And did your review of Mr. Heinze'
19 deposition testimony or any of its exhibits, including Mr.
20 Heinze' expert report, did they cause you to revisit or
21 want to change anything in your expert report?
22   A.  Absolutely not.
23   Q.  Okay.  Referring to your expert report, which
24 has been marked as Exhibit 2, do you have that in front of
25 you?

1   A.  Yes.
2   Q.  Did you write it?
3   A.  Yes.
4   Q.  Did you write every word of it?
5   A.  Yes.
6   Q.  Did counsel assist you in any way in writing it?
7   A.  No.
8   Q.  Now, am I correct you've never underwritten an
9 insurance policy; is that right?
10   A.  No.  Like I testified earlier, I was in charge
11 of the underwriting department for Union Standard, and I
12 set the standards for what we were going to write and that
13 sort of thing, but I was never a desk underwriter.
14   Q.  Is it fair, you never underwrote an insurance
15 policy; is that fair?
16   A.  Well, almost.  I mean, I -- no.  To say I was an
17 underwriter, no, I was not an underwriter.
18   Q.  Okay.  And did you read any of the Pacific
19 Employers insurance policies issued to Troy Belting that
20 are at issue in this case?
21   A.  No.
22   Q.  And do you plan to offer any opinions on what
23 those Pacific Employers policies require Pacific Employers
24 to do in this case?
25   A.  Other than what I've already testified before,

1 today.  I mean...
2   Q.  Okay.  We'll get back to that.  And same -- same
3 questions as to Hartford.
4       Did you read any of The Hartford insurance
5 policies issued to Troy Belting that are at issue in this
6 case?
7   A.  No.
8   Q.  And if I were to ask you that same other
9 question, do you plan to offer any opinions on what those
10 Hartford policies require Hartford to do in this case,
11 what is your answer to that?
12   A.  What it requires Hartford to do?  We just went
13 over the insurance agreement.
14   Q.  Okay.  Now, so, is it your -- is it -- withdraw.
15       So you plan to offer opinions in this case
16 as to the Pacific Employers and Hartford insurance
17 policies only to the extent of the insuring agreements in
18 those policies?
19   A.  Yeah.
20   Q.  Okay.  So is it fair to say that -- withdrawn.
21       Other than the one Hartford policy that
22 Mr. Leasure showed you just a short while ago today, which
23 he marked as an exhibit, Exhibit 20, I believe, that's the
24 first time you saw either a Hartford or a -- that's the
25 first time you saw a Hartford policy issued to Troy

1 Belting; is that correct?
2       MR. BRENNAN:  Objection.
3   A.  Yes.
4   Q.  (BY MR. FOX)  Okay.  And with respect to
5 Pacific Employers, is it fair to say, then, that you
6 intend to give opinions as to what the Pacific Employers
7 policies require Pacific Employers to do without having
8 ever looked at any of those Pacific Employers policies; is
9 that right?
10       MR. BRENNAN:  Objection.
11   A.  I can give an opinion regarding what an
12 insurance agreement is in any policy, in any comprehensive
13 general policy, which includes Pacific Employers or
14 Hartford or Unigard or anybody else's.
15   Q.  (BY MR. FOX)  Okay.  But it is accurate, is it
16 not, that you intend to offer opinions as to the Pacific
17 Employers policies, even though you've never looked at a
18 Pacific Employers policy in this case, right?
19       MR. BRENNAN:  Objection.
20   A.  Giving an opinion about insuring agreements and
21 comprehensive general liability and M&C policies about
22 what the insuring agreement says in any policy and, in
23 particular, the defense portion of that, we've discussed
24 earlier today.
25   Q.  (BY MR. FOX)  What you referred to a little

54 (Pages 210 - 213)

Page 214

1  earlier is what you're referring to as the defense portion
2  of the insuring agreement; do I have that right?
3      A.  Right, right.  Yes.
4      Q.  Okay, sorry.
5          But I'm going to have to ask you this
6  again, because I don't think I got an answer to this.
7          It is correct, isn't it, that based on what
8  you've testified, you plan to offer one or more opinions
9  about what the Pacific Employers policies obligate Pacific
10 Employers to do in this case without having ever looked at
11 any of those policies, right?
12         MR. BRENNAN:  Objection.
13     A.  I have not looked at the policies.  I know what
14 the insuring agreement says; I've looked at it 100 times.
15 And it's the same in any -- in all the comprehensive
16 general liability policies.  And I'm going to give
17 testimony about that.
18     Q.  (BY MR. FOX)  Now, do you have an
19 understanding, Mr. O'Malley, that in the context of a
20 lawsuit, it's for a judge or jury to determine the rights
21 and obligations of a policyholder and the carrier to one
22 another under their insurance policy, and not you?  Would
23 agree with that?
24     A.  Correct.
25         MR. BRENNAN:  Objection.

Page 215

1      Q.  (BY MR. FOX)  Now, you've testified that
2  Pacific Employers and Hartford violated a duty here;
3  that's what you're -- that's what you're opining, right?
4      A.  Yes.
5      Q.  Okay.  When was the first time that took place,
6  either as Pacific Employers or Hartford or both?
7          MR. BRENNAN:  Objection.
8      Q.  (BY MR. FOX)  You know what, let me break it up
9  with the objection.
10         When is the first time that, in your
11 opinion, Pacific Employers violated a duty here?
12     A.  Well, I can't -- I can't pinpoint a date; I can
13 only pinpoint the fact that there were several cases that
14 were settled between '77 and 2009 in which they had an
15 opportunity to go back and look and see what the other
16 carriers are.  I don't know what those dates are or when
17 those particular cases are or when they occurred.
18     Q.  So other than the specific date -- I'm not
19 asking you for, you know, a month and day, but give me
20 some time frame, some time estimate, the best you can, as
21 to when, in your opinion, Pacific Employers first violated
22 a duty here.
23     A.  Well, they violated a duty when the first claim
24 came in after Pennell, from '77 all the way up to 2009, by
25 not taking the opportunity at that time to find out who

Page 216

1  may also be on this policyholder's coverage.  And so when
2  that occurred, the timing -- but that's not manifested
3  until 2009, when they come and ask for coverage or for a
4  pro rata share of it.
5          So I don't know when it was.  At that
6  point, we know that they didn't do it, because they didn't
7  have any information.  They hadn't gone back.
8      Q.  So if I understand your last answer, in your
9  opinion, if Pacific Employers had not asked for money from
10 Troy Belting in 2009, then you would be of the opinion
11 that Pacific Employers did not violate any duty; is that
12 right?
13         MR. BRENNAN:  Objection.
14     A.  Well, they hadn't violated if they haven't asked
15 for the money.  I mean, when they asked the policyholder
16 for money, then you have to look at it and say, Well, why
17 are you asking in 2009 for claims back in the '70s and
18 '80s?  Why didn't you do something back at that time to
19 find out who -- maybe some other carriers, that would be
20 involved?  Now you're coming to them in 2009, and so
21 you're asking them for that information 25, 30 years
22 later.
23         And my testimony -- my opinion is, you
24 violated good claims practices by not doing that back in
25 1976/77, or whatever it was, all the way up to the point

Page 217

1  of where they are asking for money and asking -- giving
2  percentages of how much they want on a particular claim
3  that they settled.
4      Q.  (BY MR. FOX)  And my question is:  In your
5  opinion, if Pacific Employers had not asked Troy Belting
6  for money in 2009, would your opinion be that Pacific
7  Employers did not violate any duty?
8          MR. BRENNAN:  Objection.
9      A.  There wouldn't be any controversy.
10     Q.  (BY MR. FOX)  Okay.  What's the answer --
11 what's the answer to my question then?
12     A.  Yeah.  Well, no, there wouldn't have been any
13 controversy if they hadn't asked for it.  I mean, why
14 would there be?  But when they did ask for it in 2009,
15 then you have to say, Well, why didn't you do this back
16 20, 25 years ago?  And then you would look into it, and
17 you'd say, Well, that's not good claims handling coming
18 back 30 years from now and asking for money that you could
19 have looked at and would have had a better opportunity or
20 better served the insured if you would have found out that
21 information or tried to find out that information back 30
22 years ago.
23     Q.  So my question -- and we'll call it a
24 hypothetical, if that helps.
25         My question is:  In your opinion, if -- if,

55 (Pages 214 - 217)

Page 218

1 hypothetically, Pacific Employers had not asked Troy
2 Belting for any money in 2009, then would you agree that
3 your opinion would be that Pacific Employers did not
4 violate any duty?
5          MR. BRENNAN: Objection.
6     A.  Would not be that, no.  It would be who had
7 violated it.  It just wouldn't have made -- wouldn't have
8 done anything to the policyholder, because they should
9 have done it back 30 years ago.  And because it never
10 manifested until 2009, and then it did, then we go back
11 and say that they have.
12     Q.  (BY MR. FOX)  So if this -- I'm going to keep
13 using that 2009 date that you're referring to.
14          If that hadn't happened in 2009, then you
15 -- am I correct that you would have no reason to opine
16 that Pacific Employers violated a duty in around 1977; is
17 that correct?
18          MR. BRENNAN: We wouldn't be here.  There
19 would be no need -- go ahead.
20     A.  That's not what I said.  What I said is that
21 they would have still not been good claim practices, but
22 there would have been no controversy, so there would be no
23 reason to say that they didn't have good claim practices.
24          But when it was decided in 2009 that they
25 wanted some pro rata share, then you can find out that

Page 219

1 they had done that.  If there's no money exchanged or
2 there's no demand, nobody would have looked into it.
3     Q.  (BY MR. FOX)  Now, is it possible or impossible
4 that sometime between 1977 and 2009, the applicable law
5 might have changed?  Is that -- is that possible, the
6 applicable law governing Pacific Employers' rights to seek
7 money from Troy Belting?
8          MR. BRENNAN: Objection.
9     A.  Are you talking about the manifestation clause
10 or the pro rata clause or whatever --
11     Q.  (BY MR. FOX)  So in 1977, Pacific Employers did
12 not seek money from Troy Belting.  I mean, I'm just going
13 to use these two dates that you've been using.  Let me
14 stick with those.
15          So 1977, Pacific Employers did not
16 expressly seek money from Troy Belting; and in 2009, they
17 did, right?  Are you with me so far?
18     A.  Right.
19     Q.  Okay.  Is it possible or impossible that during
20 that period of time, the law governing Pacific Employers'
21 right to seek money from Troy Belting changed; is that
22 possible that that happened?
23     A.  Sure.
24          MR. BRENNAN: Objection.
25     Q.  (BY MR. FOX)  Okay.  Is it fair to say that

Page 220

1 your earlier testimony that if things had happened 30
2 years earlier, the parties might have located Unigard's
3 alleged coverage, they might have, they might not have,
4 that you're engaging in speculation in saying that?  Is
5 that fair to say?
6          MR. BRENNAN: Objection.
7     A.  I'm saying that they certainly would have had a
8 better chance of finding coverage, because we knew at the
9 time that Unigard might have had coverage because of the
10 testimony that they had in their own file, in the Pennell
11 file.
12     Q.  (BY MR. FOX)  That who has in the Pennell file?
13     A.  Pacific Employers.
14     Q.  Okay.  And those references, the ones to which
15 you just referred, the INA representative
16 going to Troy Belting's broker, Nicoll & Chesney (sic) --
17          MR. BRENNAN: MacChesney.
18     Q.  (BY MR. FOX)  -- MacChesney and inquiring about
19 the alleged Unigard coverage, right?
20     A.  Yes.
21     Q.  Okay.  I'd like to direct your attention to
22 paragraph 15 of your expert report, Exhibit 2, which is on
23 page 3.  Please tell me when you're there.
24     A.  Page 5?
25     Q.  Page 3, actually.

Page 221

1          MR. BRENNAN: Paragraph 15.
2     A.  Oh, yes.
3     Q.  (BY MR. FOX)  Paragraph 15; tell me when you're
4 there.
5     A.  Yes.
6     Q.  Let me read it aloud and make sure I get it
7 right, and then I'll ask you some questions on this.
8          As this evidence pertains to PEIC, records
9 established that PEIC knew that Unigard Insurance Company
10 and/or its predecessor, Jamestown Mutual Insurance
11 Company, were Troy Belting's insurer for the term
12 described above since no later than December 1977.
13          Did I read that correctly, Mr. O'Malley?
14     A.  Yes.
15     Q.  Okay.  Now, let me direct your attention to that
16 first line there.  As this evidence pertains to PEIC,
17 records establish that PEIC knew -- do you see that word
18 "knew"?
19     A.  Oh, okay.
20     Q.  And you see the end of the sentence.  And take
21 additional time, if you'd like.
22          But my first question is:  What did you
23 mean when you wrote the word "knew" in there?
24     A.  Well, they knew because they had correspondence
25 with Unigard that they had some -- they had liability or

56 (Pages 218 - 221)

1 should have known that they had a liability policy.

2    Q. I'm sorry; what did you say? That who knew or

3 should have known?

4    A. PEIC.

5    Q. And what did or should PEIC have known in 1977?

6    A. I think we've discussed that all afternoon about

7 the correspondence it had with Jim Dixon and at Unigard.

8    Q. My question is: What are you saying that PEIC

9 knew or should have known in 1977 along these lines?

10    A. They should have known that Unigard had

11 coverage, liability coverage.

12    Q. Okay. And when you write -- withdrawn.

13      When you wrote in paragraph 15 that records

14 established that PEIC knew, are you saying that in 1977,

15 PEIC was -- was certain of that, was certain that Unigard

16 or Jamestown was Troy Belting's liability insurer?

17      MR. BRENNAN: Objection.

18    A. I don't know if they were absolutely certain,

19 but they certainly -- they had an opportunity to find out.

20    Q. (BY MR. FOX) Okay.

21    A. They were corresponding and even had phone

22 conversations.

23    Q. And this is -- this is what I want to follow up

24 with you on right now.

25      Are you saying that they knew, or are you

1 saying that they should have known?

2    A. I'm saying that they probably knew.

3    Q. Okay. So now it's -- you're no longer saying,

4 as it's reflected in your report, that PEIC knew. Now

5 you're saying that PEIC probably knew; is that right?

6    A. Well, they knew --

7      MR. BRENNAN: Objection.

8    A. -- because they were corresponding with Unigard,

9 and Unigard was asking them questions. So they -- if they

10 didn't know, they should have known that they had

11 coverage, because they were talking about liability. They

12 weren't talking about compensation.

13    Q. (BY MR. FOX) Okay. And as we sit here today,

14 does Troy Belting know that Unigard or Jamestown was ever

15 Troy Belting's liability insurer?

16      MR. BRENNAN: Objection.

17    A. Did who know that?

18    Q. (BY MR. FOX) Troy Belting. Does Troy Belting

19 know that Unigard or Jamestown was Troy Belting's

20 liability insurer?

21      MR. BRENNAN: Objection.

22    A. Yeah. Well, they knew that Jamestown or Unigard

23 was, yes. They knew they had them for several years.

24    Q. (BY MR. FOX) Okay. And are they certain of

25 that?

1      MR. BRENNAN: Objection.

2    Q. (BY MR. FOX) Do you have --

3      MR. FOX: Let me finish my question first.

4      MR. BRENNAN: Sorry.

5    Q. (BY MR. FOX) Let me ask you: Do you have an

6 understanding that, as we sit here today, Troy Belting is

7 certain that Unigard or Jamestown was Troy Belting's

8 liability insurer?

9      MR. BRENNAN: Objection.

10    A. They knew that they had insurance through the

11 agent with Jamestown. I have no idea what they knew that

12 they had, because, apparently, they didn't have any

13 policies.

14    Q. (BY MR. FOX) By the way, when you say "they

15 knew," you're referring to Troy Belting?

16    A. Troy Belting.

17    Q. Okay. So they knew that based on the dealings

18 with Nicoll & MacChesney back in the 1970s, right?

19    A. Right.

20    Q. Okay. Paragraph 11; if you could turn your

21 attention to that, please. I'm going to read it.

22      In each of the underlying asbestos cases,

23 PEIC and Hartford has asserted that Troy Belting or its

24 prior insurance carriers are liable for a, quote, pro rata

25 share, unquote, of the defense and indemnity payments made

1 in these underlying asbestos cases.

2      Do you see that?

3    A. Yes.

4    Q. Okay. Mr. O'Malley, in your opinion, should a

5 policyholder ever have to pay its fair share of indemnity

6 payments in accordance with applicable law?

7      MR. BRENNAN: Object to the form.

8    A. Yes, if that's the law.

9    Q. (BY MR. FOX) If that's the applicable law --

10 if the applicable law requires a policyholder to pay its

11 fair share of, let's say, indemnity, then they should have

12 to do that, right?

13    A. That's right.

14    Q. Paragraph 13 now. I'm going to read it again.

15 I mean, I'm going to read it.

16      On several occasions, Troy Belting or its

17 agents requested that PEIC and Hartford help it

18 investigate its older insurance carriers and help it

19 preserve its rights under older insurance policies. PEIC

20 and Hartford declined to perform these functions and never

21 placed Unigard/Jamestown on notice of any underlying

22 asbestos claims.

23      Did I read that correctly?

24    A. Right.

25    Q. Okay. As to the first sentence -- actually, as

57 (Pages 222 - 225)

Page 226

1 to the first clause, on several occasions -- and feel free
2 to take time before you answer; read more of 13, if you'd
3 like.
4          My question is:  The reference at the
5 beginning of that -- of number 13 to "on several
6 occasions," when was the first such occasion?
7          MR. BRENNAN:  Objection; asked and
8 answered.
9     A.   As far as I can recall, it's after 2009.
10    Q.   (BY MR. FOX)  Okay.  Other than what you've
11 testified to thus far today, do you plan to offer any
12 opinions concerning any of the terms of any of the Pacific
13 Employers insurance policies at issue in this case?
14          MR. BRENNAN:  Object to form.
15    A.   Other than what I've already testified to about
16 the insuring agreement that, in my experience, I know what
17 it is and I know what it says, that's all.
18    Q.   (BY MR. FOX)  Okay.  You don't plan to offer
19 opinions about anything else in the Pacific Employers
20 policies, other than what you just said, right?
21    A.   Right.
22    Q.   Same question for Hartford.  I'll repeat it, if
23 you'd like.
24    A.   Yes.
25    Q.   Same answer?

Page 227

1          MR. BRENNAN:  Objection.
2     A.   Yes.
3          MR. BRENNAN:  I'm going to object to this.
4     Q.   (BY MR. FOX)  Okay.  Well, let me ask it.  I'm
5 not sure what counsel's objection is to.  Let me put it on
6 the record then.
7          So the same question as to Hartford:  Other
8 than what you've testified to today, do you plan to offer
9 any testimony about any of the terms of any of The
10 Hartford policies at issue?  That's the question.
11          MR. BRENNAN:  Objection.
12    A.   Other than what I've already testified about the
13 insuring agreement and the defense of the insuring
14 agreement --
15    Q.   (BY MR. FOX)  Other than that, no?
16    A.   Yes, nothing other than that.
17    Q.   Okay.  Did you ever speak with anyone that you
18 believed to have ever been affiliated with Troy Belting?
19    A.   No.
20          MR. BRENNAN:  Objection.
21    Q.   (BY MR. FOX)  We heard your testimony and then
22 there was some follow-up questions on the -- correct me if
23 I'm missphrasing this; I don't mean to -- the team
24 approach that it's the responsibility of the broker and
25 the insurer and the party seeking coverage to locate

Page 228

1 insurance policies.
2          Did I say that roughly correctly?
3     A.   Well, actually, I think what I said was the
4 policyholder, the insured, and the other carriers that
5 might be involved.
6     Q.   I'm sorry.  Who's in the team approach?  I
7 thought you said policyholder and insured.  Would you mind
8 repeating who's --
9     A.   Policyholder, the insurance carrier, and any
10 insurance company that might be involved.
11    Q.   Insurance carrier and insurance company, are you
12 drawing some distinction there?
13    A.   No.  Policyholder, agent, and the insurance
14 company.
15    Q.   Okay.  And here, you've testified -- am I
16 correct -- that Troy Belting -- you testified that Troy
17 Belting should have -- withdrawn.
18          Am I correct that you testified that Troy
19 Belting should not have -- should not have discarded its
20 policies, right?
21          MR. BRENNAN:  Objection.
22    A.   Well, at that point in time in history, most of
23 the carriers -- most insureds did.  They didn't want to
24 stack them around.  Now you come back and say, Well, yeah,
25 they shouldn't have.  But, I mean, I don't know if that

Page 229

1 was in violation of anything at that time -- at that point
2 in time.
3     Q.   (BY MR. FOX)  Your testimony is that most of
4 the insureds in the 1970s discarded insurance policies?
5     A.   Well, not most of them, but a lot of them did
6 because they had no need for them anymore, and they had no
7 idea about this long-tail stuff.  When the policy period
8 was over, they got a new one.
9     Q.   So it's your testimony -- when I say
10 "occurrence-based policies," do you know what I'm
11 referring to?
12    A.   Yeah.
13    Q.   It's your testimony that -- that when a -- that
14 there's nothing wrong with a policyholder discarding their
15 occurrence-based insurance policies?
16          MR. BRENNAN:  Objection.
17    A.   Nothing wrong at the time, of course.  But
18 looking back, it certainly would have helped if they had
19 kept them.  But, I mean, that's, you know, something they
20 didn't know at the time.  That's why they have insurance
21 archaeological firms that go back.  There are many, many,
22 many that have done that.
23    Q.   (BY MR. FOX)  By the way, when you say "of
24 course," it's certainly not obvious to me.  I have a lot
25 other -- a lot of other cases in which -- and

58 (Pages 226 - 229)

Page 230

1 policyholders do not generally discard insurance policies.
2         But you don't find any fault at all in Troy
3 Belting discarding its insurance policies; is that right?
4         MR. BRENNAN: Objection, form.
5     A.  Well, I just said, you know, it would have been
6 better if they hadn't, but there's nothing they can -- it
7 was their belief at the time that there wasn't any need to
8 keep them.  So, I mean, it would be nice if they had them.
9     Q.  (BY MR. FOX)  And how do you know that that was
10 their belief at the time?
11    A.  Because they got rid of them.  That's what they
12 said.  They said they got rid of them at the end of the
13 policy periods.  That's what they testified to.
14    Q.  Okay.  That's the sole basis of your belief?
15    A.  That's what they said, yeah.
16    Q.  Okay.  And -- but is it fair to say that Troy
17 Belting discarding these insurance policies, that that was
18 not a good practice; is that fair to say?
19        MR. BRENNAN: Objection.
20    A.  Looking back, it certainly wasn't, no.
21    Q.  (BY MR. FOX)  But at the time, you think that
22 was just fine?
23    A.  It was for them.  But, you know, I wouldn't have
24 done it.  I wouldn't have thought about doing it.  But, I
25 mean, they did it.  No, it wasn't a good practice, but, I

Page 231

1 mean, they did it.
2     Q.  Okay.  And you testified also, am I correct,
3 that the broker should have held on to the Troy Belting
4 insurance policies; is that correct?
5         MR. BRENNAN: Objection.
6     A.  I would have thought they would have made some
7 record of it.  I mean, they didn't have to have the
8 physical policy.  All we had to have is the deck page and
9 the policy period.  That's all they need to keep.
10    Q.  (BY MR. FOX)  And as far as you could tell,
11 that was not done here?
12    A.  As far as I know, it wasn't.
13    Q.  Okay.  And we've heard testimony that you also
14 find fault with Pacific Employers and Hartford in not
15 doing what you've opined they should have done in that
16 regard, right?
17    A.  What, in going back and looking at them?
18    Q.  Yes.
19    A.  Yeah.
20    Q.  So in your view, all members of the team, the
21 policyholder, the broker, the carriers, all of them did
22 not act as you would have liked to have seen, right?
23        MR. BRENNAN: Objection.
24    A.  Well, I don't know about the carrier, because we
25 never did find out.

Page 232

1     Q.  (BY MR. FOX)  And the "carriers" is referring
2 to Pacific Employers and Hartford?
3     A.  And Unigard.
4     Q.  Okay.  So I'm sorry; what part of my question
5 are you taking issue with?
6     A.  I'm not exactly sure what you're asking me.
7     Q.  So you earlier described this -- am I correct in
8 characterizing it as a "team approach"; was that your
9 phrase?
10    A.  Right.
11    Q.  Okay.  And just to summarize, since I've been
12 questioning you, you find fault with all of the parties to
13 this team approach in --
14        MR. BRENNAN: Objection.
15        MR. FOX: Let me finish.
16        MR. BRENNAN: Okay.
17    Q.  (BY MR. FOX)  -- in terms of what they should
18 have done with respect to Troy Belting's insurance
19 policies?
20        MR. BRENNAN: Objection.
21    A.  Yes.  I find -- you know, it would have been
22 nice if Troy Belting kept them; it would have been nice if
23 the agent had kept them; it would have been nice if the
24 carriers had done some.  And at that time, most carriers
25 were microfiching most of their policies before they were

Page 233

1 destroying them.
2     Q.  (BY MR. FOX)  The entire team dropped the ball;
3 fair to say?
4         MR. BRENNAN: Objection.
5     A.  We don't know.  Nobody went back and looked
6 specifically with the carriers.  We know that -- we know
7 specifically that -- and I don't know if the agent got rid
8 of all of his or not.  I don't know that I saw any
9 testimony on that.
10    Q.  (BY MR. FOX)  You testified that the broker
11 should not have discarded Troy Belting's policies, and you
12 haven't seen any indication that the broker kept the
13 policies; is that --
14    A.  Or has destroyed them, either one.  I don't
15 know.  They obviously had something when they put Unigard
16 on notice.
17    Q.  When who put Unigard on notice?
18    A.  The agent.
19    Q.  Just one minute.
20        Okay.  I'd ask you to turn -- still on your
21 expert report, Exhibit 2.  Ask you to turn to page 4, the
22 very first part under the opinions heading on page 4.
23 Just tell me when you're there, please.
24        Are you there?
25    A.  Yeah.

