UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PACIFIC EMPLOYERS INSURANCE COMPANY,

                    Plaintiff,

    -against-

TROY BELTING & SUPPLY COMPANY,
THE HARTFORD INSURANCE COMPANY and
ABC COMPANIES 1 THROUGH 20,

                    Defendants.

1:11-CV-0912 (TJM/DJS)

TROY BELTING & SUPPLY COMPANY,

                    Third-Party Plaintiff,

    -against-

UNIGARD INSURANCE COMPANY,
QBE AMERICAS, INC., CONTINENTAL
CASUALTY COMPANY, THE NORTH RIVER
INSURANCE COMPANY, LIBERTY MUTUAL
GROUP, INC., HARLEYSVILLE GROUP, INC.,
HARLEYSVILLE INSURANCE COMPANY,
HARLEYSVILLE INSURANCE COMPANY OF NEW YORK,
And BERKSHIRE MUTUAL INSURANCE GROUP,

                    Third-Party Defendants.

**AFFIDAVIT OF JAMES A. ROBERTSON**

STATE OF CALIFORNIA    )
                       )
COUNTY OF ORANGE       )



James A. Robertson, being duly sworn, deposes and states:

1.     I am a consultant specializing in risk management, underwriting, and matters related to customs and practices in the property-casualty insurance industry.

2.     I have been retained in this matter on behalf of Unigard Insurance Company and QBE Americas, Inc. (collectively "Unigard"), through the firm of Rivkin Radler LLP, to provide a rebuttal to certain opinions expressed in the Expert Report of Robert N. Hughes, dated October 5, 2015 ("Hughes Rpt."), and the Expert Report of James E. O'Malley, dated September 30, 2015 ("O'Malley Rpt.").

3.     I understand that Unigard is moving for summary judgment and I submit this affidavit in support of that motion.

### Qualifications

4.     Since 1992, I have been president and chief executive officer of Interisk Limited, 881 Dover Drive, Suite 360, Newport Beach, CA 92663.  I have worked in the property and casualty insurance industry for over 45 years.  My career experience includes working in various casualty underwriting positions for The Hartford Insurance Group, working for both regional and international insurance brokerage firms, working for an independent risk management consulting firm, and as director of risk management and insurance litigation consulting for Coopers & Lybrand, one of the (then) "Big Six" international accounting and consulting firms.

5.     I hold the Chartered Property Casualty Underwriter (CPCU) and Associate in Risk Management (ARM) professional insurance designations.  In addition, my education includes a Bachelor of Arts (BA) degree from the University of Iowa and a Master of Science in

Administration (MSA) degree from Pepperdine University.  I was previously licensed as a property-casualty insurance broker in California.

6.      I have had extensive practical experience with underwriting and related matters during my career.  In the past, my duties have included: underwriting applications for insurance (including primary general and umbrella liability coverages); determining the terms, conditions, rates, premiums and premium rating methods appropriate for risks assumed by an insurer; placing reinsurance on excess limits portions of primary and umbrella liability policies, on portions of the limits exceeding company retention guidelines; performing underwriting audits and compliance reviews; supervising other underwriters and maintaining relationships with insurance agents and brokers; working with and teaching individual methods of rating and setting premiums for property and liability insurance policies; and conducting training classes for underwriters on the terms and conditions of standard coverage forms and other technical matters. During a significant portion of my career I have performed research on various types of underwriting requirements and policy terms and conditions, relating to various lines of property and casualty insurance.

7.      While employed at Warren, McVeigh & Griffin as a risk management consultant from 1975-76 and 1979-83, I was responsible for writing the original version of *The Umbrella Book* in 1976, completely rewriting it in 1978-79 for publication as a loose-leaf reference on umbrella and excess liability insurance, and preparing periodic updates to that publication from 1979-84.  *The Umbrella Book* is one of over 40 publications I have authored.  Conducting research for *The Umbrella Book* provided me with extensive, detailed knowledge of umbrella coverage forms, terms and conditions, and underwriting practices.  During the time I worked on *The Umbrella Book* it became recognized as the most complete, authoritative reference on

3

umbrella and excess liability policy forms and endorsements and the analysis of coverage under such forms.  It was used extensively by risk managers, agents and brokers, lawyers, and insurance carriers.  It also was used as an educational reference for training insurance professionals.

8.     I have also conducted a significant amount of research into the terms and conditions of standard primary liability insuring forms.  In 1985, I wrote and published the first of five editions of *ISO Commercial Liability Forms: A Side-by Side Comparison*, an objective comparison of the Insurance Services Office (ISO) 1973 CGL/1976 Broad Form CGL endorsement and the 1986 occurrence and claims-made commercial general liability forms.  I continued to write and update this publication through its fifth edition in 1990.

