UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PACIFIC EMPLOYERS INSURANCE
COMPANY,

                        Plaintiff,

       v.                                   1:11-CV-912

TROY BELTING & SUPPLY COMPANY,
HARTFORD ACCIDENT AND INDEMNITY
COMPANY, HARTFORD CASUALTY
INSURANCE COMPANY, HARTFORD
INSURANCE COMPANY OF THE MIDWEST,
and ABC COMPANIES 1 THROUGH 20,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DECISION AND ORDER

       Before the Court are motions for summary judgment by Plaintiff Pacific Employers Insurance Company ("Pacific Employers"), Defendant Troy Belting & Supply Company ("Troy Belting"), Defendants Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, and Hartford Insurance Company of the Midwest ("Hartford"), and Third-Party Defendants Unigard Insurance Company and QBE Americas, Inc. ("Unigard"), in this matter involving insurance coverage for the costs of settling lawsuits related to asbestos exposure. See dkt. ##s 301, 304-306.

## I.    Background

       This case concerns insurance coverage for Troy Belting. Troy Belting is a manufacturer incorporated in New York with its principal place of business in Watervliet, New York. Troy Belting has been named as a defendant in lawsuits alleging bodily injury caused

by exposure to asbestos from products it allegedly manufactured. Settlements in these lawsuits have led to insurance payments, and Plaintiff Pacific Employers and Defendant Hartford seek repayment from Troy Belting for portions of settlements in these lawsuits that the insurers claim they were not obligated to pay. Pacific Employers issued Troy Belting insurance polices that covered liability for asbestos exposure from 1974 to 1984 and the Hartford issued such policies from 1984 to 1992. Troy seeks contribution for any damages from Third-Party Defendant Unigard.

Plaintiff Pacific Employers filed a Complaint in this matter on August 3, 2011. See dkt. #1. Plaintiff filed an Amended Complaint on August 26, 2011. Pacific Employers named as Defendants Troy Belting, Hartford Insurance Company and unidentified ABC Companies 1 through 20. Id. The Amended Complaint seeks declaratory relief concerning the extent of Plaintiff's obligation to defend and indemnify Troy Belting in connection with any asbestos law suits. Id. at ¶ 1. Pacific Employers also seeks reimbursement for moneys paid on behalf of Troy Belting in prior asbestos litigation. Id. at ¶ 2. Pacific Employers argues that Pacific Employers and Hartford have funded 100% of Troy Belting's indemnity related to asbestos injury lawsuits during the period where Troy has been a defendant. (Id. at ¶ 14). Troy Belting has refused to contribute to settlements on these asbestos claims. (Id. at ¶ 15). Pacific Employers claims that Troy Belting must contribute *pro rata* for bodily injury claims during the non-insured periods based on time on the risk. (Id. at ¶ 16). Troy Belting has not done so. (Id. at ¶ 14). Count I of the Amended Complaint seeks a declaratory judgment from the Court determining the obligations Troy Belting and the insurance company defendants to indemnify Pacific Employers for funds paid to settle claims. Count II seeks equitable contribution from Troy Belting for any excess funds expended by Pacific Employers

to settle claims.  Count III seeks a declaratory judgment on payment of defense costs.  Count IV seeks payment from Troy of these defense costs.

Troy Belting then filed an answer to the Amended Complaint, a cross-claim against Hartford, and a counterclaim against Pacific Employers.  See dkt. #12.  Hartford answered the Amended Complaint by filing a cross claim against Troy Belting and a counterclaim against Pacific Employers.  See dkt. # 16.  Troy Belting eventually obtained leave of Court to file a Third-Party Complaint against a number of non-party insurers, including Defendant Unigard.  See dkt. #40.  The Third Party Complaint named a number of insurance companies who had allegedly issued policies to Troy Belting.  See dkt. #41.  Plaintiff then filed an amended third-party complaint that named a revised group of insurers with leave of Court.  See dkt. #106.  Several of the insurers named in the third-party complaint and Amended Complaint were voluntarily dismissed from the Complaint during the course of discovery.  The Court twice denied motions for summary judgment in this case as premature, leading to additional discovery.  See dkt. ##s 196, 288.  The parties then filed the instant motions, which the Court will address in substance.

## II.      Legal Standard

The parties seek summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

**III.    Discussion**

**A.  Hartford's and Pacific Employers' Motion**

Hartford and Pacific Employers seek summary judgment from Troy Belting for settlements paid in asbestos cases where they paid 100% of the settlement but contend they are not obligated to pay 100% of the coverage. The insurers' position is that they are obligated to pay only a *pro rata* share based on its time on the risk, and that Troy Belting is obligated to pay the remainder. The insurers have listed specific cases and specific amounts of settlements. The insurers seeks reimbursement from Troy Belting for the shares of the settlements where they were not on the risk. Troy Belting responds with the same arguments to both insurers' motions, and the Court will therefore address them together.

**i.  Applicable Law**

The Court has addressed the parties arguments on how to address the issue of coverage on asbestos claims in detail in earlier decisions. The Court will not repeat that analysis here, but will instead simply offer conclusions on the applicable law for determining such claims.

The Court finds that the proper measure for allocating liability for cases such as this one is a pro-rata calcuation of time on the risk. "[W]hen continuous . . . damage takes place over a number of policy periods, the liability for that injury is allocated over the time during which . . . damage occurred." <u>Olin Corp. v. Underwriters at Lloyd's</u>, 468 F.3d 120, 126 (2d Cir. 2006) (applying New York Law). The Court also agrees that the way to determine proper allocation under those circumstances depend on the facts of the case and the conduct of the parties involved. <u>See, e.g.</u>, <u>Roman Catholic Diocese of Brooklyn v. National Union Fire Ins. Cas. Co.</u>, 21 N.Y.3d 139, 154, 969 N.Y.S.2d 808, 819 (2013) (finding that pro rata application was appropriate when the policies did not indicate a desire to assign liability to a single insurer and the injury could not be assigned "to particular policy periods."). An insured who chose to self-insure or forego insurance during some period where the risk existed can at times be responsible for a pro-rata share. <u>See, e.g.</u>, <u>Stonewall</u>, 73 F.3d at 1203 (finding that insured that "proration-to-the-insured" is available for periods when the insured declined available insurance). The principle that applies under these circumstances is that "in the absence of any policy provisions to the contrary, and with no ability to pinpoint exactly when the insured event occurred, the most equitable means of apportioning the liability for the losses is in direct proportion to each insurer's time on the risk." <u>Serio v. Pub. Serv. Mut. Ins. Co.</u>, 304 A.D.2d 167, 172, 759 N.Y.S.2d 110, 115 (2d Dept. 2003). The undisputed evidence in this case indicates that the moving insurers are responsible for their time on the

risk and that Troy Belting, or Troy Belting's other insurers, are responsible for their time on the risk.

Here, the parties dispute when the triggering event for time on the risk should begin to be measured for asbestos-related illnesses. At this point, Troy Belting asserts that the triggering event should be when the illness caused by asbestos manifests itself. The Court addressed this issue earlier, determining that the triggering event was exposure to asbestos. The Court stands by that decision for the reasons stated therein. Most New York courts have concluded that time-on-the risk should be measured from first exposure to asbestos, and the Court agrees. The Court finds that the long-germinating nature of the illness means that injury likely occurred long before symptoms manifested themselves. To rule otherwise in a case like this would mean that companies like Troy Belting, which bought at least some liability coverage before insurers started excluding asbestos, would have no coverage at all in a large number of cases. Indeed, Troy Belting would likely have to reimburse the insurers for the entire settlement in several cases here in question.[1] The Court therefore concludes that the proper way to measure injury-in-fact from asbestos exposure is the date of first exposure.

### ii. Analysis

---

[1] In their reply to Troy Belting's response to their motion, the insurers argue that all of the injuries that were the subject of the underlying suits manifested themselves *after* the policies in question terminated, meaning that if Troy Belting's standard applied, no coverage would be available for any of the suits. See Affidavit of Sarah E. Dlugoszewski in Support of Joint Reply, dkt. # 331-1, at ¶ 3 (listing diagnosis dates of all plaintiffs in the underlying suit. The earliest diagnosis occurred on May 22, 2000. Id. The Court notes that such evidence, if proved, would mean that Troy Belting would be responsible for all of the payments made by the insurers under a theory based on the manifestation of the illness. Troy Belting is better off accepting the date of first exposure as the triggering event.