59 (Pages 230 - 233)

Page 234

1   Q.  You've heard this -- I think you even read this
2  today, but let me do it again briefly; just the first two
3  sentences underneath "opinions."
4        Claims handling entails the fulfillment of
5  the insurance company's promises to its insureds as stated
6  in the insurance policy.  When handling a claim on behalf
7  of an insured, the claim staff of an insurance carrier
8  must do everything possible to protect the interests of
9  the insured in defending against loss related to the
10  claim.
11        Did I read that correctly?
12   A.  Yes.
13   Q.  Now -- and this is your opinion, correct?
14   A.  Right.
15   Q.  Okay.  And when you opine that the claim staff
16  of insurance carrier must do everything possible, you're
17  seeking to impose on the carrier a legal requirement;
18  isn't that true?
19        MR. BRENNAN:  Objection.
20   A.  Through the contract.
21   Q.  (BY MR. FOX)  I'm sorry?
22   A.  Through the contract they had with the
23  policyholder, yeah.
24   Q.  When you say "through the contract with the
25  policyholder," you're referring to the insurance policy?

Page 235

1   A.  Right.
2   Q.  And you're referring to what you've testified to
3  previously today, I think, the defense portion of the
4  insuring agreement, right?
5   A.  Right.
6   Q.  Any other portion of the insurance policy?
7   A.  No.
8   Q.  Okay.  And --
9   A.  Well, accepted claims practices is what's
10  involved in the defense part of the insuring agreement.
11   Q.  And just so we're clear, this is a requirement
12  the -- about the carrier must do everything possible.
13  That is a requirement that you believe is derived from the
14  defense portion of the insuring agreement, right?
15   A.  Well, what does the policyholder pay a premium
16  for?  He pays for defense in the matter if he has a claim
17  against him.  You have a claim against him, the insurance
18  carrier must do everything they can to help him or defend
19  him in that matter, and that goes on to notifying other
20  carriers, concurrent carriers, excess carriers, previous
21  carriers in trying to make a determination if the
22  policyholder has more limits somewhere.
23   Q.  So I'm going to ask the court reporter to read
24  it back.  If you could answer with a yes or no, I'd like
25  you to.

Page 236

1        (The requested portion was read.)
2   A.  Yes.  With my other --
3        MR. BRENNAN:  Objection to the --
4        MR. FOX:  Let the witness answer first,
5  please.
6        MR. BRENNAN:  All right.
7   A.  Well, no.  It's -- it's good claim handling.
8  It's not -- it's good claim handling practices to do that,
9  when I said you can put everybody else on notice, the
10  excess, concurrent, or whoever else.
11   Q.  (BY MR. FOX)  So I was trying to short circuit
12  this, but I'm afraid -- I don't understand why you can't
13  answer yes or no.  So I need to ask the court reporter to
14  read it back again.
15        MR. BRENNAN:  Objection to continuing to
16  ask the same question, but go ahead.
17        (The requested portion was read.)
18   A.  Yes.
19   Q.  (BY MR. FOX)  Okay.
20        MR. FOX:  No further questions.  Thank you.
21        MR. LEASURE:  I don't have anything
22  further.
23        MR. KOTULA:  Nor I.
24        MR. BRENNAN:  Anyone on the phone?
25        MS. CRUMMEY:  No.

Page 237

1        MS. SCHABERG:  No.
2        MS. YOUNG:  No.
3        MR. BRENNAN:  All right.  I think we're
4  good.
5        (Deposition concluded at 4:15 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

60 (Pages 234 - 237)

Page 238

1    CHANGES AND SIGNATURE

2  WITNESS NAME:  JAMES E. O'MALLEY, JR.

3  DATE OF DEPOSITION:  JANUARY 26, 2016

4  PAGE    LINE    CHANGE        REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

---

Page 239

1      I, JAMES E. O'MALLEY, JR., have read the

2  foregoing deposition and hereby affix my signature that

3  same is true and correct, except as noted above.

4

5      _____

6      JAMES E. O'MALLEY, JR.

7

8

9  THE STATE OF _____  )

10 COUNTY OF _____  )

11

12     Before me, _____, on this day personally

13 appeared JAMES E. O'MALLEY, JR., known to me (or proved to

14 me under oath or through _____) (description

15 of identity card or other document) to be the person whose

16 name is subscribed to the foregoing instrument and

17 acknowledged to me that they executed the same for the

18 purposes and consideration therein expressed.

19     Given under my hand and seal of office this ____

20 day of _____, 2016.

21

22     _____

23     NOTARY PUBLIC IN AND FOR

24     THE STATE OF _____

25

---

Page 240

1      IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF NEW YORK

2

PACIFIC EMPLOYMENT INSURANCE  )
3  COMPANY,                   )
          Plaintiff,          )
4                             )
                              )
5  -against-          )NO. 1:11-CV-0912(TJM/RFT)
                              )
6                             )
   TROY BELTING & SUPPLY COMPANY,)
7  THE HARTFORD INSURANCE COMPANY)
   AND ABC COMPANIES 1 THROUGH  )
8  20,                        )
                              )
9      Defendants.            )
10 _____

   TROY BELTING & SUPPLY COMPANY,)
11     Third-Party Plaintiff,  )
12                             )
13 -against-                   )
                              )
14 UNIGARD INSURANCE COMPANY,  )
   QBE AMERICAS, INC., THE     )
15 TRAVELERS COMPANIES, INC.,  )
   CNA FINANCIAL CORPORATION,  )
16 FIREMANS FUND INSURANCE     )
   COMPANY, THE NORTH RIVER    )
17 INSURANCE COMPANY, CRUM &    )
   FORSTER HOLDINGS CORP.,     )
18 LIBERTY MUTUAL GROUP, INC.,  )
   HARLEYSVILLE GROUP, INC.,   )
19 HARLEYSVILLE INSURANCE       )
   COMPANY, HARLEYSVILLE       )
20 INSURANCE COMPANY OF NEW YORK,)
   BERKSHIRE MUTUAL INSURANCE   )
21 GROUP,                      )
                              )
22     Third-Party Defendants.  )
23     REPORTER'S CERTIFICATION
24 ORAL DEPOSITION OF JAMES E. O'MALLEY, JR.
25     JANUARY 26, 2016

---

Page 241

1      I, Kathryn R. Baker, RPR, a Certified Shorthand

2  Reporter in and for the State of Texas, hereby certify to

3  the following:

4      That the witness, JAMES E. O'MALLEY, JR., was

5  duly sworn by the officer and that the transcript of the

6  oral deposition is a true record of the testimony given by

7  the witness;

8      That the deposition transcript was submitted on

9  the 5th day of February, 2016 to the witness or to the

10 attorney for the witness for examination, signature and

11 return by the 7th day of March, 2016;

12     That the amount of time used by each party at

13 the deposition is as follows:

14     Mr. Michael A. Kotula ......... (03:40:52)
       Mr. Charles E. Leasure, III ... (00:49:21)

15     Mr. Brian Fox ................. (00:37:51)
       Mr. Timothy S. Brennan ........ (00:00:00)

16     Ms. Carol Crummey ............. (00:00:00)
       Ms. Margriet Schaberg ......... (00:00:00)

17     Ms. Joanna L. Young ........... (00:00:00)

18     That pursuant to information given to the

19 deposition officer at the time said testimony was taken,

20 the following includes all counsel for parties of record:

21     Mr. Brian Fox, Attorney for the PLAINTIFF
       Mr. Timothy S. Brennan, Attorney for the

22 DEFENDANT/THIRD-PARTY PLAINTIFF, TROY BELTING & SUPPLY
   COMPANY AND THE WITNESS

23     Mr. Michael A. Kotula, Attorney for the
   DEFENDANTS, UNIGARD INSURANCE COMPANY AND QBE AMERICAS,

24 INC.
       Mr. Charles E. Leasure, III, Attorney for the

25 DEFENDANTS, HARTFORD ACCIDENT & INDEMNITY COMPANY,

---

61 (Pages 238 - 241)

Page 242

1 HARTFORD CASUALTY INSURANCE COMPANY, AND HARTFORD
  INSURANCE COMPANY

2      Ms. Carol Crummey, Attorney for the THIRD-PARTY
  DEFENDANTS, THE NORTH RIVER INSURANCE COMPANY AND CRUM &

3 FORSTER HOLDING CORP.
       Ms. Margriet A. Schaberg, Attorney for the FOR

4 THE THIRD-PARTY DEFENDANTS, HARLEYSVILLE GROUP, INC.,
  HARLEYSVILLE INSURANCE COMPANY, HARLEYSVILLE INSURANCE

5 COMPANY OF NEW YORK, AND BERKSHIRE MUTUAL INSURANCE GROUP
       Ms. Joanna L. Young, Attorney for the

6 THIRD-PARTY DEFENDANT, CONTINENTAL CASUALTY COMPANY

7      I further certify that I am neither counsel for,

8 related to, nor employed by any of the parties or

9 attorneys in the action in which this proceeding was

10 taken, and further that I am not financially or otherwise

11 interested in the outcome of the action.

12      That $_____ is the deposition officer's

13 charges to the Defendants, Unigard Insurance Company and

14 QBE Americas, Inc., for preparing the original deposition

15 transcript and any copies of exhibits;

16      Certified to by me this 5th day of February,

17 2016.

18

19


       KATHRYN K. BAKER, RPR, CSR #6955

20     Expiration Date:  12/31/16
       Veritext Legal Solutions

21

22

23

24

25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

**[& - 1978]**                                                                                    Page 1

| **&** |
| --- |
| **&**   1:6,10,17 3:4,8,9 |
| 3:18,20 4:1 5:16,21 |
| 5:23 23:25 37:23 |
| 38:1 55:10 78:20 |
| 79:12 81:9,14 97:11 |
| 98:18 100:23 101:2 |
| 101:10 103:25 |
| 104:5,12,14 105:16 |
| 105:19 106:19 |
| 108:17 126:23 |
| 164:18,19 187:21 |
| 188:14,24 189:2,3 |
| 189:15,21,25 190:3 |
| 190:6,14,18,23 |
| 191:5 194:15 197:6 |
| 198:7 220:16 |
| 224:18 240:6,10,17 |
| 241:22,25 242:2 |

| **0** |
| --- |
| **00:00:00**   241:15,16 |
| 241:16,17 |
| **00:37:51**   241:15 |
| **00:49:21**   241:14 |
| **013412**   100:18 |
| **03:40:52**   241:14 |
| **0474**   180:24 |
| **07920**   4:16 |
| **07962-1981**   4:10 |
| **08054**   3:5 |
| **0912**   1:5 240:5 |

| **1** |
| --- |
| **1**   1:7 5:13 8:18,19 |
| 8:22 37:21 70:7 |
| 103:4 113:21 |
| 119:22 120:11 |
| 183:19,24 204:21 |
| 240:7 |
| **10**   6:7 97:17 110:21 |
| 110:24 111:7 |
| 114:16 139:22 |
| 159:17 |

**100**   5:24 172:4
176:1,6,7 182:9,13
182:24 193:15,15
214:14
**102**   6:5
**10:15**   2:5
**11**   6:7,8,21 110:24
111:16,19 113:22
114:4 139:10
224:20
**11/24/76**   146:18
**110**   6:7
**111**   6:8
**113**   6:10
**11556**   3:16
**1194**   6:22
**11:00**   42:1
**11:06**   42:2
**11:25**   54:22,23
**11:28**   57:4
**11:29**   57:5
**12**   6:10 103:16
104:3 109:7,11
113:5,8,9,25 114:1
118:21 120:16
**12/31/16**   242:20
**120**   3:5 4:15 6:11
**12203**   3:11
**12211**   4:3
**123**   6:13
**126**   6:14
**12:10**   88:19
**12:19**   88:20
**12:29**   97:5
**12:43**   97:6
**12th**   168:16
**13**   6:11 73:22 75:16
120:5,8 178:15,17
225:14 226:2,5
**13412**   103:13
**139**   6:16
**14**   6:13 78:10
104:10 123:25
124:2,5 125:17
126:1

**145**   6:17
**149**   6:19
**14th**   99:17
**15**   5:22 6:14 28:6
98:18 126:19,21
127:3,9,10 220:22
221:1,3 222:13
**151**   6:22
**15th**   55:12
**16**   5:20 6:16 97:11
97:13 139:3,5,24
161:24 163:2
**16067272**   6:22
151:22
**164**   5:6
**17**   6:17 67:2 106:15
146:1,4 148:6 150:1
150:1
**173**   113:13
**175**   118:21,24,25
**176**   113:13 119:22
**177**   113:13
**179**   117:4
**18**   6:18,19 78:15
79:11 82:1 99:2
106:9 112:8 114:9
114:17 146:6 149:7
149:9,10,17 163:13
**180**   6:23 113:13
117:6
**181**   113:13
**184**   113:13
**1875**   3:21
**18th**   162:13
**19**   6:22 146:7 151:8
151:10,11
**191**   93:16
**1940s**   64:14
**1949**   22:2,8 51:8,14
52:10,19 54:6 59:16
60:9,25 61:5,12,19
63:17,23 64:4,9
71:16,24 72:14,22
78:15 79:11 85:4,16
86:4 99:2 101:11,12

**104:14 112:8 114:9**
114:17 141:3
163:12,13 193:7
**1950s**   64:14
**1958**   65:10
**1960s**   64:14
**1964**   55:12
**1970s**   64:14 73:14
174:13 224:18
229:4
**1974**   12:25 13:5
14:4 15:9 22:2,8
51:8,21 52:10,20
54:6 59:16 60:9,20
60:25 61:5,12,19
63:18,24 64:4,9
71:16,24 72:14,22
78:15 79:11 85:4,17
86:4 98:8 99:2
104:16 141:4
160:15 161:25
163:1 174:7 202:5
**1975**   67:17,21 68:17
69:5
**1976**   97:18 98:4
125:18 158:14,20
162:12 173:22
196:24 202:5,13
**1976/77**   216:25
**1977**   5:20 6:18
97:11,13 141:5
146:6 173:22 174:7
174:19 175:2 194:7
195:11,18 196:6,25
202:13,17,25 203:5
203:11 218:16
219:4,11,15 221:12
222:5,9,14
**1978**   5:22,24 6:7,9
98:18 99:17 100:17
103:20 110:24
111:21 137:19
141:5 173:22
174:19

**[1981 - 74]**                                     Page 2

**1981**   4:10
**1989**   202:19
**1990**   69:5,7
**1991**   10:21,24
**1992**   180:11 185:13
   202:19
**1993**   180:11
**1994**   151:15,22
**1995**   73:9,16
**1997**   149:13,20
**1:11**   1:5 240:5
**1:26**   129:23
**1:41**   129:24
**1:51**   139:1
**1a**   183:24 184:22,24
**1st**   104:16

**2**

**2**   5:15 37:18,19,20
   38:3 40:18,20,24
   42:16 65:4 69:24,24
   70:1 73:5,5 103:4
   106:16 120:11
   126:24 146:14
   148:6 155:2,25
   156:25 165:1
   166:21 171:1
   183:19,24,25
   206:25 210:24
   220:22 233:21
**2,000**   149:4 155:5
   155:16,24 156:25
**20**   1:8 4:3 6:23 84:5
   84:19 151:20 153:1
   153:9 178:5 180:5
   180:10 194:2
   195:20,22 212:23
   217:16 240:8
**20006**   3:22
**2000s**   72:25 74:12
   74:21
**2001**   203:6
**2005**   8:25 126:24,24
**2007**   139:10

**2009**   76:4 84:3,22
   85:13 91:14,16
   179:1 195:20 196:6
   196:10 202:5,25
   203:6 208:4,18
   215:14,24 216:3,10
   216:17,20 217:6,14
   218:2,10,13,14,24
   219:4,16 226:9
**2015**   5:19 6:6,11,12
   26:22,24 27:16,23
   37:21,24 41:6 110:3
   110:13 170:10
**2016**   1:24 2:5 238:3
   239:20 240:25
   241:9,11 242:17
**202-469-7750**   3:22
**209**   5:7
**21**   6:9 111:21
   119:18
**23**   6:6,12
**238**   5:8
**24**   152:1
**240**   5:9
**25**   10:21 20:22
   141:3,13 142:6
   159:20 160:24
   161:4 178:5 196:1
   196:18 202:1
   216:21 217:16
**26**   1:24 238:3
   240:25
**26th**   2:5
**29311**   55:23
**2:01**   139:2
**2:35**   164:13
**2:42**   164:14
**2:44**   165:9
**2:45**   165:10

**3**

**3**   5:2,16,24 54:24
   55:2,3 59:7,14
   61:10,15 62:3 73:22
   78:15 79:11 86:9,18

86:20 99:2 100:17
   117:6 121:5 149:24
   160:10,19 163:1
   178:15 220:23,25
**30**   6:11 37:24 41:6
   84:5,19 85:12 88:12
   105:20 110:4 173:5
   173:17,19 194:2
   195:19,22 196:1,18
   201:24 202:1,5
   216:21 217:18,21
   218:9 220:1
**300**   3:10 14:10
**30th**   41:20 169:17
   170:10
**31**   103:5,10,16
**315**   3:10
**32**   103:23
**33795171**   149:20
**34**   104:10
**35**   104:22 105:23
**37**   5:15 103:5 106:9
**3:00**   180:7
**3:01**   180:8
**3:25**   206:18
**3:34**   206:19
**3:37**   208:24,25
   209:1
**3rd**   103:20 162:14

**4**

**4**   5:16,17 8:25 55:9
   56:2 57:3,7,17 59:8
   108:12 166:21
   170:13,25 233:21
   233:22
**40**   42:7
**400**   42:13
**41**   103:5 106:15
**42**   107:8
**43**   107:18
**44**   108:12
**46**   103:5
**474**   182:19

**48**   120:12,16 136:21
   137:1,11,19 138:5
**49**   120:12 121:5
   150:15,19 162:13
**4:15**   2:6 237:5

**5**

**5**   5:16,18 55:7,9
   56:2 83:14 87:24
   88:22 89:2 93:13,15
   152:11 206:24
   220:24
**50**   42:7,11
**516-357-3000**   3:16
**518-465-0400**   4:4
**518-640-6900**   3:11
**533**   3:4
**54**   5:16
**57**   5:17
**5th**   241:9 242:16

**6**

**6**   5:20 73:4 97:7,9
   97:10 119:4 162:8
   162:10,11,11
   192:22,23
**6,000**   43:14
**60**   42:8,11
**600**   3:21
**60s**   66:10,23 68:13
**61**   58:23
**63**   55:23
**6578723**   126:25
**6955**   242:19

**7**

**7**   5:19,22 97:10
   98:14,16 117:10
   150:13 162:8,10,12
   163:13
**701**   2:8
**70s**   66:10,23 68:13
   216:17
**73**   113:12,21
**74**   16:11 85:2
   161:15 162:14

176:10 196:15
**75**  196:15
**76**  113:12 114:15
161:14
**77**  215:14,24
**7788**  58:23
**7th**  27:25 241:11

**8**

**8**  5:3,5,13,24 97:18
98:4,17 100:12,14
103:13,23 104:11
119:5 125:18
**80s**  216:18
**856-380-8900**  3:6
**8th**  162:12

**9**

**9**  6:5 102:23 103:1
121:21
**908-848-6300**  4:16
**92**  103:5
**926**  3:15
**93**  5:18
**94**  103:5 109:7
**97**  5:20 120:12
121:21
**973-538-0800**  4:11
**98**  5:22 120:12

**a**

**a.e.**  146:17
**a.m.**  2:5 42:2 54:23
57:5
**abc**  1:7 240:7
**ability**  83:19,20
84:13 85:3
**able**  189:9 203:25
**absolutely**  210:22
222:18
**accept**  143:8
**acceptance**  141:10
**accepted**  150:3
182:4 235:9
**accident**  3:18 95:11
95:23 96:3 151:13

164:19 241:25
**account**  15:23,24
60:1,7 153:11,13
163:20
**accounts**  47:14
**accurate**  176:19
213:15
**acknowledged**
239:17
**acquired**  67:19,20
**act**  87:25 108:14
231:22
**acting**  160:7
**action**  124:18 126:3
242:9,11
**activities**  198:1
**activity**  47:24 48:5
**acts**  184:1,8,9
**actual**  50:8,20,22
51:6,13,19,25 52:18
60:24 86:3 132:19
132:23 134:11,14
134:25 173:14,15
**add**  49:8
**added**  45:12
**adding**  49:3
**addition**  43:1 111:3
**additional**  41:1,5,9
41:19 167:22
182:15 183:9
203:12,20 221:21
**adjust**  90:2 107:14
**adjustor**  65:22 90:2
152:13 181:25
**administrative**
37:22
**admit**  160:17
**adopted**  137:21
**advise**  111:5 177:6
178:7
**affidavit**  6:19
149:11,25 150:13
**affiliated**  227:18
**affix**  239:2

**afford**  45:12,17
**afforded**  45:8
**affords**  45:2
**afraid**  236:12
**afternoon**  29:5
164:17 209:5 222:6
**agency**  16:9 31:25
47:11 102:10
**agent**  15:12 16:15
30:20 31:2 32:3,22
34:13,25 37:10 47:3
47:9 64:2,7 78:20
80:22 81:8,9,12,19
94:23 96:18 101:2
104:12,21 106:22
107:11 108:8
112:20 142:2 161:5
187:12 188:1,3,8,15
188:22,24 189:4
191:9,13 192:5,6,6
194:14 195:1 199:3
199:4,4 200:10
202:3 206:6 224:11
228:13 232:23
233:7,18
**agent's**  112:6
113:23 114:8
161:11 162:3
**agents**  49:21,24 74:1
178:20 205:12
225:17
**ago**  80:19 85:13
88:12 108:10 120:9
139:22 151:20
153:1 167:12
173:18,19 194:3
195:22 196:1 210:5
212:22 217:16,22
218:9
**agree**  13:7 35:16
92:20 121:18
153:16 214:23
218:2
**agreeing**  41:17,18
62:7,9,9 90:23

129:16
**agreement**  24:5,11
24:14 39:2,3 89:17
90:7 92:16 179:19
179:24 180:21
181:3,17 183:24
212:13 213:12,22
214:2,14 226:16
227:13,14 235:4,10
235:14
**agreements**  8:2
13:18 24:7 212:17
213:20
**agrees**  37:13 39:3
**ahead**  29:20,22
57:15,22 85:1 89:18
96:6 130:23 155:14
177:16,19 218:19
236:16
**airport**  28:22
**al**  6:14,15,16 124:8
**albany**  3:11 4:3
**allegation**  19:1
32:15 33:3 157:1
**allegations**  126:6
147:13 150:6 151:2
153:22 154:10,16
155:10,21 157:10
157:14
**allege**  18:12,14 98:2
**alleged**  12:16 14:22
15:8 18:7,24 19:3
20:7,25 22:2,7,8
32:10 33:8 34:20
35:8,10,17 36:19
37:5,8,11 50:9
127:24 142:6
174:17 220:3,19
**allegedly**  32:23
50:21 60:9 61:10,18
63:17 64:4 85:16
93:21
**alleges**  12:16 15:9
18:23

[alleging - assumed]                                                                 Page 4

**alleging**  20:22 32:1
  173:10
**allen**  66:5 97:12
  98:19 99:17,24
**allocation**  137:5
  196:10
**allowed**  157:13
**aloud**  221:6
**ambiguous**  148:22
  157:11
**amended**  131:22
**amending**  55:20
**amendment**  5:16
  55:8 56:1,10 164:8
**america**  5:25 100:16
  111:23 137:10
**americas**  1:14 2:3
  3:14 5:14 8:12
  240:14 241:23
  242:14
**amount**  118:14
  241:12
**anericas**  8:24
**answer**  16:19 36:1,4
  49:10 60:12,14
  75:19 90:13 93:22
  94:3 103:18 104:1,6
  104:24 105:3,8,13
  105:18 106:4,13,21
  107:1,6,12,12,16,20
  107:24 108:10,10
  108:13,20,25 109:4
  109:15,17,19
  114:16,23 117:9,12
  119:9,14,23 120:20
  120:24 121:2,7,9,12
  122:1,4,7,10 124:15
  128:25 129:1,7
  130:20,22,23 135:9
  136:13 137:25
  140:5,8 156:8,9,10
  212:11 214:6 216:8
  217:10,11 226:2,25
  235:24 236:4,13

**answered**  13:20
  86:6 135:24 136:9
  138:23 145:18
  155:12,12 156:21
  226:8
**answering**  36:13
  129:6
**answers**  90:18
**anybody**  41:8 77:6,8
  84:7 108:23 109:2
  134:18 135:15,20
  136:6,16 168:7
  187:17 191:12
  204:10 205:21
  213:14
**anymore**  62:13
  132:4 229:6
**anyway**  66:20
  112:25 139:19
**apart**  16:4 86:18
**apparently**  18:18
  114:24 116:12
  126:8 153:15
  194:25 197:18
  224:12
**appeals**  151:12
**appear**  38:8
**appearance**  165:23
**appearances**  5:2
  120:11
**appeared**  239:13
**appearing**  4:5,12,17
  9:5 165:18
**appears**  34:3 38:10
  126:24
**appellate**  6:22
**appendix**  6:15
**applicable**  219:4,6
  225:6,9,10
**applied**  136:20
**applies**  150:24
**apply**  33:15 108:11
  228:6 232:8,13