9.     I have performed research on many types of coverage forms used by insurance carriers to insure primary and excess liability risks from 1886 to the present.  This research includes the history and development of the policy forms, underwriting practices, and limits of liability with respect to primary, excess and umbrella liability coverages, and the separate development of property damage liability insurance after 1924.  In addition to the history of Comprehensive General Liability (CGL) coverage, I have researched the development of excess and umbrella liability limits and coverages, and the interrelationship of these coverages with key changes in primary CGL forms.  My research on the forms of coverage also has included changes in rating rules and premium determination methods, and related insurance industry customs and practices.

10.     The focus of activities in my career has been mostly on matters related to underwriting and coverage details.  However, I also have had experience related to claims practices and claim handling.  I have prepared specifications for the activities and authority of

4

claims administration firms, as well as performed audits of insurer claim files to assess adherence to good claim handling practices. I have also observed claim handling practices of many insurers in testimony provided by current and former claim adjusters and claim executives in the hundreds of cases in which I have served as an expert over the last 40 years.

11.     Since 1975, I have qualified as an expert witness on many insurance subjects and testified in depositions and/or trials in numerous matters filed in state and federal courts in Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Idaho, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, Virginia, Washington and Wisconsin.

12.     A copy of my curriculum vitae is attached hereto as Exhibit A.

13.     My opinions contained in this affidavit are based upon my extensive experience in the insurance industry and a review of numerous documents produced in this matter, including: the Third Party Complaint filed June 18, 2012; the Hughes Report; the O'Malley Report; summaries of various depositions; and so-called "secondary evidence" of alleged policies. A complete list of documents provided to me is attached to this report as Exhibit B.

### Background

14.     Troy Belting & Supply Company ("Troy Belting") has been sued by several claimants who allege they sustained bodily injuries due to exposure to asbestos, used in products manufactured or distributed by Troy Belting.

15.     Troy Belting alleges that, from 1949 to 1974, Jamestown Mutual Insurance Company ("Jamestown") issued policies to Troy Belting that provided coverage for asbestos bodily injury claims.

16.     I understand that Unigard is the successor to Jamestown.

17.     I further understand that no policies allegedly issued to Troy Belting by Unigard or Jamestown have been located by any party in this case.

### Secondary Evidence

18.     When the actual policy cannot be located, so-called "secondary evidence" of the existence and terms of the alleged policy often is proffered by the party seeking coverage. The reliability of most "secondary evidence" is questionable due to the errors that arise in transcription of information contained in such documents, which are almost invariably created for a purpose other than verifying or describing the terms and conditions of the coverage to which they refer. The information used to prepare such secondary documents often is second-hand or third-hand, and thus, no better than hearsay.

19.     Generally, the documents referencing alleged policies (*e.g.*, premium invoices, handwritten ledger pages, certificates of insurance, etc.), including those from insurance company records that refer to particular policy numbers or policyholders, do not create coverage. Such documents almost always have some other purpose than either providing or even purporting to completely describe the terms and conditions of coverage.

20.     Additionally, these documents often contain errors or incomplete information about the purported policy. Even if the documents proffered provide a reasonable basis to conclude that a policy was issued by an insurer, there may be important unanswered questions about the terms, conditions or limitations of coverage that was provided. Without seeing the entire policy, it is impossible to determine all of the terms and conditions applicable to specific claims, whether there were any applicable endorsements which modified the terms of standard,

6

pre-printed forms, and whether exclusions for a particular risk or product may have been attached to the policy.

21.     Without a complete copy of the policy and its endorsements, it may be impossible to determine whether the policy was terminated earlier than the date specified in references to the policy term.  The policy could even have been returned for cancellation if the insured made alternative arrangements for a second policy around the date the first policy was issued (a frequent practice when a company or its broker "shops" for the best coverage terms or lower premiums available from multiple insurers).

22.     The scant secondary evidence that Troy Belting presents does not establish that Jamestown or Unigard issued CGL policies to Troy Belting, or any policies that would cover the underlying asbestos bodily injury claims, during the period from 1949 to 1974.

23.     I have examined each piece of secondary evidence offered by Troy Belting.  This evidence is insufficient to establish any of the terms and conditions of the alleged missing policies allegedly issued by Jamestown and Unigard.

### Handwritten Ledger Pages and Expense Account Pages

24.     Certain handwritten Troy Belting ledger pages have been produced in this matter for the years 1952-1955 and 1961-1966.  A number of the pages are illegible, but "Jamestown" appears to be mentioned in entries dated May 1954, July 1954, September 1962, September 1963, September 1964, and September 1966.

25.     Troy Belting's expert, Robert Hughes, *presumes* that the information reflected in the ledger pages came from "credible and reliable sources that existed at the time of the writing." (Hughes Rpt. at 8).  The fact that a presumption is necessary calls into question the reliability of

the ledger entries as they relate to Jamestown/Unigard, and highlights the fact that no credible, reliable sources have been presented as evidence of the alleged policies in this matter.

26.     Even if one assumes that the ledger entries are accurate, the entries are lacking essential information, such as the full name of the insurance company, policy numbers, effective dates, limits provided, the type of policy (*i.e.*, whether auto, workmen's compensation, owners', landlords', and tenants' ("OL&T"), manufacturers' and contractors' ("M&C"), comprehensive general liability ("CGL") or some other type of policy), and the terms and conditions of such alleged policies.