The question for the Court, then, is when the "triggering event" precipitating coverage occurred in each case. Troy Belting disputes the dates the insurers offer. Troy Belting offers two arguments for denying the insurers' motions as they relate to date of first exposure, one general and one specific. Troy Belting's generally argues that the insurers "rely on hearsay and incomplete records as their only support" to establish the date of first exposure. They use summaries and reports from attorneys the insurers hired to represent Troy Belting in the underlying actions, and these reports are not sworn affidavits but summaries of testimony. Such reports, Troy Belting contends, are "classic hearsay" and cannot used to establish the date of first exposure. To the extent that the insurers rely on deposition testimony to establish exposure, Troy Belting argues that Federal Rule of Evidence 804 precludes introducing the evidence. There is no evidence that the witnesses were unavailable, and Troy Belting did not have an opportunity to depose them.

The evidence in question consists of evidence concerning 14 asbestos lawsuits that Hartford and Pacific Employers settled on Troy Belting's behalf.[2] The insurers include in

_____

[2]Those lawsuits were: <u>Benoit v. Air & Liquid Systems Corp.</u>, No. 1965/2012 (N.Y. Sup. Ct. Saratoga County); <u>Burnett v. A.J. Eckert Co, Inc.</u>, No. 871/2008 (N.Y. Sup. Ct., Schenectady County); <u>Butler v. AcandS, Inc.</u>, No. 7572/2000 (N.Y. Sup. Ct., Albany County); <u>Delap v. CBS Corp.</u>, No. 1982/2012 (N.Y. Sup. Ct., Schenectady County); <u>Dougall v. A.O. Smith Water Products</u>, No. 07964/2003 (N.Y. Sup. Ct., Schenectady County); <u>Foley v. BASF Corp.</u>, No. A00191/2013 (N.Y. Sup. Ct., Albany County); <u>Hughes v. A.J. Eckert Co., Inc.</u>, No. 2009/234 (N.Y. Sup. Ct., Fourth Judicial District); <u>Keenan v. A.J. Eckert Co., Inc.</u>, No. 2086/2008 (N.Y. Sup. Ct., Schenectady County); <u>Kupiec v. Air & Liquid Systmes Corp.</u>, No. A00093/2013 (N.Y. Sup. Ct., Albany County); <u>Mann v. American Optical Co.</u>, No. 1530/2004 (N.Y. Sup. Ct., Albany County); <u>McKinlay v. 3M Company</u>, No. 2012-842 (N.Y. Sup. Ct., Schenectady County); <u>McMillan v. A.O. Smith Water Products</u>, No. 1381/2010 (N.Y. Sup. Ct., Schenectady County); <u>Serbalik v. Air & Liquid System</u>, No. 2011 20621 (N.Y. Sup. Ct., Schenectady County); <u>Terlecky v. A.O. Smith Water Products</u>, No. 297/2005 (N.Y. Sup. Ct., Schenectady County). Hartford's Statement of Material Facts, dkt. # 305-2 at ¶ 11. Troy Belting agrees that these are the cases involved in this matter. <u>See</u> Troy Belting Response to Hartford's Statement of

(continued...)

their moving papers copies of depositions, answers to interrogatories and requests for production of documents, trial transcripts, and pre-trial reports created by defense counsel in the underlying cases. The information provided by Pacific Employers consists mostly of memoranda written by defense counsel in the underlying asbestos cases. These documents compliment the deposition transcripts supplied by Hartford by summarizing the testimony concerning dates of exposure and the supplier of the asbestos-containing material. See Exhs. 8-25 to Affidavit of Sarah E. Dlugoszewski, dtk. ##s 305-20-305-37, Exhs. C-6, 1-9 of Declaration of Brian G. Fox, dkt. ##s 308-3-308-28.

The insurers, conceding that the evidence is hearsay, rely on Federal Rule of Evidence 807 to establish admissibility. That rule provides a "residual exception" the rule against hearsay that permits introduction of "a hearsay statement . . . even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804[.]" FED. R. EVID. 807(a). Four conditions must be met: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other available evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will serve the purposes of these rules and the interests of justice." Id. Such statements are admissible only if the opposing party is provided notice before any trial or hearing of the proponent's intent to offer the statement. FED. R. EVID. 807(b). "'Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.'" Parsons v. Honeywell, 929 F.2d 901, 907 (2d Cir. 1992) (quoting Huff v. White Motor Corp., 609 F.2d 286, 291 (7th Cir. 1979)). A

_____

[2](...continued)
Material Facts, dkt. # 321-24 at ¶ 11.

statement admitted under this exception "must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." Id. These requirements are meant to ensure that "the four classes of risk peculiar to hearsay evidence, which are insincerity, faulty perception, faulty memory and faulty narration, are minimized." Batoh v. Mc-Neill-PPC, Inc., 99 Fed. R. Evid. Serv. 1268 at *28 (D. Conn. 2016) (quoting Steinberg v. Obstetrics-Gynecological & Infertility Grp., P.C., 260 F.Supp.2d 492, 495 (D. Conn. 2003)). Statements may be admitted however, even when they are not "free from all categories of risk." id. (internal citations omitted).

The Court agrees with the insurers that the evidence in question is admissible under the residual exception in Rule 807. First, there are circumstantial guarantees of trustworthiness in the statements. All were made in the context of litigation. The deposition testimony was given under oath, and the case summaries were prepared for the purposes of settlement, and were thus prepared based on the speakers' best assessment of the persuasive power of the evidence. While one piece of this evidence consists of attorneys' arguments at trial, which in general do not constitute evidence, the factual statements in such arguments do have some likelihood of truthfulness. The Court can find them admissible and still give them the value they possess. Second, the statements concerning date of first exposure address a fact material to the instant litigation; without such dates, the scope of the parties' coverage responsibilities cannot be determined. Third, and most important, this evidence is the most probative on this issue which can be obtained through reasonable efforts. To require the parties to engage in more than a dozen mini trials to produce what would likely be the exact same evidence would not be an efficient use of the parties' resources or the Court's time. Fourth, the interests of justice will be served by accepting the

evidence, as that evidence is the best way to answer the central questions in this case. The Court will therefore exercise its discretion and admit the evidence.

The insurers use this evidence as proof of the dates of first exposure which they claim should guide this matter. See Hartford's Statement of Material Facts ("Hartford's Statement"), dkt. # 305-2 at ¶¶ 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40; Affidavit of Normand Vermette, dkt. # 307, at ¶ 22.[3]  The insurers provide an expert report that calculates the parties' shares as a result of these dates and the time each party spent on the risk. Troy Belting disputes the conclusions that the insurers draw from this evidence, but does not offer any other evidence to contradict it. See Troy Belting's Response to Hartford's Statement of Material Facts, dkt. # 321-24 at ¶¶ 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40. Instead, Troy Belting argues that the evidence is inconclusive or insufficient and thus fails to meet the insurers' burden. Troy Belting also does not dispute the calculations generated from the days on the risk, just whether enough evidence supports the insurers' dates of first exposure.

The Court finds that the evidence here, which is the only evidence provided by either party of the date of first exposure, is sufficient to meet the insurers' burden. While the Court acknowledges that Troy Belting contends that the evidence is not conclusive of the

---

[3]Pacific Employers Provides two affidavits which establish exposure dates and provide the evidence to support those claims, that of Vermette, an insurance expert, and of Counsel Brian G. Fox. Pacific Employers' Statement of Material Facts itself is wholly deficient in pointing to the pages where the specific evidence that establishes these dates appears. This complicates matters, as it makes it more difficult for the Court to identify the evidence which supports the factual claims, and makes it harder for Troy Belting to respond. When parties provide evidence for the Court, they should not expect the Court to sift through hundreds of pages and identify on its own the evidence which the parties claim is material. That is why courts require statements of material facts that identify the relevant evidence specifically as part of summary judgment motions.

exact date of first exposure for many–if not all–of the injured parties in the underlying lawsuits, Troy Belting does not assert that the insurers' burden is to prove such dates by a burden beyond a reasonable doubt or by clear and convincing evidence.[4]  The Court, having reviewed carefully the evidence in question, concludes that the only evidence available hear supports the insurers' claims by a preponderance of the evidence and no reasonable juror could find for Troy Belting on this issue.  See Robinson v. Transworld Systems, Inc., 876 F.Supp. 385, 389 (N.D.N.Y. 1995) ("in an ordinary civil case, such as this one, where plaintiffs must prove their case by a preponderance of the evidence, the determinative standard is 'whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.") (quoting Anderson v Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Plaintiff's brief and response to Hartford's Statement of Material Facts disputes evidence in more detail.  The Court is unpersuaded by Troy Belting's arguments.  First, the Court notes that the insurers use the last day of any year where exposure is referenced as the date of first exposure.  This standard resolves any imprecision in favor of the insured and represents the best evidence under the circumstances.