**appropriate**  108:14
  153:18 154:19
  155:23
**approximately**  42:4
  73:9
**archaeological**
  63:11 161:6 229:21
**archaeology**  21:20
  22:10 23:9,13 25:8
  25:9
**archeology**  15:17
  21:13
**area**  18:18 68:18
**arguing**  205:21
**argument**  6:20
  205:18
**arises**  153:18
**arkansas**  68:20
**asbestos**  17:4 76:19
  77:2 91:3 95:8
  107:21,23,24 108:9
  117:22 136:20
  137:22 172:1,5,10
  172:18 175:7 179:9
  193:16 202:7
  224:22 225:1,22
**asbestosis**  107:25
**aside**  17:8,23 59:14
  61:9,15 86:9 160:19
**asked**  9:8 13:19
  14:21 24:3 41:1
  57:25 59:7 67:14
  69:12,14,17,22
  77:11,17,24 86:5
  93:19 94:11 103:16
  106:10 107:8 109:7
  110:17 112:25
  113:21 115:14
  117:7 119:2,18
  121:21 129:1,6
  135:19,20,23 136:6
  136:8 138:13,19,22
  140:1 141:22
  143:18 145:17
  147:11 155:11,19

**appropriate**  156:2,14,20 164:24
  166:20 178:14
  179:3 194:10,14,23
  196:24 197:25
  201:12 207:19
  216:9,14,15 217:5
  217:13 218:1 226:7
**asking**  12:22 34:15
  34:16 36:2,5 37:2,3
  46:15 76:6 78:23
  79:5 92:3 122:23
  123:4,19 132:17
  135:7 138:2 156:7
  159:17 171:2,4
  175:14,15,23,24
  176:4 177:18 178:5
  178:7 179:16 192:8
  193:22 195:21
  196:10,13 199:10
  200:7 209:8 215:19
  216:17,21 217:1,1
  217:18 223:9 232:6
**asks**  111:5
**assert**  57:11
**asserted**  224:23
**assign**  120:23
**assigned**  121:3
  123:13
**assignment**  12:13
**assist**  211:6
**assistant**  37:22
**assisted**  48:19,23,25
**associate**  10:18
**associated**  10:13,23
  21:1,8
**associates**  10:13,17
  10:19 24:8 29:1,2
  43:3,9 44:6
**association**  10:17
  149:12
**assume**  19:24
  101:22 143:19
  155:20 156:18
**assumed**  22:15,25
  66:20 68:7

**assumes** 31:6,9
**assuming** 161:7
  202:12
**assumption** 156:18
  160:2,5
**asterisks** 22:14
**atone** 70:14
**attached** 169:5,9,24
  210:11
**attaching** 37:23
**attempt** 49:17 194:8
**attention** 206:24
  220:21 221:15
  224:21
**attorney** 29:8 111:4
  163:16 204:21
  205:15 241:10,21
  241:21,23,24 242:2
  242:3,5
**attorneys** 24:6,12
  205:11 242:9
**audit** 48:13
**audits** 47:22
**august** 6:7,9 110:24
  111:21
**automobile** 39:11
  139:21 140:17,25
**available** 89:21
  104:22 106:1
  120:23 121:11
  181:21
**avenue** 4:9
**avoid** 204:19
**aware** 13:2 16:25
  17:9,24 18:19 19:8
  21:25 22:6 23:20
  37:4 46:11,17 50:12
  50:24 51:9,12,16,18
  51:23 53:1 54:9
  56:17,20,23 59:13
  59:18 60:6 61:14
  77:10 78:12 79:8
  82:16 87:1 90:22,25
  91:20 110:15
  124:18 133:13,18

134:10,17 137:9,18
148:12,17 158:12
165:21 172:3,7,14
172:15 174:4,6
186:15,20,23
204:13 205:23
**awareness** 46:22
  54:14

**b**

**b** 42:16 72:18 92:24
  167:10,14 169:2,10
  169:14 184:3,8
**back** 15:14 19:23
  28:18 35:13 36:6
  42:3 46:16 62:15
  73:14 76:17 78:23
  79:18 85:25 92:13
  106:16 112:7,9
  114:9,10 128:20,25
  129:7 130:4,11
  133:5,23 159:9
  161:15 162:2,2
  168:15,15 170:13
  172:25 173:16
  175:6 176:9 178:2,6
  179:2,20 183:3
  184:22 194:3
  195:22 196:1,17
  202:4 206:23 207:7
  208:23 212:2
  215:15 216:7,17,18
  216:24 217:15,18
  217:21 218:9,10
  224:18 228:24
  229:18,21 230:20
  231:17 233:5
  235:24 236:14
**background** 46:9
**bad** 173:10
**baker** 2:6 241:1
  242:19
**ball** 233:2
**bank** 43:10

**barbara** 138:9
**barcum** 25:16 72:24
  74:24 207:18
  208:10,11
**barcum's** 74:8
**based** 46:12,18
  92:12 105:24
  114:20 133:23
  134:15 147:12
  148:13 171:6,7,8,12
  214:7 224:17
  229:10,15
**basically** 12:12
  15:13 16:7 28:2
**basis** 16:4 23:17
  45:8 75:7 76:15,22
  83:24 95:11,14
  96:12 127:15 133:3
  135:4 140:4 200:4
  230:14
**basking** 4:16
**bates** 100:18 103:12
  180:18 182:18
**bear** 65:2
**began** 65:9 73:19
  76:3,6 209:2
**beginning** 73:18
  226:5
**begins** 146:22 150:2
**behalf** 11:17 24:16
  64:2 108:18 118:10
  118:15 151:16
  171:20 190:7,14
  196:23 205:3,5,5
  209:20 234:6
**belief** 24:10 32:19
  78:23 230:7,10,14
**believe** 17:22 34:18
  34:24 35:7 57:10,13
  58:8 93:22 94:14
  102:17 132:20
  147:24 159:1,19,25
  160:2,6 161:20
  165:1 166:16 167:4
  167:9 176:13 185:5

187:6 192:12,16
193:8 212:23
235:13
**believed** 227:18
**bell** 127:4
**belting** 1:6,10 3:8
  5:21,23 8:13 11:3
  11:14,18 12:16,24
  13:4 14:23 17:2,11
  18:1,8,12,13,14,23
  19:20 20:13,21
  23:25 24:6,12,16,25
  31:14 36:3,3,11
  38:1,13 44:8 49:14
  51:5,12,19 52:8,18
  53:3 54:3,13 55:10
  59:14 60:18,23 61:3
  61:9,16 62:24 63:3
  63:16,22,23 64:2,3
  64:7,9,14,25 70:7
  70:18 71:6,9,23
  72:13,19,25 73:13
  73:19,25 74:11,25
  75:4,14,15 76:6
  77:2,11,17 78:13
  79:9 81:12,23 82:19
  84:22,24 85:7 86:3
  87:18 88:24 89:8
  91:2,7,17 93:5,10
  94:13 96:18 97:12
  98:2 99:22 101:10
  104:14 105:17
  106:3,5,11,14
  108:18,24 109:3
  114:22 117:8,11
  118:1,4,11,15 126:2
  131:13 132:25
  133:8 134:12,19
  135:1,22 141:3,11
  144:25 145:7 149:2
  149:3 158:12,18
  159:3,21 165:6
  169:20 171:10,14
  172:2,3,7,12,14
  173:1,6 175:18

[belting - broker]

176:10 177:2
178:20 186:6 188:8
188:18,21 189:3,4
190:1,4,7,15,20,24
190:25 192:13,21
193:10 194:10
195:8,21,24 196:20
197:3 199:22
200:10,19 201:25
202:6,14 211:19
212:5 213:1 216:10
217:5 218:2 219:7
219:12,16,21
223:14,18,18 224:6
224:15,16,23
225:16 227:18
228:16,17,19 230:3
230:17 231:3
232:22 240:6,10
241:22
**belting's** 19:1 83:19
84:13 85:3,15 88:1
88:2,7,11 98:7
172:4 188:3,15
194:14 195:14
197:6 199:4 207:11
207:12 208:6
220:16 221:11
222:16 223:15,19
224:7 232:18
233:11
**beneath** 56:2 152:11
**benefit** 176:24 182:9
185:23
**berkley** 67:7,10,19
67:20
**berkshire** 1:20 4:7
240:20 242:5
**bernd** 209:10
**bernie** 209:11
**best** 13:17,24 47:4
185:19 215:20
**better** 84:6,20 87:17
113:14 196:6
200:18 202:23

203:4 217:19,20
220:8 230:6
**beyond** 22:4 84:25
85:2 112:9 114:10
175:16 207:2,5,9
**bill** 111:4 123:22
128:14 158:1
159:11,12
**billing** 10:7,10 11:1
11:2,5,8
**bit** 57:7 161:12
165:3 204:17
**block** 174:10
**board** 145:7,16,21
146:6 149:1
**bob** 12:6 24:1 107:4
**bodily** 117:22 172:2
172:5,10,18 202:7
**books** 9:9
**bottom** 55:15 86:20
105:23 114:15
118:21 180:18,22
**bought** 18:20 67:8
67:10 104:15
**boulevard** 3:10 4:3
4:15
**box** 4:10 55:19
**break** 41:23,24
88:18 96:25 215:8
**breath** 91:25
**brennan** 3:9 8:3
9:18,20,25 10:4
12:19 13:1,9,19
14:1,5,19,24 15:10
16:6,16 17:12,16
18:3,15 19:4,12,21
20:9,14 21:11,24
22:4,9,17,21 23:2,8
23:21 24:22 25:3
29:17,20 30:5,18
31:3,23 32:6,13,17
32:25 33:10,17,24
34:10,22 35:3,12,19
36:6,16,20 37:6,15
37:22,25 38:16

40:16,25 44:14,22
45:4,9,14 46:7,13
46:20 47:1,18 49:4
49:18 50:6,15 51:1
51:10,17,22 52:5,11
52:15,21,25 53:4,12
53:20 54:1,7,18
56:21 57:1,6,21,25
59:4,11,17,24 60:10
60:21 61:1,6,13,20
61:24 62:12 63:1,4
63:20 64:11,20
71:12,17,25 72:3,15
73:17,20 74:16,23
75:2,5 76:9 77:3,13
77:19 78:4 79:15
81:6,16,22 82:20
83:5,8 85:11,21,23
86:5,11,25 87:4,6
87:10,19 90:24 91:5
91:11,19,25 92:21
94:16,25 95:24
96:15,20,22 97:2,4
97:24 99:15 100:6
102:7,21 110:2,9,18
112:16,23 113:16
115:5,9 116:5,7,15
117:1 118:18,24
122:19 123:7,14
124:2,21 125:9,16
125:18,20,24
126:12 129:4,14,19
130:2,7,13,23 131:4
131:8,17 132:12
133:1,17,21 134:13
134:22 135:2,23
136:8,14,24 137:6
137:13,17,24 138:6
138:16,22 140:22
141:7,17,24 142:11
142:24 143:16,24
144:8,22 145:8,17
147:19 148:16,24
152:21,24 153:3
154:1,22 155:3,11

156:1,6,20 157:17
157:24 158:6 159:4
159:22 160:1,11,18
160:23 161:1,10
162:10,22 163:4,7
163:23 164:3,7
167:13 168:19,21
168:23 170:11
174:5 175:3 183:1,7
184:18,21 185:9
186:4,17,22 188:10
189:5,8 190:21
191:2,11 193:11,18
195:9 196:12
200:21 201:18
202:20 203:7,15
204:7 206:15
210:15 213:2,10,19
214:12,25 215:7
216:13 217:8 218:5
218:18 219:8,24
220:6,17 221:1
222:17 223:7,16,21
224:1,4,9 225:7
226:7,14 227:1,3,11
227:20 228:21
229:16 230:4,19
231:5,23 232:14,16
232:20 233:4
234:19 236:3,6,15
236:24 237:3
241:15,21
**brennan's** 24:2,21
**brian** 3:3 209:5
241:15,21
**brian.fox** 3:6
**brief** 6:22 28:8,10
151:12
**briefly** 28:14 234:2
**broadly** 15:4
**broker** 16:14 64:2,7
79:12 81:2,2 94:12
94:14,22 96:18
102:4 141:14,18,20
163:21 187:12

188:19 197:7
200:25 201:1,3,5
220:16 227:24
231:3,21 233:10,12
**broker's** 163:11
**brokerage** 187:24
**brokers** 199:23
**brought** 8:12 9:16
66:2 70:16
**bruner** 37:21
**burden** 30:17,22
31:22 32:4,11,20
33:7 34:9 35:17
36:18 37:4
**business** 63:12
65:15 66:20 67:7,11
71:1,4 135:11 141:9
142:12 152:16,19
153:11,14 157:3
158:3,9
**buy** 45:5,22,22

**c**

**c** 3:1 8:1 127:16
**c.a.5** 6:22
**call** 27:15,22 28:8
28:10 31:5 96:23,23
154:14 217:23
**called** 24:2 120:25
139:12 151:13
152:6
**calling** 31:8
**calls** 136:23
**campbell** 2:8
**cancellation** 104:16
162:15
**cancelled** 99:3
161:14,20 162:24
163:9
**caption** 137:9
**captioned** 126:22
**car** 141:1
**card** 239:15
**care** 96:24 128:14

**career** 30:4 65:10
68:17
**carol** 4:2 241:16
242:2
**carrier** 30:20 31:2
32:1 37:11 90:8,11
97:16 104:17
105:17 121:23,23
139:16,17 141:10
171:21 176:23
177:6 185:21 194:5
199:25 214:21
228:9,11 231:24
234:7,16,17 235:12
235:18
**carriers** 47:4,23
49:22,24 52:6 74:2
75:25 76:8 77:12,18
78:7 88:1,10 107:17
151:18 173:4 177:8
178:9,21 179:14
184:25 185:7
186:13,25 191:13
191:14 194:4
195:15 199:18
203:17 206:9,9
207:12 208:14
215:16 216:19
224:24 225:18
228:4,23 231:21
232:1,24,24 233:6
235:20,20,20,21
**carroll** 4:15
**case** 8:12 11:11
14:18 16:1,25 17:21
19:3 23:25 24:12
25:7,12,13 27:18
28:3 33:19 35:6
36:22 37:3 38:14
40:18 41:6 58:10
77:7,15 78:22 103:4
107:13,20,22,23
108:9,15 113:10
117:16,22 119:7
120:20 121:16

125:5 126:22
127:22 135:22
137:2,10 139:11,14
139:20,21 140:15
140:17,25 144:12
144:16 145:6,6
147:12 148:19
149:3 151:13 153:2
154:6,24 155:16
156:24 157:22
158:18,25 164:21
165:3,22 168:1
172:1,24 175:8,9,10
181:12 182:6,23
183:5 186:6,21
187:20 193:6
196:16 203:13
204:25 205:21
207:17 209:7 210:3
210:8 211:20,24
212:6,10,15 213:18
214:10 226:13
**cases** 14:10 74:19
76:20 87:17 107:25
136:20 176:11
193:23,23 206:11
215:13,17 224:22
225:1 229:25
**casualty** 3:19 4:13
65:18 68:6 164:20
242:1,6
**caught** 17:19 147:23
160:13
**cause** 2:4 95:11,23
210:20
**caused** 96:3 137:3
**cent** 138:13,20
**century** 149:13
**ceo** 69:11
**certain** 49:22,22
166:16 222:15,15
222:18 223:24
224:7
**certainly** 31:24
32:15 34:2 35:4

53:13 84:24 90:7
162:24 173:20
179:18 183:2
192:19 220:7
222:19 229:18,24
230:20
**certification** 5:9
240:23
**certified** 7:4 241:1
242:16
**certify** 241:2 242:7
**cgl** 44:12,21 46:6
58:23 59:2,8,23
133:15 164:6 185:6
**chance** 41:22 148:8
180:13 203:4 220:8
**change** 65:23
210:21 238:4
**changed** 67:7,12
68:8 161:21 219:5
219:21
**changes** 5:8 238:1
**characterization**
176:15
**characterizing**
232:8
**charge** 30:11 47:11
69:14 211:10
**charges** 242:13
**charles** 3:20 164:18
241:14,24
**chart** 15:17,20
16:21 22:10
**cheaper** 44:21
**check** 43:19
**chesney** 220:16
**children** 30:1
**choice** 183:15
**christmas** 26:20,21
26:22
**circuit** 151:13,24
236:11
**circumstance**
157:21

**circumstances**
23:24 120:17
179:15
**cite** 71:22 72:1
**city** 2:9
**civil** 2:10
**claim** 17:15,18
20:24 47:23 49:25
82:2,4 89:25 90:1,3
98:7 119:3,13,20
120:23 121:1,3,3,8
121:25 122:3,12,18
122:21,21 123:2,6,9
123:13,13,16
127:23 128:19
131:7,12 132:11
138:21 140:2
146:11 148:20,22
154:3,17,18 155:24
158:9 160:12
171:20,21,23
172:19,23 173:13
173:21 181:9 182:8
182:10,13 184:17
185:5,8 187:7
190:18,24 191:1,3,7
191:10,24 196:15
200:16 202:12,13
202:14 204:13,22
205:22,25 206:2,5
207:22 208:3
215:23 217:2
218:21,23 234:6,7
234:10,15 235:16
235:17 236:7,8
**claimant** 140:3,7
141:1 204:20 205:6
205:16 206:7
**claimants** 204:11
205:10
**claimed** 155:1
157:12
**claiming** 31:10,13
32:3 33:21 201:5

**claims** 12:5,12 16:4
16:8,14 17:4,14,23
18:5 20:7 39:4 45:3
45:13,18 48:2,4,8
48:13 49:25 63:12
65:10 67:15,24 68:3
68:16,17,22 69:1
77:2,23 78:3 81:20
82:7 83:18,25 84:4
84:19 88:9 90:2,3
91:3 95:7,19,19
96:13 119:8 128:16
130:18 135:11
144:9 145:5 152:13
153:10,13 166:22
167:4 170:14,19
172:2,5,10 173:9,11
173:15 175:22
176:1,5 179:9,17
182:4 190:13
192:13 193:17
201:25 202:2,7
203:1,10,18 216:17
216:24 217:17
225:22 234:4 235:9
**clarity** 106:19
**clause** 6:20 179:18
179:23,23 180:1
181:16 183:6,20
184:15 219:9,10
226:1
**clear** 33:22 38:14
41:16 52:25 62:7
103:24 154:16
209:20 235:11
**cleasure** 3:23
**cmk.com** 4:17
**cna** 1:15 240:15
**collecting** 173:1
**colorado** 68:20
**column** 23:12
**combination** 33:1
**combined** 11:2
**come** 95:8 163:8
173:5 178:6 191:22

201:24 206:23
216:3 228:24
**coming** 175:4
216:20 217:17
**commenced** 124:19
125:6 126:9 147:9
**commencement**
147:16
**commencing** 126:3
161:25
**commercial** 6:23
44:13
**committed** 43:11
**commonly** 152:15
**communicate** 132:3
188:21
**communicated**
108:23 109:2
**communicating**
188:6,18
**communications**
82:3
**comp** 120:19 123:22
131:22
**companies** 1:7,15
20:25 21:1 48:1,4
56:17 65:23 68:7
69:15,18 70:20,24
73:19 153:16
172:15,17 175:11
181:14 182:13,14
184:16 186:10
187:7 188:7,18,22
191:6,10 200:15
204:6 240:7,15
**company** 1:3,6,7,10
1:14,16,17,19,20
2:3 3:8,13,18,19,19
4:1,7,7,14 5:18,21
5:23,24 6:15 8:12
8:24 12:17,18 13:18
17:1,25 18:8,24
19:2,18,19 20:12
21:8 23:25 29:25
32:10,23 35:8 38:1

38:2,12 43:21 44:7
45:24 46:3,6 47:12
48:15,21 49:2 51:14
51:20 54:14 55:10
55:11 57:20 58:17
59:2 61:11 65:11,18
66:2,3,4,7,12,13,18
67:9,9,13,18,22,25
68:2,4,6,25 69:5,19
74:15 75:4 77:1,22
77:23 82:4 97:18,19
98:25 99:1,14
100:16 111:8,22
118:1 126:23 131:5
134:18 137:10
140:2 144:5 149:13
150:5,24 151:14
153:22 154:15
164:19,20,21
165:22 166:13,17
167:5 172:19,20
181:25 182:9
183:12 184:15
185:16 186:1,2
187:14,23 189:2
191:12 198:15,18
198:19,24 200:8,13
202:16 206:1,2
209:7,21 221:9,11
228:10,11,14 240:3
240:6,7,10,14,16,17
240:19,20 241:22
241:23,25 242:1,1,2
242:4,5,6,13
**company's** 5:13
6:21 65:17 166:23
170:20 183:15
185:23 234:5
**compensated** 42:13
**compensation** 47:24
48:17 128:19 154:6
223:12
**complaint** 123:22
124:16,20 125:13
126:3,7 131:22

144:15,17,20,24
145:23 146:22
147:10,25 155:22
157:11 158:1
**complete**  29:16 38:9
57:10 90:13
**completed**  45:5,20
132:22 134:3
**completely**  97:4
**complies**  42:17
83:15 117:5 150:14
152:2
**comprehensive**  5:17
17:2,10,25 36:25
39:11 44:12 57:19
58:19,25 100:2,5
128:13 131:20
132:20 133:15
134:1 159:2,6,20
213:12,21 214:15
**compromised**  84:24
**concerning**  226:12
**concluded**  209:1
237:5
**conclusion**  31:6
82:2 192:19,22,24
193:5
**conclusively**  150:25
**concurrent**  78:7
89:23 90:11 181:21
235:20 236:10
**conduct**  83:18,25
84:12 85:17 127:17
127:25 128:9
129:13,17 131:15
132:10
**conducted**  123:18
**conflict**  69:13
**confused**  52:22
130:10
**connecticut**  69:14
**connection**  12:11
25:4 27:16,17 42:22
43:7 62:23 67:21
80:12 142:18

**consider**  38:13,18
129:7 153:17
157:13
**consideration**
239:18
**considered**  16:17
95:19
**consistent**  43:15
144:20
**constitute**  53:9,10
**constructive**  191:23
**consultant**  46:10
47:6,15,21 66:5
69:8
**contact**  63:9
**contain**  43:10 59:20
59:22
**contained**  164:25
166:18 167:6 171:9
171:13,16 180:17
181:1 191:16
206:12
**contains**  58:23
**context**  214:19
**continental**  4:13
127:14,17 242:6
**continue**  132:1
133:25 150:24
157:21
**continued**  6:2
128:23 131:21
143:25
**continues**  107:15
**continuing**  57:23
131:2 236:15
**contract**  166:6,9,12
186:6 234:20,22,24
**contracting**  186:9
**contractor**  10:12
49:6
**contractors**  39:15
39:23 44:11 49:9
54:12 56:5,11,18
**contracts**  166:18

**contractual**  197:3
**contradictory**  162:7
**contribute**  179:17
**contribution**  176:22
192:21 195:21
**control**  9:10
**controversy**  88:13
217:9,13 218:22
**conversant**  210:9
**conversations**
222:22
**converted**  66:18
**convincing**  33:22
38:15
**coordinating**  188:17
**copies**  12:24 60:18
93:20,24 94:1,7,12
96:18 127:23 142:5
242:15
**copy**  10:1,4 38:9
57:10 111:3 134:25
142:8 144:19
146:22 147:1
161:24
**corner**  55:20
**corp**  1:17 4:1 6:13
67:20,20 124:8
240:17 242:3
**corporate**  4:3 71:11
71:13
**corporation**  1:15
47:13 57:20 67:7,10
151:15,17 240:15
**correct**  13:15 20:8
22:20 24:23 25:1
27:13 34:21 35:20
40:4,10,24 41:10
42:23 43:24 45:18
55:24 56:15 58:17
59:3,23 60:20 61:19
61:23,23 62:10
64:12,16,17,19 73:1
74:21 76:10 80:17
85:6,18 88:5 98:4
98:11 99:4 103:7,14

109:5,22 115:4,21
116:1 117:18,23
120:14 121:12
123:13 128:5
138:24 140:11,13
140:24 147:14
160:21 165:19
174:11 176:6
182:15,16 183:13
185:10 187:10
188:22 191:8,18,20
191:21 194:12,15
194:21,22 197:22
203:6 209:22 211:8
213:1 214:7,24
218:15,17 227:22
228:16,18 231:2,4
232:7 234:13 239:3
**correctly**  30:3
111:11 158:23
166:25 171:24
177:19 221:13
225:23 228:2
234:11
**correspond**  133:25
135:12
**correspondence**
15:2,12 16:5,8,9,14
17:8,15,24 18:5
25:11 37:21 49:23
78:22 79:17 82:3,17
83:3 111:14 112:3
128:23 131:19
133:5,13,23 135:7
162:3 173:22
194:20 221:24
222:7
**corresponding**
19:23 20:6 81:4
110:20 132:16
222:21 223:8
**corresponds**  19:24
**cost**  44:10,15 46:12
135:22