27.     Neither Hughes nor the ledger pages themselves explain why Jamestown is only mentioned in ledger pages dated 1954, 1963 through 1964, and 1966, yet it is alleged that Jamestown Mutual provided continuous coverage during the years 1949 through 1974. Premiums are customarily paid annually, and interim premium adjustments during a policy are common.  If Jamestown provided continuous coverage, then the records should reflect premium payments or other adjustments during each year to which the ledger pages apply.

28.     Certain expense account pages produced in this matter show credits resulting from a return of premiums.  (Troy Belting Expense Account Pages, 1959-1960; 1963-1964 [Exhibit 4 to the December 3, 2014 Miller deposition]).   Return premiums commonly result from premium adjustments to workmen's compensation/employers' liability policies, changes in the vehicles insured under an auto policy, and premium adjustments to general liability policies. Most adjustments result from premium audits to ascertain the actual rating basis for the earned premium for the most recent policy period (the written premium on commercial policies is usually based on an estimate of the next year's premium basis).  Premium rebates also may be the result of dividends which are commonly paid to workmen's compensation policyholders.

8

The most common premium adjustments and returns customarily apply to workmen's compensation policies. It is thus more likely than not that the Troy Belting return premiums reflected in the expense account pages resulted from workmen's compensation.

29.     Other documents indicate that Jamestown may have furnished workmen's compensation insurance to Troy Belting during this time. A New York Worker's Compensation Board letter dated August 25, 2009 to Troy Belting attaches employer cards and carrier code conversion charts. The Board's records indicated that Unigard (Jamestown) was providing workmen's compensation to Troy Belting in 1962 and 1964. These dates match the dates of premium adjustments reflected in the ledger pages and expense account pages discussed above in paragraphs 24 through 28. The records also reflect that Troy Belting purchased workmen's compensation from two other insurers in 1969 and 1972.

30.     The ledger pages for the period in question also identify other insurers, including, among others, Metropolitan, New England, and AMICA. This tends to indicate that Troy Belting had relationships with other insurers which could have provided liability coverage during the alleged period.

31.     In my opinion, the scant information found in the ledger pages and the expense account pages is insufficient to establish that Jamestown provided CGL coverage to Troy Belting. Even if it can be shown that liability policies were issued, it cannot be known what type of policies, their effective dates, policy numbers, terms, conditions, limits and endorsements, or whether the claims at issue in this matter would have been covered by such alleged policies.

### Broker Correspondence

32.     I reviewed two letters from Troy Belting's former insurance broker, Nicoll and Mac Chesney, Inc. One is a letter dated November 16, 1977 from Edward Nicoll of Nicoll and

9

Mac Chesney, Inc. to Allen Decker of Troy Belting. The letter states that the liability carrier "for the past ten year period prior to July 8, 1976 was the Jamestown Mutual Insurance Company (Unigard Insurance Company)." One copy of the letter with Bates PEIC 013950 has the July 8, 1976 date crossed out and "10/3/74" handwritten below.

33.     The second is a letter dated September 15, 1978 from Edward Nicoll to Allen Decker. The letter states that "Jamestown Mutual Insurance Company (Unigard Insurance Company) provided coverage from July 18, 1949 to October 3, 1974 at which time the policy was cancelled. Our records do not show the extent of coverage."

34.     The November 16, 1977 letter states that Jamestown/Unigard wrote some sort of undefined "liability" coverage for a 10 year period until July 8, 1976, while the September 15, 1978 letter states that Jamestown/Unigard provided undefined "coverage" from July 18, 1949 – October 3, 1974. The letters do not mention the types of records Nicoll and Mac Chesney had in its files, nor do they mention the type of liability coverage allegedly provided – whether auto, workers' compensation/employers' liability, M&C, OL&T, CGL, or any other kind. In fact, the September 15, 1978 letter states that the "records do not show the extent of coverage."

35.     The fact that Mr. Nicoll did not mention any policy numbers, policy limits, policy periods, or the type of liability coverage, suggests that he did not have any of the policies available for review when he wrote the letter.

36.     According to a letter from Allen Decker to Edward Nicoll dated November 16, 1977, Nicoll and Mac Chesney had ceased acting as Troy Belting's broker as of November 1, 1974. This fact, taken with the scarcity of information provided to Troy Belting by Nicoll and Mac Chesney, further suggests that Nicoll and Mac Chesney had not retained copies of any

alleged policies, nor did they possess much of any detail of Troy Belting's historical insurance coverages as of 1977 and 1978.

37.     Moreover, Troy Belting's own records contradict the claims made in the broker letters in the late 1970s. A letter dated June 25, 2001 from Arnold Jordan, Vice President of Troy Belting, addressed to John Prestage at The Hartford, states that Troy Belting was insured in the 1960s by Fireman's Mutual (U.A.C.) and only in the 1970s by Unigard. The letter also claims that the company does not retain insurance policies "beyond the year that they are in force." Significantly, Troy Belting did not consider the previous statements by the broker in the late 1970s to be authoritative or accurate concerning the prior coverage the company purchased.