Troy Belting's brief references two particular cases.  In regards to Keenan v. A.J. Eckert & Co., Troy Belting argues that the insurers misstate the evidence of when Troy Belting supplied asbestos-containing products.  Troy Belting contends that the deposition testimony cited states only that Troy Belting supplied products beginning only in the late 1970s.  An examination of the deposition demonstrates, however, that the witness first

---

[4]Moreover, the insurers have calculated the date of first exposure to be the last date of the year in which exposure occurred, meaning that Troy Belting has received the latest date possible–the benefit of the doubt–as to first exposure in that particular year.

testified that Troy Belting-supplied products appeared in the "late 1970s," but then corrected himself to state the early 1970s.  See Deposition of Frank Keenan, Exh. 17 to Dlugoszewski Affidavit, dit. # 305-29, at 206-207.

Troy Belting's brief also quarrels with the date of first exposure established in Terlecky v. A.O. Smith Water Products, contending that the December 31, 1953 date is inaccurate because the records in the case demonstrate that Troy Belting did not supply any products containing asbestos at Mr. Terlecky's workplace until 1980, a period when the moving insurers were on the risk.  Troy Belting's argument here misstates the evidence as well.  Terlecky testified that he worked in maintenance at Albany Felt from 1950-1952.  Wasyl Terlecky Deposition, Exh. 24 to Dlugoszewski Affidavit, dkt. # 305-36, at 20-21.  He then became a plumber.  Id. at 21.  That job exposed him to asbestos, and Terlecky testified that some of the asbestos-containing material consisted of pipe insulation, which was largely supplied by Troy Belting.  Id. at 34-35.  This evidence supports the date of first exposure assigned by the insurers, since Terlecky clearly identified Troy Belting as a supplier of asbestos containing pipe insulation which exposed him to asbestos from the start of his plumbing career in 1953.  The assigned date of December 31, 1953 meets this time period.  The evidence Troy Belting cites to attack the insurers' conclusions does not contain any information that contradicts that evidence.

In sum, the Court finds that the evidence cited by the insurers supports their claims of dates of first exposure and Troy Belting's challenges do not undermine those claims.  No jury could find for Troy Belting on this issue.  The Court is guided in this reasoning not only by the evidence presented and the fact that such evidence is the best available under the circumstances, but also by the fact that the evidence was produced in cases that have

terminated and judgment has been paid to the injured parties for Troy Belting's underlying liability. While Troy Belting may argue that the insurers had an interest in pushing the date of first exposure outside the period in which their policies applied, the Court notes that the insurers had an even greater interest in demonstrating that no exposure to Troy Belting products occurred at all. Without exposure, no liability could flow to the insured, and thus no payouts from the insurer for any period would have been required.

### iii. Troy Belting's Arguments for Estoppel and Laches

In the alternative, Troy Belting argues that laches and estoppel should prevent the insurers from seeking *pro rata* contribution from their insured. The company argues that the insurers waived any right to seek contribution by waiting too long after agreeing to defend the cases before seeking such payments. Moreover, though the insurers defended the suits, Troy Belting contends that they failed to take adequate steps to protect their insured's interests. They did not investigate other coverage or the facts of the underlying complaints, and maintained control of the defense without allowing Troy Belting to assert any independent defense. According to Troy Belting, the insurers had an obligation to notify Unigard, the other insurer Troy Belting identified, and inform the company that the Hartford and Pacific Employers intended to seek contribution for the claims agianst Troy Belting. These actions prejudiced Troy Belting because the delays may have impaired its rights against other insurers and prevented Troy Belting and earlier insurers from more aggressively defending the suits.

Troy Belting invokes two equitable doctrines to prevent a party from asserting rights to which they are otherwise entitled: estoppel and laches. Equitable estoppel "precludes the insurer from denying coverage if: (1) the period of time taken by the insurer to determine

compliance is unreasonable under the circumstances, and (2) the defense offered by the insurer during that period prejudices the insured." Commericial Union Ins. Co. v. International Flavors & Fragrances, 822 F.2d 267, 274 (2d Cir. 1987).  Equitable estoppel can apply when "an insurer, though not in fact obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense of the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense.  In such cases, though coverage as such does not exist, the insurer will not be heard to say so." Albert J. Schiff Associates, Inc. v. Flack, 51 N.Y.2d 692, 699, 417 N.E.2d 84, 88 (1980).  Still, "an insurer may, by timely notice to the insured, reserve its right to claim that the policy does not cover the situation at issue, while defending the action." O'Dowd v. American Surety Co., 3 N.Y.2d 347, 355, 144 N.E.2d 359, 363 (1957).

Courts find that "the failure to assert a defense for an 'unreasonable and unexplained length of time, accompanied by other circumstances causing prejudice to an adverse party, operates as a basis for the doctrine of laches.'" Matter of Finchum v. Colaiacomo, 55 A.D.3d 1084, 1085, 869 N.Y.S.2d 619, 623 (3d Dept. 2008) (quoting Matter of Holloway v. West St. Trucking, 14 A.D. 3d 816, 817 (2005)).  In the insurance context, "laches can be applied to estop a party from asserting a defense when there has been an inexcusable delay in raising the defense of noncoverage together with actual injury or prejudice[.]" Ricciardi v. Johnstown Leather, 1 A.D. 3d 661, 663 (3d Dept. 2003).  Prejudicial circumstances "include 'a change of position, intervention of equities, loss of evidence or other disadvantage.'" Finchum, 55 A.D. 3d at 1085 (quoting Matter of Riccardi v. Johnstown Leather, 1 A.D. 3d 661, 663, 768 N.Y.S.2d 28 (2003)).  Thus, the key question in either equitable estoppel or laches is prejudice.

Troy Belting asserts that these doctrines should prevent Hartford and Pacific Employers from asserting a defense of noncoverage. The insurers, Troy Belting insists, spent years defending the cases before seeking compensation. Such delay, Troy Belting claims, prejudiced the company. The insurers should have investigated coverage and notified Unigard of the claims before settling the cases. According to Troy Belting, Pacific Employers was aware that Unigard was Troy Belting's insurer since at least 1977, and did not put Unigard on notice of any claims and did not seek any contribution from Troy Belting for such claims until 2009. Failure to seek contribution from Unigard in a timely fashion means that the insurers cannot now seek contribution. In addition, Troy Belting argues that prejudice occurred because of the way the insurers, who controlled the defense, litigated the cases. Troy Belting contends the insurers had an interest in establishing dates of first exposure that limited their exposure and shifted settlement costs towards the insured or other insurers. The insurers, Troy Belting contends, did not provide notice to Troy Belting before cases were settled, preventing the company from challenging those settlements in light of potential *pro rata* contribution. Third, Troy Belting insists that the insurers should have provided Troy Belting with independent counsel to protect the company's interests in determining when exposure occurred.

Both insurers claim that they issued reservations of rights letters to Troy Belting upon agreeing to defend the underlying asbestos cases. See Pacific Employer's Statement of Material Facts, dkt. # 306-1, at ¶ 2; Hartford's Statement of Material Facts, dkt. # 305-2, at ¶ 8. Here, Hartford's Sarah Dlugoszewski, a consultant on asbestos-related matters, submitted an affidavit claiming that Hartford's "practice" since 1995 has been "to issue a reservation of rights letter with respect to the underlying asbestos-related bodily injury suits

filed against Troy Belting." Dlugoszewski Affidavit, dkt. # 318-6.  The letters contain "a full

reservation of rights, which includes Hartford's right to limit its contribution to defense and

indemnity costs to its *pro rata* share." Id.  An attached letter, sent to Troy Belting in 1995,

advises Troy Belting that Hartford contends that "with respect to asbestos related claims . . .

the injurious exposure period must fall within confirmed policy terms.  ITT Hartford will

contribute its pro rata share of indemnity and defense costs that its confirmed policies of

insurance bear to the total period of alleged injurious exposure." Exh. 1 to Dlugoszweski

Affidavit, dkt. # 318-7.