**counsel** 11:3 16:18
24:23 210:15 211:6
241:20 242:7
**counsel's** 227:5
**country** 67:6
**county** 239:10
**couple** 164:23
165:12 177:20
189:10 206:21
**course** 13:11 14:2
15:6,12 38:20 79:17
96:16 102:9 126:17
181:17 182:20
195:19 206:16
229:17,24
**court** 1:1 8:21 30:13
33:6,7 37:13,14
55:1 90:22 97:9
98:15 100:14
102:25 110:22
111:18 113:7 120:7
124:14 126:2,25
127:1 136:20
137:19 139:8
140:16 146:3 147:5
149:9 151:1,10,12
186:20 235:23
236:13 240:1
**courtesy** 92:4
**courts** 33:20 35:16
**cover** 58:11 93:15
103:2 119:12,20
120:11
**coverage** 6:23 16:11
20:22 31:11,13,16
31:18,21 32:3,22
33:2,4,21 34:3,8,18
35:23 36:24,25
40:13 45:2,5,13,17
49:3,8 50:1,14 54:5
77:9 78:7,8 79:19
80:6,23 82:18 83:4
83:21 84:25 87:17
89:21,21 90:9,12
95:21 97:17,23 99:1

99:7,13 106:12
107:11 108:8 111:6
112:7,10,15 114:8
114:12,17,18,22,23
115:6,12,15,19
116:2,11,18,21
119:3 120:3,18,22
121:11,24 122:6
127:14,25 128:21
128:22 135:13,13
137:2 140:12,19,20
141:10 142:15,17
142:21,22,22 143:2
143:5,8,12,15 144:2
147:18 150:7,24
151:2 153:20,25
154:18 155:18
156:16 157:6,8,9
159:1,2,15 162:13
163:22 173:24
174:4,10,17,22,24
175:16 181:14
194:21 197:16
203:20 216:1,3
220:3,8,9,19 222:11
222:11 223:11
227:25
**coverages** 49:21
92:18 95:11 107:17
107:22 108:18
174:25 183:10
184:3 195:6
**covered** 95:19
132:21,22 134:2
141:12 142:2
154:17 172:4 184:2
185:6 193:16,19
**covers** 133:14 159:7
**crum** 1:17 4:1
240:17 242:2
**crummey** 4:2,4
236:25 241:16
242:2
**csr** 2:6 242:19

**currently** 10:11
98:2,7
**custody** 9:10
**custom** 105:24
107:9,18 108:6,14
**customers** 46:11
47:7
**cut** 90:15 98:5
153:23 154:20
160:13 165:13
**cv** 1:5 240:5

**d**

**d** 8:1 127:16
**d.c.** 3:22
**dallas** 2:8 68:14
**damages** 155:1
181:6
**danek** 3:9 37:23
**danzig** 4:8
**dario** 17:21,23
144:12,15,20 145:5
145:6 149:3
**dario's** 147:9
**date** 22:25 73:18
74:19 78:25 82:23
94:24 98:11 135:17
136:16 138:9
161:15 163:1,3,5
215:12,18 218:13
238:3 242:20
**dated** 8:25 98:17
100:17 103:20
126:24 139:10
146:18
**dates** 22:15 70:17
94:15 107:17 111:5
161:7,11 163:14,18
215:16 219:13
**day** 2:5 55:12 87:22
92:12 159:17
215:19 239:12,20
241:9,11 242:16
**days** 42:9

**deal** 159:17
**dealing** 189:2
**dealings** 224:17
**december** 8:25
26:24 27:15,22 28:1
221:12
**decided** 28:21
196:18 218:24
**decision** 175:5
**decisions** 46:11,17
90:25 152:16,19
153:11,14 158:4,9
**deck** 231:8
**decker** 97:12 98:19
99:18,24 146:17
**declaration** 5:16
6:24 55:8 109:16
**declarations** 56:2
58:8
**declined** 69:19
76:12 179:6 225:20
**defend** 74:19 89:19
89:19 90:5,10 92:15
92:17 118:4 147:12
147:15,17 148:13
148:22 150:25
157:8,15 173:8
178:1 180:16,25
181:3,6,19 183:24
185:12 186:11,19
206:13 235:18
**defendant** 3:8 4:13
241:22 242:6
**defendants** 1:9,22
2:2 3:13,18 4:1,6
8:11 240:9,22
241:23,25 242:2,4
242:13
**defended** 91:2 118:1
172:19 179:17
193:24
**defending** 73:8,13
73:19 91:10 153:22
155:21 157:20
171:23 172:23

173:12 181:19
185:18 203:1,20
234:9
**defense** 90:8 91:17
118:7 135:16,22
138:14 150:4
153:24 154:20
157:22 172:4 173:3
173:14,15 175:21
176:2,5 179:18
180:1 181:16
182:24 183:5,8
184:24 185:5
186:12,19 193:15
203:21 213:23
214:1 224:25
227:13 235:3,10,14
235:16
**definitely** 95:25
**degree** 29:14
**demand** 208:4 219:2
**demonstrate** 34:9
34:12,13
**denial** 120:18 140:4
140:12 142:8
143:12 158:25
**denied** 127:14 140:2
**denote** 59:8
**deny** 128:7 129:10
129:12 142:22
148:13
**department** 30:11
211:11
**depend** 44:17,23
107:13,20
**depending** 153:19
**depends** 155:13
**deposed** 80:11,13
**deposition** 1:23 2:1
5:14,19 6:6,10,12
8:25 9:5,6,9 11:22
26:10 27:17,25
28:17 57:8,9 72:12
74:8 79:21 80:9
82:8,14 83:2 92:25

93:16,16 94:11
103:3,7,10 110:1,3
110:20 113:10,18
115:14 120:8,14
132:8 165:16 168:1
168:5,7,12,18 169:5
169:10,24 198:1
201:9 209:25 210:6
210:11,12,19 237:5
238:3 239:2 240:24
241:6,8,13,19
242:12,14
**depositions** 24:19
25:7,14,18,20,25
26:8,18 28:18 72:5
72:18 75:9,22,23
77:14 207:18 208:9
**derived** 177:24
235:13
**describe** 15:5 16:1
70:6
**described** 48:5
221:12 232:7
**description** 5:12 6:4
239:14
**desk** 30:12 211:13
**despite** 207:12
208:6
**destroyed** 201:5
233:14
**destroying** 233:1
**detail** 12:10
**details** 48:3 156:22
**determination**
121:11 157:25
194:4 203:23
235:21
**determine** 78:3
128:1 214:20
**determined** 140:1
150:25
**difference** 44:10,15
**different** 22:11 31:4
42:21 47:4 48:2
49:24 68:24 71:6

154:10 155:12
163:14,18 195:17
198:24 203:12
**differentiate** 21:7
**difficulties** 130:12
**digital** 9:21
**direct** 206:24
220:21 221:15
**directors** 6:18 145:7
145:16,21 146:6
149:2
**disagree** 72:20,23
158:20
**discard** 230:1
**discarded** 141:20
228:19 229:4
233:11
**discarding** 94:23
142:17 229:14
230:3,17
**disclaim** 140:20
**disclaimer** 140:19
140:24 141:4 142:8
142:13 143:12,15
143:22 158:25
**disclaimers** 141:9
**discovery** 78:11
79:7
**discretion** 181:8
183:13
**discuss** 26:13
**discussed** 9:11 12:7
57:7 193:14 213:23
222:6
**discussion** 57:4
145:6,16,20 208:24
**disk** 9:18,21 10:8
**disks** 43:11
**dispute** 31:7,7 56:24
59:10 94:20 141:23
151:17 200:4
**distinction** 228:12
**distribution** 174:21
**distributor** 70:19,23

**distributors** 71:4
**district** 1:1,1 126:25
127:1 136:20 139:8
149:20 240:1,1
**division** 11:25 12:4
**dixon** 6:8 111:21
112:4,6,14 114:4
159:9 222:7
**dixon's** 115:2 116:2
**document** 9:3 21:20
22:13,19 23:11,13
54:16 55:8 57:7,17
58:6 60:2 61:16
71:23 72:1 97:14
98:22 100:16,20,22
102:18 103:12,17
103:19 111:1,24
114:7 124:10,22,25
125:1 133:18 139:7
146:8,9 148:1,10
149:15 151:21
153:7 162:19
163:16,17 177:21
180:18 239:15
**documentation** 41:2
141:13,14
**documented** 80:5
189:19
**documents** 7:1
15:23,24,25 16:17
17:1 23:16 24:18,19
24:20 25:3,8 35:22
38:21 41:5,10,19
42:18 60:7 62:23
63:5,9,12 77:16
79:5,25 80:21,24
125:4 127:18
131:19 163:21
167:10,17,22 168:9
187:21,22 189:11
189:13,22
**doing** 12:9 48:8
71:16,18,20,24 72:9
75:3 78:24 79:2,4
84:22 88:8 142:13

172:21 173:2,2,7,8
174:13 195:17
216:24 230:24
231:15
**domestic**  67:9
**doubt**  110:4 185:22
**drawing**  228:12
**dropped**  233:2
**due**  118:15 129:1
130:11 165:4
166:17
**duly**  2:3 8:6 241:5
**dummy**  120:25
122:21 123:16
**duplicates**  169:11
**duties**  165:4 166:16
167:5 170:22
177:13 192:17,20
193:9,21 195:13
196:9
**duty**  88:23 89:5,19
89:19,24 90:5 92:15
92:17 126:11,15,17
127:25 128:8
129:13,15 131:15
147:12,15,17
148:13,22 177:6,13
177:23 178:7
180:16,25 181:2,5
183:23 185:6,12,16
186:18 192:4
200:14 203:17,19
206:13 215:2,11,22
215:23 216:11
217:7 218:4,16
**dyce**  127:16

**e**

**e**  1:24 2:1 3:1,1,20
5:4,14 6:19 8:1,1,5
126:22 127:16
149:11 238:2 239:1
239:6,13 240:24
241:4,14,24

**earlier**  88:1 96:8,8
100:22 144:11
164:24 165:12
166:15 174:10
178:1,14 186:5,24
189:11 192:9 201:4
209:6 211:10
213:24 214:1 220:1
220:2 232:7
**early**  66:10,23 68:13
115:14
**easier**  64:20
**east**  2:8
**eastern**  149:20
**easy**  85:12 154:5
**editorializing**  90:18
**edward**  8:16 97:11
98:18 106:24 152:7
**effect**  81:20 116:22
137:21 189:20
**effective**  101:10
104:14 107:17
163:12
**effort**  30:19,24
34:20 35:1,10 37:9
78:5 187:1,5,9,18
**efforts**  74:14
**eight**  67:11
**either**  16:14 19:25
21:13 35:24 77:17
94:15 177:8 178:8
179:12 200:25
202:3 212:24 215:6
233:14
**electrical**  149:12
**else's**  136:16 168:7
213:14
**employed**  10:11
72:19 209:16 242:8
**employee**  138:11
189:21,24 198:22
**employers**  15:13
16:15 19:23 38:1
75:24 77:5 79:5
118:1,10,14 123:19

151:14,17 152:6
161:16,25 163:2
165:5 171:13
175:17 176:9
181:24 189:20
197:12,15 198:23
199:7 203:13 209:7
209:21,23 211:19
211:23,23 212:16
213:5,6,7,8,13,17,18
214:9,10 215:2,6,11
215:21 216:9,11
217:5,7 218:1,3,16
219:6,11,15,20
220:13 226:13,19
231:14 232:2
**employment**  1:2
11:14 240:2
**enclosing**  111:3
**encompasses**  89:20
**endorsement**  45:8
49:3,8 54:12
**engaging**  220:4
**enhancement**  70:15
**enhancements**  71:3
**entail**  48:5
**entails**  166:23
170:14,19 234:4
**enter**  24:5,7
**entered**  197:21
**entire**  30:4 71:11,13
118:14 233:2
**entirely**  162:18
**entitled**  20:22 55:8
150:4
**entity**  31:10
**entries**  15:21 59:20
59:22 163:20
201:10
**essentially**  67:19
**establish**  84:24
221:17
**established**  78:11
79:7 196:18 221:9
222:14

**establishes**  162:19
**establishing**  78:12
79:8
**estimate**  215:20
**estimation**  89:24
144:1 174:23
186:19
**et**  6:14,15,16 124:8
**everybody**  134:6
192:7 204:11
205:10 236:9
**evidence**  12:16 13:8
13:10,11,14,17,21
13:23,25 14:22 15:1
15:5,11 16:4,13,25
17:3,9,13,24 18:4,7
19:8,13,18 21:2,9
22:1,7,25 23:3,4,6
23:12 33:22,23
36:23 38:14,15
49:16 50:3,8,13,19
50:25 51:19,25 52:3
53:7,9,11 54:4
59:15 61:9 62:2,23
74:6 76:16,23,23
77:8,11 78:12 79:8
85:8,15,20 86:8,17
87:2,8,17 110:7,15
131:16 132:9
134:10 145:5
147:21 148:14,21
158:12,17 160:9,22
161:3 163:20
201:13,15 221:8,16
**evident**  37:1
**exact**  18:19 70:17
156:2
**exactly**  66:10,19
76:4 115:7 116:10
124:16 139:22
232:6
**examination**  5:5,6,7
8:7 164:15 209:1,2
209:3 241:10

examined   102:2
example   72:24
  96:12 205:4
excerpt   5:19 6:6,10
  6:12,17
excess   52:1,6,9 61:4
  89:22 90:11 181:21
  186:14 203:22,22
  206:9 235:20
  236:10
exchanged   112:3
  158:18 219:1
excuse   48:2 130:15
  135:8 150:18
executed   239:17
exhausted   50:2
exhibit   5:13,15,16
  5:17,18,20,22,24
  6:5,7,8,10,11,13,14
  6:16,17,19,22,23
  8:18,19,21 37:18,19
  37:20 38:3 40:17,20
  40:24 42:16,16 43:1
  54:24 55:2,3,7 57:3
  57:7,17 59:7,8,14
  61:10,15 62:3 65:4
  69:24 71:23 72:18
  73:5 86:9,18,20
  92:24 93:13,15 97:7
  97:9,9,10 98:14,16
  98:17 100:12,14
  102:23 103:1,13
  104:11 106:16
  110:21,24 111:16
  111:19 113:5,8,9,22
  114:4 118:21 120:5
  120:8 123:25 124:5
  125:17 126:1,19,21
  127:3,10 139:3,5,24
  146:1,4,7,15 148:5
  148:6 149:7,9,10
  151:8,10,11 160:10
  160:19 161:24
  162:3,12 163:13
  165:1 166:21

167:10,14 169:2,10
  169:14 171:1 180:5
  180:10 198:4
  206:25 210:24
  212:23,23 220:22
  233:21
exhibits   5:11 6:3
  25:22 26:7,10 28:19
  49:6 65:8 110:19
  169:4,7,9 173:21
  174:10 197:21
  210:19 242:15
exist   63:9 130:19
existed   34:9 54:6
  141:6 142:23
existence   32:4,12,20
  33:8 34:20 35:1,10
  35:17 83:20 84:13
  85:4 127:19 130:15
exists   22:1
expanded   184:24
expect   188:8 189:1
  189:24 190:3,12
expense   15:23,24
  49:19 60:1,7 163:20
experience   47:5,15
  49:15 171:7 226:16
expert   5:15 9:11
  11:17 14:8,15,18
  23:24 24:11,16 25:4
  26:2 27:2 30:4,14
  38:9 40:18,20,23
  42:6 47:16,17 63:3
  65:3 69:9 72:18
  87:15 92:24 103:7
  126:21 127:5
  139:15 141:20
  144:9,9 148:18
  209:12,16 210:7,20
  210:21,23 220:22
  233:21
expiration   94:15,24
  96:19 242:20
expire   96:11

expired   94:8 95:20
  96:14 141:21
explain   23:23
explanation   140:4
explicitly   184:2
exposed   137:22
  175:7
exposure   137:4,21
expressed   88:21
  239:18
expressly   219:16
extends   183:8
extent   83:6 99:7
  212:17
extrinsic   147:25,25
  148:1,14,20 157:13

**f**

fact   31:9 41:5,9,19
  61:15 71:22 72:24
  93:12 119:6 122:6
  136:15 138:12,15
  138:19 140:18
  142:7 143:22,25
  144:2 159:7 160:12
  173:16 174:19
  186:18 193:14
  215:13
factor   158:3
factored   158:8
facts   69:24 70:6
  73:5 107:13 108:15
  154:24 155:6,7
  156:16,24 157:13
  178:15
failed   127:17
failing   84:1 87:25
fair   10:5 48:19 63:2
  69:4 80:10 85:14
  98:1 104:22,24
  166:18 176:15,18
  211:14,15 212:20
  213:5 219:25 220:5
  225:5,11 230:16,18
  233:3

faith   173:11
familiar   36:23 50:19
  95:16 127:2 137:1,8
far   14:4,6 15:2
  19:14 174:22 183:2
  219:17 226:9,11
  231:10,12
faster   64:22
fault   230:2 231:14
  232:12
favor   69:21
february   241:9
  242:16
federal   2:10 137:19
  139:8 140:16
feel   148:4 226:1
fella   48:7
fellowship   3:4
felt   121:24
fiction   22:20,22,24
fidelity   6:15 126:23
field   6:9,10 110:25
  111:4,14,22 112:3
  113:10,21 115:2
  116:1 117:7,13
  119:2 120:1 132:17
  135:7,10
field's   110:19
  113:17
fields   25:16 82:10
  83:1
fifth   151:13,24
  156:2
figured   82:23
file   17:5,9 34:2
  43:14 79:18 80:21
  81:3,19 84:3 122:3
  123:2,6,9,13 134:15
  134:16 194:7
  220:10,11,12
filed   124:20 125:6
  125:17 126:1
  146:23 158:19
files   18:5 23:9 49:21
  49:25 87:25 123:16

| filing 124:19 | fit 130:9 | fourth 156:2 | g |
|---|---|---|---|
| **financial** 1:15 | **five** 6:15 88:18 | **fox** 3:3 5:7 41:22 | **g** 8:1 |
| 240:15 | 96:22,23,25 156:7 | 132:13 135:8,25 | **gal** 160:13 |
| **financially** 67:4 | 206:17 | 136:22 137:7,12,23 | **gap** 50:9,10,11,21 |
| 242:10 | **flat** 107:15 | 138:7 141:16 | 50:22,23 51:21 52:1 |
| **find** 30:24 49:25 | **flow** 167:5 170:23 | 165:14 182:18 | 52:9,19 53:23 54:6 |
| 74:17 76:17 78:24 | **focus** 152:14 | 206:22 208:23 | 59:16 60:25 61:5,18 |
| 84:6,21 85:13 89:7 | **folks** 164:10,12 | 209:4,6,19 213:4,15 | 63:18,24 64:4,9 |
| 90:9 131:12 141:3 | **follow** 50:17 64:21 | 213:25 214:18 | 85:4,17 160:24 |
| 155:22 158:25 | 84:2 164:24 202:21 | 215:1,8 217:4,10 | 161:4 174:17 |
| 173:16 174:23 | 222:23 227:22 | 218:12 219:3,11,25 | **gaps** 174:6,21 |
| 179:20 181:20 | **following** 84:23 | 220:12,18 221:3 | 175:16,19 |
| 182:14 185:23 | 114:16 241:3,20 | 222:20 223:13,18 | **gather** 200:9 |
| 188:11 196:19 | **follows** 8:6 152:8 | 223:24 224:2,3,5,14 | **gathered** 125:3 |
| 202:4,23,24 203:19 | 241:13 | 225:9 226:10,18 | **gathering** 194:11 |
| 203:21 215:25 | **foregoing** 239:2,16 | 227:4,15,21 229:3 | **general** 5:17 6:23 |
| 216:19 217:21 | **form** 14:19 16:6,16 | 229:23 230:9,21 | 17:2,10 18:1 34:16 |
| 218:25 222:19 | 17:12,16 18:3 19:12 | 231:10 232:1,15,17 | 36:2,5,11,25 37:3 |
| 230:2 231:14,25 | 32:25 50:12,19,24 | 233:2,10 234:21 | 39:12 44:12,13 |
| 232:12,21 | 51:10,25 55:20 76:9 | 236:4,11,19,20 | 49:14,15 57:19 |
| **finding** 88:10 | 91:18 100:17 | 241:15,21 | 58:19,25 100:5 |
| 148:20 203:4 220:8 | 113:11,12 132:12 | **frame** 215:20 | 128:13 131:21 |
| **fine** 230:22 | 135:8,25 136:22 | **free** 148:4 226:1 | 132:3,20 133:15 |
| **finish** 75:20 224:3 | 137:12,23 138:7 | **friday** 168:25 | 151:13 159:2,6,21 |
| 232:15 | 225:7 226:14 230:4 | **front** 69:25 70:4 | 170:22 171:5 |
| **finished** 130:5 | **formed** 18:4 | 73:23 167:15 | 213:13,21 214:16 |
| **fireman's** 1:16 | **forming** 9:13 38:19 | 210:24 | **generally** 39:4,5 |
| 240:16 | **forms** 40:3 132:24 | **fulfillment** 166:23 | 89:2 140:6 150:2 |
| **firm** 3:4 4:2,8,15 | **forster** 1:17 4:1 | 170:15,20 234:4 | 182:4 230:1 |
| 24:2,21 25:3 63:5 | 240:17 242:3 | **full** 8:14 130:2,4 | **generated** 49:23 |
| 164:18 | **forth** 19:23 28:3 | 146:14 185:18 | **getting** 17:7,7 47:25 |
| **firms** 229:21 | 40:19,23 42:21 43:1 | **fully** 118:4 172:20 | 52:22 179:2 |
| **first** 8:6 26:20 46:14 | 48:1 78:23 125:4 | 172:21 | **give** 9:5 11:5 47:3 |
| 58:7,13 66:4 101:3 | 133:5,23 157:14 | **functions** 76:12 | 77:23 107:15 |
| 113:11 129:10 | **forthcoming** 82:25 | 179:6 225:20 | 125:22 143:3 |
| 130:19 146:13,14 | **forward** 162:16 | **fund** 1:16 240:16 | 156:25 191:16 |
| 166:22 170:25 | 173:5 | **funeral** 29:2 | 199:2 200:10 213:6 |
| 171:2,4 175:7,9 | **found** 135:17 141:5 | **funny** 112:25 | 213:11 214:16 |
| 177:19 202:12 | 145:6 197:23 201:1 | **further** 61:3,8 | 215:19 |
| 212:24,25 215:5,10 | 217:20 | 106:22 164:9 | **given** 41:1,4,9 48:9 |
| 215:21,23 221:16 | **foundation** 136:23 | 183:18 203:11 | 108:15 110:7,10 |
| 221:22 224:3 | **four** 113:12 155:12 | 208:21 236:20,22 | 140:24 156:9 |
| 225:25 226:1,6 | 156:7 | 242:7,10 | 239:19 241:6,18 |
| 233:22 234:2 236:4 | **fours** 42:9 | | |

**gives** 90:7
**giving** 134:14
  213:20 217:1
**gleaned** 146:10
**gluf** 6:20
**go** 11:2 12:10 20:1
  23:9 29:10,20,22
  35:13 57:15,22
  69:17 80:23 81:21
  85:1 87:21 89:18
  92:13 96:6 126:6
  130:23 135:13
  138:9 146:20
  155:14,16 162:2,2
  164:11 173:16
  175:6 177:16,19
  179:5,20 184:22
  188:8 190:23 202:3
  202:4 208:5 215:15
  218:10,19 229:21
  236:16
**goes** 94:9 112:7
  114:8 235:19
**going** 16:13 27:5,6,9
  27:25 28:2 31:5,10
  37:1 40:22 58:7
  65:3 69:23 71:9
  73:4,13 76:16 78:6
  78:25 80:9 83:5,17
  90:10,11 101:23
  107:10 112:9
  113:20 114:10
  118:20 125:22
  127:9 128:24
  129:21 130:25
  131:6 132:1 138:3,8
  138:9 142:14 145:2
  150:15 152:5 156:8
  161:23 170:16
  172:25 174:20
  176:9 178:1,2,3,4
  182:8 189:25 194:2
  194:3 199:1,2 200:9
  203:1 204:23
  205:17 206:21

  208:17,22 211:12
  214:5,16 218:12
  219:12 220:16
  224:21 225:14,15
  227:3 231:17
  235:23
**good** 8:9 41:22 88:9
  88:14,17 92:9 94:3
  95:8 96:17 125:25
  133:8 143:2 149:14
  152:12 160:2
  164:17 182:3 202:2
  203:10 209:5
  216:24 217:17
  218:21,23 230:18
  230:25 236:7,8
  237:4
**goodman** 164:18
**goodwin** 3:20
**goodwin.com** 3:23
**gotten** 26:18 29:23
**governing** 219:6,20
**great** 3:10
**group** 1:18,18,21
  4:6,7 21:20 25:9
  111:22 240:18,18
  240:21 242:4,5
**guarantee** 206:23
**guaranty** 6:15
  126:23
**guess** 10:2 46:21
  82:23 94:9 99:16
  149:18 152:20
  162:10 168:25
  196:8
**guy** 159:16 199:6
**guys** 31:3

|        **h**        |

**hair** 17:19 147:23
  160:13
**half** 29:4 155:2,25
**halfway** 83:16
**hampered** 88:2,6,10

**hand** 55:20 120:21
  132:23 134:19
  166:12,13 180:22
  239:19
**handle** 67:24 68:22
**handled** 68:3,24
  69:2 121:3 128:16
**handler's** 82:7
**handlers** 82:3
**handling** 12:5,12
  48:8,13 68:16 84:4
  84:19 166:22 167:4
  170:14,19 171:20
  173:11 182:4
  203:10 217:17
  234:4,6 236:7,8
**hands** 163:16
**handwriting** 103:19
**handwritten** 198:4
**happen** 122:2
  181:22 194:2
**happened** 66:22
  69:7 80:4,11 85:10
  95:21 108:21 137:8
  139:22 155:8 176:4
  218:14 219:22
  220:1
**happening** 176:16
**hard** 23:3
**harder** 174:23
**harleysville** 1:18,19
  1:19 4:6,7,7 240:18
  240:19,19 242:4,4,4
**harm** 176:4
**harmed** 175:21
**hartford** 1:7 3:18,19
  3:19 73:8,12 74:1
  75:24 76:7,12 77:6
  77:11,17 78:12 79:8
  85:24 88:2,6,22
  89:5 91:2 92:16
  164:19,20,20 165:5
  166:1 171:9 176:8
  176:13,25 178:20
  179:6,13,14,16