38.     In my opinion the scant information found in these letters is insufficient to establish that Jamestown/Unigard provided liability insurance to Troy Belting. They contain inconsistencies regarding the alleged period of coverage. Even if it can be shown that policies were issued, the type of coverage, their effective dates, terms, conditions, limits, and endorsements, or whether the claims at issue in this matter would have been covered by such alleged policies, are still not known, and cannot be known with any reasonable degree of certainty..

## M&C Endorsement

39.     I reviewed an "Amendment of Declarations Items 4&5" endorsement that was produced in this matter, for an alleged M&C Liability policy. The endorsement purports to amend Jamestown M&C policy 63-M29311 effective September 4, 1964, states that the insured is Troy Belting, and purports to add coverage for independent contractors.

40.     An M&C policy is sometimes described as a "monoline" policy. Purchasing a monoline M&C policy by a company like Troy Belting is consistent with the underwriting

practice that would be followed for a policyholder that chose not to purchase product liability insurance or the expanded coverage offered by a CGL form.

41.     As a broker and underwriter in the 1970s, I personally underwrote and issued monoline policies, such as M&C and OL&T policies, to insureds.  In my role as a consultant, I have reviewed many insurance programs which contained monoline policies.

42.     CGL forms were commonly available to businesses in the 1950s and 1960s to cover their risks of loss.  CGL forms were generally available after 1941.  Before the creation of the CGL form, the standard forms of liability coverage were the monoline forms.  Rating bureaus and insurers (such as Jamestown/Unigard) continued to revise and use various monoline forms of coverage and such policies were issued to and purchased by insureds for a variety of valid reasons.  (*See, e.g.,* 1973 Unigard M&C form 2038 [Exhibit 3 to the December 3, 2014 Miller deposition] (attached hereto as Exhibit C); excerpts from *Manuals of Liability Insurance* (New York: Insurance Services Office, 1971) (attached hereto as Exhibit D); Philip Gordis, *Property and Casualty Insurance, A Guide Book for Agents and Brokers* (17th Ed. 1970) (attached hereto as Exhibit E).

43.     The monoline forms of liability insurance are still offered today.

44.     An M&C policy, absent a special endorsement adding products hazard coverage, would not cover a products liability claim, including the underlying asbestos bodily injury claims for asbestos-containing products asserted against Troy Belting.

45.     In my opinion, the scant information found in the endorsement is insufficient to establish that Jamestown provided coverage to Troy Belting that would have applied to the asbestos claims at issue in this matter.  Even if that the issuance of policy 63-M29311 is accepted

as a fact, the endorsement indicates that it was an M&C policy, not a CGL form of coverage. Therefore, it would not cover the underlying asbestos bodily injury suits.

## Board Meeting Minutes

46.     I reviewed several board meeting minutes that Troy Belting relies on as evidence of the alleged policies.  It should be noted that all of these meetings took place years after the last Jamestown/Unigard policy was allegedly issued to Troy Belting.

47.     *Minutes of Directors' Meeting dated January 18, 1977*:  These minutes indicate that Troy Belting was in receipt of a $2.5MM claim against Troy Belting and Horton Manufacturing involving a Horton clutch sold by Troy Belting.  The minutes state that "Unigard…was our Insurance Carrier May 9, 1974, the day Mrs. Daurio was injured…." The Minutes further state that, "[o]ur Liability Coverage at the time of the accident was only $500,000." At this time the minutes reflect that liability limits were increased to $2.5MM

48.     *Minutes of Directors' Meeting dated January 17, 1978*:  The minutes indicate that Troy Belting was in receipt of a $2MM claim against Troy Belting and others by the estate of Henry J. Pennell, and that Troy Belting's "Product Liability Insurance has been increased to $5,000,000."

49.     *Minutes of Directors' Meeting dated January 19, 1982*:  The minutes state that the Daurio claim was settled out of court, and that "Troy Belting's insurance company, Unigard Insurance Company, settled for $2,000."

50.     *Minutes of Directors' Meeting dated January 15, 1985*:  The minutes state that "Allen E. Decker advised that the suit brought by Rose M. Pennell, the estate of Henry H. Pennell was settled out of court on January 7, 1985 for a sum of ($35,000.)  Johnson Asbestos

was to pay ($2,500.) and Insurance Company of North America will pay the rest on behalf of Troy Belting and Supply Company."

51.     Nothing in any of the minutes indicates that Troy Belting was in possession of a policy issued by Jamestown or Unigard.

52.     The January 18, 1977 minutes reference a policy limit for a Unigard policy allegedly in place on May 9, 1974, but provide no other details about the policy, if it in fact existed. The minutes provide no evidence that any Jamestown or Unigard policy was in effect before May 9, 1974.