Genell Smith-Scott provided a similar affidavit for Pacific Employers.  See dkt. #

306-3.  Smith-Scott relates that Pacific Employers "has historically defended and indemnified

Troy Belting in underyling asbestos-related bodily injury suits filed against Troy Belting,

subject to a full reservation of rights." Id. at ¶ 4.  On June 10, 2009, for example, Smith-Scott

wrote Troy Belting on behalf of Pacific Employers regarding an ongoing asbestos claim.  See

Exh. A to Smith Scott Affidavit, dkt. # 306-4.  The letter informed Troy Belting that it would

participate in paying a portion of any settlement of the case.  Id.  Such an offer "assume[d]

equitable participation by both Troy and Troy's other insurance carriers as is appropriate

under New York law." Id.  In addition, "[a]s before, PEIC expressly continues to reserve all

rights under the subject PEIC policies, including, but not limited to, the right to fully disclaim

coverage, raise additional policy terms, conditions, exclusions, limitations, definitions,

endorsements and other provisions, and assert additional defenses to coverage." Id.

Another letter, written in 2010 regarding settlement of a similar case, contained a similar

reservation of rights.  See Exh. B to Smith-Scott Affidavit, dkt. # 306-5.  That letter also noted

that "[t]o date, you have not been able to locate any additional coverage which would be

applicable to this matter." Id. Smith-Scott asserts that "the insured would be liable for all

uninsured years of coverage for this matter." Id. A 2011 letter regarding settlement likewise

contained similar representations about missing coverage blocks and an identical reservation

of rights. See Exh. C to Smith-Scott Affidavit, dkt. # 306-6.

Troy Belting responds to this evidence by citing, generally, to the affidavit of David

Barcomb, the company's general manager. See dtk. # 303-4. Barcomb avers that Troy

Belting has been named as a defendant in "several" asbestos lawsuits. Id. at ¶ 3. Troy

Belting notified Hartford and Pacific Employers, the companies that provided insurance to

Troy Belting between 1974 and 1994, of the lawsuits, "among others." Id. at ¶ 6. Barcomb

contends that the two companies have been defending such lawsuits since 1995. Id. at ¶ 7.

Barcomb contends that Pacific Employers first informed Troy Belting in April 2009 that the

insurer's defense in upcoming lawsuits was subject to a "'full reservation of rights.'" Id. at ¶

9. The letter also informed Troy Belting that Pacific Employers intended to seek contribution

from Troy Belting for periods where the insurer had not provided coverage. Id. Barcomb

contends that this was the first time that Pacific Employers had demanded contribution. Id.

Barcomb also avers that Troy Belting has attempted to reconstruct its insurance coverage for

the years before 1974. Id. at ¶¶ 20-22. Neither Hartford or Pacific Employers offered any

assistance in this effort, and both declined requests from Troy Belting to provide such aid.

Id. at ¶ 21, 23. Barcomb also contends that both insurers were aware that Unigard had some

coverage for Troy Belting, Pacific in 1977 and Hartford by "no later than 2001."[5] Id. at ¶¶ 24-

---

[5]The Court does not find the 1977 lawsuit as significant to the issue of estoppel as
Troy Belting does. This evidence indicates to the Court that Troy Belting was aware of the
possibility of asbestos litigation as early as 1977, and also aware that Unigard may have
been an insurer on such matters. Despite this knowledge, Troy Belting did not maintain

(continued...)

25.  Despite this knowledge, neither company sought contribution from Unigard from 1995-2009.  Id. at ¶ 26.[6]

The Court finds that, to the extent that the insurers issued reservation of rights letters to Troy Belting after being notified of the asbestos claims, equitable estoppel cannot apply.  As explained above, "an insurer may, by timely notice to the insured, reserve its right to claim that the policy does not cover the situation at issue, while defending the action."  O'Dowd, 3 N.Y.2d at 355.  Troy Belting points to Barcomb's affidavit in denying that Hartford reserved its rights, but Barcomb does not deny that Hartford issued a reservation of rights in 1995, and does not challenge the authenticity of the letter cited in Dlugoszewski's affidavit.  As such, all evidence in the case indicates that a valid reservation of rights existed for Hartford since 1995, and thus any claim of equitable estoppel must fail against Hartford.  Barcomb does specifically deny that Pacific Employers reserved its rights before 2009.  Pacific Evidence has provided no evidence beyond an averment it issued such letters.  The Court will therefore find that a question of fact exists as to whether Pacific Employers reserved its rights for any suit settled before that date.

Whether Pacific Employers specifically reserved its rights is not, however, dispositive on the question of equitable estoppel in this matter.  Troy Belting must

---

[5](...continued)
copies of potentially applicable insurance, and did not notify Unigard of the claims at issue in this litigation, which began appearing, all agree, in 1995.

[6]The Court notes that this case involves the settlement of 14 suits brought between 1995 and 2014.  The settlements for which the insurers seek contribution occurred between August 2005 and July 2014.  Pacific Employer's Statement of Material Facts, dkt. # 305-2, at ¶¶ 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39.  T he insurers seek contribution for excess payments under their insurance contracts.  In New York, the statute of limitations on such claims is six years.  NY CPLR § 213(2).  Troy Belting has not argued that the statute of limitations bars any of the the insurers' claims.

demonstrate prejudice, which is especially difficult in insurance cases. In general Courts have found that "the application of the doctrine of equitable estoppel, in the realm of noncoverage insurance cases, is not favored." Travelrs Prop. Cas.v. Weiner, 174 Misc. 2d 831, 835, 666 N.Y.S.2d 392, 395 (Tompkins Cty. Sup. Ct. 1997). "Public policy is not served by exposing the insurer to risks never contemplated by the insuring transaction and never made a factor in the calculation of the premium." Id. Equitable estoppel can apply, however, "where the conduct of the insurer, over a protracted period, creates the false impression that coverage is present and fosters the sense that the insurer is united in interest with the insured and has a real stake in the defense of the claim[.]" Id. To obtain relief, an "insured must not only show a vulnerability to monetary damages, but also that the insured has been prejudiced in some significant way by the conduct of the carrier." Id.

The Court finds that Troy Belting has not demonstrated any significant prejudice as a result of the insurers' conduct. Troy Belting contends that the insurers' conduct prevented it from investigating whether it had additional coverage for long-tail asbestos claims that would indemnify the company from periods where the insurer denied coverage and that the insurers had an incentive to push the date of first exposure outside the confines of their coverage. First, the Court fails to see why responsibility for failing to identify potential insurance coverage should lay with an insurer not providing that coverage rather than with an insured who claims the coverage exists. See, e.g., Commercial Union Ins. Co. v. International Flavors & Fragrances, 822 F.2d 267, 271-2 (2d Cir. 1987) ("Under New York law, compliance with a notice-of-occurrences provision in an insurance policy is a condition precedent to an insurer's liability under the policy." Such a provision applies when "the circumstances known to the insured at that time would have suggested to a reasonable

person the possibility of a claim."). Any lost or destroyed policy from a third-party insurer is certainly not the fault of the insurers here. Any claim that Troy Belting thought that the two insurers would cover all claim periods under the policy is belied both by the reservation of rights issued by Hartford and by the fact that the two insurers asserted coverage only in their policy periods. Any "bare" period was some party's responsibility. Troy Belting cannot assign blame for its failure to maintain records of insurance coverage to other insurers. Moreover, assuming the insurers are entitled to contribution from Troy Belting, such contribution does not constitute prejudice even if Troy Belting is entitled to coverage from another insurer. Troy Belting could still attempt to obtain such coverage. As far as the insurers' alleged incentive to push the date of first exposure to a period more beneficial to avoiding coverage, the Court acknowledges the theoretical possibility of such conflicted interests. At the same time, however, no evidence beyond Troy Belting's bald assertions indicate that the insurers attempted to shift the date of first exposure towards non-covered periods. Moreover, Troy Belting had a responsibility to discover and notify any insurer who could provide coverage during the periods in question. Troy Belting has not demonstrated prejudice sufficient to invoke estoppel or laches.

As to Troy Belting's argument regarding a responsibility to provide independent counsel, the Court fails to see how the failure to pay for independent counsel on the underlying claims constitutes the sort of prejudice that would invoke equitable estoppel or laches. Both doctrines require a showing of prejudice from the action complained of, and none exists here, as there is an intervening cause of Troy Belting's alleged harm. The prejudice to Troy Belting here is having to pay contribution for periods where injury occurred and the two insurers were not on the risk. Assuming, as Troy Belting claims, coverage from

Unigard for the earlier periods exists, a failure to obtain such coverage is not the insurers' fault. Regardless of the insurers' actions in failing to provide independent counsel, Troy Belting's alleged injury for Unigard's failure to pay is Unigard's fault, not Troy Belting's.

### iv. Conclusion as to the Insurers' Motions

Troy Belting challenges the basis for the insurers' calculations of the sums owed for remuneration paid, but does not challenge the accuracy of the calculations themselves. The Court will therefore grant the insurers' motions, accept the insurers' calculations, and award damages on that basis.