  180:10 181:13,24
  186:7 192:12,20
  193:9 195:13
  196:24,24 197:2
  207:5,9,15 208:1
  209:16,21 212:3,4
  212:10,10,12,16,21
  212:24,25 213:14
  215:2,6 224:23
  225:17,20 226:22
  227:7,10 231:14
  232:2 240:7 241:25
  242:1,1
**hartford's** 83:18,25
**hazard** 49:3
**head** 39:17 75:11,22
  81:7
**heading** 233:22
**headquarters** 4:9
**hear** 75:19 91:25
**heard** 39:20 210:2
  227:21 231:13
  234:1
**heinze** 167:25
  168:12 169:5,10,24
  209:10,11,13 210:2
  210:6,18,20
**held** 57:4 208:24
  231:3
**help** 74:1,2 75:4
  76:7 178:21,21
  179:4 194:10
  225:17,18 235:18
**helped** 229:18
**helpful** 35:5
**helps** 217:24
**hereinafter** 78:14
**hey** 125:24 196:18
**history** 71:11,14
  88:23 89:6,7 106:12
  107:11,16 111:5
  207:6,10,16 208:1
  228:22
**hold** 91:22 129:22

**holding** 4:1 48:1
 242:3
**holdings** 1:17
 240:17
**home** 164:11
**hopefully** 165:13
 206:22,22
**hoping** 134:7
**hot** 76:5
**hour** 29:3,4 42:14
**hours** 42:7,8,11
 165:16 173:20
**housekeeping**
 165:17
**hughes** 10:13,17,19
 10:20,23 11:2,16
 12:1,1,6 24:1,8 29:2
 43:3,9,13 44:5 50:7
 50:18 51:24 53:6,14
 55:7 56:22,25 57:8
 59:6 94:11,20 97:10
 98:17 141:19,23
 146:7 161:24 163:2
**huh** 86:14 99:25
 152:23
**hundreds** 15:25
**hyatt** 2:8
**hypothetical** 143:4
 143:9,17 154:14,23
 155:19 156:17
 217:24
**hypothetically**
 218:1

**i**

**idea** 44:18 96:17
 109:15 119:10
 144:10 153:1 157:2
 159:15 202:13
 224:11 229:7
**identify** 53:15,22
 78:19
**identity** 53:16
 239:15

**ignore** 205:13
**iii** 3:20 241:14,24
**impaired** 83:19
 84:12 85:5
**important** 72:7
**impose** 234:17
**impossible** 219:3,19
**ina** 119:2 121:6,23
 121:24 122:6,22
 132:6,9 136:19
 137:15 138:2,11
 144:1 162:15 175:4
 189:21,25 198:22
 220:15
**ina's** 137:20
**inc.'s** 5:14
**incepts** 163:2
**incident** 159:7
**include** 32:22 50:8
 53:7 81:1 187:9,12
 187:14,17
**included** 178:10
**includes** 113:11
 177:13 184:25
 185:6 186:12
 213:13 220:15
 241:20
**including** 70:8
 184:25 210:19
**indemnification**
 196:10
**indemnity** 3:18
 149:13 164:19
 172:8 176:2 182:24
 193:16 224:25
 225:5,11 241:25
**independent** 10:12
 49:5,9 69:8
**index** 5:1 6:1
**indicate** 20:11 43:23
 49:21 54:5 101:9,21
 101:23 102:5,15,22
 104:13 105:2 106:5
 109:9 112:7,10
 113:24 114:8,11

 163:11
**indicated** 23:17 57:8
 58:23 72:9 75:11,23
 82:17 92:23 105:16
 106:1,17 174:20
**indicates** 22:1 60:7
 61:16 104:20
**indicating** 23:10
 59:7 112:15 146:25
 163:14
**indication** 18:9
 143:1,2 198:7
 233:12
**industry** 46:10 47:6
 77:22 150:3 152:16
**information** 7:1
 20:3 35:5 38:20
 41:5,9,19 50:1
 78:23 82:25 84:2,23
 87:25 88:11 90:6
 94:17 122:8,11
 127:18 131:22
 132:11 133:6,7
 135:10 144:1,21,23
 146:10 155:15
 156:11,14 158:20
 171:12 179:3
 190:17,19,24 191:1
 191:3 194:9,11,11
 195:23 196:4,5
 197:18,24 199:1,7
 199:22,24 200:3,9
 200:19,25 201:6,16
 202:4,5 203:5,25
 204:2 216:7,21
 217:21,21 241:18
**initial** 56:18 59:7
**initially** 18:16 24:4
**initials** 59:2,8
**injured** 205:16
**injury** 117:22 172:2
 172:5,10,18 202:7
**inquiries** 189:16
 194:20 208:13

**inquiring** 220:18
**instance** 2:2 130:19
 132:7 167:25 171:9
 181:12 185:13
 186:1 190:13 193:7
 202:12 203:6
 207:20
**instrument** 239:16
**insulations** 136:21
 137:2,11,19 138:5
**insurance** 1:2,7,14
 1:16,17,19,20,20
 2:3 3:13,19,19 4:1,7
 4:7,7 5:13,18,24
 6:20,21 8:11,24
 12:17,18,24 13:4,7
 13:18 17:1,25 18:8
 19:2,18,19 20:12
 21:20 23:13 25:9
 29:24 31:2 32:3,10
 32:21,22,23 34:25
 35:8 37:11 38:1,12
 38:22,24 39:7,9
 40:6,7,13,14 43:4
 43:10,14,21 44:7
 45:24 46:3,6,10,10
 46:12 47:6,6,7,12
 47:15,21 48:4,20,21
 48:24,24 49:2,20,24
 50:20 51:7,14,20
 54:14 55:11 56:17
 57:20 58:17 59:1
 61:11 63:16 64:2,3
 64:7,8,24 65:11,18
 65:19,20 66:1,3,4,7
 66:12,13 67:13,18
 67:22,25 68:3,4,6
 69:5,19 74:2,3 76:7
 77:1,12,22,22 78:13
 78:14 79:9,10,23
 82:4 88:23 89:6,6
 89:15,22,23,23 90:7
 93:10,21 94:13,23
 97:18,19 98:3,25
 99:1,13 100:16

101:2 104:12,21
106:22 107:10,22
108:8 109:2 111:22
111:22 117:8,11
118:1 128:12 131:5
132:24,24 133:15
134:19,25 137:10
140:2 141:10
142:12 144:4,7
150:3,5,5,7,24
151:14,14,17
152:16 153:16,22
154:2,4,15 157:3
159:6 161:6 164:20
164:21 165:22
166:5,8,13,17,18,23
166:24 167:5,6
169:15,19,23 170:8
170:15,20,21
171:17,21 172:15
172:17,19,20
173:24 174:7,17
175:10 177:8,24
178:9,21,22 179:13
179:14,21,22
181:13,20,21,21,22
182:7,9,13,14,15
183:12,15 184:15
184:16 185:1,16,21
185:23 186:1,2,9
187:7,14,23,23
188:1,3,7,7,11,18,21
189:2,7,12 190:4,9
191:6,10,12,16
193:3 194:5 195:15
197:16 198:15,18
198:18,22,23,24
200:8,13,15,19
202:16,18 203:4
204:5,6,14 206:1,2
207:6,10,16 208:1
209:7,21 211:9,14
211:19 212:4,13,16
213:12 214:22
221:9,10 224:10,24

225:18,19 226:13
228:1,9,10,11,11,13
229:4,15,20 230:1,3
230:17 231:4
232:18 234:5,6,7,16
234:25 235:6,17
240:2,7,14,16,17,19
240:20,20 241:23
242:1,1,2,4,4,5,13
**insure** 205:1
**insured** 78:13 79:9
90:10 126:13 143:6
166:24 170:21
171:20,22 172:22
177:6,8,9 178:7,9
199:3 217:20 228:4
228:7 234:7,9
**insureds** 228:23
229:4 234:5
**insurer** 50:9,21
53:16,17 89:7 106:2
126:10,14 127:22
142:20 143:4,6,7,14
147:15,17 148:13
155:20 156:18
157:11,15,20
221:11 222:16
223:15,20 224:8
227:25
**insurer's** 148:21
**insurers** 47:22
77:23 88:24 147:12
169:13
**insuring** 39:3 44:18
44:23 89:17 92:16
179:19,23,24
180:21 181:3,17
183:24 212:17
213:20,22 214:2,14
226:16 227:13,13
235:4,10,14
**intend** 41:2 174:19
213:6,16
**intended** 173:5
174:20

**intends** 177:7 178:8
**interchangable**
209:24
**interchangeably**
204:15
**interest** 172:22
182:14
**interested** 17:4,7
24:3 242:11
**interesting** 142:4
**interests** 171:22
234:8
**interpretation** 92:15
**interpreted** 96:7
**investigate** 74:2
75:25 76:7 88:1
107:11,22 122:5
126:11,16,18
178:21 179:14
181:8 183:12 193:3
195:5,14 207:6,10
207:16 208:1
225:18
**investigated** 158:24
**investigating** 108:8
108:17 174:9
**investigation** 82:2
89:6 123:18 127:18
128:1,9 129:13,17
129:21 131:6,15
132:10 173:2,23
198:10 199:12,15
199:17 203:12
206:8 207:21
208:14
**investigations**
130:15,18,18
**involved** 15:2 24:4
31:24,25 33:5 64:24
65:19 71:6 78:21
79:16 84:21 139:11
154:25 176:3
189:16 194:15,17
216:20 228:5,10
235:10

**involves** 154:4 172:1
**issue** 57:11 142:20
143:12,13,15,19,22
197:9 211:20 212:5
226:13 227:10
232:5
**issued** 12:17,25 13:4
14:23 15:9 17:1,10
17:25 18:8,13,14
19:2,9,19 20:12,25
31:8 32:10,23 35:8
38:12 41:5 43:20
44:6 50:8,10,20,21
50:22 51:6,13,14,19
52:23 53:23 54:13
55:11 57:20 58:16
59:1 60:9,19,24
61:11,17 63:23 64:8
68:2 83:4 85:16
86:18 93:21 94:13
98:3,8 108:19 110:8
114:22 115:3,4
116:3 127:24 128:2
128:9 131:16 132:9
132:25 134:12,19
135:1 141:12,14
142:7 143:5,7,11,23
144:5,7 154:15
156:19 159:2,20
165:19,21 166:1
169:16,20,20 170:9
171:9,14 177:9
180:10 186:1 189:3
194:24 200:8
202:17,19 210:7
211:19 212:5,25
**issues** 9:11
**issuing** 18:23 27:13
68:2,10 166:13
**items** 5:16 55:9 56:2

| j |
|---|

**jacket** 58:11
**james** 1:24 2:1 5:4
5:14 6:8,19 8:5,16

8:25 37:24 111:21
126:22 139:9
149:11 152:7 238:2
239:1,6,13 240:24
241:4
**jamestown**  5:18
12:17 15:18 16:10
17:1,9,25 18:7,11
18:13,16,20,25 19:1
19:9,19,25 20:5,7
20:18,20 21:5 22:15
35:25 38:12 43:20
44:7 45:24 46:2,5
48:21 49:2 51:7,13
51:15,20 52:23
54:13 55:11,12
57:19 58:17 59:1
60:2,9,24 61:11,18
66:13,18,21 67:21
67:24 76:25 78:14
78:15 79:10 93:20
97:18 98:3,8,25
99:13 100:2,5
101:16 104:15,15
105:16 106:2,6
108:19 109:2
110:16 112:7,11,15
114:9,13,17,19,22
117:10 119:6,12,19
120:1 133:14,19
134:11,18 135:15
135:21 138:13,20
141:12,15 159:20
161:19,20 163:12
173:4 179:8 221:10
222:16 223:14,19
223:22 224:7,11
225:21
**jan**  101:12
**january**  1:24 2:5
5:19,24 6:18 27:25
100:17 101:11,14
103:20 104:14
146:6 163:12 238:3
240:25

**jersey**  3:5 4:10,16
**jim**  222:7
**joanna**  4:14 241:17
242:5
**job**  29:24
**johns**  6:13 124:8
**joined**  74:15 75:4
**jr**  1:24 2:1 5:4 8:5
238:2 239:1,6,13
240:24 241:4
**judge**  214:20
**judgment**  172:20
**judgments**  172:8
**july**  78:15 79:11
97:18 98:4 99:2
112:8 114:9,17
125:18 162:11,13
163:13
**june**  6:6,11,12
101:14
**junior**  8:16 37:25
126:22 152:7
**jury**  214:20
**jyoung**  4:17

### k

**k**  3:21
**kansas**  139:8
**kathryn**  2:6 241:1
242:19
**keep**  93:10 95:7
96:18 108:4 135:7
159:16 183:23
218:12 230:8 231:9
**kept**  94:14 95:6
142:2,5 159:9,17
229:19 232:22,23
233:12
**kind**  8:14 17:6 40:7
42:9 44:24 66:2
69:21 115:4 153:2
154:4,24 156:12
158:2,10 161:11
179:3 180:4 197:2
198:10 204:22

**kindly**  8:21 55:1
100:14 102:25
110:23 111:5,18
113:7 120:7 146:3
151:10
**kinds**  39:19 65:19
205:13
**knew**  12:9 194:1
220:8 221:9,17,18
221:23,24 222:2,9
222:14,25 223:2,4,5
223:6,22,23 224:10
224:11,15,17
**know**  10:3 11:1,4,4
11:5,7 12:6,6 14:4,6
14:10,11 15:2 16:1
16:8,9,21 18:12,17
21:15 23:6 24:14
28:6 30:20 31:15
33:6,11,13,15,20,25
33:25 34:1 35:4,15
35:21 36:18,21
37:12,16 39:12 40:7
42:8 43:16,17,17,23
44:1,5,10,19,20
46:22 47:3 48:10,17
48:18 50:5 51:2,3,5
52:8 54:16 62:12,18
66:9,19,22 70:13,13
70:13,17,25 71:1,1
71:13,19,21 72:6,7
76:3 82:18 83:3
86:1,3 87:21 90:19
92:11,12 93:19,23
93:23 96:4,4 99:10
99:11,19 100:3
101:14 105:6,11,15
105:25 106:17,24
107:14 108:13,16
108:22 109:1 110:6
111:7 112:11
113:15 114:12,18
114:19,24 115:3,7
116:3,4,8,10,12,14
116:23 122:20

124:13,16 127:10
128:16 136:25
137:8,14 141:18
142:1,12,14 144:17
144:24 145:9
146:23 147:21
148:8 149:17
152:20 153:2,8
154:23 155:8,17
156:12,16,23,24
157:1,3,9,14 159:10
165:24 168:17
175:5,9,10,20 182:3
191:4 194:6,18,19
194:19 195:7,16
196:20,21 197:17
197:20 199:6
201:22 202:6,8,10
202:11 208:16
209:10,23,24
214:13 215:8,16,19
216:5,6 222:18
223:10,14,17,19
226:16,17 228:25
229:10,19,20 230:5
230:9,23 231:12,24
232:21 233:5,6,6,7
233:8,15
**knowing**  158:15
**knowledge**  12:23
18:6 30:14 39:10
50:3 63:16 64:3
71:5 74:14 77:21
175:18 190:17
191:24 209:15
**known**  39:24,25
152:15 202:17
209:10 222:1,3,5,9
222:10 223:1,10
239:13
**knows**  86:1 141:25
200:8
**kotula**  3:14 5:5 8:8
8:17,20,23 9:2,23
10:6,7 12:21 13:3

13:12,24 14:3,7,21
15:4,14,19 16:12,19
17:14,21 18:6,22
19:8,17 20:2,11,21
21:16,25 22:6,13,19
22:23 23:6,11,23
30:2,9,22 31:5 32:2
32:9,16,19 33:6,13
33:20 34:5,15,24
35:7,15,20 36:10,17
36:18 37:2,12,17,18
37:20 38:3,18,23
40:17 41:4,24 42:3
44:16 45:1,7,11,16
46:9,16,19,24 47:5
47:20 49:7 50:2,7
50:18 51:5,11,18,24
52:8,13,17,23 53:2
53:6,14,21 54:3,10
54:21,25 55:6,13
56:22 57:16,18,23
58:3 59:6,13,19
60:1,12,23 61:3,8
61:15,22,25 62:15
63:2,21 64:12,22,23
71:15,22 72:2,4,17
73:18,22 74:20,24
75:3,7 76:11 77:10
77:16,21 78:10
79:20 81:9,21,24
83:1,10 85:14,22
86:2,8,13 87:2,5,8
87:12,23 88:14,17
88:21 91:1,7,13,16
91:24 92:3,7,23
93:14 94:17 95:2
96:2,17 97:1,3,8
98:1,15 99:19 100:8
100:13,15,19
102:12,24 103:2,6
105:5,6 110:6,12,22
111:17,20,24
112:18 113:3,6,9,17
115:8,11 116:6,9,17
117:3 118:20,25

120:6,10,13 122:23
123:10,17 124:1,3,4
124:6,9,24 125:10
125:17,19,22 126:1
126:14,20 128:24
129:5,12,16,20,25
130:5,22,25 131:2,5
131:9 132:5,18
133:3,18 134:10,17
134:24 135:4,9
136:2,10,18 137:1,9
137:15,18,25
138:12,17,25 139:4
139:6,11 140:23
141:8,19 142:4,19
143:3,18 144:4,11
145:2,11,20 146:2,5
146:9 147:24
148:19 149:1,8,10
149:15 151:9,11
153:10 154:13
155:1,4,19 156:4,10
156:22 157:20
158:3,8 159:13,25
160:4,15,19,24
161:3,11 162:17,23
163:5,10,25 164:4,9
164:12,24 167:14
178:14 180:6
201:12 209:18
236:23 241:14,23

l

l  4:14 6:8 103:3,3
   241:17 242:5
labor  11:25
lack  136:22
lady's  17:18
landlords  39:20
language  92:16
   105:11 114:14
   171:8 178:9 181:12
   185:12
large  47:14

largely  68:17
late  66:10,23 68:13
   73:14 205:18,19
laurel  3:5
law  3:4 4:2,8,15
   29:10,14,16 33:7
   37:14 63:4 90:22
   148:12 164:18
   196:11 219:4,6,20
   225:6,8,9,10
lawsuit  92:17 96:21
   148:15 152:15
   158:13,19 175:23
   176:8,20 214:20
lawsuits  73:9,13
lawyer  33:11 205:1
learned  94:12
learns  148:14
leasure  3:20 5:6
   91:15,18 162:8
   164:16,18 165:11
   170:13,18,19 174:6
   175:8 180:9 182:19
   182:22 183:4,11
   184:19 185:2,11
   186:5,20,24 188:12
   189:6,10 190:23
   191:3,15 193:12,20
   195:11,12 200:24
   201:20 203:3,9,16
   204:9,18,25 206:17
   206:20 208:21
   212:22 236:21
   241:14,24
leave  67:3,4
ledger  15:21 59:19
   59:22 163:20
   201:10
ledgers  16:20 34:13
left  26:19 69:8,22
   118:21 146:21
legal  21:4 33:18
   34:1 35:21 37:13,16
   90:25 144:9 148:17
   151:1 234:17

242:20
legwork  63:8
letter  5:20,22 6:7,9
   37:24 54:17 82:21
   97:11,16,25 98:17
   99:12,17,20,22
   110:24 111:4,21
   112:17 114:4 115:2
   116:2 142:8,8
   204:20
letters  79:12 81:2,2
   109:18 112:2
   133:11 163:21
liabilities  18:21 21:5
   199:20 200:2
liability  5:17 6:23
   17:2,6,10 18:1
   35:23 36:24,25
   38:21,23 39:6,9,11
   39:12,18,23 40:3,6
   40:7,12,14 44:12,13
   44:13 45:3,13,17,20
   45:21 53:23 54:5,12
   56:5,11 57:19 58:20
   59:1,9 60:19 61:17
   65:19 86:18,20,21
   86:24 96:11 97:17
   97:22,23 99:21
   100:2,5,9 115:15,16
   115:18,19,22,23
   116:8 128:12,13
   131:21 132:3,21,21
   133:15 134:2 144:2
   154:2,4,12 155:17
   157:6 158:13,19
   159:2,6,15,21,23
   163:22 174:25
   184:1,7 213:21
   214:16 221:25
   222:1,11,16 223:11
   223:15,20 224:8
liable  224:24
liberty  1:18 48:17
   240:18

**library**   43:3,6,10,14
  43:19
**lied**   105:20
**life**   45:23 66:1
**liked**   231:22
**likes**   152:13
**lima**   26:19
**limited**   47:16
  174:25 199:19
  200:2
**limits**   22:1 87:3
  134:8 160:22 164:1
  202:24 235:22
**line**   101:3,17 103:16
  103:23 104:10
  106:9,15 108:12
  109:7,10,11 113:21
  114:16 117:6,10
  119:4,5,18,22,22
  120:16 121:5,21
  170:25 221:16
  238:4
**lines**   146:20 222:9
**list**   9:21,21 16:17
  72:18
**listed**   168:10 169:2
  169:14 184:19
**lists**   54:16
**little**   57:7 90:17
  161:12 165:3 210:5
  213:25
**lived**   134:6
**llp**   3:9,15,20 37:23
**locate**   227:25
**located**   220:2
**locating**   187:7
**long**   10:20 28:5,24
  29:12 67:1 80:18
  95:7,20 128:16
  135:10 206:11
  229:7
**longer**   90:17 223:3
**look**   15:21,23 32:14
  33:2 80:9,25 83:10
  83:12 92:13,17

102:11 103:9
  110:17 117:6 126:6
  131:25 145:21
  148:4,8 166:20,21
  167:9 180:14,17
  182:17 186:25
  189:10,21,25
  196:22,24 197:9
  200:14 215:15
  216:16 217:16
**looked**   15:1,5,19,20
  15:25 16:7,20 38:20
  48:7 77:14 79:25
  80:6 86:9,19 101:19
  101:22,24 102:16
  102:18 109:24
  110:1 120:9 128:17
  132:8 161:13,16
  174:10 185:13
  187:20 197:15,19
  198:6 201:20
  207:22 213:8,17
  214:10,13,14
  217:19 219:2 233:5
**looking**   24:3 42:10
  48:11 87:24 107:10
  114:15 173:3,21
  180:19 185:1
  186:12,14 192:16
  229:18 230:20
  231:17
**looks**   101:11 127:8
  151:19
**lord**   149:14
**loss**   171:23 172:23
  204:3 234:9
**lost**   14:8,15,17 30:3
  30:13,17 31:17,21
  32:3,5,11,21 33:16
  33:21 34:8,20 35:1
  35:8,10,17 36:19
  37:5 38:12 49:17
  51:4 69:21 87:14
  127:22 130:24
  136:19

**lot**   48:1 67:5 128:20
  229:5,24,25
**louisiana**   68:20

**m**

**m**   6:13 54:17 55:23
  56:14,18 59:7,23
  124:7 160:20 164:5
**m&c**   39:24 40:1
  44:11,20 45:2,11,12
  45:16,19 46:3 49:2
  49:8 56:18 86:21
  95:10 128:13
  132:21 134:2
  154:13,14,18
  155:20 156:19
  159:6 160:10
  163:24 164:8
  213:21
**macchesney**   5:21,23
  78:21 79:12 81:10
  81:15 97:12 98:19
  100:24 101:2
  103:25 104:5,13
  105:16,19 106:20
  107:5 108:17
  187:21 188:14,24
  189:2,4,15,21,25
  190:3,6,14,18,23
  191:5 194:15 197:6
  198:7 220:17,18
  224:18
**machine**   2:7
**mail**   10:4
**maintain**   89:13
**maintained**   94:12
**maintaining**   71:10
**maintenance**   70:8
  71:19
**making**   91:21
  153:17 160:4 179:2
  193:7
**manager**   93:4
**manifestation**   78:25
  82:23 134:5,7