53.     The January 19, 1982 minutes indicate that Unigard paid $2,000 toward the settlement of the Daurio suit. This does not prove that there was coverage under any Unigard policy, however. It is possible that Unigard merely settled for a small amount as a business decision in order to avoid costly litigation expenses, over both the claim and the coverage. For example, Peter Ranalli, a former INA claims representative, testified that he has settled nuisance claims, and that "…there are many reasons why a carrier may settle a claim and normally any release agreement would contain verbiage that there is no admission of liability." (Deposition of Peter Ranalli dated June 23, 2015 at 96-97.)

54.     It is also common for such settlement agreements to indicate that they do not admit or confirm that the claim is covered under any policy issued by the insurance company.

55.     It is actually a common practice for insurers to settle claims for small amounts, even when the insurer believes it does not owe any duty of coverage, because it is far less expensive than litigating over the insurer's coverage obligations.

56.     With respect to the Pennell suit, the January 15, 1985 minutes indicate that INA paid the entire settlement on behalf of Troy Belting, not Unigard. In light of this fact, no

14

reasonable inference can be made that a Unigard policy existed, let alone that it covered asbestos bodily injury claims.

## Unigard Correspondence

57.     I reviewed correspondence between James Dixon and Frank Neeley of Unigard and William Field of INA regarding a wrongful death claim involving asbestos against Troy Belting by the Estate of Henry J. Pennell.

58.     According to the documents I reviewed, on or after August 24, 1977 Troy Belting received a Summons of Suit for the Pennell matter.  (January 17, 1978 Minutes of Directors Meeting).  Following receipt of this suit, Troy Belting's primary liability carrier, INA, apparently requested information regarding Troy Belting's previous liability coverage, and Allen Decker of Troy Belting passed along this request to their previous broker, Nicoll and Mac Chesney. (November 16, 1977 Decker letter and September 14, 1978 Decker letter).  As noted above in paragraphs 32 and 33, Edward Nicoll responded to Mr. Decker's requests on November 16, 1977 and September 15, 1978, indicating that Jamestown/Unigard was the previous insurance carrier for undescribed liability coverage and that Unigard had been notified of the loss. (November 16, 1977 Nicoll letter and September 15, 1978 Nicoll letter).

59.     The fact that Unigard was requesting status updates on a claim for which it had been given notice is entirely within the custom and practice of the insurance industry, even when there are no records of any policy or policies having been issued, or any information regarding what type of policy or policies may have been issued.

60.     In my experience, upon receipt of a claim, most insurers immediately assign a claim number and open a file in which to record all actions related to the claim during the time they investigate the insurer's obligations, if any, with respect to an alleged policyholder or

alleged policy. This is a common, accepted claims handling practice for insurers. For example, INA's former claims representative, Peter Ranalli, testified that "everything we handled as a claim is assigned a claim number," and that he would investigate claims with no identified policy. (June 23, 2015 Ranalli deposition at 46-49).

61.     It is simply good claims practice for an insurer to request information regarding such a claim pending the determination of the existence of any policy or policies even potentially responsive. However, requesting information about the status of a claim is not an admission that Unigard believed it covered the claim. Requesting such information is a necessary part of the process of determining what obligations the company may or may not have, and indicates that the insurer was following responsible customs and practices with respect to determining whether it had any obligations, contractual or otherwise, to Troy Belting.

### Exemplar CGL Forms

62.     Troy Belting, through its expert Robert Hughes, seeks to introduce standard CGL forms developed by rating bureaus and filed on behalf of member insurers as evidence of the terms and conditions of the alleged policies.

63.     Since the only alleged policy document produced in this matter is an endorsement that would only have been used on an M&C policy, it is misleading and irrelevant to cite the standard terms of CGL coverage forms as exemplars that allegedly would have described coverage Jamestown provided to Troy Belting. It would have been more accurate to produce a monoline M&C form, which would have shown that an M&C policy would not have applied to product liability claims.

64.     It is of little or no value to identify an insurer as a member of a rating bureau for the purpose of establishing the coverage terms of missing policies. Member and subscriber

16

companies of the rating bureaus were permitted to use filed "bureau" forms on their policies, but there have always been procedures in place in every state for companies to file their own versions of forms, or to file individualized policy forms, or to modify the standard forms for individual risk underwriting reasons, as warranted by the nature of the risk the company insured for a particular policyholder and the negotiated terms of coverage.

65.     The only consequence of not using the filed bureau forms on a policy was that rating data from such individually modified policies was excluded from the standardized statistical rating, premium and loss data reported for risks insured on bureau forms.  As a result, bureau membership or subscriber status provides no "proof" that a company used any particular coverage form on any particular policy the company issued.

66.     Contrary to the great reliance placed on the use of bureau forms by Mr. Hughes, the existence of such forms provides no assurance of the coverage that may actually have been provided to Troy Belting for any alleged policy period asserted in this matter. One would first have to establish that Jamestown/Unigard issued a policy for a particular policy period.  Then, it would be necessary to determine the terms and conditions of the policy.