### B. Third-Party Defendant Unigard's Motion[7]

Third-Party Defendant Unigard argues that the Court should grant it summary judgment. Unigard argues that no evidence exists to support Troy Belting's claim that Unigard and/or its predecessor company, Jamestown Insurance Company, provided insurance that would cover asbestos claims between 1949 and 1974. Moreover, even if Troy Belting had provided some evidence of coverage, Unigard contends that Troy Belting has not provided any information about the terms of the policies, the policy limits, or whether the policies in question provided coverage for injuries caused by asbestos exposure. As such, Unigard argues, the Court should grant the company summary judgment on these claims.

### i. Legal Standard

The issue here is whether Unigard has a duty, created by an insurance contract, to provide Troy Belting with coverage for damages the company is obligated to pay. The parties agree that no copies of any insurance policies issued by Unigard or its predecessors

---

[7]Unigard's briefing contains citations to cases in footnotes. The Court prefers that the parties cite cases in the text of their briefs, as the Court does in its opinions. Unigard should follow this practice in the future.

to Troy Belting exist.  <u>See</u> Statement of Undisputed Material Facts in Support of Unigard

Insurance Company's and QBE Americas, Inc.'s Motion for Summary Judgment ("Unigard's

Statement"), dkt. # 301-44, at ¶ 4; Troy Belting and Supply Company's Response to Unigard

Insurance Company and QBE Americas, Inc.'s State of Material Facts ("Troy Belting's

Response"), dkt. # 319-23, at ¶ 4.  The parties disagree about whether any evidence exists

to support Troy Belting's claims that Unigard's predecessor company, Jamestown Insurance

Company, actually issued policies covering Troy Belting from 1949-1974.

      In New York, "[g]enerally it is for the insured to establish coverage and for the

insurer to prove that an exclusion in the policy applies to defeat coverage."  <u>Consol. Edison

Co. of N.Y. v. Allstate Ins. Co.</u>, 98 N.Y.2d 208, 218, 774 N.E.2d 687, 690 (N.Y. 2002).  There

is no dispute that Troy Belting cannot provide copies of any of the alleged policies in

question.  "[A]n insured may rely on secondary evidence (*i.e.*, evidence other than the policy

itself) to prove the existence and terms of an insurance policy only where the insured

demonstrates that it has made a 'diligent but unsuccessful search and inquiry for a missing

[policy]."  <u>Burt Rigid Box v. Travelers Prop. Cas. Co.</u>, 302 F.3d 83, 91 (2d Cir. 2002) (internal

quotations omitted).  Because the ability to introduce such evidence is governed by Federal

Rules of Evidence 104 and 1004, the question of whether a party may use secondary

evidence is one for the Court, not a jury.  <u>Id.</u> at 91-92.  There does not appear to be any

serious dispute that Troy Belting's search for the missing policies was diligent; Troy Belting

apparently had a practice of destroying old policies, and Unigard admits it has not saved any

policy documents it may have had with Troy Belting.  As such, Troy Belting may use

secondary evidence in an attempt to prove the existence of any policies.

The parties disagree about the standard of proof required to demonstrate the existence of the policies in question. Unigard, citing to several district court cases from this Circuit and noting that the Second Circuit Court of Appeals has not resolved the question, insists that Plaintiff must prove the policies by "clear and convincing evidence."[8] Troy Belting counters that the policies need only be demonstrated by a preponderance of the evidence. The Second Circuit Court of Appeals declined to address this issue in Burt Rigid, the only case where that Court has discussed the matter in any detail. See Burt Rigid, 302 F.3d at 91. Other New York Courts, have, however, found that the usual civil standard, a preponderance of the evidence, should apply. See, e.g., Glew v. Cigna Group Ins., 590 F.Supp.2d 395, 411 (E.D.N.Y. 2008) ("While there has been some dispute as to the burden of proof, in this Court's view, the proper standard is the same as other civil cases in the federal court, namely, by a preponderance of the evidence."); Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co., 173 Misc. 2d 901, 905, 661 N.Y.S. 2d 948, 951 (N.Y. Cty. Sup. Ct. 1997)(applying New York and finding "nothing unfair in holding the plaintiff to the usual preponderance of the evidence standard of persuasion where the carrier, which is in the business of selling policies, chooses to keep no records at all of those policies."); Kenza

---

[8]Unigard argues that the Second Circuit used the clear and convincing evidence standard in Burt Rigid "insofar as it found the plethora of evidence in that case satisfied either standard." Unigard misstates the Court's findings in Burt Rigid. There, the Court noted a paucity of decisions on the issue of which standard to apply and found instead that "[i]t is not necessary for us to decide this issue . . . because . . . Burt is entitled to summary judgment on the issue of the existence and the terms of the policies even if a 'clear and convincing standard applies." 302 F.3d at 91. In other words, the Court found that a wealth of evidence existed to support a finding about the policies in question and their terms. The standard was immaterial because the evidence would support a finding under the more exacting standard. Unigard cannot use a case where the court explicitly declined to decide which standard applied to claim that the Second Circuit court resolved the issue.

Operating Corp. v. Allcity Ins. Co., No. 603313/00, 2003 NY Misc. LEXIS 2029 at *6-7 (N.Y. Cty. Sup. Ct. Oct. 20, 2003) (applying preponderance of the evidence standard). At the same time, other New York courts have found that "[a] party seeking to recover under a lost insurance policy, 'must prove its former existence, execution, delivery and contents by clear, satisfactory and convincing evidence.'" Maryland Casualty Co. v. W.R. Grance & Co., No. 83 civ. 7451, 1995 U.S. Dist. LEXIS 13715, at *5 (S.D.N.Y. Sept. 20, 1995) (quoting Boyce Thompson Institute v. Insurance Company of North America, 751 F.Supp. 1137, 1140 (S.D.N.Y. 1990)); Fulton Boiler Words v. Am. Motorists Ins. Co., 828 F.Supp.2d 490, 490 n.10 (N.D.N.Y. 2011) (concluding that "the proper standard of proof" in lost-policy cases "appears to be by clear and convincing evidence" but noting that plaintiff could not prove the policy by either standard).

The Court concludes that the proper standard of proof in such cases should be a preponderance of the evidence. The Court notes that Unigard points to cases that hold that a higher evidentiary standard applies, but does not discuss the reasoning of those cases and offers no analysis as to why an evidentiary standard higher than that usually employed in civil cases should apply. Boyce Thompson Inst., a case from the Southern District of New York, offers one such explanation, attributing the use of a heightened standard to the fact that "lost insurance instruments are a common problem."[9] 751 F. Supp. at 1140. The Court declines

_____

[9]Boyce Thompson relies on two cases to establish this standard. Neither case does so explicitly. Sadow v. Poskin Realty Corp., 63 Misc. 2d 499, 504, 312 N.Y.S.2d 901, 907 (Queens Cty. Sup. Ct. 1970) holds that "[t]o establish title by a lost deed or a lien by a lost mortgage there must be clear and certain evidence showing that the deed or mortgage was properly executed with all the formalities required by law and a showing of the contents of such instrument." Emons Industries, Inc. v. Liberty Mutual Fire Ins. Co., 545 F.Supp. 185, 188 (S.D.N.Y. 1982), did not state explicitly what standard applied. Instead, the court noted that another case, Keene Corporation v. Insurance Co. of North

(continued...)

to adopt this rationale, since both insurer and insured have copies of the insuring documents at their issuance, and a heightened evidentiary standard might actually encourage the insurer to destroy all copies of the policy, hoping the insured would not be able to produce one. While assigning a heightened standard of care to proving the existence of a lost policy might convince the insured to maintain a copy of the policy, doing so might also convince the insurer that a safer method would be to destroy any records of a former client after a certain number of years. Thus, the level of proof required has no net effect on the desire to have records preserved, presumably the aim of the Boyce Thompson court. Moreover, since cases involve lost policies most often occur in cases like this one–where a third-party has been injured due to long-ago exposure and insurance coverage may be necessary for that injured person to make any recovery–raising the level of proof would not seem to serve the public good. Finally, nothing in statutory or case law indicates that regulators or legislators intended to make the burden of proof higher for the insured who loses a policy than for a plaintiff in any other case. In the end, this is a contractual matter, and there is no reason to alter the burden of proof without firm direction from an authoritative voice. The Court will employ the preponderance of the evidence standard.