135:17 136:16,19
  137:20 138:3,4,10
  175:6 219:9
**manifested**   216:2
  218:10
**manner**   108:15
  177:7
**manual**   152:13
**manufactured**
  70:19,24
**manufacturers**
  39:15,23 44:11
  54:12 56:4,11,18
  71:2 149:12
**manufacturing**
  70:14
**manville**   6:13 124:8
**march**   241:11
**margin**   146:21
**margriet**   4:8 241:16
  242:3
**mark**   8:17 37:18
  93:12 130:1 180:3
**marked**   8:19,21
  37:19 40:24 54:24
  55:1,7 57:3,6,17
  65:4 93:13,15 97:7
  97:9,10 98:14,16,17
  100:12,14 102:23
  102:25 103:13
  110:21,23 111:16
  111:18 113:5,7,22
  114:4 120:5,7
  123:25 124:4
  126:19,21 127:2,10
  139:3,5 146:1,3,7
  149:7,9 151:8,10
  160:10 161:24
  163:1 165:1 166:21
  180:5,9 210:24
  212:23
**married**   29:23,25
**marta**   37:21
**material**   82:22
  112:9,24 114:10

195:4
**materials**  9:12 42:5
42:21,25 43:4 63:5
189:22 190:1,4
201:8
**matter**  11:12,17,23
16:3 20:17 37:25
38:9 40:19 42:6
63:4,13 109:25
118:2,5,7,11 122:17
123:1 124:7 127:6
128:8 139:7 149:11
165:17 235:16,19
**matters**  107:19
**mclolaw.com**  3:6
**mcnulty**  4:15
**mean**  12:9 13:22
16:1,7 20:1 23:10
24:13 27:4 28:12
30:6 32:8 34:12
36:25 38:25 39:4,17
43:17 44:25 45:21
46:21 47:9 50:5
51:4 61:22 62:13
71:19 73:16 74:18
75:21 78:5,6 80:6
80:23 83:3 84:18
85:7 87:20,21 95:18
100:3 102:15
110:10,18 123:3
124:16 128:11
141:25 142:17
143:1 152:19,25
153:8 154:7 155:15
156:25 157:1 158:7
159:16 161:16
170:5 173:15
175:23 176:21
191:4 192:5 194:18
197:17 199:3
205:12 209:12
211:16 212:1
216:15 217:13
219:12 221:23
225:15 227:23

228:25 229:19
230:8,25 231:1,7
**meaning**  109:8
114:7 116:2
**means**  22:25 99:10
124:17 140:19
**meant**  130:21
**medical**  17:7 113:1
123:23 128:14
159:10,11
**meet**  26:13 28:20,21
**meeting**  6:18 80:4
100:23 103:25
104:1,4,20 105:19
106:18 107:1
108:21 145:7,16,22
146:6 149:2
**meetings**  106:11,14
144:25
**meets**  38:14
**members**  231:20
**memo**  5:25 79:18
81:3,18,21 104:10
163:11
**memoranda**  112:10
114:11
**memorialize**  72:11
**memory**  16:18
**mentioned**  72:5
**merely**  124:19 125:6
**met**  101:1,5,7
104:12 106:19,21
106:23,25 107:4
209:6
**mexico**  68:20
**michael**  3:14 5:19
92:25 241:14,23
**michael.kotula**  3:17
**microfiching**  232:25
**mid**  90:19
**middle**  87:23
**midwest**  164:21
**mike**  31:4
**million**  155:2,25
156:25 204:21

**mind**  106:17 228:7
**mini**  113:11
**minute**  88:18 96:25
139:15 152:21
167:12 205:14
233:19
**minutes**  6:18 28:6
96:22,23 145:7,16
145:22 146:6 149:2
206:17
**misapprehended**
129:3
**misread**  207:8
**missing**  15:8 20:23
22:2,8 30:17 31:17
31:21 32:4,5,11,12
32:21 33:8,16,22
34:8,21 35:1,9,11
35:18 36:19 37:5
38:13 49:17 50:10
52:1 53:16 127:16
135:1
**missphrasing**
227:23
**mistaken**  20:17
21:15
**misunderstood**
185:4
**moment**  108:10
120:9
**money**  48:1 76:2
138:3 154:25 173:1
173:6 178:2 179:2
179:17 216:9,15,16
217:1,6,18 218:2
219:1,7,12,16,21
**montana**  127:1,7
**month**  165:25
215:19
**months**  78:22
133:24
**moran**  5:19 92:25
93:4
**moran's**  93:16

**morning**  8:9,10 10:5
29:3
**morristown**  4:10
**motion**  6:21
**mountain**  4:15
**move**  36:17 69:14
128:24 183:18
**moved**  161:12
**moving**  183:23
**mschaberg**  4:11
**mt**  3:5
**multiline**  65:22
**multiple**  72:4 76:19
**mutual**  1:18,20 4:7
5:18 12:17 17:1,10
17:25 18:8,13 19:2
19:19 20:6,7 21:5
22:15 29:24 38:12
43:20 44:7 45:24
46:2,5 48:17,21
49:2 51:7,13,15,20
54:13 55:11 57:19
58:17 59:1 60:9,24
61:11,18 65:18 66:1
66:3,4,13,18 67:22
67:24 68:5 76:25
78:14 79:10 93:20
97:18 98:3,8,25
99:13 101:16
104:15 105:16
106:2 109:2 110:17
112:8 114:9,17
133:14,19 135:21
141:12 159:20
221:10 240:18,20
242:5

| n |
|---|

**n**  3:1 8:1 103:3
139:8
**name**  8:15 17:19,22
55:9 65:17,23 66:4
66:6,7,9 67:8,12
68:8 75:10 78:21
121:1 139:17 159:9

164:17 187:23
238:2 239:16
**named**  158:13,19
**names**  20:24 21:1
107:17
**national**  149:12
151:14,17
**nature**  10:16 12:12
107:13 157:12
**near**  174:16
**nebraska**  69:18
**necessarily**  27:4
158:7
**necessary**  90:9
193:2 195:14 207:7
**need**  10:1 20:24
33:2,4 35:13 96:24
132:3 153:4 156:22
196:19 218:19
229:6 230:7 231:9
236:13
**needed**  29:23 72:10
130:6 208:17
**needs**  32:14 89:22
**neither**  242:7
**never**  11:8 30:3,7
44:18 45:19 48:19
58:2 64:23 76:20
77:1,6 105:20
117:14 142:23
143:7,11 144:5
155:18 179:7,8
211:8,13,14 213:17
218:9 225:20
231:25
**new**  1:1,20 3:5,11
3:16 4:3,7,10,16
55:12 66:6,7 68:20
68:22 69:1 124:14
124:18 147:5
148:12 158:2
196:11 229:8 240:1
240:20 242:5
**nice**  230:8 232:22,22
232:23

**nicest**  62:13
**nicoll**  5:20,22 78:20
79:12 81:9,14 97:11
97:11 98:18,18
100:23 101:2
103:25 104:5,12
105:16,19 106:19
106:24 107:7
108:17 187:21
188:14,24 189:2,3
189:15,21,25 190:3
190:6,14,18,23
191:5 194:14 197:6
198:7 220:16
224:18
**noise**  179:2
**nope**  209:18
**normally**  45:10
123:15
**north**  1:16 2:8 4:1
5:24 100:16 111:23
137:10 240:16
242:2
**northern**  1:1 240:1
**northwest**  65:18,23
**northwestern**  29:24
65:17 66:1,2,4 68:5
68:6
**notary**  239:23
**notations**  53:7
**note**  57:21 72:8
100:23
**noted**  239:3
**notes**  26:5 109:13
192:10,16
**notice**  5:14 6:14
8:24 9:6 76:21 77:2
77:7,9,12,18,23
78:3,9 81:8,15 84:4
121:23 122:9,17
123:1 124:7,13
126:10,11,15,15
127:23 128:8,17
131:11 142:3 147:6
147:10,11,13,16

155:9,21 179:9
181:13,15 184:16
185:7 186:13,25
191:10,16,22,23
192:1,7 194:25
195:24 197:11,12
200:15 203:17,23
204:4,6,12,20,22
205:9,14,15,18,19
205:20,22,25 206:2
206:5,9 225:21
233:16,17 236:9
**noticed**  204:11,14
208:16
**notices**  205:10,10,11
205:11,12
**noticing**  187:7
**notification**  190:13
**notified**  81:19
121:22 134:1
**notify**  90:4,4 191:5
**notifying**  235:19
**november**  5:20
97:11,13 104:16
**nuisance**  153:17,23
154:19 155:23
156:12 157:4,18,19
**number**  18:7,10
32:20 53:15,22 54:8
54:17 55:21,23
56:14 58:22,23 59:2
59:8 60:8 120:23
121:1,4,8 122:3
123:13 127:15
150:15 160:9,20
180:18,23 182:18
202:24 226:5
**numbered**  2:4 150:1
**numbers**  53:8 54:4
59:15,20 61:10 86:9
123:16 160:17
198:12,14,18,23
199:8 201:16
**nw**  3:21

| **o** |

**o**  8:1
**o'connor**  4:2,2
**o'malley**  1:24 2:1
5:4,14 6:17,19 8:5,9
8:16,17,21,25 37:24
40:20 55:1,3 62:22
63:15 93:15 100:14
102:25 103:13
104:11 110:24
111:18 113:7,22
120:7 124:5 126:21
126:22 127:3 139:5
139:10 146:3 149:9
149:11 151:10
152:7 164:17 180:9
206:20 209:5
214:19 221:13
225:4 238:2 239:1,6
239:13 240:24
241:4
**oaks**  3:10
**oath**  239:14
**object**  14:19 16:6,16
17:12 32:25 51:10
83:6 130:14 225:7
226:14 227:3
**objecting**  58:1
**objection**  12:19 13:1
13:9,19 14:1,5,24
15:10 17:16 18:3,15
19:4,12,21 20:9,14
21:11,24 22:4,9,17
22:21 23:2,8,21
29:17,21 30:5,18
31:23 32:6,13,17
33:10,17,24 34:10
34:22 35:3,12,19
36:16,20 37:6,15
38:16 40:16,25
44:14,22 45:4,9,14
46:7,13,20 47:1,18
49:4,18 50:6,15
51:1,17,22 52:5,11

52:15,21 53:4,12,20
54:1,7,18 56:21
57:1,12,21,24 59:4
59:11,17,24 60:10
60:21 61:1,6,13,20
61:24 62:12 63:1,20
64:11 71:12,17,25
72:3,15 73:17,20
74:16,23 75:2,5
76:9 77:3,13,19
78:4 79:15 81:6,16
81:22 82:20 83:5
85:11,21,23 86:5,11
86:25 87:4,6,10,19
90:24 91:5,11,15,18
91:19 92:21 94:16
94:25 95:24 96:15
96:20 97:24 99:15
100:6 102:7,21
110:2,9,18 112:16
112:23 115:5,9
116:5,7,15 117:1
118:18 122:19
123:7,14 124:21
125:9 126:12
129:14,19 130:13
130:14 131:3,8,17
132:12,13 133:1,17
133:21 134:13,22
135:2,8,23,25 136:8
136:14,22,24 137:6
137:7,12,13,17,23
137:24 138:6,7,16
138:22 140:22
141:7,16,17,24
142:11,24 143:16
143:24 144:8,22
145:8,17 147:19
148:16,24 154:1,22
155:3,11 156:1,5,20
157:17,24 158:6
159:4,22 160:1,11
160:18,23 161:1,10
162:22 163:4,7,23
164:3,7 170:11

174:5 175:3 183:1,7
184:18,21 185:9
186:4,17,22 188:10
189:5,8 190:21
191:2,11 193:11,18
195:9 196:12
200:21 201:18
202:20 203:7,15
204:7 206:15 213:2
213:10,19 214:12
214:25 215:7,9
216:13 217:8 218:5
219:8,24 220:6
222:17 223:7,16,21
224:1,9 226:7 227:1
227:5,11,20 228:21
229:16 230:4,19
231:5,23 232:14,20
233:4 234:19 236:3
236:15
**objections** 91:22
**obligate** 214:9
**obligated** 157:21,25
**obligates** 89:13,16
**obligation** 140:3
154:20 180:2 184:1
184:7,14,23 185:3,7
186:25 191:15,19
191:20 200:14
204:4,5 206:1,7
**obligations** 165:4
214:21
**obtain** 83:21
**obtained** 78:11 79:7
**obvious** 34:3 35:23
38:21 46:21,24 47:2
229:24
**obviously** 13:21
17:5 32:8 34:12
36:23 37:7 45:21
49:19 52:4 78:6
80:6 85:24 102:16
128:22 173:23
233:15

**occasion** 168:20
226:6
**occasions** 73:25
178:19 225:16
226:1,6
**occurred** 215:17
216:2
**occurrence** 95:14,23
95:25 96:8,12 181:9
229:10,15
**october** 37:21 78:15
79:11 98:8 99:2
139:10 162:14
163:1
**offer** 40:22 205:17
211:22 212:9,15
213:16 214:8
226:11,18 227:8
**offered** 11:17
**offering** 12:11 16:3
38:11
**office** 4:10 10:18
93:4 210:16 239:19
**officer** 241:5,19
**officer's** 242:12
**officers** 47:25
**offices** 2:8 10:19
69:1
**oh** 25:21,23 34:17
50:4 55:16 70:3
89:3 96:16 147:2
157:7 209:12 221:2
221:19
**okay** 14:21 15:4
23:16 31:18,19 34:5
34:15 36:1,15 37:2
37:17 38:23 41:15
43:9 49:12 54:10
55:16 57:16 58:3
69:23 70:18 76:11
76:18 86:12 89:3
90:13,16 91:1 92:23
98:1 100:11 101:9
102:12 121:17
123:10 125:5,7,20

126:9 127:12
139:18 143:5,9,10
147:2 148:3,7,11
150:20,22 151:23
164:22 165:7 166:1
166:5,15 168:18,23
169:1,13 170:1,8
171:2,8 172:18
173:8 174:1 177:5
177:22 178:12
179:5 180:3,12,15
180:20,25 181:11
183:11 184:11,13
185:2,4 190:10
191:15 192:8 193:1
193:4,20,25 195:2,5
196:8 199:21
201:23 203:9 204:2
204:9,18 205:7
207:1,15,20 208:5
208:18,20 209:5,8
210:2,5,12,18,23
211:18 212:2,14,20
213:4,15 214:4
215:5 217:10
219:19,25 220:14
220:21 221:15,19
222:12,20 223:3,13
223:24 224:17,20
225:4,25 226:10,18
227:4,17 228:15
230:14,16 231:2,13
232:4,11,16 233:20
234:15 235:8
236:19
**oklahoma** 65:12
68:18
**old** 153:9 178:5
195:25
**older** 74:2,3 75:25
76:7 83:20 84:13
178:21,22 179:14
225:18,19
**olt** 39:21

**once** 24:15 187:5
**ones** 34:11 52:22
  95:22 176:3 220:14
**oobf.com** 4:4
**open** 122:3,21
**opened** 122:17
  123:2,3,6,8
**operating** 190:6,8
**operation** 70:8
  71:10,20
**operations** 45:20
  71:6 132:22 134:3
  154:17
**opine** 12:1,2,5 14:22
  27:9 174:19 218:15
  234:15
**opined** 140:18
  231:15
**opining** 215:3
**opinion** 16:22 18:4
  32:2,10 38:19 78:24
  83:17 85:3,15 88:7
  88:22 89:4,10 96:6
  122:16,25 123:5,8
  123:12,17 127:16
  131:14 133:23
  134:15,21,24 135:3
  136:12,15 140:21
  143:14 150:11
  151:4,6 153:21
  158:24 159:5,23
  166:22 167:2
  170:22 171:5 177:5
  177:11 181:11
  183:8 192:11 193:6
  194:1 203:10,16
  205:18 207:15
  213:11,20 215:11
  215:21 216:9,10,23
  217:5,6,25 218:3
  225:4 234:13
**opinions** 9:13 11:17
  12:11 16:3 38:11
  40:19,22 42:5 62:24
  92:11 95:2,5 164:25

165:3 170:25
  211:22 212:9,15
  213:6,16 214:8
  226:12,19 233:22
  234:3
**opportunities** 84:21
**opportunity** 84:5,6
  110:7,11 153:18
  173:17,19 202:4,22
  202:24 215:15,25
  217:19 222:19
**opposed** 85:13
**opposition** 6:20
  210:14
**oral** 1:23 2:1 240:24
  241:6
**orally** 140:9,12,24
**original** 242:14
**originally** 101:10
  104:14
**outcome** 242:11
**outside** 131:25
  134:8,8 135:18
  136:16 148:14
**overlook** 142:5
**overpaid** 176:14
**owe** 142:25 204:21
**owes** 142:22
**owners** 39:20

---

**p**

**p** 3:1,1 8:1 139:8,8
**p.m.** 2:6 88:20 97:6
  129:24 139:2
  164:14 165:10
  180:8 206:19
  208:25 209:1 237:5
**pacific** 1:2 15:13
  16:15 19:23 37:25
  52:22 75:24 77:5
  79:5 117:25 118:9
  118:13 123:19
  161:16,25 163:2
  165:5 171:13
  175:17 176:9

181:24 189:20
  197:12,15 198:22
  199:7 203:13 209:6
  209:21,23 211:18
  211:23,23 212:16
  213:5,6,7,8,13,16,18
  214:9,9 215:2,6,11
  215:21 216:9,11
  217:5,6 218:1,3,16
  219:6,11,15,20
  220:13 226:12,19
  231:14 232:2 240:2
**page** 5:12 6:4 31:4
  54:11 55:8,15 56:1
  58:8,9,13 69:24
  70:1 73:5,22 83:14
  83:16 87:23 88:22
  89:2 93:15,16
  100:16 103:3,10,16
  103:23 104:10
  105:23 106:9,15
  107:8 108:12 109:7
  113:12,12,20
  114:14,15 117:3,6
  118:21,23,25
  119:22 120:11,16
  121:5,21 125:21
  139:7,24 146:8,14
  148:6 149:24
  150:13 152:1,6
  160:9 166:21
  170:13,25 178:15
  180:17 181:1
  192:22,23 206:24
  220:23,24,25 231:8
  233:21,22 238:4
**pages** 57:13 103:4,5
  103:5,5 109:16
  113:11,12 120:10
  120:11
**paid** 49:20 118:14
  118:17 120:2
  172:17,20 175:11
  175:12,19 176:1,5,7
  176:13,17,18,25

177:2,3 182:25
  186:11
**pain** 130:9
**paper** 68:10 100:17
**papers** 9:9
**paragraph** 70:7
  73:4,22 78:10 82:1
  87:24 89:1 114:21
  127:9 146:14,21
  148:2 150:1,15,19
  152:11 177:5,10
  178:17 183:20
  207:2 220:22 221:1
  221:3 222:13
  224:20 225:14
**pardon** 25:19 26:9
  28:9 43:25 60:13
  88:16 101:6 153:12
  166:7 172:13
  198:16 199:14
  207:7 209:14
**paren** 97:19,19
  98:25
**parentheticals** 56:3
**park** 3:4
**part** 16:21 30:25
  34:19,25 35:9 46:14
  48:14,14 58:4,11
  68:19 70:15 118:17
  129:10 152:5 183:3
  186:19 203:21
  232:4 233:22
  235:10
**particular** 11:11
  16:2,10 35:6 36:22
  57:10 84:6 119:13
  121:25 143:8 144:5
  171:6 172:1,24
  175:22 182:23
  190:18 191:7
  200:16 213:23
  215:17 217:2
**particularly** 34:2
  84:3 173:4 206:10
  208:10

**particulars** 111:4
123:22 128:15
158:1 159:12,12
**parties** 32:14,20
43:21 44:7 50:13
87:17 165:19
166:11 170:23
220:2 232:12
241:20 242:8
**partners** 32:7
**parts** 70:9,23
**party** 1:11,22 3:8
4:1,6,13 31:6,10,13
31:17,20 32:3,22
33:21 34:7,18 37:4
50:20 127:24
142:21 143:5,8
144:5 227:25
240:11,22 241:12
241:22 242:2,4,6
**party's** 34:25
**passed** 29:1 47:14
**pause** 92:4 129:23
165:9 180:7
**pay** 91:8,17 118:7
119:2,7,20 135:15
135:21 138:13,20
142:14 155:16,24
157:7,22 176:10
178:6 182:8 184:1,9
185:24 208:17
225:5,10 235:15
**paying** 172:7,12,14
172:15 182:1,1,9,13
**payment** 149:3
**payments** 172:8
184:3 224:25 225:6
**pays** 235:16
**peic** 73:8,13 74:1
76:6,11 77:11,17
78:12 79:7 81:4,15
82:2 83:17,24 85:24
88:2,6,22 89:5 91:2
92:16 100:18 165:5
176:12,24 178:20

179:5,13,14,16
189:25 192:12,20
193:9 195:12 207:5
207:9,16,25 209:16
209:23 221:8,9,16
221:17 222:4,5,8,14
222:15 223:4,5
224:23 225:17,19
**peic's** 82:2,7
**penalizing** 182:21
182:22
**pennell** 6:13 17:5,9
17:15,23 25:7,11,13
34:2 77:7 78:22
82:4 84:2 117:16,22
118:2,11 119:7
120:2 122:17 123:1
124:7 125:5 128:8
131:12 134:16
135:16,22 138:14
138:21 147:11
158:24 173:21
175:9 194:7 196:16
202:12 207:22,24
208:3 215:24
220:10,12
**people** 15:17 18:10
25:8 31:25 33:2,4
47:25 72:8 121:15
123:16 135:12
138:8 153:10,13
157:2 161:6 203:22
206:9
**people's** 71:3,4
**percent** 172:4 176:1
176:6,7 182:10,13
182:24 193:15,15
**percentages** 217:2
**perform** 76:12
179:6 184:1,7,9
225:20
**period** 16:11 18:19
19:6,15,16 20:16
21:14 50:9,10,11,21
50:23,23 51:7,8,21

52:1,9,19,20 53:24
54:6 59:16 60:25
61:5,5,18 63:18,24
64:4,9 72:13,20,22
79:1 82:24 85:2,2,5
85:17 91:12,13 93:5
95:21 97:17 98:6
131:25 134:9
135:11,18 136:17
141:13 142:6
159:14 160:25
161:4 180:11
219:20 229:7 231:9
**periods** 22:7,11,14
64:25 87:9 161:4
164:5 198:13,14
199:19 200:1
202:25 230:13
**permitted** 148:13
**person** 101:7 107:2
155:1 200:18
239:15
**personal** 39:18
63:16 64:3
**personally** 25:18,20
49:1 108:22 109:1
239:12
**persons** 72:19
**pertaining** 57:12
**pertains** 221:8,16
**pertinent** 120:20
**peru** 26:19
**peter** 6:6,12 100:18
103:3 104:17 120:8
**phelan** 3:9,9 37:23
37:23
**phone** 26:15,17
28:23,25 222:21
236:24
**photocopy** 49:6
**phrase** 39:1 232:9
**physical** 231:8
**picking** 129:25
**piece** 160:8