67.     The fact that Jamestown issued CGL policy 61-CGL7788 to Utica Radiator Corporation effective from 1961-1962 with "standard" wording does not serve as "proof" that any such policy was ever issued to Troy Belting.  Even if a CGL policy was ever issued to Troy Belting by Jamestown, for which there is absolutely no evidence, the insurer had the ability to use its own "manuscripted" forms.

68.     Furthermore, as mentioned previously, the only piece of documentation produced which contains an alleged policy number reflects that it was attached to an M&C policy, and not to a CGL policy.  Thus, offering sample CGL forms or the CGL policy issued to Utica Radiator

Corporation as evidence of policy language issued to Troy Belting by Jamestown is misleading and is unsubstantiated speculation with respect to the terms of coverage that might have applied to Troy Belting.

## **Hughes Report**

69.     In his report, Robert Hughes states that "more likely than not," Jamestown issued liability policies to Troy Belting for a period from July 18, 1949 to October 3, 1974, and that these alleged policies used "then-current" standard ISO CGL wording, and covered "at least the premises, operations, products and completed operations hazards." (Hughes Rpt. at 3-4). Mr. Hughes further maintains that prior to October, 1974 Troy Belting purchased $500,000 per occurrence limits, and that "[p]rior to that time there is no evidence that Troy purchased primary liability coverage for a limit less than $500,000 CSL." (Hughes Rpt. at 5-6). I disagree with these conclusions for numerous reasons.

70.     Mr. Hughes attempts to support his conclusion by stating "that a significant proportion of [Troy Belting's] business involved the sale of industrial equipment. It would not be reasonable to presume that any company could involve themselves in such a business without having product liability coverage." (Hughes Rpt. at 6.). This is pure speculation.

71.     Many businesses intentionally did not purchase product liability insurance in the years before large jury awards became common, and may not have purchased such coverage after that time, when management believed the business had only a low or slight risk of loss. The first million dollar award in a lawsuit did not occur until 1961, and even after that time such large awards were considered anomalies rather than the typical risk against which a business should protect itself.

72.     A common strategy used by businesses and recommended by many insurance agents and brokers before the mid-1970s was to keep the limits of primary insurance as low as possible, to save money, and purchase a separate excess policy, which was less expensive at that time than the premium that a primary insurer would have charged to increase its limits.

73.     Also, policyholders have a tendency to only increase their liability limits gradually over time.  There is a similar trend in the scope of insurance purchased by policyholders.  Before the introduction of strict liability for all businesses in the distribution chain of products, many non-manufacturing businesses did not perceive a need to purchase product liability insurance and settled, instead, for schedule liability policies such as the M&C and OL&T forms of coverage.

74.     The first mention of products liability coverage being purchased by Troy Belting in the Board of Directors documents that I reviewed was in 1978.  (January 17, 1978 Minutes of Directors Meeting).  Simply because Troy Belting purchased products liability coverage in later years does not prove that Troy Belting purchased this coverage in prior years.

75.     Moreover, it is my understanding that Troy Belting was a distributor of products and that they did not manufacture the items they sold.  It would be perfectly reasonable during the time period in question for a distributor to expect that the manufacturer's insurance would provide coverage for any products liability risk.  It was not uncommon for distributors to secure indemnification agreements and so-called "vendor's endorsements" (added to the manufacturer's CGL policy) from manufacturers for any potential products liability claims.  In this way, Troy Belting could avoid the expense of purchasing what might be considered at the time to be unnecessary, redundant coverage.

76.     The lack of documentation about Troy Belting's insurance relationships with Jamestown or Unigard means that no conclusions can be reached about the type of coverage Troy Belting purchased from the late 1940s through 1974, nor can we know, for example, whether Troy Belting was covered by so-called "Vendor's Endorsements" under the policies of manufacturers, which may have provided Troy Belting with primary insurance protection for product liability claims.

77.     Mr. Hughes refers to Troy Belting's conduct in the mid-1970s and later.  What Troy Belting was doing in the mid-1970s is not sufficient evidence to describe what Troy Belting may have done in the decades prior as it concerns Jamestown/Unigard.  The insurance industry had changed dramatically over the years in question, as had insurance buying practices, due to an increase in litigation in the 1970s.  It was not uncommon for insureds prior to the 1970s to perceive that they had no need for products liability coverage.  Troy Belting apparently had no history of product liability claims prior to the 1970s, and there is no reason to believe the company's management would have perceived a need for such coverage during the period Jamestown/Unigard allegedly provided insurance.

78.     With respect to the "Amendment of Declarations Items 4 & 5" endorsement for an M&C policy, Mr. Hughes questions whether the policy is really an M&C policy, or if it is a CGL policy.

79.     In his report, Mr. Hughes relies on the principle of Occam's Razor – which he generally describes as choosing the simplest model of a given phenomenon – to support his conclusion that information contained in Troy Belting's ledger pages came from credible and reliable sources that actually existed at the time of the writing.