### ii. Analysis

Troy Belting's evidence for the existence of the policies and their terms cannot meet a preponderance-of-the-evidence standard, much less the clear and convincing

---

[9](...continued)
America, 513 F.Supp. 47 (D.C.D.C. 1981) had applied Pennsylvania law, which required clear and convincing evidence, to conclude that the plaintiff had failed to prove the existence of a policy. Id. at 188. The plaintiff in the New York case, however, had more compelling evidence and had created a question of fact as to the existence of the policy and its terms. Id. at 189. The Court did not state what standard it applied.

standard. Troy Belting points to a variety of evidence in an attempt to prove the existence of the policies in question. A survey of that evidence reveals Troy Belting has failed to point to evidence of the terms of the policies in question sufficient to survive summary judgment.

Troy Belting retained Robert Hughes as an insurance expert to determine what coverage had during the period in question. Hughes concludes that "more likely than not, Jamestown Mutual Insurance Company issued liability policies to Troy Belting for a period from July 18, 1949 to October 3, 1974." Hughes' Report, Exh. 2 to Unigard's Motion, dkt. # 301-2, at 3. Hughes also concludes that "more likely than not, the liability policies issued to Troy Belting by Jamestown Mutual Insurance Company employed the then-current iteration of the standard, ISO Comprehensive General Liability wording and that the policies provide coverage for at least the premises, operations, products and completed operations hazards." Id. at 4. He contends that Troy Belting added Independent Contractor's coverage by an endorsement that amended the policy on September 4, 1964. Id. According to Hughes, the policies in question had policy limits of $500,000 per occurrence until October 3, 1974. Id. On that day, a new policy reduced the policy limits to $300,000. Id. Troy Belting had purchased an umbrella express policy at that time. Id.

Hughes points to various types of evidence to support his claims. He argues that evidence that Troy Belting reduced coverage from $500,000 to $300,000 after purchasing an umbrella policy in 1974 indicates that the company had previously purchased $500,000 in coverage. Id. at 5-6. He also argues that, as a seller of industrial equipment, Troy Belting would surely have purchased products liability insurance coverage. Id. at 6. Moreover, the contractors who purchased Troy Belting's products would have required Troy Belting to produce certificates of insurance demonstrating premises, operations and

products/completed operations coverage with significant policy limits, and installation of such equipment would have occurred only with such certificates. Id. at 6-7. Board minutes also indicate that Troy Belting's Board of Directors carefully considered finances and legal liability throughout the period in question. Id. at 7. The Board increased coverage in 1977 and 1978 because of the prospect of lawsuits. Id. An examination of ledger entries and other documents, Hughes claims, indicates that insurance coverage existed during the period in question. Id. at 7-8. Hughes points particularly to two letters, written in 1978, from the insurance brokers who handled Troy Belting's account. Id. at 8. The first letter, written in 1977, states that Jamestown Mutual (Unigard), had provided Troy Belting insurance coverage for the past ten years. The second letter, written in late 1978, indicates that Unigard provided liability coverage to Troy Belting from July 15, 1949 to October 3, 1974. Id. Hughes also points to the fact that Unigard investigated and monitored Troy Belting's defense of an asbestos-related lawsuit concerning exposure during the years Troy Belting alleges coverage existed. Id. at 10-11. Correspondence between Unigard and INA, another insurer involved, does not disclaim or deny coverage in the matter, which Hughes finds "telling." Id. at 11. This correspondence "indicates to [Hughes] that Unigard believed that one or more Jamestown policies insuring Troy Belting existed and that there was at least the potential for coverage" in the matter at suit. Id.

Hughes also attempts to use this evidence to describe the types of policies issued to Troy Belting and the coverage those policies provided. He points to a "General Change Endorsement" issued by Jamestown Mutual Insurance Company on September 15, 1964. Id. at 9. This endorsement amended a "Manufacturers' and Contractors' Liability Policy" ("M&C") that listed Troy Belting as the insured. Id. The change added "Independent

Contractors" coverage.  Id.  Hughes claims that this endorsement "raises several questions regarding the coverage" under the policy.  Id.  To Hughes, "[t]he primary question is whether or not the policy" as amended was an M&C policy or a "comprehensive general liability ("CGL") policy."  Id.  The difference between the two policies, Hughes asserts, is that only a CGL policy "covers products liability automatically."  Id. at 10.  Hughes points out that CGL policies first appeared in 1941.  Id.  By 1960, such policies had largely replaced M&C policies.  Id.  Hughes argues that "it is in my professional opinion, likely that the pre-printed endorsement amending the policy was simply a mistake, i.e., the wrong form, that was actually added to a CGL policy rather than a M&C policy."  Id.  This opinion, Hughes claims, is supported by the "competence" and "diligence" of Troy Belting and its insurance agents in protecting against liability.  Id.  Alternatively, Hughes suggests that the policy may have been an M&C policy that added a products liability endorsement.  Id.  To support this claim, Hughes argues that "if one accepts that (a) preponderance of the evidence clearly indicates that Troy Belting consistently and continuously purchased products liability coverage then it makes no difference" whether Troy Belting purchased a CGL policy or added products liability to an M&C policy with an endorsement.  Id.  Hughes' report contains exemplars of CGL policies issued during the time period in question.  Id. at 11-13.

James O'Malley, who also provided expert testimony to Troy Belting, likewise contends that Unigard provided coverage during the period in question.  See Affidavit of James O'Malley, Exh. 3 to Troy Belting's Motion for Summary Judgment, dkt. # 307-7, at ¶¶ 27-47.  O'Malley bases his opinion largely on the events surrounding a 1977 lawsuit, Estate of Henry Pennell v. Troy Belting Supply Company.  Id. at ¶ 27.  Plaintiff's then-insurer, Pacific Employers, investigated Troy Belting's earlier insurance carriers.  Id. at ¶ 28.  After this

investigation, Pacific contacted Unigard about the Pennell claim.  Id. at ¶ 29.  This action

placed Unigard on notice of the potential claim, and the company investigated the facts of

that case.  Id. at ¶ 43.  Unigard requested workers' compensation testimony, the bill of

particulars, and medical records in the case.  Id.  O'Malley contends that "industry standards"

would have required Unigard to notify the other insurers if no coverage existed.  Id. at ¶ 44.

No record of such notification exists, and Unigard did not disclaim coverage.  Id. at ¶¶ 44-45.

Unigard also continued to investigate the Pennell claim, which would not have occurred if

Unigard denied coverage.  Id. at ¶ 46.  O'Malley thus concludes that "Unigard issued

insurance policies to Troy Belting that provided coverage for asbestos related personal

injuries[.]"  Id. at ¶ 47.

Letters indicate that Unigard admitted in 1978 that the company provided some

form of coverage to Troy Belting during the period in question.  A letter sent on August 21,

1978 to Insurance Company of North America by Unigard's James L. Dixon acknowledges

the existence of some form of coverage for the Pennell matter.  See Exh. 4 to Troy Belting's

Motion for Summary Judgment, dkt. # 303-8.  Dixon states that "[t]he agent's records indicate

that our coverage goes back through Jamestown Mutual to July 18, 1949[.]"[10]  At the same

time, Dixon's investigation found that "there are no memoranda to indicate precisely what the

coverage was."  Id.  Another letter in the Pennell file kept by insurer INA to Unigard's James

L. Dixon, dated August 11, 1978, enclosed a copy of the Bill of Particulars in that case and

asked to Dixon to "advise" Unigard "of the dates and history of your coverage on this risk.  I

_____

[10]A June 25, 2001 letter from Troy Belting Vice President Arnold R. Jordan to The
Hartford Insurance Company names Fireman's Mutual as Troy Belting's insurer in the
1960s and Unigard as Troy Belting's insurer only in the 1970s.  The letter also notes that
Troy Belting destroyed copies of expired insurance policies.  See Exh. 9 to Troy Belting's
Motion for Summary Judgment, dkt. # 303-13.

understand you had it for at least 10 years prior to our policy.  Do you know who preceded your company?"  See Exh. 9 to Troy Belting's Motion for Summary Judgment, dkt. #. 303-15.  Another report in the file by an INA representative, dated January 3, 1978, indicates that Troy Belting's insurance agent had confirmed that Jamestown Mutual and its successor, Unigard, provided Troy Belting insurance from 1949 until 1974.  See dkt. # 303-16.