**pin** 193:8
**pinpoint** 215:12,13
**place** 22:2 47:12
76:20 77:11,17 92:8
196:15 206:8 215:5
**placed** 8:20 47:7
54:25 77:1,6,8 97:8
102:24 110:23
111:17 113:6 128:8
128:12 146:2 179:8
225:21
**places** 33:7 60:2
145:9 196:19
**placing** 120:6 188:7
**plaintiff** 1:3,11 3:3,8
209:6 240:3,11
241:21,22
**plaintiff's** 6:20
**plan** 211:22 212:9
212:15 214:8
226:11,18 227:8
**play** 35:9
**played** 130:11
**plaza** 3:15 4:9
**pleading** 157:15
**pleadings** 17:7
148:14
**please** 36:8 182:18
187:3 220:23
224:21 233:23
236:5
**plenty** 43:2
**point** 18:17 34:4
65:24 66:11 68:9
70:12,21 71:5 72:6
84:20 90:20 95:8,10
125:13,16 136:18
137:19 145:15
154:21 162:16
175:12,20 177:4
178:3,15 179:12
193:19 216:6,25
228:22 229:1
**pointed** 22:20,22
110:14

| | | | |
|---|---|---|---|
| **pointing**   110:12 | 233:13 | 136:16 141:14 | 205:3,5,9,12,15 |
| **policies**   12:16,20,25 | **policy**   5:17 13:7,8 | 142:21,23 143:4,7 | 206:6 214:21 |
| 13:4 14:4,23 15:8,8 | 13:14,15,17 14:8,15 | 143:11,13,19,23 | 216:15 218:8 225:5 |
| 18:13,14,24 19:2 | 14:17 17:2,6,10 | 144:3,5,7 150:5,8 | 225:10 228:4,7,9,13 |
| 20:7,23,25 22:3,8 | 18:1,7,8,9,19 19:7,9 | 154:12,14,15 | 229:14 231:21 |
| 38:13 39:9 40:3 | 19:16,20 20:12,16 | 155:20 156:19 | 234:23,25 235:15 |
| 43:14,19 44:6 46:17 | 20:19,19 21:14 22:1 | 160:9,10,17,20,22 | 235:22 |
| 47:7 50:8,10,20,21 | 22:7,11,14 30:4,14 | 161:3,14,17,18,19 | **policyholder's** |
| 50:22 51:6,13,19 | 30:17 31:8,9,17,21 | 161:25 162:1 163:2 | 191:19 192:4 204:5 |
| 52:1,1,9,14,19 | 31:22 32:1,4,5,11 | 163:9,12 164:1,5,5 | 216:1 |
| 56:19 60:8,19,24 | 32:12,21,24 33:8,16 | 164:8 166:5,8,13,24 | **policyholders**   47:8 |
| 61:4,10 63:17,23 | 33:22 34:8,9,21 | 167:6 170:7,21 | 49:23 230:1 |
| 64:3,8,24 68:3,10 | 35:2,9,11,18,24 | 171:6,9,13,17 | **pollution**   95:8 |
| 74:3 76:17 79:23 | 36:19 37:5 39:2,7 | 177:24 178:10 | **portion**   15:15 36:9 |
| 83:20,21 84:14 85:4 | 39:21,21,24,24 40:1 | 179:12,13,23 180:3 | 129:9 130:11 |
| 85:8,16 86:1,3 88:3 | 40:7,8,14 43:10,10 | 180:10,11,14,17 | 213:23 214:1 235:3 |
| 93:10,21,24 94:2,8 | 43:19 44:5,11,12,13 | 184:6 185:6,13,25 | 235:6,14 236:1,17 |
| 94:8,13,15,23 95:10 | 44:20,21 45:2,11,12 | 185:25 186:16,16 | **portions**   103:4 |
| 95:18,20 96:3,9,13 | 45:16,19,20,24 46:3 | 186:16 192:2 | 120:8,9 |
| 96:19 98:8 108:19 | 46:6 48:20,24 49:2 | 198:12,13,14,14,18 | **position**   136:19 |
| 109:13,25 110:8 | 49:8,17 51:4 53:8,8 | 198:23 199:8,19 | 137:20 157:16 |
| 115:3,4 116:3,13,23 | 53:15,15,16,22,22 | 200:1,20 201:16,16 | 200:9 |
| 116:24 127:15,19 | 53:23 54:4,4,8,13 | 202:17,18,24,24 | **possession**   9:10 51:6 |
| 127:24 128:2,4,10 | 54:17 55:21,23 56:5 | 203:5 204:5,14 | **possibilities**   172:25 |
| 128:10 130:1,15,16 | 56:11,14 57:10,19 | 205:7 206:3,14 | **possibility**   150:7 |
| 130:19 131:7,12,13 | 58:11,20,22,23 59:1 | 211:9,15 212:21,25 | **possible**   14:11 62:14 |
| 131:16 137:21 | 59:2,8,9,15,16,20,23 | 213:12,13,18,22 | 107:2 119:21 120:4 |
| 141:3,12,20 142:6 | 60:8,8 61:10,17 | 214:22 222:1 229:7 | 122:1 171:22 |
| 147:18 159:21,24 | 79:1 82:24 86:9,18 | 230:13 231:8,9 | 172:22 219:3,5,19 |
| 169:13,16,19,23 | 86:21 87:3,9,14 | 234:6,25 235:6 | 219:22 234:8,16 |
| 170:9 173:12,14,17 | 88:11 89:12,15 90:8 | **policyholder**   30:21 | 235:12 |
| 177:9 178:22 | 94:24 95:21,23,25 | 31:1,6,9 33:3 37:8,8 | **post**   4:10 |
| 186:13 189:3,12 | 96:11,11 97:23 98:3 | 37:10 39:3 48:20,23 | **potential**   147:18 |
| 191:16 194:24 | 99:3,20,21 100:9 | 48:25 49:20 77:24 | 148:21 181:14 |
| 198:8,22 200:8 | 101:10 104:13,16 | 78:3 89:20 90:4 | 184:16 185:8 |
| 201:5 202:23 | 106:5 111:7 115:10 | 133:8 142:17 150:4 | 203:17 |
| 211:19,23 212:5,10 | 115:12,16,18,22,23 | 150:6 151:3 154:3 | **potentially**   182:8 |
| 212:17,18 213:7,8 | 116:3,18,20,20 | 157:9,15 166:12,17 | **ppdlawfirm.com** |
| 213:17,21 214:9,11 | 117:8,11,14 127:22 | 167:6 173:9 174:22 | 3:12 |
| 214:13,16 224:13 | 131:20,21,25 132:1 | 175:16 176:22 | **practice**   94:22 |
| 225:19 226:13,20 | 132:2,3,10,16,19,21 | 179:16 181:18,18 | 105:24 107:9,19 |
| 227:10 228:1,20 | 132:21,24,24 | 181:23 182:21,23 | 108:6,14 122:20 |
| 229:4,10,15 230:1,3 | 133:10,11,14,20 | 185:18,20 186:12 | 124:14 147:6 |
| 230:17 231:4 | 134:2,8,8,11,14,19 | 187:10 191:13 | 230:18,25 |
| 232:19,25 233:11 | 134:25 135:18 | 203:21 204:23 | |

**practices** 71:7 88:9
 173:11 182:4
 196:15 202:2
 203:11 216:24
 218:21,23 235:9
 236:8
**preceded** 84:7 111:8
 112:11 114:13,19
**precise** 20:24
**precisely** 112:10
 114:11
**predecessor** 78:14
 79:10 221:10
**prefix** 53:15,22 60:8
**prefixes** 53:8 54:4
 59:16,23 164:5
**premises** 154:17
**premium** 44:15
 186:11 201:16
 235:15
**premiums** 67:6
**preparation** 103:7
 169:16 201:9
**prepare** 28:16
**prepared** 167:23
**preparing** 9:12 27:2
 27:16,17 42:5,22
 43:7 242:14
**preponderance**
 33:23
**preprinted** 55:20
**prerogative** 78:2
 90:1
**present** 73:9 80:11
 80:16 174:7 193:8
**presented** 91:3
 110:16
**preserve** 74:3
 178:22 207:11
 225:19
**president** 47:12
 67:15 69:11
**pretty** 37:1 46:21
 76:5 80:5

**previous** 57:22
 89:23 193:3 195:14
 235:20
**previously** 55:7
 57:14 97:10 98:16
 146:7 161:23 163:1
 167:9 235:3
**price** 46:12,18
**primary** 13:8,10,14
 30:8 37:7 86:1
 141:3,12 159:20
 204:10 205:8
**printed** 55:9
**printout** 21:13
 22:10
**printup** 139:7,12
**prior** 12:25 13:5
 14:4 15:9 16:11
 27:13 41:20 88:23
 97:17 106:12 111:7
 158:13,19 162:11
 170:9 173:24 174:4
 195:6 197:15
 199:18,25 224:24
**pro** 76:1 84:4 137:3
 137:4 161:15,19
 162:15 172:25
 174:21 175:6 178:6
 193:23 195:24
 201:25 208:4 216:4
 218:25 219:10
 224:24
**probably** 28:4 29:4
 46:1 76:1 102:9
 107:16,25 108:11
 113:14 148:25
 165:24 187:19
 223:2,5
**procedure** 2:10
**proceeding** 151:1
 242:9
**proceedings** 42:1
 54:22 88:19 97:5
 129:23 139:1
 164:13 165:9 180:7

206:18
**process** 66:17,25
 70:13
**produce** 9:8 11:6
 142:8
**produced** 2:2
**product** 25:24 26:3
 45:3,13,17 158:13
 158:19
**products** 44:24 45:5
 45:20,21 49:3,8
 70:16,19 132:22
 134:2 154:18
**professional** 65:10
 119:8
**program** 203:5
**promises** 166:24
 170:20 171:16
 234:5
**prompt** 127:17
**proof** 143:22
**proper** 37:13 48:10
 48:12 92:8
**property** 65:20 71:3
 71:4
**proposition** 37:3
**protect** 39:3 171:22
 172:22 181:17,18
 234:8
**prove** 33:21 49:17
 83:19 84:13 85:4,8
 150:5
**proved** 239:13
**proves** 96:21 159:1
 159:19,25
**provide** 63:5 127:5
 140:3
**provided** 16:18
 57:14 99:1,14
 114:16 122:6 140:6
 140:12 162:13
 184:2
**provider** 70:7
**provides** 162:19

**providing** 35:5 48:3
 71:10
**proving** 30:17,23
 31:22 32:4,11,20
 33:7,16 34:20 35:1
 35:10,17 36:19 37:5
**provision** 89:12,15
**provisions** 179:12
**public** 239:23
**pulley** 17:19 147:23
 160:13
**pulling** 183:9
**purchased** 63:17
 64:4 66:19
**purchasing** 44:11
 46:12 48:20,24
 64:24 190:8
**purported** 127:15
**purporting** 54:11
**purports** 56:10
 58:16
**purpose** 27:22
 152:12
**purposes** 188:6,9,17
 189:6 190:12 204:3
 209:25 239:18
**pursuant** 2:9 9:6
 165:18 196:11
 241:18
**put** 15:17 78:3,8
 81:8,15 84:3 126:11
 126:14 127:22
 128:17 142:3 191:9
 191:12 192:6
 194:25 195:23
 197:10,12 203:22
 204:20 227:5
 233:15,17 236:9
**putting** 121:23
 122:9 186:13

| q |
|---|

**qbe** 1:14 2:3 3:13
 5:13 8:12,24 240:14
 241:23 242:14

**qualification** 57:22
**quantum** 85:15,19
**question** 12:22 34:6
34:14 36:2,2,4,5,7
36:10,11,14 46:14
49:10 62:1,6 93:19
94:1,3 96:2 103:24
104:20,22 105:1,14
105:23 106:24
107:21 108:16
109:16,18 114:20
119:11,14 120:17
120:22,25 121:6,8
121:10 122:2,5,8
128:25 129:1,3,6,8
130:1,3,4,6,21,24
136:5 140:6 150:17
150:23 155:12
156:3,7 185:24
190:22 196:23
203:3 206:23
208:23 212:9 217:4
217:11,23,25
221:22 222:8 224:3
226:4,22 227:7,10
232:4 236:16
**questioning** 232:12
**questions** 7:4 57:12
164:9,23 165:12,15
177:20 197:25
206:21 208:22
209:8 212:3 221:7
223:9 227:22
236:20
**quick** 41:23 96:25
167:8 177:20
180:13
**quickly** 106:16
**quite** 12:22 26:19
46:15 50:17 75:10
168:25
**quote** 47:4 83:17
101:1 112:6 114:8
127:13 146:22
150:2,16,23 152:12

152:16 224:24
**quoting** 150:18

**r**

**r** 2:6 3:1 6:9 8:1
103:3 139:8 241:1
242:19
**radiator** 57:20
**radler** 3:15
**raise** 57:11 150:7
**ranalli** 6:6,12 25:15
79:17 100:18,23
103:3 104:17
106:10 109:7,24
110:13 120:9
121:21 132:6
198:17
**ranalli's** 81:3 103:6
120:13 121:15
163:10 198:1
**rata** 76:2 84:4 137:3
137:4 161:15,19
162:15 172:25
174:21 175:6 178:6
193:23 195:24
201:25 208:4 216:4
218:25 219:10
224:24
**rate** 42:13
**rated** 44:18
**reached** 118:10
**read** 11:20,22 15:14
15:15 36:6,9 46:16
62:15 82:7,14 83:22
94:5 101:13,17
104:8,18 105:9
106:7 108:1 109:5
109:22 111:11
112:12 114:25
119:16,24 127:20
128:25 129:7,9
130:2,4,7 140:10
146:25 147:3 150:9
153:4,5 166:25
170:16 171:24

177:17,18,19 181:4
183:20 208:9 210:6
210:7,9,10,12
211:18 212:4 221:6
221:13 224:21
225:14,15,23 226:2
234:1,11 235:23
236:1,14,17 239:1
**reading** 92:8 99:12
104:3,10 114:20
116:1 124:22,24
125:3
**real** 96:25
**reality** 192:5
**really** 11:4 12:6
29:23 44:17 70:25
96:4 152:20 158:11
**realm** 197:22
**reason** 56:24 59:10
72:20 94:20 119:10
119:21 120:1,4
134:4 141:22 154:8
196:21 218:15,23
238:4
**reasonable** 51:4
140:3
**reasons** 119:19
181:16
**recall** 14:13,14
15:24 18:11 19:7,16
22:12,13 25:14 30:6
58:5 60:3 66:10
67:12 68:1,13,14
72:16 75:21,22
77:15,20,20 80:2
81:7,25 83:7 103:24
106:10,19 110:5
124:11,12 127:8
144:13 145:10,11
145:13,14,24 147:7
149:5 153:8 158:11
158:11,15 162:4
169:3,4,7,25 170:1
187:22 226:9

**receive** 29:14
**received** 28:13
41:19 96:13 113:1
122:16 123:1
146:17 194:20
**receiving** 202:6
**recess** 42:1 54:22
88:19 97:5 139:1
164:13 206:18
**recites** 149:2
**recognize** 85:19
103:17
**recognized** 30:13
**recollection** 20:15
80:3,11,16 103:18
104:1,4,6 105:8,13
105:18 106:13,18
107:1 108:20,25
109:4,17 130:9
**recommended** 24:2
24:15
**reconstruct** 34:14
**reconstructed** 13:22
**record** 8:15,23 9:20
11:6 37:20 42:3
54:21 55:6 57:4,12
57:18 60:16 100:15
103:2 104:17
111:20 113:15
120:10 124:6
125:25 138:25
139:6 146:5 149:10
151:11 180:6
208:24 209:20
227:6 231:7 241:6
241:20
**recorded** 130:11
**records** 9:9 32:8,15
35:14 63:12 78:11
78:18 79:6 98:24
99:6 101:9,19,22,23
101:24 102:2,5,15
102:20,22 104:13
104:21 105:1,7,12
105:15,25 106:1,5

107:9,19 108:7
109:8,9,13 112:6,14
112:20,22 113:23
114:8 163:11 221:8
221:17 222:13
**recovery** 177:7
178:8
**redacted** 57:9
**reduced** 85:17
**refer** 31:10,12,16
43:6 58:7 65:3
69:23 73:4 106:16
113:20 118:20
127:9 149:24
150:15 152:5
**reference** 59:20
97:22 117:16
126:25 149:19
151:21 173:21
177:23 187:6 226:4
**referenced** 189:11
**references** 220:14
**referencing** 99:16
**referred** 58:8 75:8
117:17 213:25
220:15
**referring** 15:7 40:17
52:21 62:3 79:11
82:12 97:23 103:12
111:13 114:3
146:10 207:20,23
207:25 208:8
210:23 214:1
218:13 224:15
229:11 232:1
234:25 235:2
**reflected** 223:4
**refrain** 156:5
**refresh** 104:4 153:3
**refuse** 207:6,9
**refused** 207:16
208:1,5
**regard** 12:15 83:18
231:16

**regarding** 17:8,15
24:11 47:23,24 51:3
82:4 106:12 107:9
107:19 108:7,23
109:3 189:3 213:11
**regency** 2:8
**regional** 69:15
**reimbursement**
175:15
**reiterated** 37:9
**rejected** 137:20
138:5
**related** 171:23
172:23 190:4 234:9
242:8
**relates** 22:7
**relating** 127:18
**relationship** 10:17
66:12 197:3
**relevant** 9:10
**relied** 63:4
**rely** 16:13
**relying** 16:23
**remember** 17:18
25:15 27:20 28:7
60:5 72:10 110:13
139:17,20,21 141:1
151:19 158:16
170:6 187:2,22
189:13,15,19 198:2
198:4
**render** 193:6
**repair** 70:8 71:19
**repairing** 71:10
**repeat** 130:25
226:22
**repeated** 207:12
208:6
**repeating** 228:8
**reply** 107:6
**report** 5:15 9:11,12
9:22 11:20 14:25
26:1,2 27:3,11,13
27:16,19 28:3,13,13
37:24 38:5,9 40:18

40:20,23 41:6 42:6
42:22 43:7,8 65:4,9
69:10 72:19 73:23
82:1 83:14 88:22
92:24 103:7 104:3
105:20 106:4,21
117:17 126:21
127:6,10 165:1,13
166:16,20 167:10
167:23 169:16,21
170:9,14 178:15
192:12 206:25
210:7,20,21,23
220:22 223:4
233:21
**reported** 2:7 146:17
**reporter** 8:2,21 55:1
91:21 92:2,5 97:9
98:16 100:14
102:25 105:4
110:23 111:18
113:7 120:7 129:22
146:3 149:9 151:10
170:16 204:16
235:23 236:13
241:2
**reporter's** 5:9
240:23
**reports** 49:19 113:1
**represent** 8:11
100:4 164:19 209:6
**representative**
65:11 220:15
**representing** 24:22
**represents** 24:25
**request** 75:24
120:18
**requested** 7:1 15:15
36:9 74:1 129:9
178:20 225:17
236:1,17
**requesting** 165:22
166:2
**requests** 207:12
208:6,12

**require** 33:21
179:13 181:12
211:23 212:10
213:7
**requirement** 234:17
235:11,13
**requirements** 192:2
**requires** 185:14
212:12 225:10
**requiring** 184:15
**reserves** 48:11,12
**resign** 69:12,22
**resigned** 69:10
**respect** 20:6 107:21
129:2 165:3 173:11
199:7 213:4 232:18
**respond** 95:19 96:12
**response** 82:17
195:3
**responsibility**
227:24
**responsible** 144:6
**responsive** 136:4
**result** 181:9
**retained** 14:14,17
23:24 151:16
209:19,20
**retention** 24:11 25:4
26:14 63:3
**return** 241:11
**review** 8:4 12:15
25:4,18,20,25 26:7
26:10 35:22 42:7,25
63:6 72:12 79:20
107:10 108:8
120:18 152:21,24
167:21,25 168:7,9
168:12 169:15,19
169:23 170:8 171:6
201:8,10 210:18
**reviewed** 9:12 13:3
24:19 25:14 42:18
42:22 63:22 64:8
79:23 92:24 102:19
102:20 103:6 105:7

| | | | |
|---|---|---|---|
| 105:15 108:19 | 106:7,8 108:1 109:5 | 199:4,5,6,21 200:5 | **rpr**  2:6 241:1 242:19 |
| 113:17 120:13 | 109:22,23 110:1,15 | 200:6,25 201:6,7,10 | **rule**  6:21 |
| 131:19,20 167:9,10 | 111:3,9 112:12,13 | 201:13,15,17,21 | **rules**  2:10 |
| 167:17 168:5 169:1 | 112:21,24 113:18 | 203:3,8 204:6,8,13 | **ruminating**  90:20 |
| 170:1,4,5,5 201:9 | 114:5,6,25 115:1,17 | 205:3,25 206:12 | **ruth**  66:5 |
| **reviewing**  42:5 | 115:25 116:16,17 | 208:16 209:9,19,25 | **rxr**  3:15 |
| 105:12,25 169:4,7 | 117:14,15,21 119:1 | 210:1 211:9 213:9 | |
| **reviews**  58:6 148:10 | 119:16,24 120:3 | 213:18 214:2,3,3,11 | **s** |
| 153:7 163:17 | 121:16,18 122:15 | 215:3 216:12 | **s**  3:1,9 8:1 241:15,21 |
| 177:21 | 123:21 125:14,15 | 219:17,18,21 | **sales**  6:13 124:8 |
| **revisit**  210:20 | 125:25 127:5,20,21 | 220:19 221:7 | **sanctions**  6:21 |
| **rft**  1:5 240:5 | 128:3,6 129:16,18 | 222:24 223:5 | **satisfied**  62:18 |
| **richardson**  2:9 | 131:9 134:7,17 | 224:18,19 225:12 | **saw**  15:11 18:5 |
| 10:13,14,15 | 136:11 137:16 | 225:13,24 226:20 | 21:13 49:6 58:1 |
| **rid**  67:5 154:6 | 138:2 140:10,20 | 226:21 228:20 | 59:25 61:7 74:8 |
| 230:11,12 233:7 | 141:8,15 143:19,20 | 230:3 231:16,22 | 110:19 112:22 |
| **rider**  45:8,12 | 145:16 146:21,25 | 232:10 234:14 | 117:13 144:17,18 |
| **ridge**  4:16 | 147:3,4,18 148:1 | 235:1,4,5,14 236:6 | 144:23 145:1 161:2 |
| **right**  10:10,14,15 | 149:19,24 150:9,10 | 237:3 | 165:24 167:12 |
| 12:21 13:5,6,12,24 | 151:4,5,6,7,25 | **rights**  74:3 88:2,7,7 | 197:21 201:4 |
| 14:4 17:15,17 20:3 | 152:10,18 156:14 | 90:8 178:22 207:11 | 207:18 212:24,25 |
| 20:13 21:18,22 | 160:10,20,25 161:4 | 214:20 219:6 | 233:8 |
| 23:18 26:20,23 | 161:8,9 163:14,18 | 225:19 | **saying**  16:9 19:5 |
| 27:12 37:14 39:18 | 163:19,22,25 164:6 | **riker**  4:8 | 28:11 35:22 36:4,14 |
| 41:20,21,25 42:14 | 167:18 168:13,15 | **riker.com**  4:11 | 40:13 71:15 73:16 |
| 45:23 49:7,10 50:4 | 171:17 172:5 | **ring**  127:4 | 75:21 80:2 82:22 |
| 53:3 55:20 56:8,9 | 173:20 174:3,13,14 | **risk**  111:6 137:5 | 84:10,11,17 85:10 |
| 58:12 59:5,6,13 | 174:17 175:8,11,13 | 191:6 202:18 | 99:13 100:1 115:12 |
| 60:6 61:25 62:3,4 | 175:18,24,25 | **river**  1:16 4:1 | 115:16 116:1,6,13 |
| 63:13 66:20 70:5,22 | 176:12,24,25 177:2 | 240:16 242:2 | 116:19,22,23 123:5 |
| 71:16 73:2 74:6,12 | 178:14,24 179:8,25 | **rivkin**  3:15 | 131:11,18,18 133:3 |
| 74:13,22 76:10,14 | 180:19,22,22 181:2 | **rivkin.com**  3:17 | 133:14 134:18 |
| 77:20 79:6,13 80:20 | 181:3,4,5,7,10 | **road**  2:9 3:4 | 136:25 137:21 |
| 81:11,13 83:22 86:4 | 182:2,4,5,6,10,11 | **robert**  10:13,17,19 | 138:2 141:11 142:2 |
| 86:13,21,21,24 87:5 | 183:4,6,14,21 184:4 | 10:20,23 11:16 24:8 | 143:1,12 157:10 |
| 87:7,12 88:11 89:8 | 184:5,8,12,20 | 29:2 43:3,9 44:5 | 159:11 174:18 |
| 90:10 92:13,14,20 | 185:12 186:6,7 | 107:4 | 175:1 177:14 |
| 92:22 93:7 94:5,8 | 187:13 188:1,4,16 | **roberts**  139:7,12 | 184:24 195:12,25 |
| 97:20 98:7,9,11,12 | 188:25 189:1,14 | 140:15 | 196:9 199:11 |
| 98:13,24 99:8,21 | 190:6,17 191:7,17 | **role**  12:7 33:19 34:3 | 201:24 202:2,21 |
| 100:7 101:1,3,4,17 | 191:24,25 192:8 | 34:19,25 35:9 | 204:19 205:8,9 |
| 101:17,18,21 102:2 | 193:12,17,20 194:6 | 139:14 | 206:3,5 210:14 |
| 102:5,14 103:9,21 | 194:7,17 195:5,6,8 | **rose**  6:13 124:7 | 220:4,7 222:8,14,25 |
| 103:22 104:8,9,18 | 196:14,15 197:7,9 | **roughly**  228:2 | 223:1,2,3,5 |
| 105:9,10,21,22 | 197:13 198:3,5 | | |

**says** 40:6,12 55:10
55:20 56:8 58:23
60:2 62:5,6 69:10
99:6,20 101:1,9
102:15,17,22
104:24,25 106:4,4
106:21 113:23,23
114:7,7,16,19
115:15 116:11
119:18 121:3
124:15 128:15
133:19 145:22
146:13 152:6,11
155:13 162:11,12
163:11,13 170:14
171:20 177:5 181:2
181:5 183:6,21,25
184:6,23,23 185:3
186:15 192:6 194:1
204:21 207:2,5
213:22 214:14
226:17
**schaberg** 4:8 237:1
241:16 242:3
**school** 29:10,16
**scope** 22:4
**script** 113:11
**seal** 239:19
**search** 44:3 88:23
89:5 181:13 184:15
185:7 189:11
194:15,17 198:7,21
200:15,22
**searched** 182:7
**searches** 63:12
189:17
**searching** 62:22
**second** 70:7 91:22
113:4 139:24 150:2
150:16 177:5,10
**secondary** 13:11,22
14:22 15:1,5,11
16:4,13 17:3,13
18:4 19:13,17 21:1
21:9,25 22:7 49:16

50:3,8,13,19,24
51:25 52:3 53:7,9
53:11 59:15 62:23
160:8 163:19
201:12,15
**section** 167:11
**security** 67:8,9,10
67:13
**see** 11:5 12:20 17:3
33:2 34:1 55:13,17
55:19,21 58:16,22
58:24,25 63:9 65:13
70:10 73:10 74:4
76:13,16 77:8,16
78:16 79:2 82:5
84:15 88:4 90:2,3
90:11 93:17 98:20
102:11,19 105:2
109:20 112:8
114:10 117:7,10
121:13 122:5,14
134:4,15 136:4
140:18 146:13
149:22 152:9,17
161:18 163:15
169:13 177:10
178:17,23 179:10
183:2,18,25 197:23
206:8 207:3,13
215:15 221:17,20
225:2
**seeing** 48:11 124:11
124:12 149:5 194:3
**seek** 177:7 178:8
219:6,12,16,21
**seeking** 31:16,17,21
32:22 34:8,18 50:13
87:17 127:25
142:21 143:5,8
181:6 192:21
227:25 234:17
**seen** 9:2 11:8,10,11
11:11,12 38:3 45:19
45:23 46:2,5 49:2
55:3 57:9,16 58:2,3