80.     Using the logic of the Hughes Report, Occam's Razor would indicate that if Troy Belting was only purchasing M&C coverage in 1964, the company more likely than not had historically only purchased M&C coverage in all years prior.  If Troy Belting had ever purchased CGL coverage prior to 1964, there would have been no logical reason to revert to a less comprehensive form of coverage in a later period.

81.     The Hughes Report further opines that the use of the M&C endorsement was a mistake and that the incorrect endorsement form was attached to a CGL policy, arguing that in his experience the use of monoline policies, such as the M&C policy, "had almost disappeared" by 1960.  According to the Hughes Report, even if the alleged policy was truly an M&C policy, products coverage "could have (and almost certainly would have) been added by endorsement."  Mr. Hughes also speculates that "Troy Belting continuously purchased products liability coverage…." (The Hughes Report, p. 10.)

82.     These opinions are unsubstantiated by the documents and are illogical using the reasoning applied to other documents by Mr. Hughes.

83.     The M&C endorsement is the only document produced which actually contains a purported policy number, was most likely actually issued by Jamestown, and that indicates the type of insurance Jamestown may have provided.  Despite these facts, the Hughes Report questions its reliability by assuming that it was issued in error and was in fact attached to a CGL policy, despite the fact that nowhere in any documents presented does "CGL" or "Comprehensive General" appear.  He makes no similar statements questioning the reliability of any of the other secondary evidence he cites for his opinions.

84.     Occam's Razor, as explained in the Hughes Report, would seem to require the assumption that the endorsement was the correct form, that it was attached to an M&C policy,

and that only the terms of M&C coverage should be assumed to have been provided, if any conclusions at all are to be reached from the production of this document. These conclusions are the simplest inferences that may be stated about the use of the endorsement, and do not require any further speculation about the accuracy of the document or its use. Using the logic Hughes applied to this endorsement, the accuracy of the ledger pages and broker letters previously cited also should have been questioned.

85.     The Hughes Report is correct that the endorsement reflects that it was attached to an M&C policy, and that M&C policies generally exclude the products hazard.

86.     The Hughes Report fails to mention that an endorsement adding coverage for independent contractors would not have been necessary for a CGL policy, because CGL coverage already included automatic coverage for independent contractors. This fact argues against Hughes' conclusion that the endorsement was issued in error, because no such endorsement would have been used for a CGL policy.

87.     He further presumes, without any evidence, that products liability coverage would have been included because of a presumed, but unsubstantiated practice that Troy Belting "continuously" purchased products coverage. There was never any support for this opinion in any of the documents produced that I have reviewed in this matter.

88.     Mr. Hughes testified that the policy prefix "M" in the policy number 63-M29311, appearing in the M&C endorsement, was to be contrasted with the policy prefix "CGL" in the policy Jamestown issued to Utica Boiler, an entity unrelated to Troy Belting. Mr. Hughes testified "[i]t may very well be" that the Jamestown policy numbering reflects the type of policy. (Deposition of Robert Hughes conducted on January 6, 2016 at p. 98). Because the M&C

endorsement uses an "M" seriously undercuts Mr. Hughes' assumption that the M&C endorsement was issued in error.

89.    Mr. Hughes also refers in his report to correspondence relating to the Pennell claim. The comments in the Hughes Report regarding the lack of a disclaimer or denial from Unigard with respect to the Pennell claim assumes that all correspondence is extant and has been produced in this matter. In fact, it is not known whether all of the documentation that may have existed nearly 40 years ago has been located.

90.    It is equally possible that Unigard only monitored the claim while it conducted an investigation with respect to its alleged coverage obligations. No documentation describes how these actions ultimately resolved. However, we do know that Unigard was not asked to make any payments, and it did not make any payments, for indemnity or defense of the Pennell matter, suggesting that at that time the company did not believe it owed Troy Belting a duty of coverage.

91.    That no denial or reservation of rights letters have been located for the Pennell claim does not prove that such letters were never sent by Unigard, and one certainly cannot draw any definitive conclusions about what Unigard believed about its alleged coverage obligation (if any) in the late 1970s.

92.    Turning to the policy limits, there is no evidence whatsoever to determine what the policy limits were at any time prior to 1974, if Troy Belting even purchased primary coverage from Jamestown or Unigard at all. Policyholders typically increase limits over time. Saying that there is no evidence that Troy Belting purchased limits for less than $500,000 prior to 1974, as Mr. Hughes does, does not prove that Troy Belting never had limits of less than $500,000. In fact, Hughes testified it was not his opinion that the limits can be known for any period before 1974. (Hughes Dep. at p. 130).

93.     Based on my experience, it is highly unlikely that Troy Belting would have purchased liability limits of $500,000 throughout the period from 1949 through 1974.

## O'Malley Report

94.     Troy Belting's claims handling expert, James O'Malley, asserts that Jamestown/Unigard was Troy Belting's insurance carrier from 1949-1974, and that Jamestown/Unigard issued CGL coverage to Troy Belting which would apply to asbestos-related claims.