William Field, a former liability claims specialist for INA and Cigna Insurance who worked on the Pennell case, was deposed in a related coverage matter.  See Exh. 10 to Troy Belting's Motion ("Field Dep."), dkt. # 303-18.  Field testified that he wrote a letter to Jim Dixon at Unigard during that litigation informing Unigard of the status of the litigation.  Id. at 40-41.  He testified that he had likely had conversations with Dixon about coverage, but on cross-examination could not recall any such conversations specifically.  Id. at 151-52, 154.  Field agreed that he would not have written that letter "unless they were interested or had coverage."  Id. at 42.  He "guess[ed]" that Unigard had coverage and "exposure," but was "not sure."  Id. at 42, 57.  Unigard, Field determined, had been "placed on notice of the Pennell claim[.]"  Id. at 47.  Field also testified that INA had concluded that "Unigard had coverage on this risk for at least ten years prior to 1974" and that his "conclusion as the claims professional responsible for the handling of the Pennell case [was] that Unigard had issued coverage from 1949 to October 3, 1974].]"  Id. at 68, 87.  INA's "investigation" had led him to this conclusion.  Id.  This investigation, Field testified, consisted largely of meeting with Troy Belting's insurance agents, who informed INA that Unigard and its predecessors had provided the coverage.  Id. at 160.  No evidence indicates what the agents relied on in coming to this conclusion.  Id. at 162.  The fact that Unigard had assigned a claim number also indicated to Field that Unigard had coverage.  Id. at 70.  Still, Field admitted that INA's

practices in assigning numbers to claims did not necessarily reflect those of other insurers, like Unigard. Id. at 140-41. Moreover, he agreed that the fact that neither Unigard nor Jamestown contributed to the settlement in the Pennell case could have indicated that they did not cover the claim. Id. at 175. Field did not know whether Unigard or Jamestown wrote workers' compensation policies for Troy Belting, and had "no knowledge" of the types of policies the companies actually wrote. Id. at 163. He never saw a policy issued by either company in connection with the case. Id. at 180.

Peter Ranalli, who worked as a claims representative for INA/Cigna at the time of the Pennell case, also testified. See dkt. # 303-20, at 22-23. Part of his job was to investigate insurance histories in an attempt to find "concurrent coverages or any contractual obligations[.]" Id. at 24-25. His notes from that period indicate he worked on the Pennell case. Id. at 29-30. Ranalli testified that, though his report indicated that Jamestown Mutual and Unigard had provided Troy Belting coverage, he had no personal recollection of that investigation. Id. at 35-36. He also could not recall meetings with Troy Belting about the identity of previous insurers. Id. at 37. Ranalli also testified that an insurer presented with a claim for an incident where the insurer denied coverage would typically write a letter to the claimant denying coverage. Id. at 46-47. The insurer would then typically cease investigation of the claim, and would not engage in the actions Unigard did in the Pennell case, such as requesting a bill of particulars or seeking to review workers' compensation testimony. Id. at 47-48.

Troy Belting also points to corporate minutes from January 18, 1977. See dkt. # 303-22. Those minutes reference a "Summons of Suit dated 11/24/76" seeking $2,500,000 in damages. Id. The Summons named Nancy L. Daurio and John Daurio as plaintiffs and

Troy Belting and Horton Manufacturing Company as defendants.  Id.  The minutes report that

"[t]his suit was brought about because of a Horton Clutch we furnished Thos. A. Galants on a

High Boy Folder."  Unigard, the minutes allege, "was our Insurance Carrier May 9th, 1974, the

day Mrs. Daurio was injured and the Summons was turned over to them December 2, 1976."

Id.  Information on the basis for the suit was limited, however, since a complaint had not yet

been filed.  Id.  Still "[f]rom various conversations with Insurance Investigators, we are told it

is due to the fact that we are responsible for the 'Design' of the replacement drive."  Id.  The

injured plaintiff had her hair caught in a machine.  Id.  While the Company claimed a defense

to the case, the Company's "primary concern at this point is the increase in the cost of

Liability Insurance in the future due to the suit."  Id.  At the time of the accident, Troy Belting

had "liability Coverage" of $500,000, and sought additional insurance.  Id.  The minutes

report that "[u]pon receipt of the lowest quotation, we are increasing, effective January 1977,

our total liability coverage to $2,500,000.00."  Id.   Board Minutes from January 17, 1978

referenced the Pennell matter, but did not name an insurance company.  Id.  The minutes

simply state that "Alan E. Decker advised that our Product Liability Insurance has been

increased to $5,500,000.00.  This coverage is for total awards in one year."  Id.  The minutes

of Troy Belting's Board of Directors Annual Meeting from January 18, 1982 reveals that

Unigard settled the Daurio suit for $2,000.  See dkt. # 303-23.  The Pennell suit was still

pending.  Id.  The minutes do not reference an insurer in reference to that matter.  Id.

Troy Belting also points to a letter from Edward Nicoll of the Nicoll and

MacChesney insurance agency to Allen Decker of Troy Belting, dated September 15, 1978.

See dkt. # 303-24.  That letter refers to the Pennell case, noting that "[w]ith reference to your

letter of September 14, 1978, our records show that the Jamestown Mutual Insurance

Company (Unigard Insurance Company) provided coverage from July 18, 1949 to October 3, 1974[.]" Id. The company records did "not show the extent of coverage." Id. A letter dated November 16, 1977 from Nicoll to Decker stated that "the carrier of the liability coverage for the past ten year period prior to July 8, 1976 was the Jamestown Mutual Insurance Company (Unigard Insurance Company.). See dkt. # 303-25.

The evidence Troy Belting cites also includes copies of Troy Belting ledgers. Ledgers from the 1950s reveal numerous entries labeled "insurance" or "Ins." and dollar amounts that apparently represent payments. The entries do not indicate to whom the payments were made and do not state the type of insurance the money purchased. Another portion of the ledger, headlined "Insurance," illustrates payments made in the 1960s. Id. While the entries denote the name of the party paid and sometimes identify Nicoll and MacChesney, they do not identify Jamestown or Unigard as a party paid. Id. The entries also fail to address the type of insurance Troy Belting bought. Id.

The Court finds that this evidence creates a question of fact as to the existence of a policy, but that Plaintiff has not produced sufficient evidence by which a jury could find the terms and conditions of the policy by the preponderance of the evidence. The Court notes that the coverage issue here is a difficult one, in part because–even though the evidence is fairly clear that Jamestown provided some sort of coverage to Troy Belting for nearly thirty years–neither party bothered to keep copies of any insurance policies or declarations sheets. Unigard's own conduct indicates the company acknowledged Jamestown provided coverage beginning in the late 1940s, and extended that coverage until the 1970s, but the evidence for the terms and conditions of the policies in question, including whether they actually were products-liability policies that covered asbestos and the amount of coverage is insufficient.

Plaintiff attempts to fill the gaps in the record with the testimony of Hughes and O'Malley, but their opinions on the terms and conditions of the policy are simply speculative, not grounded in any facts. Indeed, Hughes simply surmises that Troy Belting must have purchased products liability insurance from Jamestown because a competent company would have done so. Such speculation is insufficient to defeat summary judgment. Likewise, while evidence of the 1974 personal injury case and the 1977 asbestos-related case are some evidence of products coverage and the terms of that coverage, particularly in the 1974 policy year, the evidence is simply too speculative for a jury to find the terms of the policies by a preponderance of the evidence. The Court itself is left to speculate as to why Unigard cannot produce any record of Jamestown's decades-long contractual relations with Troy Belting when the evidence clearly establishes that some sort of coverage existed, but speculation is insufficient when evidence of terms and conditions is lacking. Troy Belting has the burden here, not Unigard. The Court must therefore grant Unigard's motion for summary judgment.[11]

### C. Troy Belting's Motion

Troy Belting seeks judgment against the various parties on several grounds. The Court will address each in turn, as appropriate.

#### 1. Unigard

##### a. Coverage

---

[11]The Court will deny Unigard's motion to strike the expert testimony of Hughes and portions of O'Malley's testimony, dkt. #s 302, and Troy Belting's motion to strike that motion, dkt. # 304, as moot.

Troy Belting seeks summary judgment against Unigard, alleging that the evidence is sufficient to establish coverage and the coverage terms. For the reasons explained above, the Court will deny the motion in that respect.

### b. Spoliation

In the alternative, Troy Belting seeks sanctions against Unigard for spoliation, arguing that Unigard destroyed copies of the policies, even though Unigard was aware of litigation that would implicate those policies. Unigard responds that the policies were in Troy Belting's control as well, and thus spoliation sanctions cannot apply.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). Federal rules permit a court to impose sanctions for spoliation that violates a court order, but "[e]ven without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." Id. (citing Fed. R. Civ. P. 37(b)). Courts use their discretion in punishing spoliation, but such sanctions "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Id. Any sanction must serve to: "(1) deter the parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" Id. (quoting Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 71 (2d Cir. 1988)).