97:14 98:22 100:19
111:1,24 117:14
124:9,11 144:15
149:15,17 231:22
233:12
**self** 47:22
**send** 11:7 25:6
**sends** 204:20
**sense** 130:3 153:23
**sent** 24:18,19,20
25:3,11 82:3 210:13
210:15
**sentence** 70:7 105:2
146:14,21 150:2,16
166:22 171:3,4,19
177:19,24 193:5
221:20 225:25
**sentences** 234:3
**separate** 23:12 24:5
24:9
**september** 5:22
27:20,21 37:24 41:6
41:20 55:12 98:18
99:17 126:24
169:17 170:10
**series** 187:20 197:25
**seriously** 110:4
**serve** 14:15 24:16
**served** 30:3 64:1,6
87:14 126:2 145:22
217:20
**services** 70:8 71:11
71:20 184:2,8,9
**serving** 47:16
**set** 27:24 40:19,23
42:21 43:1 157:14
211:12
**settle** 155:4,24
157:22 181:9
**settled** 149:3 160:12
179:18 193:23
215:14 217:3
**settlement** 118:10
118:14,17 138:20
153:23 154:5,11,20

155:24 156:13,25
157:19,19 158:2
172:21
**settlements** 153:17
157:4 172:8
**settling** 158:9 202:1
203:1
**seven** 67:11 165:15
**share** 176:19 178:6
195:24 201:25
202:18 204:3 208:4
216:4 218:25
224:25 225:5,11
**shipman** 3:20
164:18
**shop** 47:3
**short** 165:14 212:22
236:11
**shorthand** 2:7 182:3
241:1
**shortly** 168:16
**show** 19:14 20:23
44:1,2 54:19 80:21
98:24 99:6 123:24
141:14 161:23
**showed** 212:22
**showing** 93:14
98:15 100:13
110:22 124:1
126:20 139:4 149:8
151:9
**shown** 56:14 114:14
**shows** 15:18 49:20
58:11 201:16
**shumaker** 138:9
**sic** 9:1 220:16
**side** 30:7 118:22
180:22
**siegal** 3:4
**sign** 8:4
**signature** 5:8
103:19 238:1 239:2
241:10 242:19
**signed** 24:5,7
100:17 104:17

**significant** 119:7,9
**simply** 89:25 129:20
  133:10 143:15
**single** 71:23 72:2
  160:8 162:18
**sir** 8:20 10:8 22:23
  29:8 38:4 42:3
  44:16 46:19 47:10
  49:13 54:25 56:6
  57:16 58:14 70:2
  75:17 80:14 88:21
  97:8 98:2 100:13
  102:24 111:1,17,25
  113:6 116:9 120:6
  124:10 125:19
  146:2 149:16
  151:16 152:1 156:5
  158:23
**sit** 49:1 86:2 87:5,9
  105:14 223:13
  224:6
**situation** 158:10
**six** 67:11 173:20
**slow** 105:4 204:16
**slower** 170:17
**small** 154:11 157:22
**soco** 6:15 126:23
  127:6,14
**sold** 67:6 127:15
**sole** 230:14
**solely** 63:4
**solutions** 242:20
**somebody** 48:9
  110:16 128:17
  154:3 185:23
  194:23
**somewhat** 60:4
**son** 69:15
**sorry** 15:16 89:1
  92:2,6 105:5 114:2
  118:23 130:8,24
  136:25 142:15
  168:4 170:18,24
  177:16 187:4
  188:20 204:18

  214:4 222:2 224:4
  228:6 232:4 234:21
**sort** 15:3 28:14,15
  41:9 44:24 63:11
  186:14 211:13
**sounds** 51:2,4
**source** 23:12,13,16
  72:2
**sources** 72:4
**southwestern** 67:7
  68:19
**speak** 27:2 28:5,24
  110:7 168:20,23
  189:4 227:17
**specific** 21:8 48:3
  77:15 169:15 192:1
  207:25 215:18
**specifically** 19:7,16
  20:15 21:8 77:24
  109:8,12 164:25
  165:2 170:6 184:6
  207:23 233:6,7
**speculation** 136:23
  162:18 220:4
**speedwell** 4:9
**spent** 42:5 173:20
**spoke** 26:24 27:7
  28:19 107:3
**spoken** 63:15,21
  64:1,6,13,23
**spread** 202:11
**stack** 228:24
**staff** 171:21 234:7
  234:15
**stamp** 100:18
  103:13
**standard** 34:1 35:21
  37:13,16 38:15 45:2
  45:16 47:11 67:13
  69:5,11 211:11
**standards** 33:15
  83:19,25 192:13
  211:12
**standpoint** 21:4
  47:2 177:25

**start** 10:10 72:24
  130:8,9 207:7
**started** 130:14
  179:2 193:22
**starts** 200:22
**state** 2:7,9 8:14 65:9
  73:25 83:16 127:13
  150:16 166:16
  178:19 186:21
  192:22 239:9,24
  241:2
**stated** 166:24
  170:21 234:5
**statement** 21:3 62:8
  62:10 63:2 74:7
  75:8 76:15 83:24
  147:25 170:22
  171:5
**statements** 10:7
  11:1,2,5,9
**states** 1:1 6:15 58:19
  67:11 68:21 90:23
  97:16 98:24 112:6
  126:23 151:12
  166:22 186:21
  240:1
**step** 90:19
**steps** 193:2 195:14
  207:7,10
**stick** 219:14
**stipulations** 5:3 8:3
**stock** 66:18,19
**stopped** 75:19
**story** 154:10
**strapped** 67:5
**street** 3:21
**strictly** 17:14
**strike** 36:17 128:24
**stuff** 39:19 42:10
  123:20 195:25
  229:7
**styled** 2:4
**submitted** 241:8
**subpoena** 166:2

**subpoenas** 165:18
  165:21
**subscribed** 239:16
**subset** 46:1
**successor** 19:19
  20:5 21:4
**sued** 146:24
**suggest** 119:11
  162:17
**suggesting** 202:16
**suit** 66:2 126:9
  146:18 147:9,16,22
  181:6,9,19
**suite** 3:5,10,21
**suits** 186:12
**sum** 157:23
**summarize** 60:17
  232:11
**summary** 69:23
  70:6 73:5 144:18
  178:15
**summons** 124:7,13
  124:19 125:6
  126:10,15 145:22
  146:18 147:6,10,11
  147:13,16 148:1
  155:9,21
**sums** 184:1,9
**supplementary**
  184:3
**supplied** 121:24
**supplies** 70:9
**supply** 1:6,10 3:8
  5:21,23 23:25 38:1
  55:10 101:10
  104:14 240:6,10
  241:22
**support** 6:19 20:23
  74:6 80:1 162:19
**supports** 71:23
**supposed** 135:13
  153:10,13
**sure** 24:8 26:19
  41:24 43:12 46:15
  60:16 66:17,24,24

75:10 78:1 83:11
87:20 95:25 97:3
101:15 125:21,24
130:16 135:14
146:23 158:5
168:25 169:12
174:12 175:4
181:15,25 184:10
192:9 219:23 221:6
227:5 232:6
**surprise** 141:4
**surprised** 141:2
**surprising** 142:9
**suspect** 11:7 24:1,13
152:25
**sworn** 2:4 8:6 241:5

**t**

**t** 139:8
**tail** 19:6 95:7 206:11
229:7
**take** 5:14 8:24 20:18
41:23,24 69:18
88:15,17 91:25
96:24 145:21 148:4
148:21 152:21,24
153:3,11,13 167:8
180:13 206:17
207:6,10 221:20
226:2
**taken** 2:4 5:19 6:6
6:10,12 66:9 75:10
110:3 168:17
241:19 242:10
**takes** 89:20
**talk** 191:22
**talked** 26:21 27:4
28:1,2,4,12,12 29:3
80:22 147:5 163:24
183:9 186:5,24
**talking** 15:6 56:4
58:13 62:13,18 77:5
91:12 110:4 112:2
122:21 125:18
130:14,16,17 153:1

154:9,12,24 157:2
157:19 162:6
172:25 173:15
180:4 191:23 192:1
192:15 195:10
200:12,13 205:24
205:25 206:1,10
219:9 223:11,12
**talks** 184:24
**team** 30:19,24,25
34:19,25 35:9 37:9
78:5 186:25 187:5,9
187:18 227:23
228:6 231:20 232:8
232:13 233:2
**technical** 130:12
**telephonically** 4:5
4:12,17
**tell** 21:12 24:15
27:24 28:1 36:12
40:9 42:4 49:13,16
65:15 89:18 96:5
97:22 99:12 100:8
101:11 109:19,24
115:18,23 157:12
178:3 180:4,16,25
196:8 220:23 221:3
231:10 233:23
**telling** 133:22
198:17,21
**tells** 186:21
**tenants** 39:21
**tenor** 89:4
**tenure** 88:24
**term** 94:24 187:5
221:11
**terms** 32:5,12,21
33:8 36:19 37:1,5
112:3 127:19 128:4
128:10 204:14
209:24,24 226:12
227:9 232:17
**test** 16:18
**testified** 8:6 14:7
35:16 43:13 50:7,18

51:24 53:6,14,21
56:22 74:10 82:16
83:2 93:9 94:14
100:22 120:14
140:23 141:19
144:11 152:8,12
167:21 182:3 201:4
204:4 210:5 211:10
211:25 214:8 215:1
226:11,15 227:8,12
228:15,16,18
230:13 231:2
233:10 235:2
**testify** 41:3 71:9
172:3 205:17
**testifying** 47:16 51:3
156:5,6
**testimony** 6:17 9:6
14:9,12 30:3 32:9
64:13 72:12 80:9
81:14,18 83:9 114:3
117:20 120:19
121:15,19 125:23
132:8 139:9 140:15
142:1 165:13 166:2
167:19 168:1,5,18
168:21 187:2
189:20 192:10,14
198:6 201:4 203:10
210:6,19 214:17
216:23 220:1,10
227:9,21 229:3,9,13
231:13 233:9 241:6
241:19
**texas** 2:7,9 10:14
67:8 68:18 241:2
**thank** 10:16 49:12
62:21 64:18 92:5
131:4 236:20
**thanks** 128:20
**thick** 23:10
**thing** 15:3 19:22
20:18 21:12,16,18
22:12 28:14,15 30:7
32:7 44:25 92:9

115:8 130:17 134:6
152:22 153:4,6,9
159:8 186:14
196:14 211:13
**things** 48:2 49:25
53:3 71:24 85:9
88:8 110:13 131:23
132:17 152:14
157:5 201:10 220:1
**think** 9:4 10:21 14:9
17:17 18:9,10,16,18
19:14,15 20:24
21:17,18 22:24
23:15 24:1,4 27:19
30:19,24 31:3 33:1
34:19 39:14,18
40:15 42:11 43:11
45:25,25 46:24
48:16 49:5,9 50:4
52:22 53:13 60:4
66:17 72:8,9 74:8
74:10,17 75:9,25
76:4,4,10,10 78:2,8
81:23 82:21 83:13
90:6 94:22 95:1,6,7
96:21 97:13 98:5,5
112:24 120:14
129:2,2,4,5,15
132:14,18,23
139:22 142:7
144:18,24 146:12
157:25 159:13,14
161:18,20 162:14
168:8 173:6 176:18
176:21,25 179:1
180:1 184:22
185:11 187:19
190:5 192:18 195:3
196:5 198:10
199:15 200:18
207:23 208:9,10
214:6 222:6 228:3
230:21 234:1 235:3
237:3

**thinking**  23:13
132:15 162:1
**third**  1:11,22 3:8 4:1
4:6,13 152:5 207:2
240:11,22 241:22
242:2,4,6
**thirds**  150:21
**thorough**  127:17,25
128:9 129:13,17
131:15
**thought**  21:12 36:12
48:10 54:8 66:3
90:19 96:24 191:6
228:7 230:24 231:6
**thousands**  43:17
87:21
**three**  42:9 146:8
159:8 165:24
**tim**  3:12 24:2,21,22
25:3 26:15,17,25
27:2,15 28:19,20
29:3
**time**  9:8 16:11 17:11
19:14,15 26:21
27:20 28:4,11,12
42:4 50:16 64:25
65:16,24 66:12
67:14 68:9,14 69:15
70:12,14 71:2,5,20
78:9 80:13,19 84:6
85:25 88:9,14,17
91:8,9,12,13 93:5
95:10 99:2 106:1
108:16 121:22
125:13,16,17
132:15 134:5
135:11,16,20
136:18 137:5,19
138:14 140:8
150:25 152:24
153:3 156:2 159:14
167:22 169:20
170:9 173:2 174:16
176:7,10 179:20,20
193:7 194:12

196:15 197:3,7
200:22 201:21
202:3,17,23 207:25
208:3,22 212:24,25
215:5,10,20,20,25
216:18 219:20
220:9 221:21 226:2
228:22 229:1,2,17
229:20 230:7,10,21
232:24 241:12,19
**timely**  177:7
**times**  48:7 49:22
155:13 156:7
214:14
**timing**  216:2
**timothy**  3:9 37:22
37:25 241:15,21
**tip**  25:17
**tire**  156:8
**titled**  42:18 57:18
127:6 149:11
**tjm**  1:5 240:5
**today**  9:5,17 24:22
28:17 49:1 105:14
117:20 164:24
165:1,16,18,23
166:15 167:19
212:1,22 213:24
223:13 224:6
226:11 227:8 234:2
235:3
**told**  27:8 43:13
54:10 63:22 64:7
72:17 81:15 102:4
144:19 156:15
158:17 166:1
179:19
**tomorrow**  10:5
**tongue**  25:17
**top**  39:17 55:10 56:1
75:11,22 81:7 103:9
104:22 113:20
119:22
**trace**  18:10

**trail**  6:17
**transcript**  11:22
92:7,25 113:9,18
139:9 241:5,8
242:15
**travelers**  1:15 48:16
240:15
**treatment**  69:16
**trial**  139:9
**tricky**  167:13
**tried**  34:12,12 75:12
75:24 76:20 217:21
**trigger**  95:21 136:20
137:4,20,21 138:4,4
**triggered**  95:11
137:22
**trouble**  69:19
**troy**  1:6,10 3:8 5:21
5:23 8:13 11:3,14
11:18 12:16,24 13:4
14:3,23 15:9 17:2
17:11 18:1,8,12,13
18:14,23 19:1,20
20:13,21 23:25 24:6
24:11,16,25 31:14
34:16 36:2,3,11
38:1,13 44:8 49:14
51:5,12,19 52:8,18
53:3 54:3,13 55:9
59:14 60:18,23 61:3
61:9,16 62:24 63:3
63:16,22,23 64:2,3
64:7,9,14,25 70:7
70:18 71:6,9,23
72:13,19,25 73:13
73:19,25 74:11,24
75:4,14,15 76:6
77:2,11,17 78:13
79:8 81:12,23 82:19
83:19 84:12,22,24
85:3,7,15 86:3
87:18 88:1,2,6,11
88:24 89:7 91:2,7
91:16 93:4,9,20,23
93:24 94:1,7,13

96:18 97:12 98:2,7
99:17,22 101:10
104:13 105:17
106:2,5,11,14
108:18,23 109:3
114:22 117:8,11
118:1,4,10,15 126:2
131:13 132:25
133:8 134:12,19
135:1,22 141:2,11
144:25 145:7 149:2
149:3 158:12,18
159:2,21 165:5
169:20 171:10,14
172:2,2,3,7,12,14
173:1,6 175:18
176:9 177:2 178:19
180:10 186:6 188:3
188:8,14,18,21
189:3,4 190:1,4,7
190:14,19,24,25
192:13,21 193:9
194:10,14 195:8,14
195:21,23 196:20
197:3,6 199:4,22
200:10,19 201:25
202:6,14 207:11,12
208:6 211:19 212:5
212:25 216:10
217:5 218:1 219:7
219:12,16,21
220:16 221:11
222:16 223:14,15
223:18,18,19 224:6
224:7,15,16,23
225:16 227:18
228:16,16,18 230:2
230:16 231:3
232:18,22 233:11
240:6,10 241:22
**true**  38:8 41:8 46:1
46:25 61:8 70:12
80:8 98:12 121:6
122:6 143:8 157:12
234:18 239:3 241:6

**try** 64:22 72:10 78:6
  128:1 156:8 173:5
  173:16 204:1
**trying** 16:12 55:14
  74:17,18,19 76:1,17
  84:24 108:4 174:23
  176:9 183:2 193:8
  194:4 195:20
  235:21 236:11
**tulsa** 65:11
**turn** 42:16 83:14
  117:3 150:13 152:1
  165:14 170:13
  206:21 208:22
  224:20 233:20,21
**turned** 69:17
**turns** 153:24
**twice** 187:5
**two** 68:7 139:7
  150:21 159:8
  163:14,18 181:16
  206:23 208:23
  219:13 234:2
**type** 39:6 53:22 54:5
  55:9 59:9 61:17
  83:4 85:8 86:17,24
  91:24 97:23 99:12
  99:20,20 100:9
  115:18,23 116:4,8
  116:24 163:22
**types** 39:9 49:13,16
  107:9 108:7

**u**

**u** 139:8
**uh** 86:14 99:25
**umbrella** 51:25 52:9
  61:4
**umbrellas** 39:19
**uncovered** 196:19
**underlying** 122:12
  130:18 173:12
  176:1,5 179:9
  193:16 224:22
  225:1,21

**underneath** 183:23
  183:25 234:3
**understand** 9:14
  11:16 21:3 30:2
  31:12 50:16 53:10
  53:18,25 73:2 83:1
  93:2,9 95:12 111:6
  117:13 125:5,10,11
  125:11 126:4
  130:21 142:18
  158:23 176:19
  190:22 216:8
  236:12
**understanding**
  18:20,22,25 23:17
  25:1 30:16 31:20
  34:7 43:15 45:1,7
  52:2,13,16,18 53:2
  53:5 60:18,22 65:25
  66:1,11,15,16 70:18
  70:22 71:18 73:12
  76:25 86:7 87:16
  91:2,6 96:10 114:21
  117:25 118:9,13
  124:22 142:20
  145:4 150:3 175:14
  176:8 178:4 179:4
  214:19 224:6
**understood** 94:7
  192:9
**undertaken** 207:21
**underwriter** 30:10
  30:12 211:13,17,17
**underwriters** 6:20
  47:13
**underwriting** 30:11
  211:11
**underwritten** 211:8
**underwrote** 211:14
**undue** 173:11
**unigard** 1:14 2:3
  3:13 5:13 6:7,9 8:11
  8:23 12:18 15:6,12
  15:18 16:10,15
  18:14,17,20 19:2,7

19:9,10,18,24,24
  20:5,6,12,17,20
  21:4,14 29:25 34:2
  35:23 38:12 43:20
  44:7 48:24 51:7,13
  51:15,20 52:24
  60:24 61:11,18
  65:11 66:5,7,12
  67:1,3,4,8,9,9,10,12
  67:18 68:4,5,7,9,17
  69:1 76:20 77:1,7
  78:13,15 79:3,4,9
  79:17,19 80:6,23
  81:4,8,15,19 82:4
  82:22 85:25 97:19
  99:1 104:15 105:17
  106:2 108:19,23
  110:6,16,20,25
  111:21 112:14
  114:5 117:8 119:6
  119:12,20 120:2
  122:16,24,25
  123:18 128:7
  129:12 131:11,14
  131:20,20 132:15
  132:15,18,20,23
  133:13,19 134:11
  134:18 135:15,21
  138:13,20 140:19
  141:5,10 142:3,12
  144:1 158:24
  159:19 161:18
  163:9 173:4 179:8
  192:6 194:17,19,23
  197:10 198:20
  200:5 203:24,24
  209:17 213:14
  220:9,19 221:9,25
  222:7,10,15 223:8,9
  223:14,19,22 224:7
  225:21 232:3
  233:15,17 240:14
  241:23 242:13
**unigard's** 18:11
  65:15 82:17 83:2

220:2
**union** 47:11 67:13
  69:4,11,18 211:11
**uniondale** 3:16
**unit** 67:20 68:24
  69:2
**united** 1:1 6:15
  90:23 126:22
  151:12 186:21
  240:1
**unpack** 51:11
**unquote** 83:21 94:4
  97:19 99:7 104:7
  114:24 119:15
  140:9 146:24 150:8
  151:3 152:16
  224:25
**unredacted** 57:13
**unrelated** 97:1,2,4
**unusual** 166:3
**upper** 55:19
**use** 43:6 56:17
  209:23 219:13
**uses** 101:21
**usf&g** 127:6,14,16
**usual** 8:3
**utica** 57:20

**v**

**vague** 147:13
  148:22 153:22
  154:10,16 157:11
**value** 153:17,23
  154:20 155:24
**various** 78:11 79:6
**vein** 165:11
**veritext** 242:20
**version** 57:13
**versus** 126:23 127:6
  137:10 139:7,12
**vice** 67:14
**view** 4:15 231:20
**violate** 193:21
  216:11 217:7 218:4

**violated**  83:18,25
  89:5 192:13,17,20
  193:9 195:13 215:2
  215:11,21,23
  216:14,24 218:7,16
**violating**  196:9
**violation**  229:1
**virginia**  149:21
**visit**  26:17
**visited**  26:15
**vs**  6:13,15 38:1

**w**

**w.r.**  67:19,20
**wait**  30:22 84:3
  139:15 187:3
  205:14
**waited**  196:18
**waiting**  134:4
**waiver**  144:6
**want**  31:14 36:6
  52:25 90:15,18 92:7
  92:11,12 113:2
  123:24 125:20,24
  125:25 130:10,16
  133:7,7 149:24
  153:5 156:4,9 157:7
  157:7 164:23 165:2
  165:11 181:20,25
  193:4,4,6 195:16
  204:3 210:21 217:2
  222:23 228:23
**wanted**  48:9 57:11
  60:16 130:13
  202:18 218:25
**wanting**  128:19
  133:6
**washington**  3:22
**way**  40:13 62:14
  64:20 104:4 113:15
  114:21 150:21
  152:6 162:25
  204:19 209:22
  211:6 215:24
  216:25 224:14

229:23
**we've**  40:24 57:17
  65:4 97:8 102:24
  113:6,21 114:4
  124:4 126:20 127:2
  127:10 128:18
  146:2 166:21 167:9
  180:9 182:12
  187:20 213:23
  222:6 231:13
**week**  168:16,17
**weeks**  133:24,25
  159:8,17
**went**  28:18 29:24
  36:12 48:6,7 66:4
  69:8 79:17 80:22
  81:23 133:24 135:6
  137:4 159:8,17
  182:7 189:21 198:6
  198:7 201:1 212:12
  233:5
**west**  6:15 126:23
  127:6
**westlaw**  126:25
  149:19,20 151:21
  151:22
**whatsoever**  59:15
  104:6
**william**  6:9,10 82:10
  111:22 113:10
  135:7,10
**willing**  142:5
**window**  58:10
**wise**  44:15
**withdraw**  212:14
**withdrawn**  212:20
  222:12 228:17
**witness**  2:2 3:8 10:2
  29:19 36:8 42:17
  58:6 69:9 83:15
  88:16 92:6 117:5
  148:10 150:14
  152:2,7,12,23 153:5
  153:7 156:8 162:9
  163:16,17 164:11

177:21 236:4 238:2
  241:4,7,9,10,22
**wl**  6:22
**woods**  4:3
**word**  101:21 204:12
  211:4 221:17,23
**words**  31:7 92:19
  102:19 134:20,23
  184:14 205:20
**work**  10:19 29:24
  47:19,23,24 48:4
  67:1,18 195:22
  210:3
**worked**  10:20 64:13
  72:13
**workers**  120:19
  128:18 131:22
  154:6
**working**  46:9 47:5
  72:25 74:11
**write**  128:20 199:9
  211:2,4,12 222:12
**writes**  159:10
**writing**  140:7 159:9
  159:16 211:6
**written**  24:10,14
  25:24 26:3 105:7
  109:13 140:19
  205:7
**wrong**  147:15
  161:22 229:14,17
**wrote**  37:10 80:8
  105:1 162:15
  221:23 222:13

**y**

**y**  127:16
**yeah**  11:10 13:13
  16:20 21:6,10,21
  25:13,21 27:1,8,10
  27:20 31:14 33:1
  42:12,20 43:11,16
  48:14 50:4 55:18
  56:7 58:15 62:1
  65:5,7 66:8 75:18

79:20 84:16 86:22
  87:11 90:21 97:13
  99:23 108:2 116:10
  117:3 119:14
  123:11 124:23
  139:25 140:17
  145:2 147:2 148:11
  161:13 162:11
  163:8 174:12,15
  177:16,18 181:15
  186:8 192:24,25
  193:13 195:19
  198:9 200:1,17
  201:14 205:20
  207:4 208:19,19
  210:9 212:19
  217:12 223:22
  228:24 229:12
  230:15 231:19
  233:25 234:23
**year**  29:13 87:22
  97:17 141:13 142:6
  160:24 161:4
**years**  10:21 20:22
  67:2 84:5,19 85:12
  88:12 105:20 110:4
  111:7 112:9 114:11
  127:13 139:22
  141:3 149:17
  151:20 153:1,9
  159:20 173:5,17,19
  178:5 194:3 195:19
  195:20,22 196:1,18
  201:24 202:1,5,11
  216:21 217:16,18
  217:22 218:9 220:2
  223:23
**yep**  10:6 113:16
**yesterday**  28:22
  29:2,6
**york**  1:1,20 3:11,16
  4:3,7 55:12 68:22
  69:1 124:14,18
  147:5 148:12 158:2
  196:11 240:1,20

242:5
**young**    4:14 237:2
241:17 242:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.