95.     In his report, Mr. O'Malley refers to communications between Pacific and Unigard that indicate Unigard was given notice of and investigated the asbestos-related Pennell claim, and that Unigard requested information regarding the claim. According to Mr. O'Malley, "[i]f Unigard did not have applicable policies or could not locate an applicable policy, industry standards would require Unigard to notify PEIC and Troy Belting that it does not have records of applicable coverage." (O'Malley Rpt. at 4-5).

96.     Mr. O'Malley appears to argue that the absence of any records in the Pacific Pennell file indicating that Unigard ever disclaimed or denied coverage for the Pennell claim, or that Unigard ever even issued a reservation of rights letter, indicates that Jamestown/Unigard issued CGL policies that covered asbestos claims. Had any such disclaimer, reservation of rights or denial letters been issued by Unigard, such documents would have been noted in the Pacific file because "[g]ood and accepted claims practices would have required PEIC's" documentation. (O'Malley Rpt. at 5).

97.     Lastly, Mr. O'Malley asserts that Unigard would not have continued to investigate the Pennell claim if there "was not applicable coverage issued by Unigard." Based

upon this, Mr. O'Malley concludes that "Unigard issued insurance policies to Troy Belting that provided coverage for asbestos related personal injuries." (O'Malley Rpt. at 6).

98.    I disagree with Mr. O'Malley on a number of points.

99.    The documentation that I have reviewed only indicates that Pacific/INA was told that Jamestown was Troy Belting's previous insurance carrier in a meeting with the former broker, Nicoll and Mac Chesney, or through letters from Nicoll and Mac Chesney forwarded to Pacific/INA. (INA memo dated January 3, 1978 (PEIC 013412); Letter from Troy Belting to INA dated November 18, 1977 (PEIC 013949)).

100.    As discussed above, what exactly was in Nicoll's "records" remains a mystery and does not establish the type of policies, their terms and conditions, or even the existence of the alleged policies. I have seen nothing in the correspondence from Unigard which indicates that it or anyone else was in possession of any of the alleged Jamestown policies.

101.    Additionally, simply because reservation of rights or disclaimer letters have not been produced in this matter in no way proves that they never existed. Mr. O'Malley appears to take it for granted that the Pacific Pennell file is absolutely complete with no missing documentation. It has been nearly 40 years since the events surrounding the handling of this claim occurred. There is no way to know at this time whether the claims documents that still exist are complete or if they accurately reflect all of the actions taken by the insurers (Pacific and Unigard) in the late 1970s.

102.    Mr. O'Malley also takes it as fact that Pacific followed "good and accepted claims practices" in all particulars, and assumes that any Unigard disclaimer or reservation of rights would without question be found in the Pacific Pennell file.

103.    There is no basis for any of these assertions by Mr. O'Malley.  Mr. O'Malley fails

to note that, according to "good and accepted claims practices," denial or reservation of rights

letters would never have been issued by Jamestown/Unigard to Pacific/INA, and there is no

reason why such letters would appear in Pacific's/INA's files.  Jamestown's/Unigard's only

duties would have been to Troy Belting, its alleged policyholder.  Such letters would only have

been addressed to the policyholder, according to "good and accepted claims practices," and the

customs and practices followed throughout the insurance industry with respect to either denials

or notices about the status of coverage for alleged claims.

## Conclusion

104.    There is a material difference between documents that indicate there is some

possibility that an insurer issued undescribed policies to a company, and proving the terms and

conditions of coverage of such policies.  Commercial insurance policies vary considerably from

one business to another.  Generalizations about the types of coverage businesses "typically"

purchased in any period do not establish the terms and conditions of coverage for a specific

business, such as Troy Belting.

105.    In this case, Troy Belting's experts assert that the company purchased CGL

coverage including products liability from Jamestown from 1949 to 1974.  Yet there is not a

single document that has been produced that refers to CGL coverage, nor is there any document

indicating that Jamestown/Unigard provided product liability coverage to Troy Belting.  In fact,

the only document produced that was arguably part of any policy Jamestown may have issued to

Troy Belting is the type of endorsement that would only have been used on, and was only

appropriate for use on, an M&C policy.  That policy would not have insured product liability

claims, such as the asbestos claims at issue in this matter, unless such products coverage was specifically added by endorsement. There is not a shred of proof that this was ever done.

106.   It is my opinion that there is no proof for the assertion that Jamestown/Unigard provided CGL coverage to Troy Belting. The terms and conditions of any policies Jamestown/Unigard may have issued insuring Troy Belting, their policy periods, and limits of liability are unknown. Also, it is not consistent with good insurance custom and practice to speculate about any coverage that might have been provided. Certainly, such speculation is insufficient to establish the duties and coverage owed by Jamestown/Unigard (if any) with respect to the asbestos claims at issue in this matter.

James A. Robertson, CPCU, ARM

Sworn to before me this _14th_
day of March, 2016

NOTARY PUBLIC

27