The evidence Unigard allegedly destroyed consists of the policies which provided Troy Belting with coverage between 1949 and 1978. Sanctions could certainly apply to such

material, since "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary," and copies of the policies in question are relevant to the coverage issues in this case. Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). For the Court to apply spoliation sanctions, which often include inferences concerning the missing information, "the party having control of the evidence must have had an obligation to preserve it at the time it was destroyed." Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998). That obligation typically "arises when the party has notice that the evidence is relevant to litigation–most commonly when suit has already been filed, providing the party responsible for the destruction with express notice[.]" Id. The obligation can also attach, however, "when a party should have known that the evidence may be relevant to future litigation." Id. Thus, a party seeking spoliation sanctions must show "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001)).

Unigard first disputes whether the test is even applicable. Unigard argues that no spoliation sanctions should apply because there is no evidence that the policies actually existed, and thus no sanction could be applicable in this case. The Court finds, as explained above, that there is evidence that Unigard's predecessor, Jamestown, at some point issued an insurance policy to Troy Belting. Evidence in the case exists that demonstrates that, at

least in the 1970s, Unigard acted as if some type of policy covered Troy Belting.  The parties

agree that no such policies now exist, and Troy Belting blames Unigard for destroying them.

"The first element a party must show when seeking" spoliation sanctions is "'that

the party having control over the evidence had an obligation to preserve it at the time it was

destroyed.'" <u>FDIC v. Horn</u>, No. CV 12-5958, 2015 U.S. Dist. LEXIS 44226 at *13-14

(E.D.N.Y., Mar. 31, 2015) (quoting <u>Chin</u>, 685 F.3d at 162).  Here, assuming the policies

actually existed, the parties agree that any destruction by Unigard or Jamestown occurred

before the litigation in this case commenced but have not pointed to a precise time when any

such policies might have been destroyed.  The parties also agree that the evidence did not

exist at the time that Troy Belting sought coverage from Unigard in 2009.  Still, "[t]he duty to

preserve arises, not when litigation is certain, but rather when it is 'reasonably forseeable.'"

<u>Id.</u> at 14 (qutoing <u>Byrnie</u>, 243 F.3d at 107).

Troy Belting contends that the obligation to preserve such documents arose in

1977, when Troy Belting asserts that Unigard first knew Troy Belting was named in a long-

trail asbestos claims.  Unigard was aware of the need to retain such policies, Troy Belting

insists, because the company's current policy is to preserve documents for forty years when

long-term exposure is at issue.  Despite this knowledge, Troy Belting argues, Unigard did not

retain the policies and had no reasonable measures in place to search for or retain those

policies.  Unigard responds that it was never asked to defend or indemnify the <u>Pennell</u> claim

and Troy Belting did not tender another asbestos claim to Unigard until 2009.  Moreover, the

company contends, Troy Belting faced other asbestos suits from 1977 until 2009, was aware

that New York analyzed such cases by looking to a claimant's exposure to asbestos, and still

did not notify Unigard of any claims.  Unigard also claims that Troy Belting, not Unigard, had

a responsibility to maintain copies of the insurance policies, as "[a]n insurer has no power over an insure's retention of a policy . . . and bears none of the responsibility for an insured's loss of a policy." <u>Olin v. Insurance Co. of N. Am.</u>, 966 F.2d 718, 725 (2d Cir. 1992).  As such, "it is the responsibility of the insured, not the insurance company, to keep track of which carriers have provided it with liability insurance." <u>Id.</u>

The Court finds that Troy Belting has not established that Unigard had an obligation to preserve the policies in question–assuming they existed–at the time they were destroyed. First, Troy Belting can only speculate about when Unigard destroyed any policies knowing of pending litigation.   The mere fact that Unigard participated in one lawsuit in the late 1970s that alleged asbestos injury does not create an unending obligation to preserve evidence on the chance that forty years later a former insured might again claim coverage, particularly when the evidence is not clear about who notified Unigard of the claim.   More important, the evidence was not exclusively in Unigard's possession:  Troy Belting itself destroyed the evidence it now contends Unigard had an obligation to preserve.  In effect, Troy Belting asks the Court to sanction Unigard for Troy Belting's failure to preserve policies in its possession. The fact that Troy Belting had not sought coverage from Jamestown or Unigard for thirty years before making a demand in 2009, despite the fact that other asbestos cases had arisen, also indicates that future litigation was not reasonably foreseeable on Unigard's part.[12]

_____

[12]The Court agrees with Unigard that the fact that Unigard created a document retention policy in the 2000s that would perhaps have preserved the policies if it had applied at the time that coverage ended for Troy Belting does not retroactively create an obligation to preserve documents destroyed long before the implementation of the policy.

Moreover, the way that courts treat evidence of this nature appears to lay responsibility for preserving copies of policies with the insured more than the insurer. The question of coverage in this case relies on rules for "secondary evidence" of coverage established by the courts for instances "'where the insured demonstrates that it has made a 'diligent but unsuccessful search and inquiry for the missing [policy].'" Burt Rigid, 302 F.3d at 91 (quoting Burt Rigid, 126 F.Supp.2d at 612). In some respect, this holding implies, as stated in Olin, that the obligation to produce and preserve an insurance policy in a coverage case lies with the insured, not the insurer. If the obligation were with the insured, then the insured would not be required to demonstrate that it had no policy. The Court's rule as stated in Burt Rigid demonstrates an attempt to soften the blow when an insured fails to retain policy documents. The courts have crafted remedies for those who assert coverage but cannot produce policies. If there were any sort of continuing obligation on insurers to preserve evidence of coverage or coverage documents, the courts could have constructed a different rule and created an inference of coverage if fault for the loss of documents lay with the insurer. Because Troy Belting cannot meet this element, the Court will deny the motion for spoliation sanctions.[13]

---

[13]As to the second part of the test for sanctions, Troy Belting does not offer any argument as to how Unigard acted with a culpable state of mind in destroying the policies. Courts have found that "the 'culpable state of mind' factor is satisfied by showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it] or *negligently*." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108 (2d Cir. 2002) (quoting Byrnie, 243 F.3d at 109) (emphasis in original). Giving Troy Belting the benefit of all doubts, the Court concludes that, if the Court were convinced that the policies had been issued and no longer exist, destruction of such policies could only have been intentional or the result of negligence. Assuming that the policies actually existed and were in Unigard's possession, the Court would be compelled to find that their destruction was either done knowingly, though perhaps without any intent to avoid a duty to preserve the material, or as a result of negligence. If the policies actually existed, the factor would

(continued...)

## 2. Pacific Employers and Hartford

Troy Belting seeks to estop Pacific Employers and Hartford from seeking contribution on the equitable grounds stated above. The Court will deny the motion for the reasons stated above.

## IV. Conclusion

For the reasons stated above, the motions for summary judgment of Plaintiff Pacific Employers Insurance Company, dkt. # 305, and Defendant Hartford Accident and Indemnity Company, dkt. # 306, are hereby GRANTED. Troy Belting is hereby DIRECTED to reimburse Hartford in the amount of $290,164.21 and Pacific Employers in the amount of $431,110.46. Troy Belting's Motion for Summary Judgment, dkt. # 303, is hereby DENIED. Unigard's motion for summary judgment, dkt. # 301, is hereby GRANTED. Unigard has no duty to defend or indemnify Troy Belting in the underlying asbestos-related actions at issue in this case. Unigard's motion to strike expert testimony, dkt. #s 302, is hereby DENIED as

---

[13](...continued)
be satisfied. The Court finds that the insurance policies were relevant to the claims at issue in this case, since they would define Unigard's coverage obligations, if any. The third part of the test is satisfied.

In any case, courts are clear that "the destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence–or utterly inadequate evidence–in support of a given claim to survive summary judgment on that claim." Kronisch, 150 F.3d at 128. At the same time, "where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line." Id. Troy Belting did not propose a particular spoliation sanction. Unless that sanction were to be to impose a coverage obligation on Unigard and to assign a policy limit, the sanction would do little to cause the Court to reconsider its decision on summary judgment. To survive a motion for summary judgment in a missing policy case, the proponent of coverage must produce evidence of the policy's terms. Troy Belting has only speculation in this respect.

moot. Troy Belting's motion to strike Unigard's motion to strike, dkt. # 304, is hereby DENIED as moot.

IT IS SO ORDERED.

Dated: September 29, 2016

Thomas J. McAvoy
Senior, U.S. District Judge